# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 23-10994

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVALL,

*Plaintiffs-Appellants,*

v.

WALTER WENDLER; DR. CHRISTOPHER THOMAS; JOHN SHARP;
ROBERT L. ALBRITTON; JAMES R. BROOKS; JAY GRAHAM; TIM
LEACH; BILL MAHOMES; ELAINE MENDOZA; MICHAEL J. PLANK;
CLIFF THOMAS; DEMETRIUS L. HARRELL, JR.;
MICHAEL A. HERNANDEZ, III,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS IN NO. 2:23-CV-48,
HONORABLE MATTHEW JOSEPH KACSMARYK, U.S. DISTRICT JUDGE

## BRIEF FOR PLAINTIFFS-APPELLANTS

ADAM B. STEINBAUGH
JEFFREY D. ZEMAN
FOUNDATION FOR INDIVIDUAL RIGHTS
  AND EXPRESSION
510 Walnut St., Suite 1250
Philadelphia, Pennsylvania 19106
(215) 717-3473

JT MORRIS
  *COUNSEL OF RECORD*
CONOR T. FITZPATRICK
FOUNDATION FOR INDIVIDUAL RIGHTS
  AND EXPRESSION
700 Pennsylvania Ave. S.E.,
  Suite 340
Washington, D.C. 20003
(215) 717-3473

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PARTIES

The cause number and style of the case is No. 23-10994, *Spectrum WT v. Wendler* (USDC Civil No.2:23-CV-48, Northern District of Texas).

The undersigned counsel of record certifies that the following listed persons or entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

### <u>Plaintiffs-Appellants</u>
Spectrum WT
Barrett Bright
Lauren Stovall

### <u>Attorneys for Plaintiffs-Appellants</u>
JT Morris
Conor T. Fitzpatrick
Foundation for Individual Rights and Expression
700 Pennsylvania Ave. SE, Suite 340
Washington, D.C. 20003

Adam B. Steinbaugh
Jeffrey D. Zeman
Foundation for Individual Rights and Expression
510 Walnut St., Suite 1250
Philadelphia, PA 19106

## Defendants-Appellees

Dr. Walter Wendler
Dr. Christopher Thomas
John Sharp
Robert L. Albritton
James R. Brooks
Jay Graham
Michael A. Hernandez, III
Tim Leach
Bill Mahomes
Elaine Mendoza
Michael J. Plank
Cliff Thomas
Demetrius L. Harrell, Jr.

## Attorneys for Defendants-Appellees

Allison Marie Collins
Heather Lee Dyer
Joseph N. Mazzara
Charles Kenneth Eldred
Amy S. Hilton
Christopher D. Hilton
Drew Anne Beglau
Office of the Attorney General of Texas
P.O. Box 12548
Capitol Station
Austin, TX 78711

## Other Interested Parties

West Texas A&M University
Texas A&M University System

Respectfully,

/s/ JT Morris
JT Morris
*Counsel of record for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves important questions about First Amendment protection for art, entertainment, and similar expression, including when, if ever, public university officials can censor that expression on campus because they dislike the intended or perceived message. The opportunity to address details about these questions at oral argument will aid the Court's decision-making process.

For those reasons, Plaintiffs respectfully request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF AUTHORITIES .................................................................. vii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES ..................................................................... 2

STATEMENT OF THE CASE ................................................................ 3

SUMMARY OF THE ARGUMENT ........................................................ 13

ARGUMENT ............................................................................................ 15

I.    Standard of Review ....................................................................... 15

II.   The First Amendment Protects Drag Performances Because
      They Are Expressive. .................................................................... 16

      A.    The First Amendment protects expression beyond the
            written or spoken word. ....................................................... 18

      B.    The First Amendment protects drag shows because
            they are expressive. ............................................................. 19

            1.    First Amendment protection for expressive
                  conduct turns on intent and context, not genre or
                  the mode of expression. ............................................... 21

            2.    The intent and context of Plaintiffs' drag shows
                  underscores why they are protected expression. ......... 26

            3.    Neither *Rumsfeld v. FAIR* nor history weakens
                  First Amendment protection for drag shows. .............. 29

      C.    First Amendment protection for drag performance is
            just as robust at public universities. ................................... 33

III.  Because the First Amendment Protects Drag Performance,
      Plaintiffs Are Substantially Likely to Succeed on the Merits. ...... 36

A.    The district court erred by not enjoining Defendants' viewpoint-based ban on Plaintiffs' expression....................36

    1.    When campus officials silence expression because they think the message offends, they discriminate based on viewpoint..................................37

    2.    President Wendler's words prove he banned drag performances from campus based on viewpoint..........39

    3.    The First Amendment does not permit officials to regulate expressive conduct because of its viewpoint. .......................................................42

    4.    Defendants cannot invent after-the-fact reasons to avoid Wendler's viewpoint-based edict....................44

B.    Excluding Plaintiffs' drag show from a public forum because of its content violates the First Amendment. .........47

    1.    Legacy Hall is a designated public forum open to students and the public for performances. ..................47

    2.    The university's prohibition on "drag shows" is a content-based restriction. ............................................49

C.    The ongoing drag show ban is subject to, and fails, strict scrutiny. ......................................................................52

    1.    President Wendler's stated reasons for banning campus drag shows are not a compelling interest. .......................................................................52

    2.    Post-hoc concerns for "lewdness" or "sexualized conduct" do not meet Defendants' compelling interest burden...........................................................55

    3.    Banning Plaintiffs' age-restricted drag shows does not serve a compelling interest in protecting minors.........................................................................56

    4.    Defendants' drag show ban is not narrowly tailored or the least restrictive means........................59

    5.    The district court erred by invoking intermediate scrutiny.......................................................................60

D. The district court erred by not enjoining Defendants' ongoing drag show ban as an unconstitutional prior restraint. ...................................................... 61

    1. President Wendler imposed a prior restraint by blocking expression based on subjective criteria ......... 61

    2. Wendler's predictions about Plaintiffs' message do not justify the prior restraint. ................................. 62

    3. The district court erred in ignoring Plaintiffs' prior restraint claim. ..................................... 66

E. Plaintiffs have standing against Defendants Wendler, Thomas, and Sharp. ............................................... 66

IV. The Prior Restraint on Plaintiffs' Expression Will Continue to Work Irreparable Harm Contrary to the Public Interest. ........ 67

A. Plaintiffs, who are planning a March 2024 campus drag show, face more irreparable harm. .............................. 67

B. The balance of harms and the public interest favor Plaintiffs' First Amendment rights. ....................................... 69

CONCLUSION ....................................... 70

CERTIFICATE OF SERVICE ................................................ 72

CERTIFICATE OF COMPLIANCE ....................................... 73

# TABLE OF AUTHORITIES

## Cases

*Am. Booksellers Ass'n v. Hudnut,*
  771 F.2d 323 (7th Cir. 1985)................................................................53

*Barnes v. Glen Theatre, Inc.,*
  501 U.S. 560 (1991) .......................................................................22

*Bd. of Educ. of the Westside Cmty. Schs. v. Mergens,*
  496 U.S. 226 (1990) .......................................................................69

*Bethel Sch. Dist. No. 403 v. Fraser,*
  478 U.S. 675 (1986) .......................................................................34

*Brown v. Enter. Merchs. Ass'n,*
  564 U.S. 786 (2011) ................................................................ passim

*Byrum v. Landreth,*
  566 F.3d 442 (5th Cir. 2009)........................................................15, 16

*Canady v. Bossier Par. Sch. Bd.,*
  240 F.3d 437 (5th Cir. 2001).............................................................24

*Chiu v. Plano Indep. Sch. Dist.,*
  260 F.3d 330 (5th Cir. 2001)........................................................37, 39

*Chiu v. Plano Indep. Sch. Dist.,*
  339 F.3d 273 (5th Cir. 2003)........................................................38, 62

*Christian Legal Soc'y v. Walker,*
  453 F.3d 853 (7th Cir. 2006).............................................................69

*City of Erie v. Pap's A.M.,*
  529 U.S. 277 (2000)................................................................ passim

*City of Lakewood v. Plain Dealer Publ'g Co.,*
  486 U.S. 750 (1988) .......................................................................46

*Clark v. Cmty. for Creative Non-Violence,*
  468 U.S. 288 (1984) ...................................................................21, 26

*Cohen v. California*,
403 U.S. 15 (1971) ................................................................. 25, 60

*Elrod v. Burns*,
427 U.S. 347 (1976) ...................................................................... 16

*Erzoznik v. Jacksonville*,
422 U.S. 205 (1975) ...................................................................... 57

*FCC v. Pacifica Found.*,
438 U.S. 726 (1978) ................................................................. 56, 58

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) ............................................. 24, 30, 31

*Freedman v. Maryland*,
380 U.S. 51 (1965) ........................................................................ 66

*Freedom from Religion Found. v. Abbott*,
955 F.3d 417 (5th Cir. 2020) .......................................................... 67

*Friends of Georges, Inc. v. Mulroy*,
_ F. Supp. 3d _, 2023 WL 3790583 (W.D. Tenn. June 2, 2023) .......... 17

*Gay Student Servs. v. Tex. A&M Univ.*,
737 F.2d 1317 (5th Cir. 1984) ............................................. 63, 64, 65

*Hays Cnty. Guardian v. Supple*,
969 F.2d 111 (5th Cir. 1992) ...................................................... 35, 47

*Healy v. James*,
408 U.S. 169 (1972) ............................................................. 23, 33, 38

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016) ...................................................................... 42

*HM Fla.-ORL, LLC v. Griffin*,
_ F. Supp. 3d _, 2023 WL 4157542 (M.D. Fla. June 23, 2023) ............ 17

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995) ............................................................. 22, 24, 30

*Imperial Sovereign Ct. of Mont. v. Knudsen,*
  _ F. Supp. 3d _, 2023 WL 6794043 (D. Mont. Oct. 13, 2023) ........ 17, 50

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
  993 F.2d 386 (4th Cir. 1993) ......................................................... passim

*Joseph Burstyn, Inc. v. Wilson,*
  343 U.S. 495 (1952) ............................................................................. 19

*Justice for All v. Faulkner,*
  410 F.3d 760 (5th Cir. 2005) ............................................................. 47

*Kennedy v. Bremerton Sch. Dist.,*
  142 S. Ct. 2407 (2022) ........................................................... 22, 27, 46

*Mahanoy Area Sch. Dist. v. B.L.,*
  141 S. Ct. 2038 (2021) (Alito, J., concurring) .................................... 35

*Martin v. Parrish,*
  805 F.2d 583 (5th Cir. 1986) ............................................................. 34

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
  138 S. Ct. 1719 (2018) (Thomas, J., concurring) .............................. 17

*Matal v. Tam,*
  137 S. Ct. 1744 (2017) ................................................................. 38, 40

