No. 23-10994

---

**In the United States Court
of Appeals for the Fifth Circuit**

---

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVALL,

*Plaintiffs-Appellants*

v.

WALTER WENDLER; DR. CHRISTOPHER THOMAS; JOHN SHARP;
ROBERT L. ALBRITTON; JAMES R. BROOKS; JAY GRAHAM;
TIM LEACH; BILL MAHOMES; ELAINE MENDOZA;
MICHAEL J. PLANK; CLIFF THOMAS; DEMETRIUS L. HARRELL, JR.;
MICHAEL A. HERNANDEZ, III,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of Texas in No. 2:23-CV-48,
Honorable Matthew Joseph Kacsmaryk, U.S. District Judge

---

**BRIEF OF *AMICUS CURIAE* SOUTHERN METHODIST UNIVERSITY
DEDMAN SCHOOL OF LAW FIRST AMENDMENT CLINIC
IN SUPPORT OF APPELLANTS AND REVERSAL**

---

Peter Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX  75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

*Attorneys for Amicus Curiae Southern Methodist University
Dedman School of Law First Amendment Clinic*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

1. No. 23-10994, *Spectrum WT, et al. v. Walter Wendler, et al.*

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellants' Certificate of Interested Persons and in the Certificates of Interested Persons of the other Amici Curiae—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

***Amicus Curiae***
Southern Methodist University Dedman School of Law First Amendment Clinic[1]

***Attorneys for Amicus Curiae***
Peter Steffensen
SMU Dedman School of Law First Amendment Clinic
P.O. Box 750116
Dallas, TX  75275-0116

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305

*(continued on next page)*

---

[1] The views expressed do not speak for Southern Methodist University or the SMU Dedman School of Law.

No publicly traded company has an ownership interest of 10% in the entities listed above.

Respectfully submitted,

*/s/ Peter B. Steffensen*
*Attorney of Record for Amicus Curiae*
*Southern Methodist University*
*Dedman School of Law*
*First Amendment Clinic*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .......................2

TABLE OF CONTENTS ............................................................................4

TABLE OF AUTHORITIES ....................................................................5

STATEMENT OF AMICUS CURIAE......................................................7

ARGUMENT .............................................................................................8

    I.    The Court Below Failed to Address Whether President Wendler's Decision to Ban Spectrum WT's Drag Show was a Prior Restraint. ...................................8

    II.    The Doctrine of Prior Restraint Focuses on the Act of Censorship, not the Substance of the Speech. ......................................................................9

    III.    President Wendler's Cancellation of Spectrum WT's Drag Show Should Have Been Scrutinized by the District Court as a Prior Restraint.......................12

    IV.    The "Text, History, and Tradition" of the First Amendment Support the Conclusion that President Wendler's Decision was a Prior Restraint.................16

CONCLUSION .........................................................................................18

CERTIFICATE OF SERVICE..................................................................20

CERTIFICATIONS UNDER ECF FILING STANDARDS .................21

CERTIFICATE OF COMPLIANCE ......................................................22

## TABLE OF AUTHORITIES

**Cases**

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .................................................10

*Brooks v. Auburn Univ.*, 412 F.2d 1171 (5th Cir. 1969) .........................................12

*Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330 (5th Cir. 2000) ..............................12

*Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273 (5th Cir. 2003) ....................9, 11, 16

*Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016) ......................................................................................................12

*Freedman v. Maryland*, 380 U.S. 51 (1965) ...........................................................14

*Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417 (5th Cir. 2020) ..........................................................................................9, 12, 13, 15

*Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317 (5th Cir. 1984) ..........11, 15

*Healy v. James*, 408 U.S. 169 (1972) ......................................................................11

*Near v. Minn. ex rel. Olson*, 283 U.S. 697 (1931) ..............................................9, 17

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ..................................................8, 10

*NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022), *cert. granted*, --- S. Ct. ----, 2023 WL 6319650 .......................................................................16

*New York Times Co. v. United States*, 403 U.S. 713 (1971) .....................................9

*Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ....................................10, 14

*Pitt. Press Co. v. Pitt. Comm'n on Human Relations*, 413 U.S. 376 (1973) ..........................................................................................................10

*Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575 (S.D. Tex. 2003), *appeal dismissed*, 67 F. App'x 251 (5th Cir. 2003) ...........................9, 13

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) ..........................9, 10, 11, 14

*Shelton v. Tucker*, 364 U.S. 479 (1960) ..................................................................11

*Stacy v. Williams*, 306 F. Supp. 963 (N.D. Miss. 1969)...........................................11

*Staub v. City of Baxley*, 335 U.S. 313 (1958)..........................................................9

*Thomas v. Chi. Park Dist.*, 534 U.S. 316 (2002) ...................................................16

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ................9, 11

*Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.*, 452 F.2d 564 (5th Cir. 1971)................................................................................................11

*Whitney v. California*, 274 U.S. 357 (1927)............................................................18

*Widmar v. Vincent*, 454 U.S. 263 (1981) ...............................................................11

## Other Authorities

4 W. Blackstone, Commentaries on the Laws of England (1769) ..........................17

Jack M. Balkin, *Old-School/New-School Speech Regulation*, 127 Harv. L. Rev. 2296 (2014) ..............................................................................................14

Stephen R. Barnett, *The Puzzle of Prior Restraint*, 29 Stan. L. Rev. 539 (1977)........................................................................................................................10

## Rules

Fed. R. App. P. 29(a)(4)(E) ........................................................................................7

Fed. R. App. P. 29(b)(4)..............................................................................................7

## Constitutional Provisions

Tex. Const. art. I, § 8 ...............................................................................................18

## STATEMENT OF AMICUS CURIAE[2]

The First Amendment Clinic at Southern Methodist University Dedman School of Law defends and advances the freedoms of speech, press, assembly, and petition through litigation, public advocacy, and education. The Clinic serves as a resource on the liberties guaranteed by the First Amendment, and provides students with real-world practice experience to prepare them to become leaders on First Amendment issues when they become practicing attorneys. The Clinic engages in advocacy and representation across the State, including in this Court, and thus has a special interest in promoting the sound interpretation of the First Amendment.

---

[2] No party's counsel authored this brief in whole or in part. No party, or party's counsel, made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amicus curiae or their counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E), (b)(4). Appellants and Appellee Walter Wendler do not oppose the filing of this brief; the remaining Appellees do not consent.

## ARGUMENT

### I. The Court Below Failed to Address Whether President Wendler's Decision to Ban Spectrum WT's Drag Show was a Prior Restraint.

The district court denied Plaintiffs' request for preliminary injunctive relief and dismissed their damages claims, largely under the banner of a qualified immunity analysis in which the court held it was not "clearly established" that drag performances were protected speech, ROA.857-862, 864-868, 873, and that President Wendler's viewpoint-based decision to ban Spectrum WT's charity drag show was not "objectively unreasonable." ROA.863-864. Absent from the district court's analysis, however, was any consideration of Plaintiffs' third cause of action: prior restraint. *See* ROA.250-253, 311-313.

The district court's failure to consider whether President Wendler's actions here were an unconstitutional prior restraint is an independently compelling basis for reversal. The doctrine of prior restraint is concerned with preventing arbitrary exercises of official discretion which stop the exercise of speech in its tracks. That makes a prior restraint "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). And it is why licensing schemes which are designed to pre-authorize speech before its speakers are given access to a forum must be governed, at a minimum, by "narrow, objective, and definite standards to guide" official decisionmakers—qualities which

were entirely lacking here. *Se. Promotions, Ltd. v. Conrad*, <u>420 U.S. 546, 553</u> (1975).

## II. The Doctrine of Prior Restraint Focuses on the Act of Censorship, not the Substance of the Speech.

President Wendler's targeted, ex ante decision to bar Spectrum WT's drag show because he disliked its potential message is a "classic" example of a prior restraint, because it "regulat[es] speech contingent on the will of an official—such as the requirement of a license or permit that may be withheld or granted in the discretion of an official[.]" *Chiu v. Plano Indep. Sch. Dist.*, <u>339 F.3d 273, 280</u> (5th Cir. 2003) (citing *Staub v. City of Baxley*, <u>335 U.S. 313, 322</u> (1958)). His decision was unmoored from any objective standards which constrained him from acting on the basis of viewpoint, a fact to which he freely admitted. <u>ROA.265-267</u>; *see Freedom from Religion Found., Inc. v. Abbott*, <u>955 F.3d 417, 427</u> (5th Cir. 2020); *Pro-Life Cougars v. Univ. of Hous.*, <u>259 F. Supp. 2d 575, 582-85</u> (S.D. Tex. 2003), *appeal dismissed*, <u>67 F. App'x 251</u> (5th Cir. 2003).

