No. 23-10994

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVALL,

*Plaintiffs-Appellants,*

v.

WALTER WENDLER; DR. CHRISTOPHER THOMAS; JOHN SHARP; ROBERT L.
ALBRITTON; JAMES R. BROOKS; JAY GRAHAM; TIM LEACH; BILL MAHOMES; ELAINE
MENDOZA; MICHAEL J. PLANK; CLIFF THOMAS; DEMETRIUS L. HARRELL, JR.;
MICHAEL A. HERNANDEZ, III,

*Defendants-Appellees.*

Appeal from the United States District Court for the Northern District of Texas
Case No. 2:23-CV-48

## BRIEF OF *AMICUS CURIAE* OF THE SECULAR STUDENT ALLIANCE IN SUPPORT OF PLAINTIFFS-APPELLANTS

SAMUEL T. GROVER
*Counsel of Record*

FREEDOM FROM RELIGION
FOUNDATION, INC.
P. O. Box 750
Madison, Wisconsin 53701
(608) 256-8900
sam@ffrf.org

*Counsel for Amicus Curiae
Secular Student Alliance*

### SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed person and entity as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### **Amicus Curiae**

Secular Student Alliance

### **Attorney for *Amicus Curiae***

Samuel T. Grover
Freedom From Religion Foundation
P.O. Box 750
Madison, WI 53703
(608) 256-8900
sgrover@ffrf.org

*Counsel for Amicus Curiae*
*Secular Student Alliance*

### CORPORATE DISCLOSURE STATEMENT

The Secular Student Alliance is a 501(c)(3) nonprofit corporation. There is no parent corporation or publicly held corporation that owns 10% or more of Secular Student Alliance's stock.

# TABLE OF CONTENTS

Page(s)

Supplemental Certificate of Interested Persons..........................................i

Corporate Disclosure Statement ..............................................................i

Table of Contents ................................................................................ ii

Table of Authorities............................................................................ iii

Interest of Amicus .............................................................................. 1

Introduction .......................................................................................2

Argument............................................................................................4

    I.   President Wendler engaged in unconstitutional viewpoint discrimination by censoring speech based upon his personal religious preferences...................4

    II.  The District court's assertion that there is no "intentional and overwhelmingly apparent" message involved in holding a drag show fundraiser ignores the history of drag and its modern application..................9

       A.  American ballroom style drag performances, like the ones at the fundraiser, are historically rooted in protesting religious restrictions on the expression of gender and sexuality............................................9

       B.  The current political climate in the United States, and particularly in Texas, continues to make drag shows inherently political acts that protest Christian nationalism. ..............................................................12

Conclusion........................................................................................15

Appendix A .....................................................................................16

Certificate of Compliance ...................................................................18

Certificate of Service..........................................................................19

## TABLE OF AUTHORITIES

*Cases*                                                    *Page(s)*

*Bible Believers v. Wayne County, Michigan*,
    805 F.3d 228 (6th Cir. en banc 2015) ................................................6

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992) ..........................................................................6

*In re Tam*,
    808 F.3d 1321 (Fed. Cir. 2015) ........................................................6

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ..........................................................................7

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ..........................................................................5

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .......................................................................4, 5

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .......................................................................4, 5

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ..........................................................................4

*Spectrum WT v. Wendler,*
    2:23-CV-048 (W.D. Tex. 2023) ....................................................9, 12

*Tinker v. Des Moines Indep. Sch. Dist.*,
    393 U.S. 503 (1969) ........................................................................14

*Turner Broadcasting Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ..........................................................................4

*U.S. v. Richards*,
    755 F.3d 269 (5th Cir. 2014) ............................................................5

*U.S. v. Stevens*,
    559 U.S. 460 (2010) ..........................................................................5

## Other Authorities

Alison Chapman, Alejandra Carabello, & Erin Reed, *LGBTQ+ Legislative Tracking Spreadsheet* (2023), *available at* https://bit.ly/3QS1tck ......................13

