No. 23-10994

# In the United States Court of Appeals for the Fifth Circuit

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVALL,

*Plaintiffs-Appellants,*

*v.*

WALTER WENDLER; DR. CHRISTOPHER THOMAS; JOHN SHARP; ROBERT L. ALBRITTON; JAMES R. BROOKS; JAY GRAHAM; TIM LEACH; BILL MAHOMES; ELAINE MENDOZA; MICHAEL J. PLANK; CLIFF THOMAS; DEMETRIUS L. HARRELL, JR.; MICHAEL A. HERNANDEZ, III,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

## BRIEF FOR DEFENDANT-APPELLEE WALTER WENDLER

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

JOSEPH N. MAZZARA
Assistant Solicitor General
Joe.Mazzara@oag.texas.gov

Counsel for Defendant-Appellee

# Certificate of Interested Persons

No. 23-10994

Spectrum WT; Barrett Bright; Lauren Stovall,

*Plaintiffs-Appellants,*

*v.*

Walter Wendler; Dr. Christopher Thomas; John Sharp; Robert L. Albritton; James R. Brooks; Jay Graham; Tim Leach; Bill Mahomes; Elaine Mendoza; Michael J. Plank; Cliff Thomas; Demetrius L. Harrell, Jr.; Michael A. Hernandez, III,

*Defendants-Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, defendant-appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ Joseph N. Mazzara

Joseph N. Mazzara
*Counsel of Record for*
*Defendant-Appellee Walter Wendler*

i

## Statement Regarding Oral Argument

This case is before this Court in an interlocutory posture regarding the denial of a preliminary injunction to allow an event that was scheduled nearly a year ago. As the parties' briefs adequately lay out the facts and legal arguments, the decisional process would not be significantly aided by oral argument. If the Court deems oral argument appropriate, however, President Wendler respectfully requests permission to participate.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ......................................................... i

Statement Regarding Oral Argument .................................................... ii

Table of Authorities ......................................................................... v

Introduction ................................................................................. 1

Issue Presented ............................................................................. 2

Statement of the Case ..................................................................... 2

    I.   Factual Background ................................................................ 2

    II.  Procedural Background ........................................................... 5

Summary of the Argument ............................................................... 8

Standard of Review ....................................................................... 10

Argument ................................................................................... 10

    I.   Appellants Are Unlikely to Succeed on the Merits............................... 11

        A.  The First Amendment does not protect non-expressive conduct. ............................................................................ 11

            1.  Under *FAIR*, drag shows are non-expressive conduct. ............... 11

            2.  Appellants' cases are inapposite. .................................... 19

            3.  Because drag shows are non-expressive conduct, rational basis applies ............................................................. 21

        B.  President Wendler's rejection of appellants' application to hold a drag show in Legacy Hall satisfies the applicable forum analysis ............................................................................ 23

            1.  The Court should apply the limited-public-forum analysis. ........ 23

            2.  President Wendler's putative policy satisfies the standard for limited-purpose fora. ............................................. 29

        C.  Lewd speech and conduct on campus are not protected by the First Amendment ................................................................ 35

        D.  President Wendler's email is not dispositive of any issue. ................ 36

    II.  The Other Factors Support Affirmance. ......................................... 37

        A.  Appellants cannot show irreparable harm. ...................................... 37

B.  The threatened injury to the movant does not outweigh the threatened harm to the non-movant, and granting the injunction will disserve the public interest. ........................................ 39

III.  Sovereign Immunity Applies. ................................................... 40

Conclusion ........................................................................................ 43

Certificate of Service ......................................................................... 44

Certificate of Compliance .................................................................. 44

# Table of Authorities

Page(s)

**Cases:**

*Anibowei v. Morgan,*
70 F.4th 898 (5th Cir. 2023), *petition for cert. filed* (U.S. Sept. 1,
2023) (No. 23-199) ............................................................. 10

*Apple Barrel Prods., Inc. v. Beard,*
730 F.2d 384 (5th Cir. 1984) ............................................... 10

*Ark. Educ. Tel. Com'n v. Forbes,*
523 U.S. 666 (1998) ......................................................... 9, 26

*Barnes v. Glen Theatre, Inc.,*
501 U.S. 560 (1991) ............................................................. 20

*Bethel School District No. 403 v. Fraser,*
478 U.S. 675 (1986) ............................................................. 35

*Blau v. Fort Thomas Pub. Sch. Dist.,*
401 F.3d 381 (6th Cir. 2005) .................................................. 8

*Board of Ed. of Hendrick Hudson Central School Dist. v. Rowley,*
458 U.S. 176 (1982) ............................................................. 30

*Brandt v. Bd. of Educ. of City of Chi.,*
480 F.3d 460 (7th Cir. 2007) (Posner, J.) ................................ 1

*Canal Auth. of State of Fla. v. Callaway,*
489 F.2d 567 (5th Cir. 1974) ............................................... 10

*Chacon v. Granata,*
515 F.2d 922 (5th Cir. 1975) .......................................... 9, 37-38

*Chiu v. Plano Indep. Sch. Dist.,*
260 F.3d 330 (5th Cir. 2001) ............................................... 11

*Christian Legal Soc. v. Martinez,*
561 U.S. 661 (2010) ..................................................... *passim*

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ............................................................. 22

*City of Erie v. Pap's A.M.,*
529 U.S. 277 (2000) ............................................................. 20

*Clark v. Cmty. for Creative Non-Violence,*
468 U.S. 288 (1984) .................................................. 2, 8, 12, 40

*Coleman v. Dretke*,
    409 F.3d 665 (5th Cir. 2005) (per curiam) .......................................................31

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*,
    473 U.S. 788 (1985) .................................................................... 27, 29

*D.C. v. Heller*,
    554 U.S. 570 (2008) .................................................................... 21-22

*F.C.C. v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) .......................................................................... 22

*Gay Student Servs. v. Tex. A&M Univ.*,
    737 F.2d 1317 (5th Cir. 1984) ............................................................. 20

*Good News Club v. Milford Central School*,
    533 U.S. 98 (2001) ............................................................................ 23

*Hague v. CIO*,
    307 U.S. 496 (1939) .......................................................................... 25

*Hays County Guardian v. Supple*,
    969 F.2d 111 (5th Cir. 1992) .............................................................. 25

*Healy v. James*,
    408 U.S. 169 (1972) .............................................................. 20, 27, 30, 36

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) .......................................................................... 20

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) .................................................................. 11, 16

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University*,
    993 F.2d 386 (4th Cir. 1993) ............................................................. 20

*Williams ex rel. J.E. v. Reeves*,
    954 F.3d 729 (5th Cir. 2020) ............................................................. 40

*Justice For All v. Faulkner*,
    410 F.3d 760 (5th Cir. 2005) ............................................................. 25

*Martin v. Parrish*,
    805 F.2d 583 (5th Cir. 1986) ............................................................. 35

*Matal v. Tam*,
    582 U.S. 218 (2017) (Kennedy, J., concurring in part) .......................... 11, 16, 20

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................................... 39

*Papish v. Board of Curators of University of Missouri*,
    410 U.S. 667 (1973) .............................................................. 19, 28, 35

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
   460 U.S. 37 (1983)........................................................................ 25-26

*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*,
   748 F.3d 583 (5th Cir. 2014) ...................................................... 22

*Planned Parenthood Gulf Coast, Inc. v. Phillips*,
   24 F.4th 442 (5th Cir. 2022) ....................................................... 40

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) ...................................................................... 27

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ...................................................................... 20

*Robinson v. Hunt Cnty., Texas*,
   921 F.3d 440 (5th Cir. 2019) ...................................................... 20

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) .............................................. 9, 11, 26, 29-30, 34

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
   547 U.S. 47 (2006)................................................................*passim*

*Se. Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975)...................................................................... 20

*Southern Utah Drag Stars v. City of St. George*,
   No. 4:23-CV-00044-DN-PK, 2023 WL 4053395 (D. Utah June 16,
   2023)............................................................................................... 21

*Spence v. State of Wash.*,
   418 U.S. 405 (1974)...................................................................... 12

*Texas v. Johnson*,
   491 U.S. 397 (1989) ................................................................12, 28

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2016) ...................................................... 39

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ...................................................................... 30

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ................................................................. 37

*United States v. O'Brien*,
   391 U.S. 367 (1968) ...........................................................12- 14, 17, 35

*United States v. Rodriguez*,
   33 F.4th 807 (5th Cir. 2022) ....................................................... 23

