# In the United States Court of Appeals for the Fifth Circuit

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVALL,

*Plaintiffs-Appellants*,

*v.*

WALTER WENDLER; DR. CHRISTOPHER THOMAS; JOHN SHARP; ROBERT L. ALBRITTON; JAMES R. BROOKS; JAY GRAHAM; TIM LEACH; BILL MAHOMES; ELAINE MENDOZA; MICHAEL J. PLANK; CLIFF THOMAS; DEMETRIUS L. HARRELL, JR.; MICHAEL A. HERNANDEZ, III,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

## APPELLEE WALTER WENDLER'S RESPONSE TO APPELLANTS' OPPOSED MOTION FOR INJUNCTION PENDING APPEAL AND APPELLEE'S OPPOSED MOTION TO RECONSIDER

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

JOSEPH N. MAZZARA
Assistant Solicitor General
Joe.Mazzara@oag.texas.gov

Counsel for Defendant-Appellee

# Certificate of Interested Persons

No. 23-10994

Spectrum WT; Barrett Bright; Lauren Stovall,

*Plaintiffs-Appellants,*

*v.*

Walter Wendler; Dr. Christopher Thomas; John Sharp; Robert L. Albritton; James R. Brooks; Jay Graham; Tim Leach; Bill Mahomes; Elaine Mendoza; Michael J. Plank; Cliff Thomas; Demetrius L. Harrell, Jr.; Michael A. Hernandez, III,

*Defendants-Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, defendant-appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ Joseph N. Mazzara
Joseph N. Mazzara
*Counsel of Record for*
*Defendant-Appellee Walter Wendler*

# Table of Contents

Certificate of Interested Persons ..............................................................i

Table of Authorities ..............................................................................iii

Introduction ............................................................................................1

Argument ................................................................................................2

   I.   Emergency Relief is Not Warranted. ...........................................2

      A.  Appellants should not be rewarded for inexcusable delay. ...................2

      B.  Appellants are unlikely to succeed on the merits. ................................3

          1.  Drag shows are non-expressive conduct, and therefore not protected by the First Amendment................................4

          2.  Alternatively, President Wendler's rejection of appellants' application to hold a drag show in Legacy Hall satisfies the applicable forum analysis. ...............................9

          3.  Lewd speech and conduct on campus are not protected by the First Amendment. ...............................14

      C.  Other factors support affirmance. .........................................15

          1.  Appellants cannot show irreparable harm. ...............................15

          2.  Any threatened injury to appellants does not outweigh the threatened harm to President Wendler, and the public interest favors denying the injunction. ...............................16

   II.  The Panel Should Deny on Reconsideration Appellants' Motion to File a Second Reply Brief. ...............................16

Conclusion ............................................................................................19

Certificate of Service ............................................................................21

Certificate of Compliance .....................................................................21

# Table of Authorities

Page(s)

**Cases:**

*Anderson Bros. Corp. v. O'Meara,*
306 F.2d 672 (5th Cir. 1962) ............................................................ 2

*Bethel School District No. 403 v. Fraser,*
478 U.S. 675 (1986) .................................................................. 14

*Board of Ed. of Hendrick Hudson Central School Dist. v. Rowley,*
458 U.S. 176 (1982) .................................................................. 10

*Chiu v. Plano Indep. Sch. Dist.,*
260 F.3d 330 (5th Cir. 2001) ............................................................ 4

*Christian Legal Soc. v. Martinez,*
561 U.S. 661 (2010) ................................................................ 9-13

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ................................................................ 7, 8

*Clark v. Cmty. for Creative Non-Violence,*
468 U.S. 288 (1984) .................................................................. 4

*Coleman v. Dretke,*
409 F.3d 665 (5th Cir. 2005) ........................................................... 11

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,*
473 U.S. 788 (1985) .................................................................. 11

*Covey v. Arkansas River Co.,*
865 F.2d 660 (5th Cir. 1989) ............................................................ 2

*D.C. v. Heller,*
554 U.S. 570 (2008) ................................................................... 7

*Elrod v. Burns,*
427 U.S. 347 (1976) .................................................................. 15

*F.C.C. v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993) ................................................................... 8