*McCauley v. Univ. of the V.I.,*
  618 F.3d 232 (3d Cir. 2010) .............................................................. 35

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ..................................................................... 50, 52

*Miller v. California,*
  413 U.S. 15 (1973) ............................................................................. 55

*Moore v. City of Kilgore,*
  877 F.2d 364 (5th Cir. 1989) ............................................................. 46

*N.Y. State Rifle & Pistol Ass'n., Inc. v. Bruen,*
  142 S. Ct. 2111 (2022) ....................................................................... 32

*Norma Kristie, Inc. v. City of Oklahoma City,*
  572 F. Supp. 88 (W.D. Okla. 1983) ....................................... 17

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.,*
  969 F.3d 12 (1st Cir. 2020) .................................................. 46

*Papish v. Bd. of Curators of the Univ. of Mo.,*
  410 U.S. 667 (1973) (*per curiam*) .................................. passim

*Prof'l Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty.
Coll. Dist.,*
  730 F.2d 258 (5th Cir. 1984) ............................................... 39

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ............................................... 49, 52, 59

*Reno v. ACLU,*
  521 U.S. 844 (1997) ..................................................... 51, 57

*Renton v. Playtime Theatres,*
  475 U.S. 41 (1986) ............................................................. 51

*Robar v. Vill. of Potsdam Bd. of Trustees,*
  490 F. Supp. 3d 546 (N.D.N.Y. 2020) ................................. 27

*Robertson v. Anderson Mill Elementary Sch.,*
  989 F.3d 282 (4th Cir. 2021) ............................................... 41

*Robinson v. Hunt Cnty.,*
  921 F.3d 440 (5th Cir. 2019) ............................................... 38

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
  515 U.S. 819 (1995) ..................................................... 38, 41

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006) ............................................... 21, 30, 31

*S. Utah Drag Stars v. City of St. George,*
  _ F. Supp. 3d_, 2023 WL 4053395 (D. Utah June 16, 2023) ... 17, 20, 27

*Sable Commc'ns of Ca., Inc. v. FCC,*
  492 U.S. 115 (1989) ..................................................... 57, 58

x

*Schacht v. United States*,
    398 U.S. 58 (1970) ................................................................ 18

*Schad v. Borough of Mount Ephraim*,
    452 U.S. 61 (1981) ......................................................... 19, 31

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ................................................... passim

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969) ............................................................. 65

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ........................................ 54

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) .............................. 33, 55, 69

*Spence v. Washington*,
    418 U.S. 405 (1974) ............................................................ 21

*Tagami v. City of Chicago*,
    875 F.3d 375 (7th Cir. 2017) ............................... 28, 29, 61

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) .......................................68, 69

*Texas v. Johnson*,
    491 U.S. 397 (1989) ................................................... passim

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ..................................................... 18, 21

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ............................................................ 13

*United States v. O'Brien*,
    391 U.S. 367 (1968) ............................................................ 60

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ..........................................52, 54, 59

*Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.*,
    452 F.2d 564 (5th Cir. 1971) ............................................................. 63

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ........................................... 48, 52, 53, 54

*Winters v. New York*,
    333 U.S. 507 (1948) ............................................................. 19

*Woodlands Pride, Inc. v. Paxton*,
    No. H-23-2847, 2023 WL 6226113 (S.D. Tex. Sept. 26,
    2023) ................................................. 10, 11, 17, 19, 27

*Zalewska v. Cnty. of Sullivan*,
    316 F.3d 314 (2d Cir. 2003) ............................................. 26

## Statutes

Tex. Educ. Code § 51.9315(g) ....................................................... 3

## Other Authorities

James E. Leahy, *Flamboyant Protest, the First Amendment, and
    the Boston Tea Party*,
    36 Brook. L. Rev. 185, 210 (1970) ...................................... 31

Michael Hardy, *Country Revival*, Tex. Monthly (July 2017) ................... 7

Shannan Najmabadi, *Texas House Calls on Texas A&M
    Chancellor to Halt White Nationalist Rally*, Tex. Trib. (Aug. 14,
    2017) ........................................................................... 7

Tex. A&M Univ. Sys., Sys. Policy 02.02, Office of the Chancellor,
    § 1.12 ........................................................................... 7

Tex. A&M Univ. Sys., Sys. Policy 02.02, Office of the Chancellor,
    § 2.1 ............................................................................ 7

*Walter Wendler Full Interview*, KAMR, Apr. 27, 2023,
    https://www.myhighplains.com/video/walter-wendler-full-
    interview/8598931 ........................................................ 11

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. Plaintiffs-Appellants Spectrum WT, Barrett Bright, and Lauren Stovall appeal from the district court's September 21, 2023, order denying their amended motion for a preliminary injunction. ROA.849–74. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). Plaintiffs filed a timely notice of appeal on September 26, 2023. ROA.882–84.

## STATEMENT OF ISSUES

1.    From stage performances to video games, the Supreme Court has long held that the First Amendment protects art and entertainment because it is expressive. Plaintiffs wish to perform a PG-13 charity drag show at West Texas A&M University, which the University's president agreed is "performance" and "artistic expression." Did the district court err in concluding that Plaintiffs' drag show lacks First Amendment protection?

2.    Public officials violate the First Amendment when they stifle protected expression based on their personal worldview. Before anyone took the stage, West Texas A&M's president banned drag shows in campus forums open to student expression because, in his view, drag shows promote values that clash with his own. Did the district court err in not enjoining this viewpoint-based prior restraint on protected expression?

## STATEMENT OF THE CASE

This case is about a public university president openly defying the Constitution to ban students' onstage drag performances from campus public forums because he believes drag shows send a "demeaning" and "derisive" message. ROA.265–67. In refusing to enjoin President Wendler's viewpoint-driven ban on Plaintiffs' PG-13 charity drag show, the district court overlooked President Wendler's stated reasons for imposing a prior restraint on Plaintiffs' expression and instead accepted Wendler's after-the-fact rationale, abandoning a century of First Amendment jurisprudence.

### *West Texas A&M opens its facilities to student expression, including stage performance.*

West Texas A&M University opens certain campus spaces for students, recognized student organizations, and the general public to use for a broad range of expressive activity. ROA.220–21 ¶¶ 27–33. Texas law and university policy bar administrators from denying access to these spaces based on students' "political, religious, philosophical, ideological, or academic viewpoint" or the content of their "expressive activities." Tex. Educ. Code § 51.9315(g); ROA.339–41.

One of these spaces is Legacy Hall in West Texas A&M's student center. ROA.221 ¶¶ 33–34. The university maintains Legacy Hall as an open forum for students' expressive activities like concerts, theatrical performances, and other entertainment. *Id.* ¶¶ 32–34. Students and the public alike use Legacy Hall and similar campus forums for an array of events, including beauty pageants, singing competitions, concerts, religious worship, political events—and, as recently as 2019, student drag shows. ROA.327–32 ¶¶ 6–16; ROA.343–83.

### *Spectrum WT, a recognized student group, organizes a drag show in Legacy Hall.*

Spectrum WT is a longstanding, recognized student organization at West Texas A&M. ROA.215 ¶ 10. Plaintiffs Barrett "Bear" Bright and Lauren Stovall are two of Spectrum WT's student leaders. ROA.216–17 ¶¶ 14–15.

Spectrum WT often organizes campus events like proms, queer movie nights, and discussions about history, all focusing on issues important to the LGBTQ+ campus community. ROA.216 ¶ 13. Spectrum WT's members express themselves through these events, raising awareness of LGBTQ+ culture on campus and in the surrounding community. ROA.215–17 ¶¶ 11, 13–15.

To that end, in November 2022, Spectrum WT started planning a March 31, 2023, charity drag show at Legacy Hall. ROA.226 ¶¶ 52–56. For Spectrum WT and its members, the show was important to express support and advocate for the LGBTQ+ community. ROA.229 ¶ 74. Proceeds from the event would benefit an LGBTQ+ charity, just as prior drag shows in Legacy Hall had. ROA.216, 223–24 ¶¶ 13, 41; ROA.328–29 ¶¶ 8–9; ROA.351–60.

The students planned their event to be anything but risqué. They instructed performers to avoid profane music or "lewd" conduct. ROA.229–30 ¶¶ 79, 81. And they described the planned performances as appropriate for those over 13 years old. ROA.229 ¶¶ 76–79; ROA.232 ¶ 94. The students also barred minors from attending, except those accompanied by a parent or guardian so that performers' family members could attend. ROA.229 ¶ 80.

Administrators and staff helped Spectrum WT plan the show, working with the students to consider any risks to participants or the audience, and helping them with promotional materials. ROA.227 ¶ 60; ROA.230–33 ¶¶ 86–94, 99–100. They expressed support for the event,

praised the students' leadership, and approved the show to move forward. ROA.230–33 ¶¶ 86–94, 99–100.

### *President Wendler cancels Spectrum WT's performance, rebuking drag shows as "expression which denigrates" women.*

Eleven days before the show, Defendant and Vice President for Student Affairs Christopher Thomas informed Spectrum WT that President Wendler was canceling the drag show. ROA.233 ¶¶ 103–04. Thomas explained that Wendler disliked the idea of the drag show, believing it discriminated against women. *Id.* ¶ 104.

In a public edict posted online and emailed to the campus community, President Wendler declared that "West Texas A&M will not host a drag show on campus" because a "harmless drag show" could never be "possible." ROA.265–67. Wendler's 734-word edict focused on the "ideology" underlying drag shows. *Id.* Drag, he wrote, is "a performance exaggerating aspects of womanhood (sexuality, femininity, gender)" that, through "slapstick," "stereotype women in cartoon-like extremes for the amusement of others." *Id.* "When humor becomes harassment, it has gone too far," Wendler opined. *Id.* And he insisted that "[d]rag shows are derisive, divisive and demoralizing," promoting "ideology" by focusing on "group membership," not "individual" achievement. *Id.*

At the same time, Wendler admitted the Constitution stood in his way:

> I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, ***even when the law of the land appears to require it.***

ROA.267 (emphasis added). Nowhere in Wendler's 734-word email did he even hint about concerns of "lewdness." ROA.265–67.

Defendant and Texas A&M System Chancellor John Sharp, having authority over President Wendler,[1] chose not to rein in Wendler's boastful departure from the First Amendment, even as public attention mounted. ROA.218 ¶ 18; ROA.235 ¶ 120; ROA.243 ¶ 158. And Chancellor Sharp could have—he often intervenes in free speech controversies within the Texas A&M system.[2]

---

[1]    Tex. A&M Univ. Sys., Sys. Policy 02.02, Office of the Chancellor, §§ 1.12, 2.1, *available at* https://policies.tamus.edu/02-02.pdf [https://perma.cc/XF69-TU2Q].