The harm inflicted by a prior restraint is thus one of means, not ends: a prior restraint prevents speech—for example, a publication,[3] an act of protest,[4] or a work

---

[3] *Near v. Minn. ex rel. Olson*, <u>283 U.S. 697, 704-05</u> (1931); *see also New York Times Co. v. United States*, <u>403 U.S. 713, 725-26</u> (1971) (Brennan, J., concurring) ("[T]he First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result.").
[4] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, <u>393 U.S. 503, 504</u> (1969).

of performance art[5]—from ever entering the marketplace of ideas in the first place, regardless of its perceived value. *See* Stephen R. Barnett, *The Puzzle of Prior Restraint*, 29 Stan. L. Rev. 539, 543 (1977) ("[T]he doctrine focuses on the form or method of the restraint instead of the substance of the speech (or conduct)."). It is an "immediate and irreversible sanction" that "freezes" speech in place, "at least for the time." *Neb. Press*, 427 U.S. 539, 559 (1976); *Conrad*, 420 U.S. at 553 (a trait common to all prior restraints is that they give "public officials the power to deny use of a forum in advance of actual expression."); *cf. Pitt. Press Co. v. Pitt. Comm'n on Human Relations*, 413 U.S. 376, 390 (1973) ("The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.").

Accordingly, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). With that "heavy presumption" also comes a "heavy burden" on the part of the official enforcing the restraint to justify its imposition. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing

---

[5] *Conrad,* 420 U.S. at 547-48.

authority, is unconstitutional." *Chiu*, 339 F.3d at 281 (quoting *Conrad*, 420 U.S. at 553).

These requirements apply with equal force to facilities on public university campuses. *Healy v. James*, 408 U.S. 169, 180 (1972). As the Supreme Court has long held, the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); *see also Tinker*, 393 U.S. at 512 ("The Nation's future depends on leaders trained through wide exposure to the robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection.") (cleaned up).

Thus, "[w]hen [a] restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint . . . ." *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984) (quoting *Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.*, 452 F.2d 564, 566 (5th Cir. 1971)). Like any other system of prior restraint, then, the "'denial [to particular groups] of use of campus facilities for meetings and other appropriate purposes' must be subjected to the level of scrutiny appropriate to *any* form of prior restraint." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) (emphasis added); *see also Stacy v. Williams*, 306 F. Supp. 963, 971 (N.D. Miss. 1969) ("[P]rior restraints must be narrowly drafted so as to suppress only that

speech which presents a 'clear and present danger' of resulting in serious substantive evil which a university has the right to prevent.").

### III. President Wendler's Cancellation of Spectrum WT's Drag Show Should Have Been Scrutinized by the District Court as a Prior Restraint.

President Wendler's decision barring Spectrum WT's charity drag show exhibited all the hallmarks of an unconstitutional prior restraint. For one, Wendler's decision to override the University's standard procedure for reserving campus facilities—which Spectrum WT followed and under which it obtained tentative approval, ROA.230-233—and replace it with his own judgment is the type of "unbridled discretion" that decades of prior restraint precedent has considered odious. *Freedom from Religion Found.*, 955 F.3d at 427; *see also Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 472-73 (5th Cir. 2016) (Jones, J., dissenting). Even "[a]ttributing the highest good faith" to President Wendler, the right of student groups to access a forum made generally available by the University for all forms of expressive activity "cannot be left to the discretion of the university president on a pick and choose basis." *Brooks v. Auburn Univ.*, 412 F.2d 1171, 1172 (5th Cir. 1969).