*Explainer: Drag Queens and How They Got Pulled Into Politics*, Associated Press (Oct. 2022), *available at* https://bit.ly/3QE1fEA....................................................2

George Cunningham, *Anti-transgender rights legislation and internet searches pertaining to depression and suicide*, 17 PLoS One 12 (Dec. 2022), *available at* https://ncbi.nlm.nih.gov/pmc/articles/PMC9778603 ...........................................14

Human Rights Campaign, *Human Rights Campaign Found. State Equality Index: 91% of Anti-LGBTQ+ Bills in 2022 Failed to Become Law* (Jan. 2023), *available at* https://bit.ly/3u9FR2t.....................................................................................12

José Criales-Unzueta, *From Underground Subculture to Global Phenomenon: An Oral History of Ballroom Within Mainstream Culture*, Vogue Magazine (June 2023), *available at* https://vogue.com/article/oral-history-ballroom-pride-2023 ...............................11

Kate Redburn*, Before Equal Protection: The Fall of Cross-Dressing Bans and the Transgender Legal Movement, 1963-86,* 40 L. & History Rev. 679 (2023) .......10

Madison Pauly, *Inside the Secret Working Group That Helped Push Anti-Trans Laws Across the Country*, Mother Jones (March 2023), *available at* https://bit.ly/3skeKRJ..........................................................................................13

Meg Metcalf, *The History of Pride: How Activists Fought to Create LGBTQ+ Pride*, The Library of Cong., *available at* loc.gov/ghe/cascade/index.html? appid=90dcc35abb714a24914c68c9654adb67 ....................................................12

*Religious Landscape Study*, Pew Research Center (2014), *available at* https://pewresearch.org/religion/ religious-landscape-study ................................7

Simon Doonan, *Drag the Complete Story,* 214, Laurence King Pub. (2019) ...10, 11

*Strategic Plan*, The Trevor Project, *available at* https://thetrevorproject.org/strategic-plan...........................................................13

**INTEREST OF AMICUS[1]**

The Secular Student Alliance ("SSA") is a 501(c)(3) educational nonprofit and network of over 200 student chapters on high school and college campuses. Dedicated to advancing nonreligious viewpoints in public discourse, the mission of the Secular Student Alliance is to organize, unite, educate, and serve secular students and student communities that promote the ideals of scientific and critical inquiry, democracy, secularism and human-based ethics. SSA empowers secular students to proudly express their identity, build welcoming communities, promote secular values, and set a course for lifelong activism. SSA and its chapters and affiliates value the efforts of high schools, colleges, and universities to ensure an inclusive and welcoming educational environment.

SSA's interest in this case stems from serious concerns of SSA members that public university officials will be permitted to censor the speech of SSA members and other students based on the personal religious beliefs of university employees. In support of the fundamental First Amendment rights of speech and assembly, SSA seeks to protect students from government animus and censorship aimed at LGBTQIA+ and nonreligious students.

---

[1] No party's counsel in this case authored this brief in whole or in part. No party or party's counsel contributed any money intended to fund preparing or submitting this brief. No person, other than Amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

Fewer issues have caught the American political attention in the past year like that of drag performances. Despite drag having a long artistic tradition and history as a source of expression supporting LGBTQIA+ rights, it appears that the question of when and where drag may be performed is reaching a fever pitch in the American consciousness. *See* Jeff McMillan, *Explainer: Drag Queens and How They Got Pulled Into Politics*, Associated Press (Oct. 2022), *available at* https://bit.ly/3QE1fEA. As with all issues that enter the public discourse, there are a range of opinions surrounding drag. But while misinformation surrounding drag has led some to call for bans on it, there are few values more critical to democracy than that of free speech. First Amendment jurisprudence places strict limits on when and how government actors may restrict speech—our Constitution ensures that government actors may not censor a particular opinion simply because they disagree with it.