*Valley v. Rapides Parish Sch. Bd.*,
   118 F.3d 1047 (5th Cir. 1997)............................................................ 39
*Voting for Am., Inc. v. Steen*,
   732 F.3d 382 (5th Cir. 2013)...............................................14, 17, 21
*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) .................................................................. 9, 26-27
*Widmar v. Vincent*,
   454 U.S. 263 (1981) ......................................................... 9, 29-30, 34

**Constitutional Privisions:**
U.S. Const. amend. I..........................................................................*passim*

**Other Authorities:**
*Dr. Walter Wendler*, W. Tex. A&M Univ.,
   https://tinyurl.com/mr3mmtuz .....................................................31
https://www.stlyrics.com/lyrics/thisisthearmy/ladiesofthechorus.ht
   m (last accessed December 20, 2023) ..................................................16
https://www.youtube.com/watch?v=QR9BjFpPeK0 (last accessed on
   December 20, 2023)............................................................................ 5
https://www.youtube.com/watch?v=ZbBZRnWoPbY (last accessed
   December 20, 2023)..........................................................................16
"Trans/Non Binary Resources," *Trans/Non-binary Resources*, W.
   Tex. A&M Univ., https://www.wtamu.edu/student-
   support/spectrum/trans-non-binary.html (last visited Dec. 28,
   2023) ................................................................................................ 34
*WTAMU Resources*, W. Tex. A&M Univ.,
   https://www.wtamu.edu/student-
   support/spectrum/resources.html (last visited Dec. 28, 2023) ....................... 34

## Introduction

Appellants insist that President Wendler canceled its March 2023 drag show and banned future drag shows at Legacy Hall on West Texas A&M's campus because he disagreed with the viewpoint their shows would portray. He did not. President Wendler expressed unqualified approval of the only identifiable objective behind the show: raising money for suicide prevention. And appellants have never explained *what* particular viewpoint they intended to convey through their shows, thereby failing to identify any potential discrimination directed at their purported message. As the district court concluded, President Wendler's decision to restrict drag shows on campus was about appellants' *conduct*, not their views or message. If appellants' 2023 drag show had intended to convey "Christ is King," "Hail Satan," or anything in between, President Wendler would still have canceled it.

In denying the preliminary injunction, the district court concluded that Spectrum WT had not demonstrated that its March 2023 drag show was canceled for any reason other than that the President (a veteran college administrator) reasonably deemed such overtly sexualized dress, appearance, and behavior that accompanies a drag show—or, in a word, lewdness—as antithetical to a neutral, healthy educational environment. This is well in line with the standards adopted by this Court's sister circuits. "[C]lothing as such is not—not normally at any rate—constitutionally protected expression," and appellants' fundamental complaint is that they were not allowed to wear certain clothes at a particular time and place. *Brandt v. Bd. of Educ. of City of Chi.*, 480 F.3d 460, 465 (7th Cir. 2007) (Posner, J.). Appellants nevertheless ask this Court to presume that President Wendler's denial of their application to

conduct the March 2023 drag show in Legacy Hall can only be explained by animus toward messages associated with the LGBTQ+ community. But President Wendler's prohibition of a specific event does not prevent and has not prevented appellants from "showing support for the LGBTQ+ community," sending "ideological message[s] of support and acceptance for the LGBTQ+ community," or engaging in "advocacy in favor of LGBTQ+ rights." Appellants Br. 20; ROA.228. And it is the appellants' burden to show that "the First Amendment even applies" here. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Because they have not met that burden, they cannot show likelihood of success on the merits, let alone the other requirements of an injunction. This Court should affirm.

## Issue Presented

Was the district court correct that appellants failed to meet their burden to obtain a preliminary injunction?

## Statement of the Case

### I.  Factual Background

Appellants requested permission to host a drag show on March 31, 2023, at Legacy Hall on the West Texas A&M campus. ROA.226-27. The stated purpose of the drag show was "to raise funds for an LGBTQ+ charity," ROA.216, with the proceeds "earmarked for donation to an LGBTQ+ suicide-prevention group," ROA.229. President Wendler described that cause as "noble." ROA.265. At no point have appellants stated with particularity what viewpoint—other than, perhaps,

raising suicide awareness—they actually intended to express through their planned March 2023 drag show.

President Wendler announced his decision to cancel appellants' March 2023 drag show in a March 20, 2023, email to West Texas A&M students, faculty, and staff. ROA.265-67. In the email, President Wendler further expressed solidarity with the charitable aspect of the event: "The nonprofit organization focuses on suicide prevention—a noble cause—in the LGBTQ community. Any person considering self-harm for any reason is tragic." ROA.265. But West Texas A&M University prohibits "[p]ublic behavior that is disruptive, lewd, or indecent." ROA.484. And President Wendler was canceling the drag show because it would likely include conduct that was not just harassing but also lewd in that it includes "exaggerat[ed] aspects of . . . sexuality."[1] ROA.265. Specifically, he explained, drag shows typically include conduct that exaggerates aspects of women's sexuality, "sterotype[s] women," "discriminate[s] against womanhood," and amounts to "misogynistic behavior." ROA.265. He stated that such conduct is not conducive to the educational environment because it is "derisive, divisive and demoralizing misogyny." ROA.266. And President Wendler compared the drag show to "debas[ing] Latinas" and to "'black-face' performances." ROA.265-66.

---

[1] Contrary to appellants' suggestion otherwise (at 7), when President Wendler objected to conduct "exaggerating aspects of sexuality," he was discussing lewd conduct. After all, one can imagine someone on a stage exhibiting exaggerated aspects of male sexuality, both parts of male anatomy and their tendencies, and no reasonable person would fail to classify such conduct as lewd.

Appellants concede that "[s]ome drag performances are intentionally risqué." ROA.229. But they say that they "planned and intended [the March 2023] charity drag show to be 'PG-13,'" and "informed [University] administration and staff" that "the show would be 'PG-13.'" ROA.229. And they alleged that "[c]onsistent with its commitment to a 'PG-13' show, Spectrum WT instructed performers not to engage in any 'lewd' conduct." ROA.229. But appellants do not allege that they informed West Texas A&M administration and staff that they instructed performers not to engage in any lewd conduct *before* the show was canceled. And, viewing the situation from the perspective of a reasonable administrator at the time the request was made, at least three red flags become apparent. *First*, appellants never elaborated on what they meant by "PG-13." *Second*, "Spectrum WT forbade anyone under 18 from attending the event unless accompanied by a parent or guardian," which is hardly consistent with the ordinary meaning of "PG-13." ROA.229. *Third*, appellants' online advertisement boasted that the event's master of ceremonies would be a performer with a history of lewd drag shows, and its participants would *compete* to see who could be the most over-the-top. ROA.514; ROA.516. Specifically, the advertisement described the event as follows:

**A Fool's Drag Race**
A Fools' Drag Race will pit WT student organizations' fiercest drag performers against each other to support The Trevor Project

**About this Event**
A Fools' Drag Race will feature drag performers from an array of student organizations stomping it out to see who's the fiercest of them all. Proceeds from ticket sales and tips will benefit The Trevor Project, which provides 24/7 crisis support services to LGBTQ young people.

The night's emcee is popular Amarillo drag queen Myss Myka, and the judges' panel will include Amarillo drag performers and other special guests. Doors open at 5:30, and the fun starts at 6 p.m.

VIP tickets (a table of 6) are $50 individual VIP tickets can be bought at the door ($10) while supplies last. General-admission tickets are $5 online or at the door.

Sponsors: Spectrum, Black Student Union, WT K-Pop, F1RSTGEN, Resident Hall Association, Buff Allies

ROA.515.

Nothing in the advertisement suggested that this particular drag show would comply with school policy against "lewd" behavior. ROA.484. To the contrary, the participation of "Myss Myka"—who had participated in an extraordinarily lewd drag show in Lubbock on February 24, 2023—strongly suggested otherwise. *See* ROA.516.[2] During that show, "Myss Myka" simulated masturbation (ROA.516 at 3:14) and rubbed his crotch (at 4:16) while lying on stage in front of onlookers. "Myss Myka" also simulated frottage, or what is more colloquially known as "humping," with one of the members of the audience (at 5:20). ROA.516.

## II. Procedural Background

Appellants filed their complaint on March 24, 2023, four days after President Wendler canceled the proposed drag show, seeking a temporary restraining order ensuring their ability to hold their March 31, 2023, drag show on campus. ROA.16;

---

[2] The video referenced at ROA.516 is available for viewing on youtube at this link: https://www.youtube.com/watch?v=QR9BjFpPeK0 (last accessed on December 20, 2023).