*Healy v. James,*
408 U.S. 169 (1972) .............................................................. 10, 14-15

*Iancu v. Brunetti,*
139 S. Ct. 2294 (2019) ............................................................. 4, 8

*Martin v. Parrish,*
805 F.2d 583 (5th Cir. 1986) ........................................................... 14

*Matal v. Tam*
  582 U.S. 218 (2017) ..................................................................... 4, 7
*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................ 16
*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*,
  748 F.3d 583 (5th Cir. 2014) ........................................................7-8
*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .......................................................... 4, 10, 13
*Rumsfeld v. Forum for Academic & Institutional Rights., Inc.*
  547 U.S. 47 (2006) ...................................................................... 4-6
*Spence v. State of Wash.*,
  418 U.S. 405 (1974) ...................................................................... 4-5
*Texas v. Johnson*,
  491 U.S. 397 (1989) .......................................................................... 5
*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2016) ......................................................... 16
*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ....................................................................... 10
*United States v. O'Brien*,
  391 U.S. 367 (1968) ...................................................................... 4-6
*United States v. Rodriguez*,
  33 F.4th 807 (5th Cir. 2022) ...........................................................9
*Valley v. Rapides Parish Sch. Bd.*,
  118 F.3d 1047 (5th Cir. 1997) ........................................................ 16
*Vasquez-De Martinez v. Garland*,
  34 F.4th 412 (5th Cir. 2022) .......................................................... 17
*Voting for Am., Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ....................................................... 6-8
*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ..........................................................................2
*West Virginia v. B. P. J., by Jackson*,
  143 S. Ct. 889 (2023) ....................................................................... 1
*Whole Women's Health v. Jackson*,
  13 F.4th 434 (5th Cir. 2021) ............................................................ 1
*Widmar v. Vincent*,
  454 U.S. 263 (1981) ..................................................................10, 13

**Constitutional Provisions and Rules:**

U.S. Const. amend. I ..........................................................................*passim*

Fed. R. App. P.:

    8(a) ............................................................................................ 1

    27 ........................................................................................... 17-18

    27(a)(2)(A) .................................................................................. 16

    28(c) ...................................................................................... 17-18

**Other Authorities:**

11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure
(3d ed. 2023):

    § 2946 ....................................................................................... 15

    § 2948.1 .................................................................................3, 15

*Dr. Walter Wendler*, W. Tex. A&M Univ.,
https://tinyurl.com/mr3mmtuz ...................................................... 11

Lyrics to "This is the Army" Song,
http://tinyurl.com/bdzhup47 (last accessed Feb. 16, 2024) ..............................6

"Trans/Non-binary Resources," *Trans/Non-binary Resources*, W. Tex. A&M
Univ., http://tinyurl.com/bdz4a7uv (last visited Feb. 16, 2024) ...................... 13

*WTAMU Resources*, W. Tex. A&M Univ., http://ti-
nyurl.com/2hu38rtj (last visited Feb. 16, 2024) ............................................. 13

# INTRODUCTION

"[I]t is a wise rule in general that a litigant whose claim of urgency is belied by its own conduct should not expect discretionary emergency relief from a court." *West Virginia v. B. P. J., by Jackson*, 143 S. Ct. 889, 889 (2023) (Alito, J., dissenting from denial of application to vacate injunction). In their latest motion, appellants seek emergency relief in the form of a judicial exemption from generally applicable University rules governing the uses to which students may put school property. But the purported emergency is entirely of appellants' own making. The record shows that appellants have been planning the event in question—and have been concerned about its consistency with university policy—for nearly a year, if not longer. *See* ROA.36. This Court should not rush to judgment on the merits because of appellants' election to engage in procedural delay.

Emergency relief is not warranted here in any event. Federal Rule of Appellate Procedure 8(a) permits an injunction pending appeal upon the movant showing: (1) a strong likelihood of success on the merits; (2) irreparable injury without an injunction; (3) that the balance of hardships supports an injunction; and (4) that the public interest favors such relief. *Whole Women's Health v. Jackson*, 13 F.4th 434, 441 (5th Cir. 2021). Failure to meet any one of these prongs is fatal. *Id*. Appellants fail all four.