[2]    *E.g.,* Shannan Najmabadi, *Texas House Calls on Texas A&M Chancellor to Halt White Nationalist Rally*, Tex. Trib. (Aug. 14, 2017), https://www.texastribune.org/2017/08/14/texas-house-calls-texas-m-chancellor-stop-white-nationalist-rally-occu [https://perma.cc/4M5S-XEZC]; Michael Hardy, *Country Revival*, Tex. Monthly (July 2017), https://features.texasmonthly.com/editorial/country-revival [https://perma.cc/DCK5-C56C].

***The district court denies injunctive relief.***

On March 24, 2023, Plaintiffs sued President Wendler and Texas A&M System officials. ROA.16. The same day, they moved for a temporary restraining order and a preliminary injunction. ROA.126–62. The students explained that without immediate relief, they would have to seek an off-campus venue, as the banned campus event was scheduled for the next Friday. ROA.157.

Three days later, the district court ordered Defendants to respond to the TRO motion by March 30, just one day before Plaintiffs' planned on-campus show. ROA.163. Left with little choice, the students withdrew their TRO to avoid simultaneously planning two events—one on-campus if the district court granted the TRO, and another off-campus if the court denied relief. ROA.172–73; ROA.236 ¶ 122. Exiled from campus, Spectrum WT scrambled to raise funds and organize a show at a public park far from West Texas A&M. ROA.236 ¶¶ 122–26.

Soon, Plaintiffs amended their verified complaint, alleging four causes of action: three claims for injunctive and declaratory relief based on First Amendment viewpoint discrimination, exclusion from a public forum, and prior restraint; and a damages claim against President

Wendler. ROA.212–75. Because Spectrum WT plans to hold another on-campus show on March 24, 2024, Plaintiffs amended their motion for a preliminary injunction, asserting their First Amendment claims for viewpoint discrimination, exclusion from a public forum, and prior restraint. ROA.281–409.

In response, President Wendler argued for the first time—contrary to his edict—that drag shows are not inherently expressive. ROA.446. So too did he claim for the first time that Plaintiffs' planned show was "lewd," despite never letting Plaintiffs take the stage. ROA.446–47. But Wendler submitted no affidavit or other evidence showing that he considered "lewdness" when he exiled drag shows from campus. *See generally* ROA.468–517. He and the other Defendants also moved to dismiss. ROA.411–38, 521–37.

The district court denied Plaintiffs' motion for a preliminary injunction and dismissed their damages claim against Wendler. ROA.849–74. Reasoning that "it is not clearly established that all drag shows are inherently expressive," the district court effectively held that Plaintiffs' planned drag shows lack First Amendment protection. ROA.858–62. It did hold, however, that Plaintiffs have standing as to

Chancellor Sharp and Vice President Thomas, and rejected Wendler's claim to sovereign immunity. ROA.868–72. In sum, the district court allowed only Plaintiffs' claims for declaratory and permanent injunctive relief against those three Defendants to remain.[3] ROA.873.

### *In a separate action, Judge Hittner rejects the district court's reasoning.*

Five days later, Judge David Hittner for United States District Court for the Southern District of Texas permanently enjoined a Texas statute touted as a "Drag Ban" because it violates the First Amendment. *Woodlands Pride, Inc. v. Paxton*, No. H-23-2847, 2023 WL 6226113 (S.D. Tex. Sept. 26, 2023). Judge Hittner noted that the district court's opinion here is one of the "only" cases denying First Amendment protection to a drag show.[4] *Id.* at *14. He also explained how President Wendler's "sentiment reinforces this Court's opinion that while some people may find a performance offensive or morally objectionable, it does not mean the performance is not expressive or given First Amendment protection."

---

[3]    Plaintiffs also moved the district court under Fed. R. Civ. P. 54(b) to certify final judgment on its dismissal of the damages claim against Wendler. ROA.875–80. The district court denied the unopposed motion. ROA.918–19.

[4]    To Plaintiffs' knowledge, the district court's opinion is the sole one concluding that drag shows lack First Amendment protection. *See* cases cited *infra* p. 17 n.7.

*Id.* Texas has appealed Judge Hittner's ruling. *Woodlands Pride v. Paxton,* No. 23-20480 (5th Cir. Oct. 3, 2023).

**The drag show ban is irreparably harming Plaintiffs, including their constitutional right to put on a show this March.**

As public attention grew after Plaintiffs sued, President Wendler revealed in a television interview his resolve to bar drag shows from campus: "I wouldn't have done anything any differently." ROA.623.[5] And he has stuck to his word. Wendler has not renounced his public edict banishing drag shows from campus. ROA.235 ¶ 119.

Spectrum WT has applied to hold a drag show in Legacy Hall on March 24, 2024. ROA.237 ¶ 130(b). But Defendants' ongoing campus drag show ban imperils that exercise of Plaintiffs' First Amendment rights. ROA.238–39 ¶¶ 133, 136. As Wendler has shown, he will throttle Spectrum WT's planned show at the last minute because he finds it "inappropriate" and "denigrat[ing] and demean[ing to] women." ROA.265–67. And even now, Plaintiffs are suffering constitutional harm, because the ongoing ban frustrates their ability to plan and prepare for

---

[5] *See also Walter Wendler Full Interview*, KAMR, Apr. 27, 2023, https://www.myhighplains.com/video/walter-wendler-full-interview/8598931, at 25:11–26:36.

an on-campus performance that the First Amendment protects. *See* ROA.238–39 ¶¶ 133, 136, 140; ROA.240–41 ¶ 144.

## SUMMARY OF THE ARGUMENT

From the public square to public universities, the government must remain neutral not only in our "political system," but also our "cultural life." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). Yet the president of West Texas A&M University, Walter Wendler, has been anything but neutral. Before Plaintiffs even took the campus stage for a PG-13 drag show, Wendler cancelled it. Then, in a written edict banning all drag shows from campus, Wendler decried drag shows as "artistic expression which denigrates others—in this case, women," all while admitting "the law of the land" compelled him not to censor the students.

Whether tinged with political views or pure "slapstick" humor, the First Amendment protects art and entertainment. When public officials ban stage performance from a public venue because the message might conflict with their own worldview, they violate the First Amendment. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555–58 (1975). And that is precisely what President Wendler is doing, along with the Defendants propping up his edict, Vice President Thomas and Chancellor Sharp.

Even more, Texas A&M officials have refused to rescind Wendler's viewpoint-driven ban on drag shows at West Texas A&M. That ongoing

ban threatens Plaintiffs' First Amendment right to hold their charity drag show planned for March 24, 2023, at Legacy Hall, a designated public forum on campus. Only swift injunctive relief can protect Plaintiffs from irreparable harm.

Yet the district court refused to enjoin Defendants' sweeping attack on protected expression at a public university. The district court stands alone in erroneously holding that drag shows lack the same uncompromising First Amendment protection that all art and entertainment enjoys. Every other federal court to address drag shows has held that the First Amendment protects them.[6] And a century of Supreme Court decisions protecting expressive conduct against the value judgments of public officials proves those courts right—and the district court wrong.

Because the First Amendment protects drag performance, the district court also erred by not enjoining Defendants' drag ban as a viewpoint-driven, content-based, prior restraint in a campus public forum. Nothing justifies such stark censorship. Wendler's fear-mongering about "lewdness"—before Plaintiffs have even taken the

---

[6]  *See* cases cited *infra* p. 17 n.7.

campus stage for their PG-13 show—is no license to silence protected expression, especially when Wendler raised "lewdness" only after Plaintiffs sued him. Nor does the district court's concern about "children in the audience" excuse Defendants' censorship. No minors are allowed at Plaintiffs' show without a parent. And Defendants cannot, in the words of Justice Scalia, dictate what "parents *ought* to want." *Brown v. Enter. Merchs. Ass'n*, 564 U.S. 786, 804 (2011) (emphasis in original).

This Court should reverse and remand to restore the First Amendment to West Texas A&M University and stop the irreparable harm to Plaintiffs' First Amendment liberties.

## ARGUMENT

### I.    Standard of Review

A preliminary injunction denial "grounded in erroneous legal principles is reviewed de novo," even if "the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (cleaned up). "Whether free speech rights have been infringed presents a mixed question of law and fact reviewed de novo, and when a preliminary

injunction turns on a mixed question of law and fact, it, too, is reviewed de novo." *Id.* (cleaned up). Thus, de novo review is apt here.

Plaintiffs are entitled to a preliminary injunction on the first three causes of action—for viewpoint discrimination, exclusion from a public forum, and prior restraint in violation of the First Amendment—in their First Amended Complaint. ROA.241–53. *See generally Byrum*, 566 F.3d at 445, 451 (setting out the preliminary injunction factors and reversing and remanding for entry of preliminary injunction to protect the plaintiffs' First Amendment rights). Plaintiffs have shown a substantial likelihood of success on the merits, as Defendants have imposed a prior restraint, silencing Plaintiffs' protected expression on campus because of the viewpoint and content of Plaintiffs' message. And because Defendants are infringing Plaintiffs' First Amendment rights by muzzling protected expression at a public university, Defendants are both causing Plaintiffs irreparable injury and harming the public interest. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## II.    The First Amendment Protects Drag Performances Because They Are Expressive.

The First Amendment protects Plaintiffs' planned charity drag shows. Indeed, the First Amendment protects "a wide array of conduct

that can qualify as expressive, including nude dancing, burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1741–42 (2018) (Thomas, J., concurring). So when Americans get on stage and express themselves, whether through pantomime, an evocative ballet, or an electric guitar wailing the national anthem, the First Amendment protects it.

That protection extends to drag performance. *E.g., Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88, 91–92 (W.D. Okla. 1983) ("Any inequality between [a drag show] and a musical or play is a distinction without a difference."). In fact, every court to consider the question has held that the First Amendment protects drag shows.[7] But

---

[7] *Norma Kristie*, 572 F. Supp. at 92; *Woodlands Pride*, 2023 WL 6226113 (enjoining Texas' statutory drag ban); *Friends of Georges, Inc. v. Mulroy*, _ F. Supp. 3d _, 2023 WL 3790583 (W.D. Tenn. June 2, 2023) (Parker, J.) (enjoining Tennessee's statutory drag ban); *Imperial Sovereign Ct. of Mont. v. Knudsen*, _ F. Supp. 3d _, 2023 WL 6794043 (D. Mont. Oct. 13, 2023) (Morris, J.) (enjoining Montana's statutory drag ban); *HM Fla.-ORL, LLC v. Griffin*, _ F. Supp. 3d _, 2023 WL 4157542 (M.D. Fla. June 23, 2023) (Presnell, J.) (enjoining Florida's statutory drag ban); *S. Utah Drag Stars v. City of St. George*, _ F. Supp. 3d_, 2023 WL 4053395 (D. Utah June 16, 2023) (Nuffer, J.) (ordering city to grant permit for drag show on public property). To date, *Woodlands Pride*, *Friends of Georges*, and *HM Fla-.ORL* are on appeal.

standing alone, the district court reasoned that drag performance lacks the same First Amendment protection as other art and entertainment. That was error, and the Court should reverse.