That conclusion does not change even if the performance space Spectrum WT sought access to, Legacy Hall, could be considered a limited or nonpublic forum.[6]

---

[6] But it is more properly considered a designated public forum. *See* ROA.221-224; *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2000) (considering "(1)

Even under the less stringent scrutiny applied under those circumstances, "prior restraints on speech … must contain neutral criteria sufficient to prevent (1) censorship that is unreasonable in light of the purpose served by the forum *and* (2) viewpoint-based censorship." *Freedom from Religion Found.*, 955 F.3d at 429 (emphasis in original).

President Wendler's actions here failed in both respects. His decision to bar Spectrum WT's drag show prevented a work of performance art from being displayed in a forum designed for that precise purpose. *See* ROA.221-223. What's more, the JBK Student Center and Legacy Hall had hosted drag shows on at least two prior occasions, one during President Wendler's tenure. ROA.223-224. As to *Freedom from Religion Foundation*'s second concern—that a lawful prior restraint scheme prevent viewpoint-based censorship—President Wendler's own public reasoning on the matter showed that his decision was rooted in exactly the kind of viewpoint-driven animus that *must* fail constitutional scrutiny. *See* ROA.265-267.

Nor did President Wendler's decision operate under a policy that maintained "procedural safeguards designed to obviate the dangers of a censorship system." *Conrad*, 420 U.S. at 559 (quoting *Freedman v. Maryland*, 380 U.S. 51, 58 (1965).

---

the government's intent with respect to the forum, and (2) 'the nature of the [forum] and its compatibility with the speech at issue.'" (quoting *Estivern v. La. St. Bar Ass'n*, 863 F.2d 371, 378 (5th Cir. 1989)); *see Pro-Life Cougars*, 259 F. Supp. 2d at 582.

In *Freedman*, as re-affirmed by *Conrad*, the Court held that for a prior restraint scheme to be upheld, it must ensure: (1) that the "burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor"; (2) that "any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo"; and (3) that "a prompt final judicial determination must be assured." *Id.* at 560. None of these safeguards were present here. ROA.252. This lawsuit alone is proof of that— after all, it is Spectrum WT, not the University, who had to bring this suit in order to vindicate their rights. *Freedman* and *Conrad* required just the opposite.

The lack of these procedural safeguards in President Wendler's censorship decision also place the district court's failure to consider the prior restraint issue into sharper relief. If a lawful speech-licensing regime at a minimum requires that the initial burden on speech be brief, and that it be subjected to prompt judicial resolution, the district court's failure even to consider the prior restraint question tacitly prolongs the operation of an unlawful censorship scheme which was the censor's "heavy burden" to justify in the first instance—a burden which it still has not met. *Org. for a Better Austin*, 402 U.S. at 419; *see also* Jack M. Balkin, *Old-School/New-School Speech Regulation*, 127 Harv. L. Rev. 2296, 2316-18 (2014) ("Prior restraints (which include licensing schemes) are especially troublesome

because they shift the costs of action, the burdens of proof, and the consequences of inertia from the state to the speaker.").

Additionally, the district court's focus on whether it was clearly established that Spectrum WT's proposed drag performance was protected expression leapfrogs the prior restraint question entirely. Rather than consider whether President Wendler's decision acted as an unlawful speech licensing regime, the opinion below focused on "predicting in advance the content and consequences" of Spectrum WT's proposed drag performance before it even occurred. *Gay Student Servs.*, 737 F.2d at 1317; *see* ROA.858-862.

That question may of course be essential to the resolution of the other First Amendment claims raised by the Plaintiffs. But prior restraint doctrine reserves judgment on the alleged substance of the speech being suppressed, focusing instead on the licensing regime itself, and whether state censors are acting with "unbridled discretion" when they target particular speakers for silencing. *Freedom from Religion Found.*, 955 F.3d at 427. President Wendler's own words should have left little doubt in this early phase of the litigation that his viewpoint-based decision to censor Spectrum WT was precisely the kind of "unbridled discretion" the First Amendment protects against. *See* ROA.267 ("I will not appear to condone the

diminishment of any group at the expense of impertinent gestures toward another group for any reason, even when the law of the land appears to require it.").[7]

## IV. The "Text, History, and Tradition" of the First Amendment Support the Conclusion that President Wendler's Decision was a Prior Restraint.