From funding decisions to student organization regulations, university presidents hold a significant amount of power and responsibility regarding all aspects of student life. Unfortunately for the students of West Texas A&M University, President Wendler has decided to forgo that responsibility in favor of enforcing his personal religious beliefs as a matter of university policy. By placing

an ongoing ban on drag performances, President Wendler has engaged in unconstitutional viewpoint discrimination, creating a real and imminent threat to all student organizations whose members may wish to organize events expressing an opinion contrary to his own.

It is no surprise that drag is an issue bringing students to the courts to ask for protection from unconstitutional censorship. We are currently in an era of rising religious extremism in the United States, and drag has historically played a critical role in protesting religiously motivated political repression. As these issues arise, all government actors, including both university presidents and courts, have a constitutional obligation to step back from their preconceived notions of what drag is and what purposes it serves, and to view each circumstance in its objective, factual, and historical contexts. Both President Wendler and the district court have failed in this regard. Now, this Court has the opportunity to reverse the district court's denial of Spectrum WT's preliminary injunction motion, and ensure that the constitutional right to free speech of all West Texas A&M students is protected.

**ARGUMENT**

## I.    President Wendler engaged in unconstitutional viewpoint discrimination by censoring speech based upon his personal religious preferences.

First Amendment jurisprudence places strict limits on when and how a government actor may utilize their power to restrict access to a government-run public forum. In addition to reasonable time, place, and manner restrictions, government actors must apply only "narrow, objective, and definite standards" when regulating speech. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Neutral regulation of a public forum must be accomplished without reference to the content of a speaker's message. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (applying strict scrutiny review to a content-based restriction on speech). Content-based regulations include laws regulating speech "by particular subject matter" or "by its function or purpose." *Id.* Such restrictions are "presumed to be unconstitutional." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citing *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 641–43 (1994)). Restrictions upon the content of speech have been allowed in only a few limited areas, "which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest

in order and morality." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992). These limited areas include obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *See U.S. v. Stevens*, 559 U.S. 460, 468 (2010); *U.S. v. Richards*, 755 F.3d 269, 273–74 (5th Cir. 2014). But these are extremely narrow exceptions that have been applied sparingly by courts. The general rule remains: "The First Amendment generally prevents government from proscribing speech . . . or even expressive conduct . . . because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." *R.A.V.*, 505 U.S. at 382. The Supreme Court describes this rule as "axiomatic." *Rosenberger*, 515 U.S. at 828.

There is a subset of content-based restrictions on speech that are even *more* anathema to the free speech principle embodied in our First Amendment. "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Reed*, 576 U.S. at 168 (citing *Rosenberger*, 515 U.S. at 829). When it comes to viewpoint discrimination the Supreme Court has been clear that seeking to protect the sensibilities of others fares no better as a justification for censorship than expressions of personal distaste: "the legal significance of viewpoint discrimination is the same whether the government disapproves of the message or claims that some part of the populace will disapprove of the message." *In re Tam*,

808 F.3d 1321, 1336 (Fed. Cir. 2015). Because "listeners' reaction to speech is not a content-neutral basis for regulation," *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992), protecting others from speech the government deems harmful remains unconstitutional viewpoint discrimination. "Simply stated, the First Amendment does not permit a heckler's [or university president's] veto." *Bible Believers v. Wayne County, Michigan*, 805 F.3d 228, 252 (6th Cir. en banc 2015).

It is this "more egregious" form of discrimination that President Wendler engaged in when he subverted West Texas A&M University's neutral forum regulations and opted instead to censor Spectrum WT's event based upon his own personal religious beliefs. In his official statement to the university community, President Wendler stated:

> I believe every human being is created in the image of God, and therefore, a person of dignity. Being created in God's image is the basis of Natural Law… Does a drag show preserve a single thread of human dignity? I think not… The WT community should live by the Golden Rule. As a Christian, I personally learned this in the book of Matthew, 'So in everything, do to others what you would have them do to you, for this sums up the Law and the Prophets…