ROA.265-67. Appellants subsequently withdrew their request for a TRO, opting to hold their drag show off campus instead. ROA.172. Appellants continued to seek injunctive and declaratory relief to secure their ability to hold drag shows on campus in the future, including a show planned for March 2024. ROA.212, 281. Finally, appellants sought compensatory, nominal, and punitive damages against President Wendler in his individual capacity, as well as attorneys' fees and costs. ROA.48.

In seeking a preliminary injunction, appellants alleged and argued, among other things, that they "intend[ed] to organize and put on drag shows and similar events on campus in the near future." ROA.236. They also indicated that they "fear[ed]" that these future shows will be subject to censorship as well. ROA.314-15. At the time, those planned events included (1) "Queer Movie Night" on October 31, 2023 where they intend to exhibit "The Rocky Horror Picture Show," which portrays sexual assault conducted for laughs, (2) a "second-annual drag-show" to benefit The Trevor Project, for which they have already submitted a reservation, intended to be held in Legacy Hall on March 22, 2024, ("March 2024 Drag Show") and (3) "Queer History Night, a program Spectrum WT holds several times a year," at some unexplained future time or times. ROA.237.

Appellants admit that they have been allowed to have "Queer Movie Night" and "Queer History Night" in the past. ROA.216 ("In furtherance of its mission, Spectrum WT hosts periodic events, including Lavender Prom, Queer History Night, and Queer Movie Night"). Appellants emphasized their need for a preliminary injunction when they initially filed their complaint, suggesting they would be harmed because President Wendler would likely nonetheless cancel *future* Queer Movie and

Queer History nights. *See* ROA.237. References to those two events are notably absent from their briefing on appeal—likely because during the pendency of the lower-court litigation, appellants were able to put on the following events:

- Appellants reserved and used a room in the Virgil Henson Activities Center for drag show practice on March 28, 2023;

- Appellants reserved space on the on-campus lawn area to protest the Event Cancellation on March 31, 2023; and

- Appellants co-sponsored a Carni-Ball event with WT's Residence Hall Association which was held at the Jack B. Kelley Student Center on April 28, 2023.

ROA.541. Regarding the March 2024 drag show, the paperwork, which includes a requirement for a risk assessment regarding physical dangers involved with dancing, will not be completed until about thirty days out from the scheduled show. ROA541-42.

President Wendler filed a motion to dismiss, ROA.414-438, and response to appellants' motion for a preliminary injunction. ROA.442-517. President Wendler primarily argued that appellants were unlikely to succeed on the merits of their claims because they failed to state a claim, qualified immunity applies, drag shows are not inherently expressive conduct, and appellants cannot show irreparable harm. ROA.414-438; ROA.442-467. The district court denied appellants' amended motion for preliminary injunction because they did not demonstrate a substantial likelihood of success on the merits of their claims—specifically, they failed to establish a First Amendment violation—and it was "doubtful that Appellants will suffer irreparable harm in the coming months while this issue is litigated." ROA.873. The district court

also held that sovereign immunity does not apply to appellants' claim for injunctive relief, ROA.870-72, but that President Wendler is entitled to qualified immunity for the claims against him in his individual capacity. ROA.856. Appellants then appealed the denial of their preliminary-injunction motion. ROA.882.

## Summary of the Argument

Appellants bear a heavy burden to show that the *denial* of a preliminary injunction was an abuse of discretion. They cannot meet it for three independent reasons.

**I.** To start, the district court was correct that on this record, appellants are unlikely to succeed on the merits. The appellants accuse President Wendler of engaging in viewpoint discrimination (ROA.303), excluding appellants from "campus public forums" (ROA.306), and imposing an unconstitutional prior restraint (ROA.311). And they want President Wendler enjoined from denying requests to hold a drag show in Legacy Hall. But President Wendler does not know, and the record does not contain evidence of, the "particular views" appellants were going to express about any particular topic at or through their 2023 drag show. Dressing in costume is something one does. To express some message through clothing, something more is needed, s*ee, e.g.*, *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 389 (6th Cir. 2005), and the conduct associated with drag shows does not suffice. As an initial matter, the burden is on "the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive." *Clark*, 468 U.S. at 294 n.5. Appellants failed to meet that burden because any message conveyed by a drag show must be explained to be understood and therefore is not protected by the First Amendment. *See, e.g.*, *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006). ("*FAIR*") Further, Legacy Hall is a limited public forum

not a public forum, and thus subject to greater regulation. *See, e.g.*, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Indeed, "[t]he Court has rejected the view that traditional public forum status extends beyond its historic confines." *Ark. Educ. Tel. Com'n v. Forbes*, 523 U.S. 666, 678 (1998). Legacy Hall's limited nature is in part indicated by the fact it is not open to the general public. And in the context of a limited public forum, West Texas A&M is not required to subsidize student groups by providing university space. *See, e.g.*, *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 683 (2010). Indeed, access to university property may be lawfully curtailed when necessary to serve the ends of education. *See Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981) (explaining that First Amendment rights must be analyzed "'in light of the special characteristics of the school environment.'"). That is precisely what President Wendler did when, relying on his experience, he denied use of Legacy Hall to appellants. Appellants have thus failed to show that they have a substantial likelihood of succeeding on the merits. This Court can affirm on any one of these bases.

**II.**   Regardless of appellants' likelihood of success on the merits, this case is before this Court on appeal from the denial of a preliminary injunction, and the record is silent as to whether appellants face any future harm. Appellants must show the injury they allege to be imminent is not merely speculative to obtain a preliminary injunction. *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). President Wendler disapproved a drag show that was to be emceed by an individual whose last local show would have indisputably violated the school's policy against lewd behavior if it had taken place on campus. Appellants' assertions that he would prevent them from expressing their pro-LGBTQ+ views in a way that was conducive to the educational

environment are entirely speculative. Because appellants fail to carry their burden to show irreparable harm, this Court should affirm.

**III.**  The Court may also affirm on the alternative ground that this case is barred by sovereign immunity. *Contra* Appellants Br. 66-67. Appellants failed to adequately allege ongoing harm (or any harm, for that matter), and the relief they seek is not properly characterized as prospective, much of their feared "censorship" having never taken place.

## Standard of Review

"The decision to grant or deny a preliminary injunction lies within the discretion of the district court and may be reversed on appeal only by a showing of abuse of discretion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023), *petition for cert. filed*, (U.S. Sept. 1, 2023) (No. 23-199) (quoting *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984)). The factual findings supporting the district court's ruling are reviewed for clear error. *Id*. Conclusions of law are reviewed de novo. *Id*.

## Argument

"[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion" on all four elements. *Anibowei*, 70 F.4th at 902 (quoting *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). Those are: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant should the injunction be denied outweighs the threatened harm to the nonmovant should the injunction be granted; and (4) that granting the preliminary injunction will not disserve the public interest. *Id*. The district court correctly concluded that appellants have failed to carry their

burden to obtain a preliminary injunction, though appellants are wrong that the district court properly determined that sovereign immunity does not apply.

## I.   Appellants Are Unlikely to Succeed on the Merits.

Appellants alleged three causes of action under the First Amendment that are relevant to this pre-discovery interlocutory appeal: viewpoint discrimination, ROA.241, exclusion from a public forum, ROA.245, and prior restraint, ROA.250. But, per the district court, appellants failed to meet their burden to obtain a preliminary injunction on any of these claims because, as pled, the allegedly "censored" conduct—a drag show without any indication as to the viewpoint it was expressing—was not inherently expressive, and because appellants failed to a proper forum analysis. ROA.853-854.

### A.   The First Amendment does not protect non-expressive conduct.

#### 1.   Under *FAIR*, drag shows are non-expressive conduct.

The district court was correct as a matter of law that drag shows are non-expressive conduct. Appellants' vague assertions that drag shows in general convey some sort of message to some observers is not enough to obtain preliminary injunctive relief on any of their free speech claims. A claim of viewpoint discrimination in particular requires more because such "discrimination is a form of content discrimination, in which 'the government targets not subject matter, *but particular views taken by speakers on a subject*.'" *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001) (emphasis added) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Indeed, "the essence of viewpoint discrimination" is "the Government's disapproval of . . . *messages* it finds offensive." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (emphasis added) (quoting *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part).

**a.**    To start, it is important to emphasize that the burden is on appellants "to demonstrate that the First Amendment even applies." *Clark*, 468 U.S. at 294. "To hold otherwise" the Supreme Court has explained "would be to create a rule that all conduct is presumptively expressive." *Id.* The Supreme Court has several times re-iterated that it "cannot accept the view that an apparently limitless variety of con-duct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974) (quot-ing *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). To determine "whether par-ticular conduct possesses sufficient communicative elements to bring the First Amendment into play, [the Supreme Court] [has] asked whether 'an intent to con-vey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (cleaned up) (quoting *Spence*, 418 U.S. at 410-11).