President Wendler also moves for reconsideration of the single-judge decision granting appellants' motion to file a second reply brief. ECF. No. 112. Such motions cannot be decided by a single judge under this court's rules. *See, e.g.*, Fifth Circuit Rules 27.1.13 and 27.2.1. Regardless, permitting appellants to file a doubly long reply

brief unfairly prejudices President Wendler, is against the interests of justice, and incentivizes lawfare.[1]

**ARGUMENT**

## I. Emergency Relief is Not Warranted.[2]

### A. Appellants should not be rewarded for inexcusable delay.

"An injunction is an equitable remedy," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982), and "equity is not intended for those who sleep on their rights." *Covey v. Ark. River Co.*, 865 F.2d 660, 662 (5th Cir. 1989). Even though equity can "relieve against mistake, it will not assist a man whose condition is attributable to the want of due diligence which may be fairly expected from a reasonable person." *Anderson Bros. Corp. v. O'Meara*, 306 F.2d 672, 677 (5th Cir. 1962).

Appellants have had almost five months to seek an injunction pending appeal. The most obvious time to seek emergency relief would have been in September of 2023, when appellants filed their notice of appeal. *See* ECF. No. 1. They likewise could have moved for such relief immediately after their motion to expedite was denied in October, ECF No. 22, knowing that briefing would not resolve until late

---

[1] In the interest of judicial economy, this brief incorporates, rather than reiterates, the factual statement contained in President Wendler's brief on the merits. *See* ECF No. 94 at 2-8.

[2] The arguments in subparts B. through C. track and summarize those made in President Wendler's merits brief, ECF No. 94, which is fully incorporated here. Any omission is an unintended consequence of the abbreviated word limit applicable to a motions response and should not be construed as a waiver, forfeiture, or abandonment of an issue or argument.

December, early January, at the earliest. But they did not. Instead, knowing all the while that their March 2024 drag show was looming, appellants waited until they were on the precipice of their alleged irreparable harm, and then they decided to rush this Court into making a consequential decision on matters of first impression while demanding the Court act on a timeline created not by the facts but appellants' strategic decisions. In other words, nothing has changed factually since the denial of appellants' preliminary injunction below that would justify such extraordinary relief. Appellants have created a false emergency and now seek to have this Court save them from their dilatory tactics.

Given appellants' role in causing this delay—which they do not even attempt to excuse—appellants' motion for an injunction pending appeal should be denied. *Cf.* 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2023) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction").

## B. Appellants are unlikely to succeed on the merits.

Appellants alleged three causes of action under the First Amendment: viewpoint discrimination (ROA.241), exclusion from a public forum (ROA.245), and prior restraint (ROA.250). But, per the district court, appellants failed to meet their burden to obtain a preliminary injunction on any of these claims because, as pled, the allegedly "censored" conduct was not inherently expressive, and because appellants failed to conduct the applicable forum analysis. ROA.853-854. Those holdings should be affirmed.

1. **Drag shows are non-expressive conduct, and therefore not protected by the First Amendment.**

Drag shows are non-expressive conduct. Appellants' vague assertions that drag shows in general convey some sort of message to some observers does not justify injunctive relief. A claim of viewpoint discrimination, for example, requires more because such "discrimination is a form of content discrimination, in which 'the government targets not subject matter, *but particular views taken by speakers on a subject.*'" *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001) (emphasis added) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). "[T]he essence of viewpoint discrimination" is "the Government's disapproval of . . . *messages* it finds offensive." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (quoting *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring)) (emphasis added). And the burden is on appellants "to demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293-94 n.5 (1984).

The Supreme Court has several times reiterated that it "cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). Instead, to determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [the Supreme Court] [has] asked whether 'an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by

those who viewed it.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (cleaned up) (quoting *Spence*, 418 U.S. at 410-11).