### A. The First Amendment protects expression beyond the written or spoken word.

The First Amendment prevents the government from "abridging the freedom of speech." U.S. Const. amend. I. As the Supreme Court explained, while the "First Amendment literally forbids the abridgment only of 'speech,' [] we have long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

Thus, the First Amendment also protects "expressive conduct." *Id.* at 403. For example, it protects burning the American flag—in both reverence and protest. *Id.* at 416–17. It protects wearing black armbands to school to protest a war. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969). And it protects wearing American military uniforms in a theatrical production criticizing a war. *Schacht v. United States*, 398 U.S. 58, 62–63 (1970).

Not only does the First Amendment embrace expressive conduct conveying a political message, but it also embraces entertainment. The

Supreme Court has "long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown,* 564 U.S. at 790. This is because "[w]hat is one man's amusement, teaches another's doctrine." *Winters v. New York*, 333 U.S. 507, 510 (1948). Entertainment "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

Likewise, the Constitution protects all modes of artistic expression, including "books," "plays," "movies," and "video games." *Brown*, 564 U.S. at 790. So even when art meshes with "live entertainment, such as musical and dramatic works" it still "fall[s] within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981).

### B.    The First Amendment protects drag shows because they are expressive.

Drag shows communicate a wide range of messages. As Judge Hittner recently explained, "[d]rag shows express a litany of emotions and purposes, from humor and pure entertainment to social commentary on gender roles." *Woodlands Pride*, 2023 WL 6226113, at *14. Likewise, Judge Nuffer from the District of Utah recently held that drag shows "are

indisputably protected speech and are a medium of expression, containing political and social messages regarding (among other messages) self-expression, gender stereotypes and roles, and LGBTQIA+ identity." *S. Utah Drag Stars*, 2023 WL 4053395, at *20. He also minced no words: "The City's arguments to the contrary do not merit discussion." *Id.*

In the same way, Plaintiffs' planned drag shows express messages. Spectrum WT is an organization dedicated to providing a space for "LGBT+ students and allies to come together," to "raise awareness of the LGBT+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community." ROA.215 ¶ 11. To help spread Spectrum WT's message, Plaintiffs organized a drag show to raise funds for an LGBTQ+ suicide prevention charity and "convey messages advocating for and showing support for the LGBTQ+ community." ROA.229 ¶ 74. Spectrum WT's show, like many drag shows, might also "offer[] counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity." ROA.228–29 ¶¶ 72–73.

Yet the district court reasoned Plaintiffs' drag show—and drag performance in general—lack constitutional protection. ROA.858–62.

Not only does the district court stand alone, but its holding also defies a century of First Amendment jurisprudence about what constitutes protected expression.

> 1.     *First Amendment protection for expressive conduct turns on intent and context, not genre or the mode of expression.*

First Amendment protection for expressive conduct does not turn on genre or the mode of expression. Instead, if the "conduct . . . is intended to be communicative" and "in context, would reasonably be understood by the viewer to be communicative," the First Amendment protects it. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (citing *Tinker*, 393 U.S. 503 and *Spence v. Washington*, 418 U.S. 405 (1974)). If conduct is "inherently expressive," the First Amendment protects it. *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006) (citing *Johnson*, 491 U.S. at 406).

The district court erred three times over in departing from that standard. First, it erred holding that for the First Amendment to apply, expressive conduct must "obviously convey or communicate a discernable, protectable message." ROA.854. Not so. The Supreme Court rejected that view nearly 30 years ago, holding that "a narrow, succinctly

21

articulable message *is not a condition of constitutional protection*."
*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569
(1995) (emphasis added). As it explained, if the First Amendment were
"confined to expressions conveying a particularized message, [it] would
never reach the unquestionably shielded painting of Jackson Pollock,
music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id.*
Thus, even if "an observer" of Plaintiffs' drag show "may not discern that
the performers' conduct communicates 'advocacy in favor of LGBTQ+
rights,'" as the district court claimed (ROA.861), the First Amendment
still protects Plaintiffs' drag show.

Second, the district court wrongly suggested that the First
Amendment protects only expressive conduct that conveys "'overtly
political' message[s]." ROA.853. The First Amendment protects nude
dancing at a strip club. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566
(1991). And the same First Amendment protects religious expressive
conduct, like kneeling in prayer. *See, e.g.*, *Kennedy v. Bremerton Sch.
Dist.*, 142 S. Ct. 2407, 2421 (2022) ("the Free Speech Clause provides
overlapping protection for expressive religious" conduct).

Third, the district court erred by concluding that "'campus protest' cases" require expressive conduct to "convey [an] 'intentional and overwhelmingly apparent' message." ROA.853 (citing cases). But none of the cases the district court cited concerned a public university, much less held that university students have watered down First Amendment rights. *Contra Healy v. James*, 408 U.S. 169, 180 (1972) (the Supreme Court's decisions "leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large," and its protection is "nowhere more vital" than on college campuses). The district court also mistook *Texas v. Johnson*, in which the Supreme Court merely observed that a flag burner's political message was "intentional and overwhelmingly apparent." 491 U.S. at 406. That observation does not narrow the standard. Rather, the Supreme Court affirmed in *Johnson* that the First Amendment protects expressive conduct so long as there is an intent to convey a message and viewers would understand the conduct as expressive. 491 U.S. at 404.

If an "intentional and overwhelmingly apparent message" were the standard, *Hurley* would not have affirmed, just six years after *Johnson*, that the First Amendment "unquestionably" protects the abstract

expression of Pollock, Schoenberg, and Carroll. 515 U.S. at 569. At bottom, it does not matter if observers "get" what the artist is trying to express. What matters is if observers would understand that the artist is trying to express *something,* whatever it may be. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) (citation omitted).

That is why the context of expressive activity is key. *Johnson*, 491 U.S. 405. This Court explained that when applying the expressive conduct standard from *Johnson*, the Court "look[s] to the particular activity, combined with the factual context and environment in which it was undertaken." *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001) (citations omitted).

That makes good sense. Context distinguishes an expressive picket line from walking. It also separates an expressive civil rights sit-in from sitting down. *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1241 (citation omitted). "And context divides 'simply [b]eing in a state of nudity,' which is 'not an inherently expressive condition,' from the type of nude dancing that is to some degree constitutionally protected." *Id.* (alteration in original) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000)).

Glossing over the context of drag performance, the district court stated that "ballet, orchestra, paintings, sculptures," and other non-verbal expression would still be protected without *Hurley* because they "either 'convey a particularized message' or are 'works of fine art.'" ROA.859 n.14. But the district court did not explain why there is a constitutional difference between dancing on a stage in drag to Bruno Mars versus dancing in a tutu to Tchaikovsky. There isn't one.

As Justice Scalia explained writing for the Supreme Court in *Brown*, "[r]eading Dante is unquestionably more cultured and intellectually edifying than playing Mortal Kombat. But these cultural and intellectual differences are not *constitutional* ones." 564 U.S. at 796 n.4 (emphasis in original). And so even if a court can see "nothing of any possible value to society" in some particular expression, he wrote, it is "as much entitled to the protection of free speech as the best of literature." *Id.* (cleaned up); *see also Cohen v. California*, 403 U.S. 15, 25 (1971) (the Constitution "leaves matters of taste and style so largely to the individual" because government officials "cannot make principled distinctions" between what is "palatable" or "distasteful"). Whether one

views drag performance as political commentary, high art, or slapstick entertainment, the First Amendment protects it.

> ### 2. The intent and context of Plaintiffs' drag shows underscores why they are protected expression.

Drag shows like those planned by Spectrum WT and its students are expressive conduct because they are communicative—even if their motifs, themes, or intended messages vary between performers. That's clear when applying the correct test for expressive conduct: whether "in context, [drag shows] would reasonably be understood by the viewer to be communicative." *Clark*, 468 U.S. at 294. Instead, the district court isolated drag shows from their context, suggesting that "a person's choice of dress or appearance in an ordinary context does not possess the communicative elements necessary to be considered speech[.]" ROA.859 n.15 (quoting *Zalewska v. Cnty. of Sullivan*, 316 F.3d 314, 320 (2d Cir. 2003)). On that basis, the district court equated drag performance to "men . . . dressed in attire stereotypically associated with women" or "scantily clad baristas." ROA.860.

Context separates an organized, choreographed drag show on stage under bright spotlights from the day-to-day "choice of dress" (ROA.849 n.11), just as context "distinguishes the 'unquestionably shielded'

paintings of Jackson Pollock from the drips on a tarp below a house painter." *Robar v. Vill. of Potsdam Bd. of Trustees*, 490 F. Supp. 3d 546, 565 (N.D.N.Y. 2020) (cleaned up) (landowner's display of disused toilets in a garden constituted protected expression). Context is why, for example, Americans understand that a coach kneeling at the 50-yard line is expressing himself. *See generally Bremerton Sch. Dist.*, 142 S. Ct. at 2426–27.

The context of Plaintiffs' planned drag performances shows the district court erred. Here, Spectrum WT intends to communicate a message with performances wearing gender non-conforming clothes, on stage in a venue intended for student expression, dancing to themed music. Its performance would take place in front of a willing, ticketed audience invited to attend an event advertised for the purpose of supporting an LGBTQ+ charity.

All of that also highlights why viewers of Plaintiffs' shows would understand them to be expressive. *E.g.*, *Woodlands Pride*, 2023 WL 6226113, at *14; *S. Utah Drag Stars*, 2023 WL 4053395, at *20. And Plaintiffs' flyers for the event leave no doubt as to its context as a pro-LGBTQ+ event, by LGBTQ+ groups, in support of an LGBTQ+ charity:



ROA.232 ¶ 94.

The district court cited *Tagami v. City of Chicago* in discounting the context of Plaintiffs' show. ROA.861 (citing 875 F.3d 375, 378 (7th Cir. 2017)). But *Tagami* helps illustrate why drag shows are inherently expressive. There, the Seventh Circuit held the First Amendment did not protect a woman publicly baring her breasts as a form of protest because there were no "facts from which it might reasonably be inferred that onlookers would have readily understood that this public display of nudity was actually a political protest against the City's public-indecency

ordinance." *Id.* Contrast that decision with the Supreme Court holding
that nude dancing on a stage is protected expressive conduct, given the
difference between live entertainment conveying a message and mere
public nudity. *See Pap's A.M.*, 529 U.S. at 289. While Plaintiffs' PG-13,
non-lewd show is worlds away from nude dancing, the constitutional
principle applies the same.

Drag shows like Plaintiffs' are inherently expressive. Even the
Attorney General of Texas recently told the Court "that these types of
drag-show performances might well constitute 'inherently expressive
conduct' protected by the First Amendment."[8] The Court should reverse
the district court's error concluding otherwise.