At the Founding, the prohibition on prior restraints "was central to the Speech Clause as originally understood, because the 'core abuse against which it was directed was the scheme of licensing laws implemented by the monarch and Parliament to contain the 'evils' of the printing press in 16th-and 17-century England." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 453 (5th Cir. 2022), *cert. granted*, --- S. Ct. ----, 2023 WL 6319650. But though these concerns grew out of press censorship by the Crown, "Founding-era Americans similarly viewed the freedom from prior restraints as a central component of the freedoms of speech and the press." *Id.*

Though "[t]he English licensing system expired at the end of the 17th century, . . . the memory of its abuses was still vivid enough in colonial times that Blackstone warned against the 'restrictive power' of such a 'licenser'-an administrative official who enjoyed unconfined authority to pass judgment on the content of speech." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320 (2002) (quoting 4 W. Blackstone,

---

[7] For that reason, too, President Wendler's decision was not "objectively reasonable" and therefore he should not be entitled to qualified immunity on Plaintiff's prior restraint claim. *See Chiu*, 339 F.3d at 284 (enforcement of an "obviously unconstitutional" prior restraint policy was objectively unreasonable).

Commentaries on the Laws of England 152 (1769)). In other words, the Founding-era prohibition on prior restraints, as originally understood and incorporated into the First Amendment, extended to legislative and regulatory regimes which targeted speech writ large, not just the press.

Built into this understanding was a foundational preference for corrective action, rather than proactive censorship—that is, whatever power government held under the American constitutional system to take action against speech, the Constitution preferred that that action occur after, not before, the speech has been uttered. As Blackstone explained, "[e]very freeman has an undoubted right to lay what sentiments he pleases before the republic; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequence of his own temerity." *Near*, 283 U.S. at 713-14 (quoting 4 W. Blackstone, Commentaries on the Laws of England 152 (1769)).

The First Amendment's prohibition on prior restraints is thus an essential tool for ensuring that ideas and expression can freely be communicated, while accounting for the fact that speakers must accept the consequences of their speech. This very idea is expressed even more succinctly in the Texas Constitution's Bill of Rights, which guarantees that "[e]very person shall be at liberty to speak, write or publish

his opinions on any subject, being responsible for the abuse of that privilege . . . ." Tex. Const. art. I, § 8.[8]

Put simply, even if President Wendler sincerely believed that the speech he anticipated in Spectrum WT's drag show was harmful, the Framers nonetheless intended for their speech to flourish. Indeed, "the remedy to be applied is more speech, not enforced silence." *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring). Because the "text, history, and tradition" of the First Amendment, ROA.852, support an understanding that President Wendler's actions here were precisely the kind of prior restraint that the Founders aimed to guard against, the district court erred by not considering the issue at all.

## CONCLUSION

For these reasons and the reasons stated by Appellants, the Court should reverse the denial of Plaintiffs' preliminary injunction motion and remand.[9]

---

[8] *Cf. Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("To courageous, selfreliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion.").

[9] The First Amendment Clinic thanks SMU Law 3L Students and Associate Members of the State Bar Remington Giller and Suzi Goebel for their invaluable contributions to this brief.

Dated: November 20, 2023

Respectfully submitted,

/s/ Peter B. Steffensen
Peter Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, Texas 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

*Attorneys for Amicus Curiae*
*Southern Methodist University*
*Dedman School of Law*
*First Amendment Clinic*

## CERTIFICATE OF SERVICE

I certify that on November 20, 2023, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Peter B. Steffensen*
*Attorney of Record for Amicus Curiae*
*Southern Methodist University*
*Dedman School of Law*
*First Amendment Clinic*

**CERTIFICATIONS UNDER ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Peter B. Steffensen*
*Attorney of Record for Amicus Curiae*
*Southern Methodist University*
*Dedman School of Law*
*First Amendment Clinic*

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 2,817 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Peter B. Steffensen*
*Attorney of Record for Amicus Curiae*
*Southern Methodist University*
*Dedman School of Law*
*First Amendment Clinic*