ROA.265–67. President Wendler views drag as "derisive, divisive, and demoralizing misogyny," comparable to "blackface." *Id.* Whether performing drag violates the Golden Rule or President Wendler's personal Christian sensibilities should have no bearing on whether Spectrum WT is permitted to hold its event. It

goes beyond President Wendler's authority—or the authority of any government actor—to place a prior restraint on speech for potentially violating religious principles. This has been the law since at least 1952, when the Supreme Court held in *Joseph Burstyn, Inc. v. Wilson* that a New York statute authorizing state officials to censor "sacrilegious" films unconstitutionally abridged the rights to free speech and free press. *See* 343 U.S. 495 (1952). The Court summarized its reasoning quite eloquently, stating, "[F]rom the standpoint of freedom of speech and the press, it is enough to point out that **the state has no legitimate interest in protecting any or all religions from views distasteful to them** which is sufficient to justify prior restraints upon the expression of those views. It is not the business of government in our nation to suppress real or imagined attacks upon a particular religious doctrine, whether they appear in publications, speeches, or motion picture." *Id.* at 505 (emphasis added).

There are few issues more subjective than that of religious belief. There are hundreds of recognized "religions" in the United States. *See, Religious Landscape Study*, Pew Research Center (2014), *available at* https://pewresearch.org/religion/religious-landscape-study. Even within the same religious identity rarely do any two given adherents share identical views on every topic. This kind of subjective censorship runs contrary to the Supreme Court's mandate that all criteria for forum access be narrow, objective, and definite. The Court's requirement exists for good

reason. Giving any single public university administrator unilateral power to decide what speech can or cannot occur on campus based on their personal moral compass would have a disastrous impact on the right to free speech. A Christian president of a public university would be able to ban any secular winter celebrations on campus on the basis that their faith teaches that "Jesus is the reason for the season." A Muslim university president could ban visual art on campus that depicts the prophet Mohommed because it is against Islamic belief. An Orthodox Jewish president could ban women from wearing pants on campus due to their belief that it is sinful. Any university president could essentially co-opt the power of their office to turn a publicly funded university into a religious one that suits their personal belief system.

First Amendment jurisprudence creates strict guidelines for when and how a government actor may utilize their power to place limitations on speech, so that no single individual may abuse said power. West Texas A&M *has* a set of objective and definite standards for determining which events can occur on its campus—one that Spectrum WT followed, and, under those objective criteria received approval—until President Wendler intervened, substituting his personal preferences for the university's policies. *See* First Am. Compl. for C.R. Violations, ¶ 4 (ECF No. 28). If President Wendler's censorship is allowed to stand, it will create a very real and imminent threat not only to Spectrum WT, but to any other

student organization on the West Texas A&M campus who might dare to express an opinion contrary to President Wendler's personal religious beliefs. The First Amendment cannot abide such a result.

II.    **The District court's assertion that there is no "intentional and overwhelmingly apparent" message involved in holding a drag show fundraiser ignores the history of drag and its modern application.**

A.    **American ballroom style drag performances, like the ones at the fundraiser, are historically rooted in protesting religious restrictions on the expression of gender and sexuality.**

In its decision, the district court asked the question: "if the 'fundraiser' features cross-dressing like other theatrical performances, but not an 'overtly political' message, does it convey the 'intentional and overwhelmingly apparent' message required in the 'campus protest' cases applicable to school settings?" *Spectrum WT v. Wendler,* 2:23-CV-048, 5 (W.D. Tex. 2023). As noted above, the approval process that the Spectrum WT fundraiser had successfully gone through prior to President Wendler's intervention indicates that this specific fundraiser did not contain obscene content. Unfortunately, by focusing so heavily on the fact that *some* drag shows are intended for mature audiences, the court failed to properly consider the actual expression encompassed in the planned drag show. Historically, drag has played a role in protesting the religiously motivated repression of gender diversity and expression—and Spectrum WT's fundraiser was no exception.