In *Rumsfeld v. Forum for Academic & Institutional Rights., Inc.* the Supreme Court elaborated on the meaning of "expressive conduct" and how to figure out when con-duct is expressive and when it is not. 547 U.S. 47 (2006). The case was brought by an association of law schools and law faculties. *Id.* at 51-52, 63-65. The plaintiffs ar-gued that a statute requiring law schools to grant recruiters access to law school cam-puses equal to other recruiters on campus was compelling law schools to engage in conduct that effectively expressed support for the military even though they opposed the military's policy on homosexuals in the military. *Id.* at 52-53. They alleged that this violated the law schools' First Amendment freedoms of speech and association. *Id.* at 53. The Supreme Court ruled against FAIR on the basis that what they alleged was "expressive conduct" was in fact merely conduct.

First, the Supreme Court reiterated "the view that conduct can[not] be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 547 U.S. at 65–66 (quoting *O'Brien*, 391 U.S. at 376). This view—that not all conduct equates to speech—dates back to at least *O'Brien*, where the Court had held that burning a draft card in protest of the Vietnam War was *not* expressive conduct, and that even if the act included expressive conduct, the government could regulate and criminalize the non-expressive conduct of burning a draft card. 391 U.S. at 375. In *FAIR*, the Court further explained, that since *O'Brien*, courts "have extended First Amendment protection only to conduct that is *inherently expressive*." 547 U.S. at 66 (emphasis added).

The *FAIR* court then held that restricting the access of military recruiters to law school campuses was not protected by the First Amendment because allowing them on campus was not inherently expressive. The Court in *FAIR* pointed out that law schools registering their disagreement with the military and what the military represented by "treating military recruiters differently from other recruiters," was not obvious. *Id.* This "expression" of disagreement, the Court observed, was "expressive only because the law schools accompanied their conduct with speech explaining it." *Id.* For example, certain law schools required military interviews with students to be done on undergraduate campuses. *Id.* "The point" of that was "not overwhelmingly apparent." *Id.* (cleaned up). In other words, someone observing an interview between military recruiters and a student "has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." *Id.*

Important to the Court's holding was that "[t]he expressive component of a law school's actions [was] not created by the conduct itself but by the speech" accompanying it. *Id.* As the Court explained, where "such explanatory speech is necessary," that "is strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *Id.* After all, "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* The Court emphasized that if combining speech and conduct were sufficient to raise a First Amendment issue, then if someone said "that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes," the courts "would have to apply *O'Brien* to determine whether the Tax Code violates the First Amendment." *Id.* "Neither *O'Brien* nor its progeny supports such a result." *Id.*

Contrary to appellants' dismissive approach to *FAIR*'s relevance here (at 30-31), this is by no means a novel approach to *FAIR* in expressive conduct cases. "Conduct does not become speech for First Amendment purposes merely because the person engaging in the conduct intends to express an idea." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *FAIR*, 547 U.S. at 66). It expressly relied on *FAIR* in a case evaluating whether certain acts taken during the course of voting constituted expressive or non-expressive conduct. *Id.*

**b.**     On this interlocutory record, appellants have failed to show the conduct colloquially known as a "drag show" is inherently expressive. They have not identified the particular "messages" disapproved of, or the "*particular* views" that were to be "taken by speakers" and expressed at or through their drag show, let alone the subject matter. In appellants' operative complaint, they do allege a variety of things that some have "come to associate" with drag shows in general. ROA.228-29. In their

brief on appeal, they also assert (at 20) that "[p]laintiffs organized a drag show to raise funds for an LGBTQ+ suicide prevention charity and 'convey messages advocating for and showing support for the LGBTQ+ community,'" and that "Spectrum WT's show, like many drag shows, *might* also 'offer[] counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity.'" (last alternation in original) (emphasis added). But a purpose is different than a message. The purpose of most theaters is to make money. That does not make wealth acquisition the message of Macbeth. At no point do appellants meaningfully allege what their March 2023 drag show was meant to convey or what precisely was "censored" when President Wendler canceled the event. All anyone knows is that some men were going to dress in women's clothing and participate in questionable conduct on stage in front of onlookers of various ages. They also knew that "Myss Myka," who mere weeks prior during a "show" simulated masturbation, writhed on a stage while rubbing his crotch, and pretended to participate in frottage with an observer in the crowd, would be the master of ceremonies for the on-campus event. ROA.516. Any reasonable university administrator would ban such conduct, and in fact, the university's policies already do. ROA.484.

Indeed, the closest appellants actually get to identifying any particular view or message is when they say that "[t]he proceeds from the March 2023 drag show are earmarked for donation to an LGBTQ+ suicide-prevention group." ROA.229. But that is not a viewpoint President Wendler suppressed. If anything, President Wendler amplified that message by spreading it to a broader campus audience in his email announcement encouraging readers to "send the dough." ROA.267. If "the 'essence of viewpoint discrimination'" is "the Government's disapproval of . . . messages it finds offensive," appellants needed to identify a message President

Wendler disapproved, *Iancu*, 139 S. Ct. at 2299 (quoting *Matal*, 582 U.S. at 248)—not one that he endorsed and propagated to a larger audience.

Moreover, as appellants admitted below by giving a list of examples from Shakespeare to Ronald Reagan, and from "Powder Puff" games to drag shows, dressing in costume (whether drag or otherwise) requires some sort of explanatory speech because it is not inherently expressive of this or that particular thing. ROA.297. Indeed, as appellants noted below performances involving men dressing as women have been around for a long time—all with very different purposes and messages. ROA.228. For example, a 1943 movie called "This Is the Army" starring Ronald Reagan featured a show in which several members of the military dressed as women, later joined by others dressed as "nerdy men," performing a song and dance for an audience at a theater.[3] The lyrics convey the intended message—which in no way resembles that allegedly conveyed by appellants' proposed show—comparing the strange experience of being drafted out of normal life into the army to the strange experience of being drafted out of normal life into a female chorus.[4] If the movie were watched on "mute," it would not be clear what message the men who happened to be dressed as women were trying to convey. On the other hand, the same could not be said about a film, play, or show in which silent characters guillotine the Statue of Liberty, Uncle Sam, or apple pie.

The need for these explanations in the drag show context demonstrates, under *FAIR*, that drag shows are *not* inherently expressive conduct. Because an observer

---

[3] Available at https://www.youtube.com/watch?v=ZbBZRnWoPbY (last accessed December 20, 2023).

[4] Lyrics available at https://www.stlyrics.com/lyrics/thisisthearmy/ladiesofthechorus.htm (last accessed December 20, 2023).

watching a drag show has no way of knowing whether the performers are expressing anything until the message behind the performance is accompanied by an explanation, like those above. In other words, "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under *O'Brien*," let alone the First Amendment. *FAIR*, 547 U.S. at 66. And even if they were intending to express some general positive idea about the LGBTQ+ community, "[c]onduct does not become speech for First Amendment purposes merely because the person engaging in the conduct intends to express an idea." *Voting for Am.*, 732 F.3d at 388.

To distinguish themselves from a classic staging of Shakespeare that would involve a man dressing as Lady Macbeth, a dissatisfied World War II soldier, or a fake cheerleader, appellants insisted below that drag shows in a generalized sense (though not necessarily its particular drag show) are expressive conduct in the following ways:

- "Today, drag has become a mainstream form of performance art and a commentary on identity." ROA.228.

- "Over the past half-century, the public has come to associate drag with advocacy in favor of LGBTQ+ rights." ROA.228.

- "Drag performances carry an ideological message of support and acceptance for the LGBTQ+ community." ROA.228.

- "Drag performances have, in the current political climate, taken on a renewed political tone, offering counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity." ROA.228.

And in their brief, appellants further used speech to explain the conduct in their drag show and other drag shows:

- "Plaintiffs organized a drag show to raise funds for an LGBTQ+ suicide prevention charity and 'convey messages advocating for and showing support for the LGBTQ+ community.'" (at 20)

- "Spectrum WT's show, like many drag shows, *might* also 'offer[] counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity.'" (at 20) (alteration in original) (emphasis added)

But appellants could just have easily proposed to hold a rugby game or a bake sale "to raise funds for an LGBTQ+ charity" with the proceeds "earmarked for donation to an LGBTQ+ suicide-prevention group." ROA.229. No one would maintain that the rugby game or the bake sale would be inherently expressive activity. And even if the stated purpose of both were to be "a commentary on identity," or "advocacy in favor of LGBTQ+ rights," or "an ideological message of support and acceptance for the LGBTQ+ community," or "counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity," *FAIR* says that would not transform either into inherently expressive activity protected by the First Amendment. The same is true for drag shows.