And as the Court has also explained, where "explanatory speech is necessary," that "is strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.* ("*FAIR*"), 547 U.S. 47, 66 (2006). After all, "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* The Court emphasized that if combining speech and conduct were sufficient to raise a First Amendment issue, then if someone declared "that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes," the courts "would have to apply *O'Brien* to determine whether the Tax Code violates the First Amendment." *Id.* "Neither *O'Brien* nor its progeny supports such a result." *Id.*

As appellants admitted below by giving a list of examples from Shakespeare to Ronald Reagan, and from "Powder Puff" games to drag shows, dressing in costume (whether drag or otherwise) requires some sort of explanatory speech because it is not inherently expressive of this or that particular thing. ROA.297. Indeed, as appellants noted below performances involving men dressed as women have been around for a long time—all with very different purposes and messages. ROA.228. For example, a 1943 movie called "This Is the Army" starring Ronald Reagan featured a show in which several members of the military dressed as women, later joined by others

dressed as "nerdy men," performing a song and dance for an audience at a theater.[3] The lyrics convey the intended message comparing the strange experience of being drafted out of normal life into the army to the strange experience of being drafted out of normal life into a female chorus.[4] If the movie was watched on "mute," it would not be clear what message the men who happened to be dressed as women were trying to convey. On the other hand, the same could not be said about a film, play, or show in which silent characters guillotine the Statue of Liberty, Uncle Sam, or apple pie.

The need for these explanations in the drag show context demonstrates, under *FAIR*, that drag shows are *not* inherently expressive conduct. Because an observer watching a drag show has no way of knowing whether the performers are expressing anything until the message behind the performance is accompanied by an explanation, like those above. In other words, "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under *O'Brien*," let alone the First Amendment. *FAIR*, 547 U.S. at 66. And even if they were intending to express some general positive idea about the LGBTQ+ community, "[c]onduct does not become speech for First Amendment purposes merely because the person engaging in the conduct intends to express an idea." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013). Further, appellants have failed to identify the "*particular* views" that were to

---

[3] Available at http://tinyurl.com/mu664msb (last accessed Feb. 16, 2024).

[4] Lyrics available at http://tinyurl.com/bdzhup47 (last accessed Feb. 16, 2024).

be "taken by speakers" and expressed at or through their drag show. In appellants' operative complaint, they do allege a variety of things that some have "come to associate" with drag shows in general. ROA.228-29. In their brief on appeal, they also assert (at 20) that "[p]laintiffs organized a drag show to raise funds for an LGBTQ+ suicide prevention charity and 'convey messages advocating for and showing support for the LGBTQ+ community,'" and that "Spectrum WT's show, like many drag shows, *might* also 'offer[] counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity.'" (last alternation in original) (emphasis added). But a purpose is different than a message. The purpose of most theaters is to make money. That does not make wealth acquisition the message of Macbeth. At no point do appellants meaningfully allege what their March 2023 drag show meant to convey or what precisely was "censored" when President Wendler canceled the event, or what their planned 2024 drag show is meant to convey or what would be "censored."

The closest appellants come to identifying any particular view or message is their claim that "[t]he proceeds from the March 2023 drag show are earmarked for donation to an LGBTQ+ suicide-prevention group." ROA.229. But that is not a viewpoint President Wendler suppressed. Indeed, President Wendler amplified that message by spreading it to a broader campus audience in his email announcement encouraging readers to "send the dough" for the group's anti-suicide cause. ROA.267. If "the 'essence of viewpoint discrimination'" is "the Government's disapproval of . . . messages it finds offensive," appellants needed to identify a message President

Wendler disapproved, *Iancu*, 139 S. Ct. at 2299 (quoting *Matal*, 582 U.S. at 248)—not one that he endorsed and propagated to a larger audience.

Where, as here, a government official's decisions or policies "regulate conduct only and do not implicate the First Amendment, rational basis scrutiny is appropriate." *Voting for Am.*, 732 F.3d at 392 (citing *D.C. v. Heller*, 554 U.S. 570, 628 n. 27 (2008). Under rational basis review, this Court must assume President Wendler's alleged policy is valid and must be sustained so long as it "is rationally related to a legitimate state interest." *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 748 F.3d 583, 594 (5th Cir. 2014) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). Rational basis review "seeks only to determine whether any conceivable rationale exists." *Id.* (citing *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). And "the state is not required to 'prove' that the objective of the law would be fulfilled." *Id.* (citing *Beach Commc'ns*, 508 U.S. at 315 (holding that "a legislative choice is not subject to courtroom fact-finding")).