>    3.    *Neither Rumsfeld v. FAIR nor history weakens First
>           Amendment protection for drag shows.*

Below, Wendler insisted that *Rumsfeld v. FAIR* imposed a new rule
that if conduct requires "explanatory speech," it is not "inherently
expressive" and lacks First Amendment protection. ROA.453–54. The
district court reasoned similarly, citing *FAIR* for the notion that without
"accompanying political or dialogue," observers won't understand a drag

---

[8]    Appellant's Opposed Motion for Stay Pending Appeal, *Woodlands Pride, Inc.
v. Paxton*, No. 23-20480, Doc. 42 at 14 (5th Cir. Oct. 27, 2023).

show is "communicat[ing] . . . LGBTQ+ rights," rendering drag performance unprotected. ROA.860–61 & n.16. Both are wrong.

*FAIR* is a compelled-speech case, not one limiting protection for expressive conduct. 547 U.S. at 62–65. Law schools wanting to bar military recruiters claimed the government was compelling them to speak in favor of the military by allowing recruiters on campus. The Supreme Court rejected their argument, noting that excluding military recruiters was "expressive only because the law school accompanied their conduct with speech explaining it." *Id.* at 66.

But *FAIR* does not hold that an accompanying explanation divests expressive conduct of First Amendment protection. Nor could it—an explanation often augments the message inherently expressive conduct conveys. Imagine a painter revealing her latest work. If half the audience sheds tears because the painting evokes sadness, the painter doesn't lose the First Amendment if she explains her work is supposed to convey happy thoughts. The audience understood the painting communicated *something*—and that's enough. *Hurley,* 515 U.S. at 569; *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1241 (citation omitted). In the same way, drag performers do not lose the First Amendment if their intended

message differs from how another perceives it, just as President Wendler says he perceives the "artistic expression" of drag shows to be "mocking" and "cartoon-like . . . amusement." ROA.265–66.

*FAIR* simply reaffirmed *Johnson*'s recognition that the First Amendment protects "inherently expressive" conduct. 547 U.S. at 66. And because live entertainment, music, and theatre—all intrinsic to drag shows—are inherently expressive, the First Amendment protects them, with explanation or without. *Schad*, 452 U.S. at 65–66 (collecting cases). These mediums *are* expression. Getting on stage and performing *is* expression, and has been since the Ancient Greeks took to the Athenian stage.

Expressive conduct has deep roots in American tradition. "History may have been quite different had the Boston Tea Party been viewed as mere dislike for a certain brew and not a political protest against the taxation of the American colonies without representation." *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1241 (citing James E. Leahy, *Flamboyant Protest, the First Amendment, and the Boston Tea Party*, 36 Brook. L. Rev. 185, 210 (1970)). The patriots who challenged tyranny in Boston Harbor would also challenge the district court's

suggestion that expressive conduct was unknown to America's historical "Free Speech ecosystem." ROA.851–52.

In any event, the district court's appeal to *Bruen* does not change the outcome here. ROA.851 (citing *N.Y. State Rifle & Pistol Ass'n., Inc. v. Bruen*, 142 S. Ct. 2111, 2161 (2022)). *Bruen* requires that the *government* justify regulation of Second Amendment rights by pointing to text, history, and tradition. *Bruen*, 142 S. Ct. at 2126, 2131–33. It does not require Americans to prove a historic right against their government controlling ideas and expression. *See id.* at 2132. ("Just as the First Amendment protects modern forms of communications . . . .") (citation omitted). Our founding documents establish that enduring freedom. And as explained, a long line of Supreme Court jurisprudence upholding the First Amendment's guarantee of free expression controls here.

In short, Plaintiffs' planned drag shows have an unmistakable expressive intent. Getting on stage and dancing in costume is quintessentially expressive, and those who observe it would understand the events communicate something. That is why the First Amendment protects the Plaintiffs' performance at West Texas A&M.

### C.   First Amendment protection for drag performance is just as robust at public universities.

First Amendment protection for drag shows does not lose its potency at public universities. Rather, the First Amendment applies with no "less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. The need to preserve adult college students' ability to "generate, debate, and discuss both general and specific ideas, hopes, and experiences" is why "courts must be especially vigilant against" limits on campus expression. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020) (vacating the denial of a preliminary injunction against university verbal harassment policy).

The Supreme Court's holding in *Papish* shows this principle in action. *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973) (per curiam). There, campus officials sanctioned a student after she published a newspaper featuring on its cover a vulgar and "indecent" cartoon—"depicting policemen raping the Statue of Liberty and the Goddess of Justice" *Id.* at 667. She distributed the newspaper in an area of campus frequented by "many" minors, and at a time the university was hosting high school seniors and their parents. *Id.* at 674–76 (Rehnquist, J., dissenting). Rejecting the dissent's admonishment about "lewd"

speech, the Supreme Court announced that expression "on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670.

If the First Amendment protected the cartoon in *Papish*, it protects campus drag shows like Spectrum WT's, featuring clothed performers dancing to non-profane music. Yet the district court departed from *Papish* and turned instead to *Fraser*—a case regulating minors' speech in K–12 schools—to propose that "school officials" can limit speech that might "undermine the school's basic educational mission." ROA.863 (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986)). This was error.

The interests of universities and their adult students differ from those of pupils in elementary schools. That's why the "teachings of *Tinker*, *Fraser*, *Hazelwood*, *Morse*, and other decisions involving speech in public elementary and high schools, cannot be taken as gospel in cases involving public universities."[9] *McCauley v. Univ. of the V.I.*, 618 F.3d

---

[9] This Court has once cited *Fraser* in the public college employment context, upholding discipline of a professor who cursed at and harassed his students. *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986) (citing *Fraser*, 478 U.S. 675 (1986)). For the reasons stated, that narrow decision does not permit a ban on protected student expression on a public university campus, like the one here.

232, 247 (3d Cir. 2010); *see also Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2049 n.2 (2021) (Alito, J., concurring) (due to their "age, independence, and living arrangements," regulating college students' speech "may raise very different questions from those presented" in K–12 cases).

While primary and secondary schools act *in loco parentis*, public universities "are intended to function as marketplaces of ideas," where students and faculty "often have values, views, and ideologies that are at war with the ones" held by college officials. *McCauley*, 618 F.3d at 243–44 (cleaned up). In that way and others, public universities are far removed from K–12 schools, instead closer to a town where students are "contributing citizens" and gather in public streets and parks—traditional forums for the First Amendment. *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992). At bottom, there is no comparison between the captive audience of a K–12 classroom and the marketplace of ideas of a university campus.

In the end, the First Amendment protects drag shows on- and off-campus, just as strongly as it protects every other form of art and entertainment for which the Supreme Court has upheld First

Amendment protection. Because of that robust protection, Defendants are violating the First Amendment by shutting down Plaintiffs' drag shows because they offend President Wendler's views.

## III. Because the First Amendment Protects Drag Performance, Plaintiffs Are Substantially Likely to Succeed on the Merits.

Because drag performances are protected expression, the First Amendment prohibits President Wendler and the other Defendants from banning the performances from campus public forums, discriminating against the shows based on perceived viewpoint, or imposing a prior restraint on drag performances.  Plaintiffs are likely to succeed on the merits of these claims because Defendants cannot meet strict scrutiny's exacting standard. The district court erred in concluding otherwise. ROA.873.

### A.    The district court erred by not enjoining Defendants' viewpoint-based ban on Plaintiffs' expression.

President Wendler proclaimed to the West Texas A&M community that he banned drag shows from campus because the message he thinks drag shows convey offends his views and offends others. ROA.233–34 ¶ 105; ROA.265–67. That is textbook viewpoint discrimination. And no

after-the-fact justification can save Defendants from Wendler's brazen censorship.

To that end, the district court erred in not holding that the drag ban violates the First Amendment. While the district court incorrectly chided Plaintiffs for calling the campus drag ban "textbook" viewpoint discrimination without doing the "forum analysis required in a Free Speech campus case"[10] (ROA.854), it ignored a core First Amendment principle: "[V]iewpoint discrimination is a clearly established violation of the First Amendment *in any forum*." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001) (emphasis added). Whether in the campus quad or a performance space like Legacy Hall, campus officials cannot silence students or their organizations just because they do not like the message.

> 1.  *When campus officials silence expression because they think the message offends, they discriminate based on viewpoint.*

"Viewpoint discrimination is . . . an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515

---

[10] In fact, Plaintiffs performed a forum analysis below, as they have here, explaining why Legacy Hall is a designated public forum where content distinctions warrant strict scrutiny. ROA.306–11; *infra* Section III.B.

U.S. 819, 829 (1995). That is why viewpoint discrimination is "presumptively unconstitutional." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 284 (5th Cir. 2003). Public officials cannot suppress speech because it affronts their values.

"[C]ensorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017)). The Court's holding in *Robinson* echoes that "bedrock principle underlying the First Amendment . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414.

That unyielding First Amendment protection against viewpoint discrimination applies at public universities like West Texas A&M. *Rosenberger*, 515 U.S. at 835–36; *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,* 993 F.2d 386, 393 (4th Cir. 1993) (because fraternity's "ugly woman" contest was protected expression, university could not punish members based on viewpoint); *see also Healy*, 408 U.S. at 180 ("[S]tate colleges and universities are not enclaves immune from

the sweep of the First Amendment."). That protection extends to all campus public forums, and even nonpublic ones. *Prof'l Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 263 (5th Cir. 1984); *Chiu*, 260 F.3d at 350.

In sum, when campus officials refuse to stay neutral on the viewpoints students express, and instead suppress speech student speech based on subjective tastes, they violate the First Amendment. *Papish*, 410 U.S. at 670; *Iota Xi,* 993 F.2d at 393.

### 2. President Wendler's words prove he banned drag performances from campus based on viewpoint.

By elevating Wendler's personal views over Plaintiffs' protected expression, Defendants are violating the First Amendment. In fact, Defendants' ongoing censorship singles out one type of artistic expression—drag performance—from many, all because President Wendler dislikes the message he thinks drag performance sends.

And his words prove it.

In his edict to the West Texas A&M campus, Wendler accepts that drag shows are "performance" and "artistic expression." ROA.265–67. But he denounces the messaging, accusing it of "mocking another person or group." *Id.* He condemns Plaintiffs' yet-to-be-conveyed message as

"derisive, divisive and demoralizing misogyny, no matter the stated intent." *Id.* He also complains drag "stereotype[s] women in cartoon-like extremes for the amusement of others and discriminate[s] against womanhood." *Id.* And to explain it away, Wendler points to his beliefs about natural law, religion, and "human dignity." *Id.*

President Wendler's words prove he banned drag shows from campus based on viewpoint. Just as "[g]iving offense is a viewpoint" that expression can convey, *Matal*, 582 U.S. at 243, so too is the "mocking another person," "stereotyp[ing] women," and "derisive" messaging that Wendler's edict complains about. ROA.265–67; see *also Iota Xi*, 993 F.2d at 387.