Cross-dressing bans first rose to prominence in the late nineteenth and early twentieth centuries, and were commonly interpreted by law enforcement and judges across the country as bans on drag performances. *See,* Kate Redburn*, Before Equal Protection: The Fall of Cross-Dressing Bans and the Transgender Legal Movement, 1963-86,* 40 L. & History Rev. 679 (2023). As the twentieth century progressed, and LGBTQIA+ communities in the United States became increasingly visible, religious anxieties surrounding gender nonconformity heightened. Drag queens were frequent, explicit targets of The Moral Majority, with leaders like Mary Whitehouse, Anita Bryant, and Jerry Fallwell Sr. contributing to the social stigma surrounding LGBTQIA+ identities. *See* Simon Doonan, *Drag the Complete Story,* 214, Laurence King Pub. (2019) (Amicus Br. App'x A). The resulting heightened social stigma has led to a number of problems for many LGBTQIA+ youth, including social isolation, suicidal ideation, and being displaced from their homes. In major cities, such as New York, many of these young people have found community and support in the competitive "ball" scene. Drag families—groups of performers who provide each other with mentorship and community—began forming, many of which continue to this day. These competitions formed a significant part of the foundation for the style of drag that now dominates the mainstream American consciousness, and is the style of drag that likely would have been performed at the Spectrum WT fundraiser. *See,* José

Criales-Unzueta, *From Underground Subculture to Global Phenomenon: An Oral History of Ballroom Within Mainstream Culture*, Vogue Magazine (June 2023), *available at* https://vogue.com/article/oral-history-ballroom-pride-2023.

As a result of the continued clash between gender non-conformity and Christian fundamentalism in the United States, drag plays a critical role in countering religiously motivated repression. For example, when conservative street preachers began flooding San Francisco's historically gay neighborhood, The Castro, in the 1970s, neighborhood drag performers began to explicitly co-opt the attire of Catholic nuns in order to satirize the religious extremism being used to attack their community. This group came to be known as the "Sisters of Perpetual Indulgence" and is now known internationally for their work protesting religious extremist attacks on gender expression. *See Doonan*, *supra* at 214 (App'x A). It is not just performers who explicitly satirize religion, however, that view drag as an intentional act of political protest. Even the most "mainstream" of drag performers, RuPaul, has stated about drag: "I'm not doing drag to give you makeup tips. This has always been a political statement." *Id.* at 233 (App'x A).

The influence of Christian fundamentalism cannot be ignored when looking at the expressive nature of drag in the United States. Throughout the era of cross-dressing bans, drag queens were subject to significant violence from both state actors and the public at large, the effects of which echo into the modern era. Even

Pride celebrations, which today look like parades, dance parties, and music festivals, ultimately have their roots in the Stonewall Uprising, an explicit form of resistance to state-sponsored violence. *See* Meg Metcalf, *The History of Pride: How Activists Fought to Create LGBTQ+ Pride*, The Library of Cong., *available at* loc.gov/ghe/cascade/index.html?appid=90dcc35abb714a24914c68c9654adb67.

### B.   The current political climate in the United States, and particularly in Texas, continues to make drag shows inherently political acts that protest Christian nationalism.

Expressive activity is often a direct product of the political climate that it occurs within. In its decision, the district court incorrectly determined that because "drag" in its most broad sense can be used to refer to everything from sexualized performances, to powder puff football games, to "ugly woman contests," the Spectrum WT fundraiser was not necessarily expressive conduct. *See Spectrum WT* at 14. This determination, however, ignores not only the history of this *specific* style of drag, but also the current political climate surrounding LGBTQIA+ rights that gave rise to Spectrum WT's event.