Appellants fare no better by insisting that drag shows send a clear message today, even if they did not in the past. ROA.288 (emphasis added). Appellants would have one believe that drag shows today can only have these kinds of meaning, but this ignores that "This Is the Army" and innumerable films like it, which contain constitutionally similar conduct but very different messages, still exist in circulation. Indeed, even appellants concede that drag shows are *not* the same: "[s]ome drag performances are intentionally risqué, some comedic, some outlandish, and some would not give a moment's pause to a Motion Picture Association reviewer." ROA.229. Appellants cannot transform conduct (dressing in costume typically worn by the

opposite gender, playing in rugby games, selling cupcakes, etc.) into speech simply by talking about unexpressed messages some drag shows "might" (at 20) intend to convey. The First Amendment does not apply to drag shows because they are non-expressive conduct, and therefore the appellants are unlikely to prevail on the merits of their viewpoint discrimination, exclusion from a public forum, and prior restraint claims. The district court should be affirmed.

### 2. Appellants' cases are inapposite.

Unable to satisfy the test established by *FAIR*, appellants cite cases involving areas of First Amendment jurisprudence irrelevant to resolving this case, non-binding precedents, and others that have been called into question by intervening Supreme Court decisions.

For example, appellants cite (at 34) *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667 (1973), for the proposition that "[i]f the First Amendment protected the cartoon in *Papish*, it protects campus drag shows like Spectrum WT's, featuring clothed performers dancing to non-profane music." But *Papish* concerned the expulsion of a student for distributing a campus newspaper containing a self-explanatory image of the Statue of Liberty being raped by police officers, which was claimed to be indecent. *Id*. at 667-68. Because *Papish* predates *FAIR* by decades, it is no longer good law to the extent they are inconsistent. But they are not: Nothing in *Papish* or its cursory analysis of whether publishing a newspaper was conduct or speech, addresses whether a particular act that does not involve the spoken or printed word is expressive.

Further, the rest of appellants' binding authorities are distinguishable on the basis that they are not school campus cases (e.g., *Matal v. Tam*, 582 U.S. 218 (2017); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995); *R.A.V. v. City of St. Paul,* 505 U.S. 377 (1992); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975); *Robinson v. Hunt Cnty., Texas*, 921 F.3d 440 (5th Cir. 2019)); their "holdings" have never commanded a majority of the Court, like in the nude dancing cases (e.g., *City of Erie v. Pap's A.M.,* 529 U.S. 277 (2000); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991)); or they do not implicate expressive conduct (e.g., *Healy v. James*, 408 U.S. 169 (1972); *Gay Student Servs. v. Tex. A&M Univ.,* 737 F.2d 1317 (5th Cir. 1984)).

Appellants also cite (passim) *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University*, 993 F.2d 386 (4th Cir. 1993) to draw a parallel between the George Mason fraternity's "Ugly Woman Contest" and the drag show in this case. They rely on this parallel (at 38-40, 44, 53) to argue that, given President Wendler's email, President Wendler clearly engaged in First Amendment viewpoint discrimination when he canceled appellants' March 2023 drag show. But *Iota* is not only a non-binding out-of-circuit precedent, *Iota* pre-dates *FAIR* by over a decade and was decided without the benefits of *FAIR's* approach to distinguishing between expressive conduct and conduct needing explanatory speech. Further, when the Fourth Circuit ruled that George Mason University engaged in viewpoint discrimination when it banned a fraternity's "Ugly Women Contest," it did so with the benefit of an affidavit from the university's vice president that specifically identified the viewpoint expressed by the fraternity that the university sought to suppress: "that racial and

sexual themes should be treated lightly." *Id.* There has been no similar concession or identification of a particular view that was to be conveyed by the March 2023 drag show, or any future drag show the appellants hope to put on at West Texas A&M.

Similarly, appellants attempt (at 17 & n.7) to buttress their argument with pronouncements like "every court to consider the question has held that the First Amendment protects drag shows." Appellants' Br. 17 & n.7. But those cases are lower court cases, involve statutes or local ordinances as opposed to decisionmaking of university administrators, and do not provide analysis of whether drag shows are inherently expressive. For example, in *Southern Utah Drag Stars v. City of St. George*, when the district court held that drag shows are "indisputably protected speech," it explained that the defendants' contrary arguments "do not merit discussion." No. 4:23-CV-00044-DN-PK, 2023 WL 4053395, at *20 (D. Utah June 16, 2023); *see also* ROA.867; n. 27 (district court's discussion of how some of these cases are distinguishable). The district court here concluded to the contrary in a reasoned opinion and should not be disregarded based on such *ipse dixit*.

### 3. Because drag shows are non-expressive conduct, rational basis applies.

Where, as here, a government entity's decisions or policies "regulate conduct only and do not implicate the First Amendment, rational basis scrutiny is appropriate." *Voting for Am.*, 732 F.3d at 392 (citing *D.C. v. Heller*, 554 U.S. 570, 628 n. 27 (2008). Contrary to appellants' assertions otherwise (at 52), because, as discussed above in section I.A., drag shows are not generally expressive conduct, President

Wendler's putative policy of preventing appellants from hosting a drag show in Legacy Hall is subject to rational basis review and not strict scrutiny.

Under rational basis review, this Court must assume President Wendler's alleged policy is valid and it must be sustained so long as his alleged policy "is rationally related to a legitimate state interest." *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 748 F.3d 583, 594 (5th Cir. 2014) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). Rational basis review "seeks only to determine whether any conceivable rationale exists." *Id.* (citing *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). And "the state is not required to 'prove' that the objective of the law would be fulfilled." *Id.* (citing *Beach Commc'ns*, 508 U.S. at 315 (holding that "a legislative choice is not subject to courtroom fact-finding")).

Even if President Wendler's purported policy has no evidentiary or empirical basis, it "satisfies rational basis review." *Id.* (citing *Beach Commc'ns*, 508 U.S. at 315). Indeed, if reasonable minds can disagree on the policy, that "suffices to prove that the [policy] has a rational basis." *Id.* Lastly, "there is no least restrictive means component to rational basis review," and courts must accept generalizations, "'even when there is an imperfect fit between means and ends' or where the classification 'is not made with mathematical nicety.'" *Id.* (quoting *Heller,* 509 U.S. at 321).

President Wendler's putative policy regarding certain conduct easily satisfies rational basis. President Wendler asserted in his email that drag shows harass women and allowing them could cause an issue with State and federal laws and regulations. ROA.266. Further, he raised issues with the lewdness of drag shows, and their "exaggerated aspects of womanhood (sexuality, femininity, gender)." ROA.265. All of these are rational reasons for prohibiting non-expressive conduct in West Texas A&M's limited public fora. Because the Court may (and should) decide this case

based on the fact that there was no First Amendment injury because the only thing banned was non-expressive conduct, any of those rationale satisfy constitutional scrutiny.

## B. President Wendler's rejection of appellants' application to hold a drag show in Legacy Hall satisfies the applicable forum analysis.

Even if this Court were to decide that appellants have shown that the First Amendment is implicated by President Wendler's denial of the use of Legacy Hall for drag shows, his actions also satisfy the standard applicable to limited-public-fora. *See United States v. Rodriguez*, 33 F.4th 807, 811 (5th Cir. 2022) ("[W]e may affirm the judgment for any reason supported by the record").

### 1.   The Court should apply the limited-public-forum analysis.

If the Court concludes that drag shows enjoy some First Amendment protection, Legacy Hall on WTAMU's campus is (at most) a limited-public forum. "The standards that [courts] apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum." *Good News Club v. Milford Central School*, 533 U.S. 98, 106 (2001). Appellants' authorities, which involve undifferentiated cases from a variety of contexts, and many of which do not even involve public fora at all, are not to the contrary.

**a.**   When a student group asks to use school resources—including campus facilities—for its own purposes, the limited-public-forum analysis applies. In *Christian Legal Soc. v. Martinez*, the Supreme Court decided that an analogous "case fit[] comfortably within the limited-public-forum category" because the plaintiff student group was not asking to be freed from a state prohibition, but to be extended "a state

subsidy." 561 U.S. 661, 682 (2010). Hastings College of Law gave officially recognized student groups access to campus facilities and student activities fees. *Id*. But official recognition was premised on adherence to the law school's all-comers policy, under which the plaintiff—a Christian students' organization—would have been required to welcome members that did not adhere to the community's statement of faith. *Id*. While the denial of these university subsidies may have applied some "indirect pressure" on the students to adopt the all-comers policy, the policy was not a mandate. *Id*. The students were free to forego the benefit and maintain exclusive membership. Noting that "our decisions have distinguished between policies that require action and those that withhold benefits," the Court determined that "[a]pplication of the less restrictive limited-public-forum analysis better accounts for the fact that" the defendant "is dangling the carrot of subsidy, not wielding the stick of prohibition." *Id*. at 682-83.