Even if President Wendler's purported policy has no evidentiary or empirical basis, it "satisfies rational basis review." *Id.* (citing *Beach Commc'ns*, 508 U.S. at 315). Indeed, if reasonable minds can disagree on the policy, that "suffices to prove that the [policy] has a rational basis." *Id.* Lastly, "there is no least restrictive means component to rational basis review," and courts must accept generalizations "'even when there is an imperfect fit between means and ends' or where the classification 'is not made with mathematical nicety.'" *Id.* (quoting *Heller,* 509 U.S. at 321).

President Wendler's policy regarding certain conduct easily satisfies rational basis. President Wendler asserted in his email that drag shows harass women and

allowing them could cause an issue with State and federal laws and regulations. ROA.266. Further, he raised issues with the lewdness of drag shows, and their "exaggerated aspects of womanhood (sexuality, femininity, gender)." ROA.265. All of these are rational reasons for prohibiting non-expressive conduct in West Texas A&M's limited public fora. Because the Court may (and should) decide this case based on the fact that there was no First Amendment injury because the only thing banned was non-expressive conduct, any of those rationales satisfy constitutional scrutiny.

2. **Alternatively, President Wendler's rejection of appellants' application to hold a drag show in Legacy Hall satisfies the applicable forum analysis.**

Even if this Court were to decide that appellants have shown that the First Amendment is implicated by President Wendler's denial of the use of Legacy Hall for drag shows, his actions also satisfy the standard applicable to limited public fora. *See United States v. Rodriguez*, 33 F.4th 807, 811 (5th Cir. 2022) ("[W]e may affirm the judgment for any reason supported by the record").

When a student group asks to use school resources—including campus facilities—for its own purposes, the limited-public-forum analysis applies because the student group is not requesting to be freed from a state prohibition, but to be extended "a state subsidy." *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 682 (2010). Thus, West Texas A&M is entitled to "preserve the property . . . for the use to which it is lawfully dedicated." *Id.* at 679 (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

That is not to say that universities enjoy unbridled authority to restrict access to its limited public fora. Conditions on the use of school facilities must be based in distinctions that (a) are "reasonable in light of the purpose served by the forum" and (b) do not "discriminate against speech on the basis of viewpoint." *Id.* at 685 (quoting *Rosenberger*, 515 U.S. at 829). West Texas A&M's rejection of the appellants' March 2023 drag show, and the possibility of future rejections on the same basis, clears both hurdles.

**a.** Start with reasonableness. The Supreme Court has instructed courts considering restrictions on the use of university property to bear three things in mind. *First*, the reasonableness analysis must be "shaped by the educational context in which it arises." *Id.* at 685. Access to university property may therefore be lawfully curtailed when necessary to serve the ends of education. *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981) (explaining that First Amendment rights must be analyzed "'in light of the special characteristics of the school environment.'" (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)).

*Second*, in assessing whether a restriction is in fact necessary to serve the ends of education, courts should be chary of "substitut[ing] their own notion of sound educational policy for those of . . . school authorities." *Christian Legal Soc.*, 561 U.S. at 685 (quoting *Board of Ed. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). The First Amendment is sensible of "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Healy v. James*, 408 U.S. 169, 181 (1972) (citation omitted). Indeed, the Court took pains in *Christian Legal*

*Society* to admonish "due decent respect," for the law school's "determination of what constitutes sound educational policy." 561 U.S. at 687 & n.16.

*Third*, the authority of school officials to shape the educational environment applies both in and out of the classroom. A university's "commission" to "choose among pedagogical approaches" extends to "extracurricular programs" like the proposed drag show at issue here. *Id.* (deferring to a school's determination of "what goals a student-organization forum ought to serve").