Thus, the district court erred by concluding that Wendler was targeting "offensive conduct" and not the viewpoints in Plaintiffs' lawful expression. ROA.865. The district court pointed to Wendler's statements about supporting the "noble cause" of Plaintiffs' charity efforts and that "[his] recommendation is to skip the show and send the dough." *Id.* But those statements merely underscore how Wendler targeted expression— the performance—based on its perceived message. Suppose President Wendler believed Plaintiffs' "artistic expression" uplifted women instead

of "mocking" them. In that case, he likely would encourage others to both *go to* the show and "send the dough." *See* ROA.265–67.

The district court also erred by suggesting that Plaintiffs must show President Wendler targeted Plaintiffs' "specific motivating ideology or the opinion or perspective." ROA.865 (quoting *Rosenberger*, 515 U.S. at 829). Setting aside that Wendler's letter invoked ideology (ROA.265–66), *Rosenberger* does not go that far. Rather, the Supreme Court rejected the idea that viewpoint discrimination is "bipolar," explaining that "exclusion of several views on" an issue "is just as offensive to the First Amendment as exclusion of only one." *Rosenberger*, 515 U.S. at 831.[11]

It matters not if Wendler has targeted Plaintiffs' expression because he deems it offensive to women, and not because he disagrees with Plaintiffs' pro-LGBTQ+ message. He is still censoring speech based on viewpoint. Even if President Wendler mistakenly believed Plaintiffs' intended message was to offend, his actions would still violate the First

---

[11] The district court also pointed to *Robertson v. Anderson Mill Elementary School*, a case about an elementary school principal refusing to include an LGBTQ+-themed essay in a school-sponsored, fourth-grade essay booklet for ostensibly viewpoint-neutral reasons. ROA.865 n.24 (citing 989 F.3d 282, 290 (4th Cir. 2021)). Those facts are a far cry from President Wendler imposing his personal views to block a recognized student organization's performance in a public university venue open to student expression.

Amendment. *See Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016) (holding that a police officer could challenge his demotion for perceived political activity under the First Amendment, "even if, as here, the employer makes a factual mistake about the employee's behavior.").

Letting the district court's reasoning to stand would allow campus administrators to gag students and disfavored speech just by labeling speech "offensive" or "divisive," when they know the message is anything but. And here, there is no mistake about the students' intended message: Plaintiffs verified in their complaint that their drag show is important to "convey messages advocating for and showing support for the LGBTQ+ community." ROA.229 ¶ 74. Yet Defendants still refuse to rescind President Wendler's edict. *See generally* ROA.442–517; ROA.235 ¶ 119. In all cases, they are censoring speech based on viewpoint.

> 3. *The First Amendment does not permit officials to regulate expressive conduct because of its viewpoint.*

Whether for pure speech or expressive conduct, the First Amendment's bar against viewpoint discrimination stands fast. The district court erred by reasoning otherwise.

For one thing, *Texas v. Johnson* does not endorse giving the government a stronger hand to silence a view just because it's delivered

through expressive conduct, contrary to what the district court suggested. ROA.864–85. In fact, the Supreme Court in *Johnson* explained the "enduring lesson, that the government may not prohibit expression simply because it disagrees with its message, *is not dependent on the particular mode in which one chooses to express an idea.*" *Johnson*, 491 U.S. at 416 (emphasis added). Just as Texas could not limit flag burning to conveying only messages that "d[o] not endanger the flag's representation of nationhood and national unity," *id.* at 417, Defendants cannot limit campus stage performances to only those that do not offend President Wendler.

Wendler's edict recalls the city officials who censored the controversial rock musical "Hair" in *Southeastern Promotions v. Conrad*, 420 U.S. 546 (1975). Those officials denied a group's application to perform "Hair" in a municipal auditorium, insisting that the musical "was not in the best interest of the community" because it clashed with their standard of "clean and healthful and culturally uplifting" performances. *Id.* at 549. But the Supreme Court struck down the denial, refusing to "hold theater subject to a drastically different standard" of First Amendment protection than other forms of expression. *Id.* at 557–

58. If the First Amendment barred officials from censoring a spicy musical based on what they believed "clean and healthful," then surely it bars Defendants from stifling Plaintiffs' PG-13 drag show because it doesn't meet President Wendler's preferences.

Wendler's edict also recalls the George Mason University officials from the Fourth Circuit's decision in *Iota Xi*. There, administrators sanctioned a fraternity for hosting an "ugly woman contest," insisting the contest was riddled with "racist and sexist" overtones, including contestants "dressed as caricatures of different types of women. . . ." *Iota Xi*, 993 F.2d at 387–88. The Fourth Circuit rejected those reasons because they violated the First Amendment's bar on viewpoint discrimination, as "the 'ugly woman contest' . . . ran counter to the views the University sought to communicate to its students and the community." *Id*. at 393. So too should this Court reject Wendler's viewpoint-based concerns about sexism and misogyny he gave for banning Plaintiffs' protected expression. ROA.265–67, 865–67.

> 4. *Defendants cannot invent after-the-fact reasons to avoid Wendler's viewpoint-based edict.*

President Wendler offered a newfound basis for his censorship in his district court briefing: He accused Plaintiffs' PG-13 drag show of

"lewd[ness]." *E.g.,* ROA.447. As Plaintiffs explain later, even if the Court considers that basis, it fails to pass strict scrutiny. *See infra* Section III.C.2. But the Court need not consider it. Instead, the Court should bind President Wendler to the viewpoint-based reasons he stated in his edict for muzzling Plaintiffs' protected expression, and hold that the district court erred in considering Wendler's after-the-fact excuse for censorship.

Start and end with President Wendler's thorough explanation for his decision.[12] ROA.265–67. President Wendler's edict rests only on his belief that a drag show is a "show, performance or artistic expression" inherently offensive to women. *Id.* Neither "lewd" nor any similar word appears in Wendler's 734-word email. *Id.* The edict cites no university policy on lewdness. *Id.* And Wendler did not offer an affidavit or other contemporaneous evidence below suggesting that he considered "lewdness," or anything similar, when he banished Spectrum WT's drag show from campus.

Courts routinely reject post hoc explanations for silencing protected speech like Wendler's. Just last year, the Supreme Court refused a school

---

[12]  Wendler's statement was deliberate, and he told the media that he "probably spent ten minutes per word" on his email: "It was very carefully done, every word chosen carefully." ROA.623 at 25:00–27:47.

district's explanation for subduing a high school coach's quiet prayer after football games because it "never raised concerns along these lines in its contemporaneous correspondence" with the coach. *Bremerton Sch. Dist.*, 142 S. Ct. at 2432 n.8 (2022). The Supreme Court reiterated that "government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented post hoc in response to litigation." *Id.* (citation omitted) (cleaned up); *see also Moore v. City of Kilgore*, 877 F.2d 364, 389 (5th Cir. 1989) (explaining the dangers that standardless "post hoc rationalizations" pose to free expression) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988)); *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.,* 969 F.3d 12, 26–27 (1st Cir. 2020) (citing cases in support of the rule against post hoc censorship justifications).

President Wendler is bound to his viewpoint-driven reasons for silencing protected expression on campus. To that end, the district court erred by crediting Wendler's invented justification of "lewdness." ROA.863–64.

Whether spoken political speech or a wordless performance that communicates support for a shared identity, the First Amendment

protects student expression from public college administrators who would bend the campus to their beliefs. The Court should affirm that principle and reverse.

### B. Excluding Plaintiffs' drag show from a public forum because of its content violates the First Amendment.

Legacy Hall is a designated public forum under the First Amendment, and thus the content-based restriction Wendler's edict imposes on Plaintiffs' use of Legacy Hall, and any other campus public forum, is presumptively unconstitutional.

#### 1. *Legacy Hall is a designated public forum open to students and the public for performances.*

When a public university opens a space to student expressive activity, it creates a designated public forum. *Hays Cnty. Guardian*, 969 F.2d at 116; *see also Justice for All v. Faulkner*, 410 F.3d 760, 769 (5th Cir. 2005) (holding that when a university opens its parts of its university for student expression, it creates a designated public forum). West Texas A&M does precisely that with Legacy Hall and similar spaces.

By policy, West Texas A&M allows any person, "subject to reasonable time, place, and manner restrictions, to engage in expressive activities on campus." ROA.272–73. It broadly defines "campus" to

include both its "land and buildings." ROA.272. It allows student organizations to use these facilities to plan "any special event," including "fundraising activity" or "social gatherings or functions." ROA.269, 272. And it broadly prohibits administrators from "action" or denial of "any benefit" on the "basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." ROA.273.

The university also holds out Legacy Hall as available to students and the public for many uses, including expressive ones. ROA.221 ¶¶ 32–34; ROA.327–32 ¶¶ 6–16; ROA.343–83. And consistent with the university's policies and promotion, students have long used these spaces for performances, concerts, worship services—and even previous drag shows. *Id.*

When a public university creates "a forum generally open for use by student groups," like West Texas A&M has with Legacy Hall, it must show that its restrictions "satisfy the standard of review appropriate to content-based exclusions." *Widmar v. Vincent*, 454 U.S. 263, 270 (1981). Content-based restrictions, like excluding drag from a designated public

forum, "are presumptively unconstitutional" and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

>   2.   *The university's prohibition on "drag shows" is a content-based restriction.*

Content discrimination occurs when the government "target[s] speech based on its communicative content." *Reed*, 576 U.S. at 163. Defendants' ban on drag shows is content-based. It singles out a particular type of expression—drag performance—for differential treatment. Defendants do not restrict the dance team, cheerleaders, theatre productions, or any other student group from holding events involving performers dancing to music—only drag shows. *See* ROA.327–28 ¶¶ 6–7, ROA.329–30 ¶ 10, ROA.343–50, ROA.361–67 (showing various performances at West Texas A&M like a "Scholarship Pageant" featuring "seven beautiful contestants," a "male beauty pageant," and a "song-and-dance competition"). Nor has President Wendler barred student organizations from showing "R" or "PG-13" movies if minors are present.

Wendler singled out drag shows. That is content discrimination. Indeed, courts time after time have held that restrictions targeting drag shows are content-based. *See Imperial Sovereign Ct. of Mont.*, 2023 WL

6794043, at *9–10 (citing cases and similarly holding that a ban on drag shows "targets speech based upon content").

Still, the district court assumed that a regulation of "sexualized" speech is not content-based, and that it is "more regulable" as a "time, place, or manner" restriction." ROA.854–55. That was error. A time, place, or manner restriction must be "justified without reference to the content of the regulated speech," "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels" for expression. *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (cleaned up). The district court did not apply that standard, much less explain why Defendants' drag show ban meets it.