Anti-LGBTQIA+ legislation has increased exponentially in recent years. In 2022 there were approximately 315 anti-LGBTQIA+ bills nationwide. *See* Human Rights Campaign, *Human Rights Campaign Found. State Equality Index: 91% of Anti-LGBTQ+ Bills in 2022 Failed to Become Law* (Jan. 2023), *available at* https://bit.ly/3u9FR2t. As of writing, there have been 542 anti-LGBTQIA+ bills

introduced nationwide in 2023, most of which are centered around restricting the rights of transgender and otherwise gender nonconforming people. Texas alone has introduced fifty-eight anti-LGBTQIA+ bills so far this year, more than any other state. *See* Alison Chapman, Alejandra Carabello, & Erin Reed, *LGBTQ+ Legislative Tracking Spreadsheet* (2023), *available at* https://bit.ly/3QS1tck. Many of these bills come from explicitly religious sources, such as the Alliance Defending Freedom, a well known Christian nationalist organization. *See* Madison Pauly, *Inside the Secret Working Group That Helped Push Anti-Trans Laws Across the Country*, Mother Jones (March 2023), *available at* https://bit.ly/3skeKRJ.

The fact that Spectrum WT's fundraiser was for the Trevor Project, is also of particular note when discussing the current political climate. The Trevor Project is a nonprofit organization that provides crisis support services for LGBTQIA+ youth who are experiencing suicidal ideation or otherwise find themselves in a mental health crisis. *See Strategic Plan*, The Trevor Project, *available at* https://thetrevorproject.org/strategic-plan. In the wake of the Christian nationalist attack on LGBTQIA+ rights, targeted youth are experiencing significant negative mental health outcomes. There is emerging evidence that suggests that crisis lines like the Trevor Project see an uptick in calls from LGBTQIA+ youth when these bills are introduced, regardless of whether they are passed. *See* George Cunningham, *Anti-transgender rights legislation and internet searches pertaining*

*to depression and suicide*, 17 PLoS One 12 (Dec. 2022), *available at*

https://ncbi.nlm.nih.gov/pmc/articles/PMC9778603.

The current political context is important, because it makes the intended

message of the Spectrum WT fundraiser all the more apparent. Spectrum WT

intentionally formulated its fundraiser to be a show of support for the LGBTQIA+

community, and to offer messaging that counters the uptick in anti-LGBTQIA+

discourse. *See* First Am. Compl. for C.R. Violations, ¶ 74 (ECF No. 28). The

district court's decision to ignore this context when ruling that there is nothing

inherently expressive about the Spectrum WT fundraiser is akin to ruling that there

is nothing inherently expressive about wearing a black armband to protest the

Vietnam War, because sometimes armbands are worn for fashion purposes. *But see*

*Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503 (1969).

Like all art, drag does not exist in a vacuum, but as a response to the world

around it. Though the historical cross-dressing bans of the nineteenth and twentieth

centuries have been overturned, there is no way to separate modern drag from its

historical roots of resisting legalized religious oppression. The proponents of

modern Christian nationalism have made clear their intention to reinstate these

Christian morality laws, and to criminalize forms of gender expression that do not

align with their personal religious beliefs, regardless of what the Constitution

requires. The Spectrum WT fundraiser was an explicit and obvious reaction to the

impact of the Christian nationalist movement on both the state and national levels. When one considers both the history of American drag and the political conditions that gave rise to the Spectrum WT fundraiser, the intention and message behind the event become obvious. Thus, the district court erred in declaring that there is nothing inherently expressive about the Spectrum WT fundraiser.

## CONCLUSION

For the above reasons, this Court must reverse the denial of Spectrum WT's preliminary injunction motion by the United States District Court for the Northern District of Texas, and remand, due to the ongoing, irreparable harm created by President Wendler's censorship at West Texas A&M.

Date: November 20, 2023

Respectfully submitted,

/s/ Samuel T. Grover
Samuel T. Grover
Freedom From Religion Foundation
P.O. Box 750
Madison, WI 53703
(608) 256-8900
sam@ffrf.org

*Counsel for Amicus Curiae*
*Secular Student Alliance*

# APPENDIX A



### The Sisters of Perpetual Indulgence

Drag has been a symbol of decadence, moral decline and general ungodliness since Caligula threw on a handwoven hemp shift dress. Much of the intolerance directed at the LGBTQ world has been religiously motivated. Drag has been an easy target for those – Mary Whitehouse, Anita Bryant, Jerry Falwell and all those 'moral majority' leaders – who are looking for sinners to convert, or burn at the stake. How to combat religious zealots? There's only one way: beat them at their own game, but with humour. Enter the Sisters of Perpetual Indulgence.