So too here. Just as the student group in *Christian Legal Society* could continue to meet, albeit without the benefit of school funding and uninhibited use of campus facilities. President Wendler's policy does not prevent students from meeting off campus to put on a drag show on their own dime, or even to practice their drag show in school facilities. Indeed, that is precisely what they did. ROA.172. Moreover, just as the students in *Christian Legal Society* could continue to speak whatever message they wished, President Wendler's policy does not muffle any pure speech. Students are not forbidden from standing up on their soapbox in the quad, canvassing fliers, or authoring missives in the student paper. Nor are they prohibited from organizing other activities that further their mission of "convey[ing] messages advocating for and showing support for the LGBTQ+ community." Appellants' Br. 33. They

simply are not permitted to use the University's resources to put on a drag show. In sum, the "limited-public-forum precedents adequately respect both [Plaintiffs'] speech and expressive . . . rights, and fairly balance those rights against [West Texas A&M University's] interests as a property owner and educational institution." *Christian Legal Soc.*, 561 U.S. at 683.

**b.**    Notwithstanding authority showing that Legacy Hall is a limited-purpose public forum, appellants contend (at 47-48) that Legacy Hall is a designated public forum, subject to more restrictive First Amendment protections. But they offer no support for that proposition. The two cases they cite involve "the outdoor open areas of [a university's] campus," *Justice For All v. Faulkner*, 410 F.3d 760, 769 (5th Cir. 2005), and "the outdoor grounds of the campus such as sidewalks and plazas," *Hays County Guardian v. Supple*, 969 F.2d 111, 116 (5th Cir. 1992). Appellants make no argument for extending these traditional public forums to a campus hall. And despite their suggestions to the contrary, university policy identifies only "common outdoor areas of the university's campus" as "traditional public forums." ROA.273.

In confining traditional-public-forum status to common outdoor areas, West Texas A&M tracks the Supreme Court's breakdown of the three types of First Amendment fora. Traditional public forums, the first type, belong "[a]t one end of the spectrum." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). "In these quintessential public forums," which include "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly," the government's authority to restrict speech is sharply curtailed. *Id.* (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). The second type of First Amendment forum is "public property which the state has opened for use by the public as a place for expressive activity." *Id.* Such

designated public forums are "bound by the same standards as apply in a traditional public forum," but only for so long as the State "retain[s] the open character of the facility." *Id.* at 46. The third type—to which Legacy Hall belongs—is the limited public forum. A limited public forum is created when "a government has 'reserv[ed] a forum] for certain groups or for the discussion of certain topics.'" *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (alteration in original) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

Legacy Hall is neither a public forum nor a designated public forum. It is not a public park or street, and the Supreme "Court has rejected the view that traditional public forum status extends beyond its historic confines." *Ark. Educ. Tel. Com'n v. Forbes*, 523 U.S. 666, 678 (1998). Nor has West Texas A&M designated Legacy Hall a public forum. Legacy Hall is not open to the general public. To the contrary, students who wish to use the space must submit a facility use request in accordance with protocols that expressly "reserve[] the right to cancel an event and immediately remove access to campus if an event violates the policies and regulations of the Texas A&M University System, the rules and procedures of [the university], or if an event is deemed to be unsafe." ROA.269.

Appellants observe (at 49) that the university does "not restrict the dance team, cheerleaders, theatre productions, or any other student group from holding events involving performers dancing to music—only drag shows." But opening Legacy Hall to *some* student events does not render it a public forum open to *all* student events. "A government 'does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public

discourse.'" *Walker, Inc.*, 576 U.S. at 215 (citing *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802 (1985)). Instead, "to ascertain whether [a government] intended to designate a place not traditionally open to assembly and debate as a public forum," the Supreme Court "has looked to the policy and practice of the government" as well as "the nature of the property and its compatibility with expressive activity." *Id.* at 215-16 (alteration in original) (quoting *Cornelius*, 473 U.S. at 802).

Appellants have not pointed to any policy or practice permitting anything approaching a drag show in Legacy Hall. Inasmuch as appellants see an equivalence in longstanding collegiate activities like a musical production or a cheerleading demonstration, they beg the question. As discussed below at 31, the university administration, specifically President Wendler, considers drag shows disruptive of the educational environment in a way that these traditional activities have not been, to date. And administrators such as the president of the university must be permitted to draw such distinctions. Any other rule would put universities to the choice of either turning campus facilities over to students with no administrative oversight whatsoever or shutting them down for use by student groups altogether. "And where the application of [public] forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place." *Pleasant Grove City v. Summum*, 555 U.S. 460, 480 (2009).

**c.**  Appellants' remaining authority is no more on point. Appellants cite, for example, cases involving the associational rights of student organizations to receive official university recognition. *See, e.g.*, *Healy*, 408 U.S. at 187-88 (holding that a

public university may not deny official recognition to Students for a Democratic Society affiliate "simply because it finds the views expressed . . . to be abhorrent"). But appellants are not seeking to be recognized as an official student group. They already have that recognition. ROA.215 ¶ 10. The university has also regularly permitted them use of school facilities and continues to do so. ROA.541.

Appellants also cite cases related to students' right to advocate a particular message to other students on campus in writing. *See, e.g.*, *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670-71 (1973) (per curiam) (holding that a public university could not punish a student for publication of an indecent political cartoon). But appellants remain free to realize its mission to "convey messages advocating for and showing support for the LGBTQ+ community" and to "offer counter-messaging against efforts to ban or regulate expression related gender or sexual identity" in a variety of ways. Appellants' Br. 20 (alteration in original). In fact, appellants report that appellants have hosted significant programing on campus that goes well beyond pure speech, including "proms, queer movie nights, and discussions about history, all focusing on issues important to the LGBTQ+ campus community." Appellants' Br. at 4. Nothing about President Wendler's prohibition of drag shows threatened these sorts of messages or events.

Most puzzlingly, appellants cite cases explicating a State's authority to completely ban or criminalize certain expressive conduct—regardless of where it happens. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397 (1989) (flag burning). The university has never asserted such breathtaking control over its students. President Wendler has not—and likely could not—prohibit appellants from or punish students for

attending or hosting drag shows off campus. In fact, appellants hosted such a drag show in March of 2023. ROA.236 ¶¶ 122-26.

This case has nothing to do with speech codes, a ban on disfavored student organizations, or a State's ability to regulate public morals via the criminal code. It instead presents the discrete question of whether the Free Speech Clause of the First Amendment requires a university to host a particular drag show in a limited public forum on university property whenever a student requests use of that space. Appellants seek a ruling that West Texas A&M University was required to open Legacy Hall for conduct that—in President Wendler's professional judgment—was contrary to the University's educational purposes.

### 2. President Wendler's putative policy satisfies the standard for limited-purpose fora.

Once it is established that Legacy Hall is a limited-purpose forum, President Wendler (acting on behalf of WTAMU) is entitled to "preserve the property under its control for the use to which it is lawfully dedicated." *Christian Legal Soc.*, 561 U.S. at 679 (quoting *Cornelius*, 473 U.S. at 800). This common-sense principle flows from the notion that" a defining characteristic of limited public forums" is that the State possesses "the authority to 'reserv[e] [them] for certain groups.'" *Id.* at 681 (alteration in original) (quoting *Rosenberger*, 515 U.S. at 829). Universities are not simply high-dollar venues for student events. "A [u]niversity's mission is education." *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981). Which is why federal courts "have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.*

That is not to say that universities enjoy unbridled authority to restrict access to its limited public fora. Conditions on the use of school facilities must be based in distinctions that (a) are "reasonable in light of the purpose served by the forum" and (b) do not "discriminate against speech on the basis of viewpoint." *Christian Legal Soc.*, 561 U.S. at 685 (quoting *Rosenberger*, 515 U.S. at 829).. West Texas A&M's rejection of the appellants' March 2023 drag show, and the possibility of future rejections on the same basis, clears both of these hurdles.

**a.** Start with reasonableness. The Supreme Court has instructed courts considering restrictions on the use of university property to bear three things in mind. *First*, the reasonableness analysis must be "shaped by the educational context in which it arises." *Id.* at 685. Access to university property may therefore be lawfully curtailed when necessary to serve the ends of education. *Widmar*, 454 U.S. at 268 n.5 (explaining that First Amendment rights must be analyzed "'in light of the special characteristics of the school environment.'" (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)).