With these principles in mind, the district court was well within its discretion to credit President Wendler's determination that drag shows disserve the educational purposes of West Texas A&M. President Wendler is a veteran educator with a doctorate in Curriculum and Instruction. He has served in university administrations for decades, including as Chancellor of Southern Illinois University Carbondale and as Vice Chancellor for the entire Texas A&M University System.[5] In President Wendler's professional judgment, drag shows involve "conduct [that] runs counter to the purpose of [West Texas A&M University]" because such conduct is "derisive, divisive and demoralizing." ROA.266. President Wendler voiced particular concern over the way in which drag shows sexualize and objectify the human body, and thereby undermine the University's goal of creating an educational environment

---

[5] This information is taken from President Wendler's official biography published on West Texas A&M's webpage. *See Dr. Walter Wendler*, W. Tex. A&M Univ., https://tinyurl.com/mr3mmtuz. This Court may take judicial notice of information contained on official websites. *See Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam) (explaining that a Fifth Circuit panel can "tak[e] judicial notice of the state agency's own website").

that "elevate[s] students based on achievement and capability, performance in a word, without regard to group membership." ROA.266. He also recognized drag shows' inherent lewdness given their tendency to "exaggerate aspects of . . . sexuality." ROA.265-67. And he explained that the University's "educational mission" encourages a campus culture that is "implacable and exacting" and expressly "sanctioned by the legislature, the governor and numerous elected and appointed officials." ROA.266.

Federal courts—and appellate courts in particular—are ill-suited to second-guess the reasonableness of such concerns, anchored as they are in the learned experience of administrators. In *Christian Legal Society*, the school's all-comers policy was deemed to be reasonable in part because the Court accepted the University's position that the policy would "encourage tolerance, cooperation, and learning among students." 561 U.S. at 689. That was President Wendler's explicit objective too. He stated that he would not support any show or performance that "denigrates others." ROA.266.

Also notable is what President Wendler's rejection of the March 2023 drag show, and rejection of future drag shows, does *not* entail. It does not create a speech code. It does not purport to censor discussion of drag shows. Indeed, appellants were permitted to stage an on-campus protest against President Wendler's decision. ROA.541. Moreover, the cancellation of drag shows has not prevented the same student groups from sponsoring expressive activities that convey the same message putatively furthered by the canceled show—for example movie nights and historical discussions. So to the extent a drag show may be considered expressive, "substantial

alternative channels remain open for" appellants to convey their various messages. *See Christian Legal Soc.*, 561 U.S. at 690 (deeming law school's all-comers policy "all the more creditworthy in view of the" fact that students could still "use chalkboards and generally available bulletin boards to advertise events").

   **b.**   The rejection of the March 2023 drag show and any similar future rejections of access to school facilities to put on a drag show are also viewpoint neutral. Appellants' drag show was denied, and similar future shows may be denied, regardless of their intended purpose—whether to poke fun at the LGBTQ+ community or to express solidarity with it. The rejection, and possible future rejections, thus "draw[] no distinction between groups based on their message or perspective." *Id.* at 694. That critical fact distinguishes this case from *Widmar* and *Rosenberger*, both of which involved university actions that "singled out religious . . . organizations for disadvantageous treatment." *Id.* at 684.

   Further, West Texas A&M hosts a webpage for Spectrum WT's student group. That page includes resources for "trans/non-binary," with "Dos" and "Don'ts" for allies.[6] It also provides links and phone numbers to resources for LGBTQ+ people on a general resources page, including numbers for university counselors.[7] No one has been asked or directed to take down this website that contains language like "Shut down transphobia" and encourages readers to call women persons

---

   [6] "Trans/Non-binary Resources," *Trans/Non-binary Resources*, W. Tex. A&M Univ., http://tinyurl.com/bdz4a7uv (last visited Feb. 16, 2024).

   [7] *WTAMU Resources*, W. Tex. A&M Univ., http://tinyurl.com/2hu38rtj (last visited Feb. 16, 2024).

"Designated Female at birth." Neither President Wendler, West Texas A&M, nor any West Texas A&M policy engaged in viewpoint discrimination against appellants.

### 3. Lewd speech and conduct on campus are not protected by the First Amendment.

A third, independent, basis on which this Court may affirm is that universities may prohibit lewd conduct without violating the First Amendment. Even if a drag show constitutes protected speech or expressive conduct—it does not—"[t]he First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech . . . would undermine the school's basic educational mission." *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 685 (1986). "*Bethel* admittedly involved a high school audience and it may be suggested that its justification for speech restraints rests largely on this fact." *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986). Nevertheless, there is not a great deal of difference between a high-school senior and a college freshman, and this Court has "view[ed] the role of higher education as no less pivotal to our national interest." *Id.* The *Bethel* Court also held that it is "perfectly appropriate" for a public school to "disassociate itself" from "vulgar speech and lewd conduct [that] is wholly inconsistent with the 'fundamental values' of public school education." *Bethel*, 478 U.S. at 685-86.