Putting aside the scarcity of evidence in the record suggesting Plaintiffs' PG-13 show is "sexualized," the Supreme Court's decision in *Reno v. ACLU* makes short work of the district court's error. There, the Supreme Court struck down a restriction on "indecent" and "patently offensive" speech, intended "to protect children," as a "content-based blanket restriction on speech" that "cannot be 'properly analyzed as a form of time, place, and manner regulation.'" *Reno v. ACLU*, 521 U.S.

844, 868 (1997) (quoting *Renton v. Playtime Theatres*, 475 U.S. 41, 46 (1986)).

President Wendler's edict also fails all three "time, place, and manner" requirements. First, the ban on drag shows is defined *solely* by the content of the performers' speech. ROA.265–67. Second, Defendants cannot explain what "significant governmental interest" the ban is "narrowly tailored" to address. For instance, Wendler did not complain that Plaintiffs' ticketed event well outside of regular class hours posed any threat to the university's educational functions. *Id.* Third, Defendants blanket ban leaves no alternate channels for Plaintiffs to perform on campus. Plaintiffs' last-minute scramble to raise funds and hold the 2023 show at an off-campus venue does not satisfy the "alternative channel" prong. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Se. Promotions*, 420 U.S. at 556.

The Court should reject any suggestion that Defendants' drag show ban is a constitutional time, place, or manner restriction. "Never," "nowhere," and "you cannot" is not a time, place, or manner restriction.

It is content-based censorship, and thus presumptively unconstitutional. *Reed*, 576 U.S. at 163.

### C.   The ongoing drag show ban is subject to, and fails, strict scrutiny.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). And when the government restricts speech because of its content or viewpoint, it must overcome strict scrutiny. *McCullen*, 573 U.S. at 478. Thus, Defendants must show that the viewpoint- and content-based ban on drag shows "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar*, 454 U.S. at 270. Defendants cannot meet that burden.

> *1.     President Wendler's stated reasons for banning campus drag shows are not a compelling interest.*

Discriminating against the views of some to prevent offense to others serves no compelling government interest. And *Widmar* shows why. In *Widmar*, the University of Missouri at Kansas City denied an evangelical Christian student group the use of university facilities otherwise "generally available for . . . registered student groups." 454

U.S. at 264–65. The Supreme Court explained that singling out a particular subject for differential treatment is subject to "the most exacting scrutiny." *Id.* at 276. Applying that rule, the Supreme Court held the university's content-based restriction violated the First Amendment because the university's stated goal, "achieving greater separation of church and State," was not compelling enough to justify discriminating against the students' religious speech. *Id.* at 276.

In the same way, banning drag shows to advance President Wendler's belief that drag shows "denigrate and demean women" does not serve a compelling interest. ROA.265–67. Wendler, like the administrators in *Iota Xi*, is suppressing Plaintiffs' speech "because it r[uns] counter to the views" Wendler "s[eeks] to communicate to [the] students and the community." 993 F.2d at 393. But that is not redressing a harm; it is silencing speech that a public official disfavors. "The state may not ordain preferred viewpoints [about women and femininity] in this way. The Constitution forbids the state to declare one perspective right and silence opponents." *Am. Booksellers Ass'n v. Hudnut*, 771 F.2d 323, 325 (7th Cir. 1985). And at public universities, officials cannot

silence students "in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670.

The district court erred in shifting the burden to Plaintiffs to "reconcile" the "competing legal obligations" imposed by harassment law, as "expressly or impliedly invoked" by Wendler's letter. ROA.855. It is Defendants' burden, not Plaintiffs', to establish how a blanket ban on expression "is necessary to serve" an interest in curbing harassment of women. *Widmar*, 454 U.S. at 269–70; *see also Playboy Ent. Grp.*, 529 U.S. at 816. Wendler, for his part, made no argument in the district court that his actions were justified by any interest in mitigating harassment. *See* ROA.442–68.

True, President Wendler's edict paid trivial lip service to the "U.S. Equal Opportunity Commission" and "harassment." ROA.266–67. But it states no more. His edict did not assert that Plaintiffs' planned drag show would violate a harassment policy or identify another policy Plaintiffs might violate. *Id.* And in any event, university harassment rules yield to the First Amendment, not the opposite. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125 (11th Cir. 2022) (university harassment policy violated the First Amendment); *see also Speech First, Inc. v.*

*Fenves*, 979 F.3d 319, 338–39 (5th Cir. 2020) (noting "the consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

> ### 2.    *Post-hoc concerns for "lewdness" or "sexualized conduct" do not meet Defendants' compelling interest burden.*

After Plaintiffs sued, Wendler for the first time claimed Plaintiffs' show was "lewd." ROA.446–47. As explained, the Court should reject Wendler's after-the-fact excuse. *See supra* Section II.A.4. But even if the Court considers Wendler's appeal to "lewdness," it fails to show a compelling interest. Likewise, so does the district court's rationale in labeling Plaintiffs' drag show "sexualized." ROA.853.

Neither "lewd" nor "sexualized" expression fall within the few narrow categories of unprotected speech, like "obscenity" does. *See Brown*, 564 U.S. at 791. And no one contends that drag shows like Plaintiffs' qualify as obscenity under *Miller v. California*, 413 U.S. 15 (1973).

Simply labeling protected expression like drag shows "lewd" or "sexualized" does not give Defendants a license to censor those shows. Indeed, the Supreme Court all but settled in *Papish* that censoring

speech on a state university campus in the name of "lewdness" does not serve a compelling interest. 410 U.S. at 669–70.

Likewise, censoring speech at a public university because it is "sexualized" is not necessary to serve a compelling interest. If it were, expressive conduct, from displaying a replica of Michelangelo's David to the short-skirted cheerleading squad, would be at the mercy of every college administration's particular tastes. And here, while the district court painted drag shows as "sexualized," the record refutes that view. Not only did Plaintiffs forbid profane music and shun "lewd" dancing, but President Wendler never mentioned anything "sexualized" in his drawn-out edict. ROA.229–30 ¶¶ 79, 81; ROA.265–67.

> 3. *Banning Plaintiffs' age-restricted drag shows does not serve a compelling interest in protecting minors.*

Despite the record, the district court still fixated on "sexualized conduct," reasoning that it "is more regulable under various First Amendment doctrines—especially when children are in the audience." ROA.854 (citing *Pap's A.M.*, 529 U.S. at 295; *FCC v. Pacifica Found.*, 438 U.S. 726, 732 (1978)). That erred on the facts and the law.

Again, the district court overlooked the record: Plaintiffs' planned drag shows *prohibit* children from attending unless accompanied by a

parent or guardian. ROA.229 ¶ 80. There was and is no danger of children "in the audience" at Plaintiffs' drag show, performed on a university campus after-hours, without a parent's or guardian's blessing. And Defendants have no compelling interest in dictating "what [they] think[] parents *ought* to want." *Brown*, 564 U.S. at 804. Rather, expression falling short of obscenity standards "cannot be suppressed solely to protect the young from ideas or images" that an official "thinks unsuitable for them." *Erzoznik v. Jacksonville*, 422 U.S. 205, 213–14 (1975).

For that reason, the district court erred in crediting Defendants' censorship with serving a "compelling interest in protecting the physical and psychological well-being of minors." ROA.864 (quoting *Sable Commc'ns of Ca., Inc. v. FCC*, 492 U.S. 115, 126 (1989)); *see ACLU*, 521 U.S. at 868 (invalidating most of the Communications Decency Act even though "the purpose of the CDA is to protect children from the primary effects of 'indecent' and 'patently offensive' speech"). In fact, the Supreme Court in *Sable* "reiterate[d] that the government may not reduce the adult population to only what is fit for children," while invalidating part

of a federal law targeting "dial-a-porn" telephone services under the First Amendment. 492 U.S. at 128 (cleaned up).

*Sable* also shows why *FCC v. Pacifica*, which the district court cited in raising its concern about "children . . . in the audience" (ROA.854), does not support a compelling interest here. There, the Supreme Court reiterated that even though *Pacifica* recognized an interest in protecting children from "indecent material," its "emphatically narrow holding" is limited to the "unique attributes of broadcasting," like broadcast's ability to "intrude on the privacy of the home" and be "uniquely accessible to children, even those too young to read." *Sable Commc'ns of Ca.*, 492 U.S. at 127 (cleaned up) (quoting *Pacifica*, 438 U.S. at 748–49). On the other hand, *Pacifica* does not apply where "affirmative steps" are required to "receive the communication," like a ticketed, age-restricted campus drag show that intrudes on no home and is not "uniquely accessible to children." *Id.* at 127–28 ("Placing a telephone call is not the same as turning on a radio and being taken by surprise by an indecent message."). And the district court's reliance on *Pap's A.M.* fares no better. ROA.854 (citing 529 U.S. at 295). That decision was about regulating secondary

effects from expression. 529 U.S. at 295. But here, Defendants are directly restricting Plaintiffs' protected expression.

In the end, the district court erred in concluding that a sweeping ban on age-restricted campus drag shows serves a compelling interest protecting minors—an interest President Wendler did not raise in his edict.

>    *4.    Defendants' drag show ban is not narrowly tailored or the least restrictive means.*

Defendants' ban on drag shows is neither narrowly tailored nor the least restrictive means of furthering their goals. *See Playboy Ent. Grp.*, 529 U.S. at 813 (content regulation permissible only if the government "chooses the least restrictive means to further the articulated interest") (cleaned up). A content-based law is not narrowly tailored if it leaves untouched a significant amount of expression causing the same problem. *Reed*, 576 U.S. at 172; *see also Brown*, 564 U.S. at 805 (explaining that banning minors from purchasing violent video games "is seriously underinclusive" because it "excludes portrayals other than video games"). But that's precisely what Defendants' ban does. There is no evidence Wendler has banned any other expression which might "denigrate or demean women." ROA.267.

Again, Defendants do not restrict the dance team, scantily clad cheerleaders, theatre productions, or any other student group using campus facilities to perform and dance to music—only drag shows. Likewise, based on Wendler's edict, "lewd" music, movies, television shows, and the like on campus remain untouched. *See* ROA.265–67.

Exiling protected expression from a university campus just to shield some from offense is neither narrowly tailored nor a least restrictive means. Instead, those who might find a drag show misogynistic or offensive can simply not attend and "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen*, 403 U.S. at 21. The First Amendment ensures the people have that choice, instead of public officials making it for them.

> 5.    *The district court erred by invoking intermediate scrutiny.*

The district court proposed that the drag ban is subject to intermediate scrutiny. ROA.873. It is not. Intermediate scrutiny applies only if "the governmental interest is unrelated to the suppression of free expression." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). But President Wendler's ban relates *solely* to banning drag shows as a form of "artistic expression." ROA.266. This case is not *Tagami*, where a

generally applicable ban on public nudity conflicted with someone wanting to use nudity as a form of protest. 875 F.3d at 378; *see also* ROA.861 (citing *Tagami*). Plaintiffs' planned drag shows violate no law, and Defendants have never claimed otherwise.