The Sisters kicked off in 1979 with a bout of impromptu street theatre, a spontaneous creative response to the preachers who had begun to descend on the Castro in San Francisco, preaching hellfire and damnation. A group of gays donned Belgian nuns' habits and a smidgen of makeup, and confronted the proselytizers. Over time their drag evolved: riffs on the extreme styles of Catholic nuns' habits were augmented with Mardi Gras elements of heavy goth glam makeup, massive fake bosoms and junky costume jewellery. The high camp ecclesiastical fashion show in Fellini's *Roma* springs easily to mind. By combining elements of religious piety with rampant decadent artifice, they successfully satirize conventions of gender and morality.

The Sisters have proven to be more perpetual than anyone might have imagined. Orders are now found internationally, focusing their devotions on LGBTQ activism and fundraising. They are big proponents of the drag queen tradition of name puns: examples include Sister Rhoda Kill and Sister Stigmata Hari.

214    Radical Drag

But what makes drag so wickedly compelling in these new politicized times? According to drag queen Gilda Wabbit, drag ensures that any political message hits home, 'like a strong drink before a tough conversation'. And then there is that Medusa effect. Speaking to *The New York Times*, Alabama activist Ambrosia Starling underscored the mesmerizing visual power of a fierce diva drag queen on any crowd: 'Who's going to pay attention to a 40-year-old queer standing on the steps with a bunch of queers? I wanted those cameras to look and not look away.'

Does this new movement have a leader? Late-night talk show host John Oliver thinks so. He suggested that RuPaul could run for president using the slogan 'Make America Fierce Again'. RuPaul's first post-Trump DragCon event offered political panels with drag stars such as Bob the Drag Queen. Ru declared, 'I understand what it is we must do. We're going to mobilize young people who have never been mobilized, through our love of music, our love of love, our love of bright colours.' Ads for *RuPaul's Drag Race* season 9 featured the tagline 'Drastic times call for dragtastic measures', and RuPaul's own Twitter feed began to sparkle with unflattering allusions to the 'Manchurian pumpkin'. 'I'm not doing drag to give you makeup tips', RuPaul declared, adding, 'This has always been a political statement.'

Some have suggested that Trump, with his makeup, wig, penchant for drama and exaggerated gestures, verges on being a drag queen himself. Speaking to *The New York Times*, RuPaul pooh-poohed this theory: 'As drag queens, we know we're putting on a facade and we're always aware of it, which is what scares the status quo. He believes he looks good. He believes he's looking like a real man.' He is, in other words, perfect drag king fodder for any and all of those brilliant butches who satirize toxic masculinity with such panache.

And the subversive dragtastic drag kings of the world are on *fuego*. Kristine BellaLuna (aka Landon Cider), Kandee Johnson, Kat Sketch – to name but three – are creating Insta vids and YouTube tutorials in which they drag-kingify themselves into The Donald. Technology and social media are disseminating mocking, shocking, radical, satirical drag far and wide into every corner of the universe. Is it gonna be yuuuge? It already is.

More than a look queen: Ryan Burke's exquisite self-portraits propel the whole concept of look queening into the realm of radical psychedelia.

### CERTIFICATE OF COMPLIANCE

This amicus brief complies with the page limitation of Fed. R. App. P. 29(a)(5) and Circuit R. 29 because it consists of 3,309 words and does not exceed 6,500 words.

This amicus brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ Samuel T. Grover*
Samuel T. Grover

*Counsel for Amicus Curiae*
*Secular Student Alliance*

Dated: November 20, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2023, the foregoing amicus brief was filed

electronically with the Clerk of the Court for the United States Court of Appeals

for the Fifth Circuit through the Court's CM/ECF system. I certify that all

participants in the case who are registered CM/ECF users will be served by the

appellate CM/ECF system.

*/s/ Samuel T. Grover*
Samuel T. Grover