*Second*, in assessing whether a restriction is in fact necessary to serve the ends of education, courts should be chary to "substitute[e] their own notion of sound educational policy for those of . . . school authorities." *Christian Legal Soc.*, 561 U.S. at 685 (quoting *Board of Ed. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). The First Amendment is sensible of "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Healy*, 408 U.S. at 181 (citation omitted). Indeed, the Court took pains in Christian Legal Society to admonish

"due decent respect," for the law school's "determination of what constitutes sound educational policy." *Christian Legal Soc.*, 561 U.S. at 687 & n.16.

*Third*, the authority of school officials to shape the educational environment applies both in and out of the classroom. A university's "commission" to "choose among pedagogical approaches" extends to "extracurricular programs" like the proposed drag show at issue here. *Id.* (deferring to law school's determination of "what goals a student-organization forum ought to serve").

With these principles in mind, the district court was well within its discretion to credit President Wendler's determination that drag shows disserve the educational purposes of West Texas A&M. President Wendler is a veteran educator with a doctorate in Curriculum and Instruction. He has served in university administrations for decades, including as Chancellor of Southern Illinois University Carbondale and as Vice Chancellor for the entire Texas A&M University System.[5] In President Wendler's professional judgment, drag shows involve "conduct [that] runs counter to the purpose of [West Texas A&M University]" because such conduct is "derisive, divisive and demoralizing." ROA.266. President Wendler voiced particular concern over the way in which drag shows sexualize and objectify the human person, and thereby undermine the University's goal of creating an educational environment

---

[5] This information is taken from President Wendler's official biography published on West Texas A&M's webpage. *See Dr. Walter Wendler*, W. Tex. A&M Univ., https://tinyurl.com/mr3mmtuz. This Court may take judicial notice of information contained on official websites. *See Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam) (explaining that a Fifth Circuit panel can "tak[e] judicial notice of the state agency's own website").

that "elevate[s] students based on achievement and capability, performance in a word, without regard to group membership." ROA.266. He also pointed out how such shows are lewd, *i.e.* "exaggerate aspects of . . . sexuality." ROA.265-67. And he explicitly invoked the university's "educational mission." ROA.266. In invoking the mission, he acknowledged that the campus culture to which West Texas A&M aspires is "implacable and exacting"—yet it is the one "sanctioned by the legislature, the governor and numerous elected and appointed officials." ROA.266.

Any federal court is ill-suited to second-guess the reasonableness of President Wendler's concerns—and an appellate court in particular—as they are anchored in his intimate understanding of college campuses. Although it is the duty of the courts to interpret constitutional guarantees, they recognize this reality by giving considerable deference to the judgment calls of experienced administrators. For example, in *Christian Legal Society*, the law school's all-comers policy was deemed to be reasonable in part because the Court accepted the university's position that the policy would "encourage tolerance, cooperation, and learning among students." 561 U.S. at 689. That was President Wendler's explicit objective here as well. He stated that he would not support any show or performance that "denigrates others." ROA.266.

Also notable is what President Wendler's rejection of the March 2023 drag show, and rejection of future drag shows, does *not* entail. It is not a speech code. It does not purport to censor discussion of drag shows. And far from voicing of a disfavored opinion on that subject, appellants were able to protest on campus his decision. ROA.541. Moreover, the cancellation of this one event has not prevented the same student groups from sponsoring expressive activities that convey the same message

putatively furthered by the canceled show—for example movie nights and historical discussions. And to the extent a drag show may be considered expressive, "substantial alternative channels remain open for" appellants to convey their various messages. *See Christian Legal Soc.*, 561 U.S. at 690 (deeming law school's all-comers policy "all the more creditworthy in view of the" fact that students could still "use chalkboards and generally available bulletin boards to advertise events").

Appellants question the reasonableness of the cancellation of their March 2023 drag show throughout their brief based on a purported "scarcity of evidence in the record suggesting Plaintiff's PG-13 show is 'sexualized.'" Appellants' Br. 50. Leaving aside that such second guessing is precisely what deference to university administrators is designed to *avoid*, the record supports rather than undermines President Wendler's concern that appellants' drag show would "stereotype women in cartoon-like extremes" by "exaggerating aspects of womanhood (sexuality, femininity, gender)." ROA.265. Appellants' March 2023 show was to be "emcee[d] [by] popular Amarillo drag queen "Myss Myka." ROA.449. As discussed above, a recent performance by Myss Myka involved simulated masturbation, and frequent presentation of his barely covered crotch. ROA.516. Even assuming appellants' shows would have been half as vulgar, President Wendler's concern for the educational environment would remain reasonable.

**b.**   The rejection of the March 2023 drag show and any similar future rejections of access to school facilities to put on a drag show are also viewpoint neutral. Appellants' drag show was denied, and similar future ones may be denied, regardless of their intended purpose—whether to poke fun at the LGBTQ+ community or to

express solidarity with it. The rejection, and possible future rejections, thus "draw[] no distinction between groups based on their message or perspective." *Christian Legal Soc.*, 561 U.S. at 694. That critical fact distinguishes this case from *Widmar* and *Rosenberger*, both of which involved university actions that "singled out religious … organizations for disadvantageous treatment." *Christian Legal Soc.*, 561 U.S. at 684.

Further, West Texas A&M hosts a webpage for Spectrum WT's student group. That page includes resources for "trans/non-binary," with "Dos" and "Don'ts" for allies.[6] It also provides links and phone numbers to resources for LGBTQ+ people on a general resources page, including numbers for university counselors.[7] No one has been asked or directed to take down this website that contains language like "Shut down transphobia" and encouragements to call women persons "Designated Female at birth." President Wendler, West Texas A&M, and West Texas A&M policy have at no point engaged in viewpoint discrimination against appellants.

Appellants nevertheless assert (at 39) that the March 2023 rejection and possible future rejections of requests to host on campus drag shows would be viewpoint discriminatory because the initial rejection was justified by the President's "dislike" for "the message he thinks drag performance sends." It is true that President Wendler criticized drag shows for, among other things, their "mocking another person or group." ROA.266. But, as discussed above, it was the educational

---

[6] "Trans/Non Binary Resources," *Trans/Non-binary Resources*, W. Tex. A&M Univ., https://www.wtamu.edu/student-support/spectrum/trans-non-binary.html (last visited Dec. 28, 2023).

[7] *WTAMU Resources*, W. Tex. A&M Univ., https://www.wtamu.edu/student-support/spectrum/resources.html (last visited Dec. 28, 2023)

environment at West Texas A&M that fundamentally motivated cancellation of appellants' show. And though the Supreme Court recognized "the mere dissemination of ideas . . . on a state university campus may not be shut off in the name alone of 'conventions of decency," *Papish*, 410 U.S. at 670, it is has also held that a university may preserve the educational environment by enforcing "nondiscriminatory application of reasonable rules governing conduct," *id.* at 671; *O'Brien*, 391 U.S. at 376.

## C. Lewd speech and conduct on campus are not protected by the First Amendment.

A third, independent, basis on which this Court may affirm is that universities may prohibit lewd conduct without violating the First Amendment. Even if a drag show constitutes protected speech or expressive conduct—it does not—"[t]he First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech . . . would undermine the school's basic educational mission." *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 685 (1986). "*Bethel* admittedly involved a high school audience and it may be suggested that its justification for speech restraints rests largely on this fact." *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986). Nevertheless, there is not a great deal of difference between a high-school senior and a college freshman, and this Court has "view[ed] the role of higher education as no less pivotal to our national interest." *Id.* The *Bethel* Court also held that it is "perfectly appropriate" for a public school to "disassociate itself" from "vulgar speech and lewd conduct [that] is wholly inconsistent with the 'fundamental values' of public school education." *Bethel*, 478 U.S. at 685-86.

Restricting lewd conduct is a permissible restriction on the "time, place, and manner" in which students may express themselves. For example, the Supreme

Court in *Healey v. James* held that campus groups do not have a First Amendment right to flout campus rules or to fail to adhere to generally accepted standards of conduct, and that requiring campus groups to follow rules and maintain standards of conduct is a reasonable time-manner-place restriction. 408 U.S. at 192–93.

West Texas A&M does in fact prohibit "[p]ublic behavior that is disruptive, lewd, or indecent." ROA.484. President Wendler could reasonably assess that a prospective drag show will be offensively lewd or indecent, and therefore disapprove the show without violating the First Amendment (even assuming that all drag shows have inherent expressive conduct, which they do not).