Restricting lewd conduct is a permissible restriction on the "time, place, and manner" in which students may express themselves. For example, the Supreme Court in *Healy v. James* held that campus groups do not have a First Amendment right to flout campus rules or to fail to adhere to generally accepted standards of

conduct, and that requiring campus groups to follow rules and maintain standards of conduct is a reasonable time-place-manner restriction. *Healy*, 408 U.S. at 192-93.

West Texas A&M does in fact prohibit "[p]ublic behavior that is disruptive, lewd, or indecent." ROA.484. President Wendler could reasonably assess that a prospective drag show will be offensively lewd or indecent, and therefore disapprove the show without violating the First Amendment.

## C.  Other factors support affirmance.

### 1.  Appellants cannot show irreparable harm.

Here the second factor—whether an injunction pending appeal is necessary to prevent irreparable harm—folds into the first. While "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), appellants have not shown any First Amendment interest in using University property to host a drag show.

Indeed, the absence of immanent irreparable harm is confirmed by appellants' own litigation decisions. It is a well-established principle of equity that delay in seeking emergency relief undermines the assertion that, absent an injunction pending appeal, irreparable harm will result. *See* Wright & Miller § 2948.1. If there were truly "an urgent need for immediate relief" lest a judgment in the ordinary course be "rendered ineffective," then appellants would not have delayed their request until the alleged harm was upon them. *Id.* at § 2946.

**2. Any threatened injury to appellants does not outweigh the threatened harm to President Wendler, and the public interest favors denying the injunction.**

When the government is a party, the balance-of-equities- and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Texas v. United States*, 809 F.3d 134, 187 & n.204 (5th Cir. 2016). A court therefore must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

There is no harm to appellants in denying their emergency motion for an injunction pending appeal. Appellants have not established that they have an absolute right to conduct an on-campus drag show. On the other hand, there would be great harm to President Wendler and West Texas A&M should the Court issue a blanket injunction that deprives University administrators of their ability to professionally assess facilities requests

The balance of equities and public interest thus weigh heavily in favor of denying the preliminary injunction, and the Court should reject appellants' requested relief.

## II. The Panel Should Deny on Reconsideration Appellants' Motion to File a Second Reply Brief.

President Wendler seeks reconsideration by the full panel of the single-judge grant of appellants' motion for leave to file a supplemental brief. *See* ECF No. 112. The panel should deny appellants' motion on reconsideration for five reasons. *First*, appellants do not make a legal argument as required by Fed. R. App. P. 27(a)(2)(A). Rule 27(a)(2)(A) states that a motion "*must state with particularity* the grounds for

the motion, the relief sought, and *the legal argument necessary to support it*." (emphasis added). Fifth Circuit Rule 27.4 reminds counsel that they "must comply with the requirements of Fed. R. App. P. 27." The local rules thus accentuate the need for supporting legal arguments. *See also Vasquez-De Martinez v. Garland*, 34 F.4th 412, 414 (5th Cir. 2022) (per curiam) (denying motion after observing that "nowhere in the two-short pages that Counsel says 'support' his motion does Counsel cite *any* law on our authority to grant" the motion, "let alone how to evaluate it").

In lieu of legal argument, appellants cite the relevant rules of appellate procedure and appeal to vague notions of justice. ECF No. 104 at 4, 6. Such vapid statements do not suffice. Indeed, they obscure the extraordinary nature of appellants' request. Fifth Circuit Rule 27.1.13 grants the clerk (and single judges under Rule 27.2.1) authority to grant a motion "[t]o file reply or supplemental briefs in addition to the single reply brief permitted by Fed. R. App. P. 28(c) *prior to submission to the court*." (emphasis added). Appellants' motion for leave is not "prior to submission to the court" of either their "reply or supplemental brief[]" or their "single reply brief." The Rules thus preclude not only the clerk but also a single judge from ruling on the motion, strongly indicating that granting such motions is highly disfavored. It also indicates that appellants' filing is not a typical "procedural motion," (*see* Fifth Cir. Rule 27.1), and it emphasizes the need for the fulsome "legal arguments" contemplated by Fed. R. App. P. 27.