Defendants are stuck with strict scrutiny. And they have failed to "specifically identify an actual problem in need of solving" and show that "the curtailment of free speech [is] actually necessary to the solution." *Brown*, 564 U.S. at 786. The Court should reverse.

## D. The district court erred by not enjoining Defendants' ongoing drag show ban as an unconstitutional prior restraint.

President Wendler banned the students' performance before they ever took the stage. That is a classic prior restraint, as Plaintiffs alleged and showed in moving for a preliminary injunction. ROA.250–53, 311–13. Yet the district court overlooked Plaintiffs' prior restraint claim, addressing it nowhere in its decision. That, along with not enjoining the drag ban at West Texas A&M as a prior restraint, was error.

### 1. *President Wendler imposed a prior restraint by blocking expression based on subjective criteria.*

When officials like President Wendler deny speakers access to a public forum because the message does not conform to subjective criteria,

they impose an unconstitutional prior restraint. *Southeastern Promotions*, discussed above, says so. There, the Supreme Court concluded that city officials imposed an unconstitutional prior restraint by excluding "Hair" from a municipal theater because it did not fit the city's "clean and healthful and culturally uplifting" criteria. 420 U.S. at 549. Likewise, President Wendler imposed a prior restraint by barring Plaintiffs' drag shows from campus forums because the message does not meet Wendler's criteria about what does or does not "demean women." ROA.265–67.

Actions "regulating speech contingent on the will of an official— such as the requirement of a license or permit that may be withheld or granted in the discretion of an official—are unconstitutional burdens on speech classified as prior restraints." *Chiu*, 339 F.3d at 280. And here, Defendants are "regulating speech contingent on the will" of President Wendler, denying Plaintiffs the exercise of their First Amendment rights. The Court should reverse and enjoin this unconstitutional prior restraint.

> **2.** *Wendler's predictions about Plaintiffs' message do not justify the prior restraint.*

President Wendler's pre-show perception—or misperception—of Plaintiffs' message highlights why the campus drag ban is a prior

restraint. "[A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." *Se. Promotions*, 420 U.S. at 559. But by prohibiting Plaintiffs' protected expression *before* they took the campus stage, Defendants are employing the "freewheeling censorship" the Supreme Court warned of.

That "freewheeling censorship" endangers expression at public universities just as it does a city theatre. When a "restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint and carries a heavy presumption against its constitutionality." *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984) (quoting *Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.*, 452 F.2d 564, 566 (5th Cir. 1971)). Applying that rule, this Court held that Texas A&M University violated the First Amendment when an administrator refused to recognize the Gay Student Services group "clearly based on his perception that the organization would attempt to

convey ideas about homosexuality," which he believed were harmful. *Id.* at 1322 (emphasis omitted).

Wendler's edict is no different, accusing drag of conveying messages that are "demeaning," "derisive," "mocking," "objectifying," and "inappropriate." ROA.265–67. But the First Amendment prohibits Defendants from restraining Plaintiffs' PG-13 charity show before they step on stage, just because of Wendler's "perception" that Plaintiffs will "attempt to convey ideas" that Wendler believed were harmful. *Gay Student Servs.*, 737 F.2d at 1322.

That is why the Court should reject President Wendler's after-the-fact complaint about off-campus performances by "Miss Myka," the slated guest emcee for Plaintiffs' cancelled 2023 drag show. *E.g.,* ROA.447, 864. For one thing, President Wendler never mentioned "Miss Myka" in his email banning drag shows. ROA.265–67. Only after Plaintiffs sued Wendler did he dig around for information about "Miss Myka" to *speculate* that the performer might have defied Plaintiffs' clear instruction to avoid lewd conduct. ROA.229 ¶ 79; ROA.447, 449. And even then, Wendler never contended he knew of "Miss Myka" or had concerns about the guest emcee. *See* ROA.442–67. Just as the Court

should refuse any after-the-fact appeal to "lewdness," it should refuse any after-the-fact speculation about "Miss Myka." *See supra* Section III.A.4.

Even had Wendler considered "Miss Myka" when issuing his edict, the ban would still be a prior restraint. Mere conjecture about expression cannot justify blocking it. *Se. Promotions*, 420 U.S. at 554–55; *Gay Student Servs.*, 737 F.2d at 1325. Under Wendler's view, public university officials could bar a celebrated actress from performing on campus if she once appeared nude in a performance, even in the face of assurances that the campus performance contained no nudity. Or they could prevent students from inviting a prominent political thinker to campus just because he once said something offending an administrator's beliefs. The Court should reject that expression-chilling view.

The only way public officials can justify a prior restraint on access to a public forum—if ever—is with "narrow, objective, and definite standards to guide" officials in granting or denying access. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969). But Wendler's skewed criteria are none of those. And even if they were, Defendants have failed to (1) prove that Plaintiffs' speech is unprotected; (2) provide an adversarial proceeding and judicial determination of whether the speech

is protected; and (3) ensure that "within a specified brief period," the school "either issue[s] a license or go[es] to court to restrain" the speech. *Freedman v. Maryland*, 380 U.S. 51, 58–59 (1965).

> 3. *The district court erred in ignoring Plaintiffs' prior restraint claim.*

For the above reasons, the district court erred in passing over Plaintiffs' prior restraint claim, let alone not enjoining Defendants' drag ban as an unconstitutional prior restraint—even while acknowledging the Founders' disdain for prior restraints. *See* ROA.851–82. That discrepancy magnifies the error. So too does Defendants' failure to contest Plaintiffs' prior restraint claim beyond insisting—wrongly—that drag performance is not inherently expressive. ROA.716.

A preliminary injunction is needed to restore the First Amendment to West Texas A&M and remove the prior restraint stifling Plaintiffs' protected expression. That is one more reason the Court should reverse.

## E. Plaintiffs have standing against Defendants Wendler, Thomas, and Sharp.

While it erred on the First Amendment merits of Plaintiffs' claims, the district court correctly held that Plaintiffs have standing to sue Vice President Thomas and Chancellor Sharp for prospective relief in their

official capacities.[13] ROA.870–72. It also correctly rejected President Wendler's claim of sovereign immunity in his official capacity, finding that Plaintiffs have shown the required "ongoing violation" under *Ex Parte Young* and this Court's decision in *Freedom from Religion Found. v. Abbott*. 955 F.3d 417, 424–25 (5th Cir. 2020); ROA.868–70. The Court should affirm those holdings, should Defendants challenge standing and assert sovereign immunity here.

## IV. The Prior Restraint on Plaintiffs' Expression Will Continue to Work Irreparable Harm Contrary to the Public Interest.

Plaintiffs satisfy the remaining factors for preliminary injunctive relief: Wendler's ban is causing and will cause irreparable injury as Plaintiffs prepare a second drag show just months away, and as a prior restraint on speech, it is contrary to the public interest—especially in higher education.

### A. Plaintiffs, who are planning a March 2024 campus drag show, face more irreparable harm.

Only swift preliminary injunctive relief can stop the ongoing harm to Plaintiffs' First Amendment rights. This Court has "repeatedly

---

[13] The district court upheld the Board of Regents Defendants' standing challenge. ROA.872. Plaintiffs do not contest that holding on appeal.

held . . . that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (cleaned up). And President Wendler has signaled every intent to continue enforcing his ban against Plaintiffs' future drag shows—including one planned for March 22, 2024. ROA.237 ¶ 130(b).

Even after Plaintiffs filed suit, President Wendler has proven resolute in preventing drag shows on campus. In an April 27, 2023, television interview, Wendler said he couldn't "talk about" his email edict due to the litigation, only to affirm: "I wouldn't have done anything any differently." ROA.623 at 25:00–27:47.

Absent injunctive relief, every sign indicates that President Wendler will again overturn his staff members' approval of Plaintiffs' events; that Vice President Thomas will do Wendler's bidding; and that Chancellor Sharp will again stand behind Wendler's censorship. And given his stated disdain for Plaintiffs' expression, Wendler has every incentive to make Plaintiffs wait and see if he will rescind his ban, or instead wield his authority again to throttle Plaintiffs' protected

expression. That uncertainty harms Plaintiffs' expression even more, as they must spend time and scarce resources preparing an alternative event off-campus, including arranging a venue and promoting the new location. *See* ROA.240–41 ¶ 144(b)–(d). In short, more harm to their expressive freedoms will take root well *before* March 24, 2024.

### B. The balance of harms and the public interest favor Plaintiffs' First Amendment rights.

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). That's especially true on campus, where "courts must be especially vigilant against assaults on speech in the Constitution's care." *Speech First, Inc.*, 979 F.3d at 339.

By contrast, President Wendler identifies no potential harm to the university or himself from the drag show proceeding other than offense to women and to his own worldview. That's not enough. The notion that public universities "do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of the Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion).

## CONCLUSION

Even if President Wendler's opinion were shared by all but Spectrum WT's members, Defendants cannot justify silencing Plaintiffs based on their preferred values. *Papish*, 410 U.S. at 670. That argument lost in *Southeastern Promotions*. It lost in *Iota Xi*. And it must lose here. The First Amendment's promise of viewpoint neutrality, so vital to free expression at public colleges and universities, demands it.

Plaintiffs ask the Court to reverse the denial of their preliminary injunction motion and remand, as Plaintiffs face ongoing irreparable harm to their First Amendment rights absent prompt injunctive relief.

Dated: November 13, 2023          Respectfully submitted,

/s/ JT Morris
JT Morris
Conor T. Fitzpatrick
   Foundation for Individual Rights
   and Expression
700 Pennsylvania Ave. S.E., Suite 340
Washington, D.C. 20003
Tel: (215) 717-3473
jt.morris@thefire.org
conor.fitzpatrick@thefire.org

Adam B. Steinbaugh
Jeffrey D. Zeman
    Foundation for Individual Rights
    and Expression
510 Walnut St., Suite 1250
Philadelphia, PA. 19106
Tel: (215)717-3473
adam@thefire.org
jeff.zeman@thefire.org

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

This certifies that on November 13, 2023, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing via the Court's ECF filing system on all registered counsel of record.

/s/ JT Morris
JT Morris
Attorney for Plaintiffs-Appellants

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. App. P. 32(a)(7)(B) because this brief contains 12,961 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 32.2.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Local Rule 32.1 and the type style requirements of proportionally spaced typeface using 14-point Century Schoolbook font for text and 12-point Century Schoolbook font for footnotes.


Dated: November 13, 2023          /s/ JT Morris
                                  JT Morris
                                  Attorney for Plaintiffs-Appellants