### D. President Wendler's email is not dispositive of any issue.

Appellants argue (at 2, 13, 39, 40, 45, 60) that President Wendler admitted in his campus-wide email that his rejection of the drag show was unconstitutional.[8] But despite the incessant claims by appellants that President Wendler conceded that their drag show was an "artistic expression," he did not. ROA.266. What President Wendler said was that he does "not support any show, performance or artistic expression which denigrates others." ROA.266. Though appellants assert these phrases are all referring to their March 2023 drag show, at most President Wendler was merely listing a set of different things that can be used to denigrate others.

President Wendler's March 2023 email was sent to explain his decision to cancel the drag show against the backdrop of his overarching views about respect for others and opposition to lewdness and particular kinds of conduct. ROA.265-67. The email in no way refers to Spectrum's planned drag show as expressive conduct or speech,

---

[8] Nevertheless, of course, because his rejection of the drag show did not violate the Constitution, it cannot become unconstitutional via an explanation of his choice.

and it goes out of its way to make clear the reason for the cancellation was objection to conduct exaggerating sexuality (*i.e.* lewd conduct), not to speech. ROA.265-67.

Appellants' argument is reminiscent of the argument against President Trump's executive order suspending for 90 days the entry of foreign nationals from certain countries. *Trump v. Hawaii,* 138 S. Ct. 2392, 2403 (2018). The challengers argued that "a series of statements by the President and his advisers" showed unconstitutional animus towards Islam and evidenced that the order was therefore unconstitutional. *Id.* at 2406, 2417. The Court dismissed those concerns, holding that "the issue before us is not whether to denounce the statements. It is instead the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility." *Id.* at 2418.

Similarly, the issue here is not whether to denounce President Wendler's email or whether he properly stated the law. The issue is whether proposed drag shows are protected by the First Amendment. They are not.

## II. The Other Factors Support Affirmance.

### A.   Appellants cannot show irreparable harm.

In addition to being unlikely to prevail on the merits, the Court can affirm because the record supports the district court's conclusion that appellants failed to show the remaining elements of a preliminary injunction. ROA.873. In particular, appellants must show the injury they allege to be imminent, and not merely speculative, to obtain a preliminary injunction. *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). Referring to a past injury—assuming the denial of their March 2023 drag show was an injury (and it is not)—is not proof of an ongoing or probable future injury that can justify a preliminary injunction. Appellants have not shown the existence of any West Texas A&M policy or regulation prohibiting any or all events

implicating the First Amendment. President Wendler disapproved an event that does not implicate the First Amendment, but no future expressive events were banned or canceled. And appellants have provided *zero evidence* that future requests will not be decided on their particular facts.

It is also possible that a future proposed event that more plainly excludes children and is non-lewd will be approved. The question is entirely speculative and depends on unknown facts. Indeed, appellants' earlier concern that they would not be able to put on their Queer History and Queer Movie nights may have already been proven false if the absence of a reference to those events in their appellants' brief mean anything. Moreover, their next drag show is still scheduled for March 2024, and West Texas A&M has it tentatively placed on their calendar. ROA.237**.** No evidence about the future show has been proffered at all, neither evidence that the show will be disapproved, nor that the show will not be lewd, nor anything in between. This is all just to emphasize the speculative nature of appellants' assertions, as well as the interlocutory nature of this appeal, which has arrived before any discovery has been taken. *See Chacon*, 515 F.2d at 925.

If appellants are denied permission to conduct a specific future event after making a sufficient showing that the event will not be lewd and is actually protected by the First Amendment, then they can seek a temporary restraining order and injunctive relief then. But they have not done so on the record before this Court, and it is their burden to show their concerns are not merely speculative. Because appellants fail to carry their burden to show irreparable harm, this Court should affirm.

**B.  The threatened injury to the movant does not outweigh the threatened harm to the non-movant, and granting the injunction will disserve the public interest.**

When the government is a party, the balance-of-equities- and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Texas v. United States*, 809 F.3d 134, 187 & n.204 (5th Cir. 2016). A court therefore must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

There is no harm to appellants in affirming the district court's denial of their motion for preliminary injunction. Appellants have not established that they have an absolute right to conduct an on-campus drag show. *See, e.g., supra* Section I. Moreover, they allege that they have applied to have an on-campus drag show in March 2024, but that the request has not yet been granted or denied. Whether it will be granted or denied is speculative (and even if it is denied, that would not necessarily be a First Amendment harm, as discussed above).

On the other hand, there is great harm to West Texas A&M in a blanket injunction that deprives University administrators of their prerogative to professionally assess particular facilities requests. At this early juncture, we do not know the particularities of any future events appellants might wish to hold. University officials should be given the first opportunity to review these details, when they come, for consistency with school policy.

The balance of equities and public interest thus weigh heavily in favor of denying the preliminary injunction. This is an independent reason why the Court should not issue a preliminary injunction.

## III.  Sovereign Immunity Applies.

Appellants argue (at 66-67) that the district court correctly concluded that they have standing and that sovereign immunity does not apply. This is wrong. The district court wrongly concluded that the appellants met their burden to establish standing and to circumvent sovereign immunity. Sovereign immunity in particular bars appellants from obtaining any of the relief they have sought.

Under the *Ex parte Young* doctrine, a federal court only has jurisdiction over a lawsuit against a "state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020). For *Ex parte Young* to apply, three criteria must be satisfied: (1) A plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective. *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 451 (5th Cir. 2022).

Appellants have failed to meet the second two criteria. First, appellants failed to adequately allege facts showing an ongoing violation of federal law. And for the reasons explained above, they have not established that "the First Amendment even applies" here. *Clark*, 468 U.S. at 293 n.5. They cannot do so because drag shows are not inherently expressive conduct. And second, the relief appellants seek cannot be properly characterized as prospective given the facts alleged, and especially given all of the events that have occurred (and would have occurred anyway) since they filed their suit—events they vociferously complained would not happen.

Appellants are not currently being harmed or otherwise affected by anything President Wendler is doing or not doing (nor have they been harmed at any point because there was no First Amendment violation). Indeed, in spite of appellants'

claims otherwise (*see* ROA.314-315), Spectrum WT has been able to conduct numerous events conveying messages advocating for or supporting the LGBTQ+ lifestyle. For example, on March 28, 2023, they were able to reserve and then use a room in the Virgil Henson Activities Center to rehearse their off campus drag show. ROA.541. The fact they were able to conduct this practice squarely raises the question about what the need for a preliminary injunction would even be at this point. Also, on March 31, 2023, they were able to protest, on a campus lawn, President Wendler's actions regarding their March 2023 drag show. ROA.541. In April 2023, appellants co-sponsored, without any interference by President Wendler or anyone else, a "Carni-Ball event" with West Texas's Residence Hall Association at the Jack B. Kelley Student Center. ROA.541. And notably absent from their briefing before this Court, though discussed at length in their briefing below (ROA.216, 237, 314-15), is any mention of their prior concern that their fall 2023 semester events, specifically Queer Movie Night and Queer History Night, may have been canceled.

Appellants have not shown the existence of any policy of prohibition on any type of First Amendment activity that needs to be enjoined. President Wendler applied university policy and disapproved drag shows but did not change university policy. University regulations are not enacted by email. His email did not ban any future events protected by the First Amendment. Appellants provided no evidence below that future requests for permission to use campus facilities will not be determined on particular facts. Perhaps a future proposed event will more plainly be a non-lewd event—more plainly, anyway, than an event advertised as "PG-13" to which unaccompanied minors are not allowed—and will be approved. Appellants next drag show is not scheduled until March 2024. Appellants have also provided no evidence, other than President Wendler's putative ban of lewd drag shows in his email,

regarding whether any future event protected by the First Amendment will be canceled for an illegitimate reason.[9] Accordingly, appellants cannot obtain injunctive relief, or any other relief, against President Wendler in his official capacity because such claims are barred by sovereign immunity, and the Court lacks jurisdiction over those claims.

---

[9] Though it is presumably possible for them not to receive permission to hold the event for myriad independent and innocuous reasons, such as failing their risk assessment. *See, e.g.*, Thomas Declaration at ROA.539-42.

## Conclusion

The Court should affirm the district court, except as to its ruling regarding the applicability of sovereign immunity.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General

/s/ Joseph N. Mazzara
Joseph N. Mazzara
Assistant Solicitor General
Joe.Mazzara@oag.texas.gov

Counsel    for    Defendant-Appellee
Walter Wendler

## CERTIFICATE OF SERVICE

On December 28, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Joseph N. Mazzara
JOSEPH N. MAZZARA

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,865 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Joseph N. Mazzara
JOSEPH N. MAZZARA