*Second*, to the extent appellants were unsure of how to proceed when two appellees' briefs are filed for different defendants by different counsel, Fifth Circuit Rule 27.1.13 instructs that only a "single reply brief [is] permitted by Fed. R. App. P.

28(c)." All parties are bound by this Rule, and appellants advance no arguments demonstrating they are somehow exempt. Their failure to abide by this Rule reflects straightforward noncompliance and nothing more.

*Third*, appellants had a lengthy opportunity from the time President Wendler's counsel was granted an extension on November 28 (ECF No. 71) to move under Rule 27 to file an overlength consolidated reply. Such motions are routine; litigants regularly file them. *See* Unopposed Motion for Extension of Time to File Defendant-Appellant's Opening Brief, *Woodlands Pride, Inc. v. Paxton*, No. 23-20480 (5th Cir. Dec. 4, 2023), ECF No. 69 at 2 (seeking an extension to their principal brief "to align the briefing schedule for all appellants to the same date for the ease of the parties and the Court"). Leave should not now be granted given that appellants—who have repeatedly indicated their desire to expedite this case (ECF No. 12; ECF No. 64 at 1 n.1)—have declined to timely act under the rules, instead waiting until their filing was rejected to seek the required leave. Given their self-imposed dalliance, there would be nothing unjust about denying their motion.

*Fourth*, granting appellants' motion for leave would prejudice President Wendler. Rule 32(a)(7)(B)(ii) generously allows parties 6,500 words for a reply brief. Appellants' sanctioned reply brief (ECF No. 96) was 5,904 words. The unauthorized supplemental brief appellants now seek leave to file is 6,492 words. Combined, appellants' 82 pages worth of reply and supplemental briefing would exceed the rules' word limit for replies by 5,896 words—nearly double the maximum. Further, combined, appellants' reply and supplemental brief is a mere 564 words shorter than their principal brief, or about a page and a half. For all intents and purposes,

appellants sought to file an extra-length brief, without complying with Fifth Cir. Rule 32.4's requirement to submit their request ten days prior to the brief's due date. Appellants should not have been granted a second bite at the apple after they blew past several options in the rules for timely relief.

*Fifth*, appellants suffer no prejudice. If this Court's rules are to have any binding effect, self-inflicted consequences that flow from failure to comply with those rules cannot—standing alone—excuse litigants. What appellants are asking for is extraordinary special treatment. In effect, they seek double the word-count allotted to them, an option that would almost certainly be unavailable under the authorized procedural avenues they neglected. While it is normal for parties to timely ask for—and receive—an extra word allotment when responding to multiple briefs, it is highly unusual for a litigant to receive *twice* the allotted word count. *See e.g.*, Clerk Order Granting Motion to File Brief in Excess of Word Count, *Dobbin v. Lake*, No. 23-50215 (5th Cir. July 7, 2023), ECF No. 44 (increasing word limit for appellant's brief from 13,000 to 16,000 words in case involving multiple appellee briefs). This Court should not indulge appellants' tactics to achieve advantages outside the scope of the Rules.

## Conclusion

The Court should deny appellants' motion for an injunction pending appeal and should reconsider, and deny, appellants' motion to file a supplemental reply brief.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

AARON L. NIELSON
Solicitor General

BRENT WEBSTER
First Assistant Attorney General

/s/ Joseph N. Mazzara
JOSEPH N. MAZZARA
Assistant Solicitor General
Joe.Mazzara@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Defendant-Appellee
Walter Wendler

## Certificate of Conference

On February 20, 2024, I conferred with JT Morris, counsel for appellants, and Allison Collins, counsel for appellees. Mr. Morris stated that appellants oppose the motion, and Ms. Collins indicated that appellees do not oppose it.

/s/ Joseph N. Mazzara
JOSEPH N. MAZZARA

## Certificate of Service

On February 20, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Joseph N. Mazzara
JOSEPH N. MAZZARA

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5143 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Joseph N. Mazzara
JOSEPH N. MAZZARA