

Joseph N. Mazzara
Assistant Solicitor General

joe.mazzara@oag.texas.gov
(512) 936-1700

March 15, 2024

**VIA CM/ECF**
Mr. Lyle W. Cayce, Clerk
United States Court of Appeals for The Fifth Circuit

    Re:    No. 23-10994, *Spectrum W.T., et al. v. Wendler, et al.*

Dear Mr. Cayce:

    After this Court carried with the case appellants' motion for an injunction pending appeal (No. 125), appellants filed an emergency application (Attachment B) for the same relief before the United States Supreme Court. After appellees responded (Attachments C and D) and appellants filed their single reply, (Attachment E), the United States Supreme Court denied appellants' emergency application for an injunction pending appeal (Attachment A).

            Respectfully submitted.

           /s/ Joseph N. Mazzara
           JOSEPH N. MAZZARA
           *Counsel for Defendant-Appellee*

cc: Counsel for All Parties (via CM/ECF)

# ATTACHMENT A

FRIDAY, MARCH 15, 2024

ORDER IN PENDING CASE

23A820     SPECTRUM WT, ET AL. V. WENDLER, WALTER, ET AL.

The application for writ of injunction pending appeal presented to Justice Alito and by him referred to the Court is denied.

# ATTACHMENT
# B

No. 23A___

# In The
# Supreme Court of the United States

SPECTRUM WT, ET AL.,
*Applicants,*

v.

WALTER WENDLER, ET AL.,
*Respondents.*

To the Honorable Samuel Alito, Associate Justice
of the Supreme Court of the United States and Circuit Justice for the Fifth Circuit

**EMERGENCY APPLICATION FOR INJUNCTION PENDING APPELLATE REVIEW OR, IN THE ALTERNATIVE, PETITION FOR WRIT OF CERTIORARI AND INJUNCTION PENDING RESOLUTION**

**IMMEDIATE RELIEF REQUESTED**

Adam B. Steinbaugh
Jeffrey D. Zeman
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 Walnut St.
Suite 900
Philadelphia, PA 19106

Robert Corn-Revere
JT Morris
 *Counsel of Record*
Conor T. Fitzpatrick
Joshua T. Bleisch
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave.
Suite 340
Washington, DC 20003
215-717-3473
jt.morris@thefire.org

*Counsel for Applicants*

## QUESTIONS PRESENTED

1.      Whether public university administrators violate the First Amendment when they ban student expression from campus simply because it offends others, as several circuits have recognized in similar cases.

2.      Whether the courts below erred in not enjoining a viewpoint-based prior restraint on an entire category of protected stage performances.

**PARTIES, RULE 29.6 STATEMENT, AND RELATED PROCEEDINGS**

Applicants are Spectrum WT, a recognized student organization at West Texas A&M University, Barrett Bright, and Lauren Stovall. They are Plaintiffs in the United States District Court for the Northern District of Texas, and Appellants in the United States Court of Appeals for the Fifth Circuit. Applicants each represent that they have no parent entities and do not issue stock.

Respondents are Walter Wendler, Dr. Christopher Thomas, and John Sharp.

The related proceedings are:

*Spectrum WT v. Wendler*, 2:23-CV-048-Z (N.D. Tex. Sep. 21, 2023), denying Plaintiffs' motion for a preliminary injunction and granting in part Defendants' motion to dismiss, attached as Exhibit A;

*Spectrum WT v. Wendler*, 23-10994 (5th Cir. Oct. 11, 2023), denying Plaintiffs' motion to expedite the appeal, attached as Exhibit B;

*Spectrum WT v. Wendler*, 2:23-CV-048-Z (N.D. Tex. Feb. 5, 2024), declining to expedite Plaintiffs' motion for an injunction pending appeal, attached as Exhibit C; and

*Spectrum WT v. Wendler*, 23-10994 (5th Cir. Feb. 22, 2024), carrying Plaintiffs' motion for an injunction pending appeal with the case, attached as Exhibit D.

**TABLE OF CONTENTS**

QUESTIONS PRESENTED...........................................................................ii

PARTIES, RULE 29.6 STATEMENT, AND RELATED PROCEEDINGS.................iii

TABLE OF CONTENTS ..........................................................................iv

TABLE OF AUTHORITIES........................................................................vi

OPINIONS BELOW ................................................................................2

JURISDICTION ....................................................................................5

STATEMENT OF THE CASE .....................................................................5

REASONS FOR GRANTING THE APPLICATION...................................................11

I.  Plaintiffs Are Likely to Succeed on the Merits, As It Is Indisputably
    Clear That the University Officials Are Violating the First
    Amendment. ....................................................................................12

    A.  Like with any stage performance, the First Amendment protects
        Spectrum WT's drag performance. ..............................................13

    B.  The district court's refusal to consider the ongoing prior restraint
        highlights why this is an extraordinary case, making the Court's
        intervention vital. ....................................................................18

    C.  President Wendler's edict discriminates against perceived "offensive"
        viewpoints. .............................................................................20

    D.  The University officials' ongoing viewpoint- and content-based ban
        on drag performance cannot survive strict scrutiny. .......................23

II.  Without a Swift Injunction Against the Ongoing Prior Restraint,
     Plaintiffs Will Suffer Irreparable Harm to their Expressive Freedoms. .......27

III. Ensuring Public University Presidents Do Not Impose Their Views
     Over Free Expression on Campus is Critical to the Public Interest..............28

IV.  Alternatively, the Court Should Treat This Application as a Petition
     for Certiorari and Grant Certiorari Now, As This Case Reveals Conflict
     Between Lower Courts Over a Constitutional Issue of Immediate
     Importance. ...................................................................................32

CONCLUSION ....................................................................................34

APPENDIX OF EXHIBITS

APPENDIX EXHIBIT A: United States District Court for the
Northern District of Texas, Order Denying Preliminary Injunction
(Sep. 21, 2023) ............................................................................. App.3

APPENDIX EXHIBIT B: United States Court of Appeals for the
Fifth Circuit, Order Denying Motion to Expedite Appeal
(Oct. 11, 2023) ............................................................................ App.30

APPENDIX EXHIBIT C: United States District Court for the
Northern District of Texas, Order Declining to Expedite Motion
for an Injunction Pending Appeal (Feb. 5, 2024) ...................... App.32

APPENDIX EXHIBIT D: United States Court of Appeals for the
Fifth Circuit, Order Carrying Motion for an Injunction
Pending Appeal with the Case (Feb. 22, 2024) ......................... App.34

APPENDIX EXHIBIT E: Plaintiffs' First Amended Verified Complaint
(Apr. 18, 2023) ............................................................................ App.37

APPENDIX EXHIBIT F: Appendix to Plaintiffs' Brief in
Support of Amended Motion for a Preliminary Injunction
(Apr. 20, 2023) .......................................................................... App.102

APPENDIX EXHIBIT G: Appendix to Plaintiffs' Brief in
Support of Rule 62(d) Motion for Injunction Pending Appeal
(Jan. 30, 2024) .......................................................................... App.193

APPENDIX EXHIBIT H: Declaration of Christopher Thomas
(Feb. 19, 2024) ......................................................................... App.234

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ......................................................................... 17, 18

*Am. Trucking Ass'ns, Inc. v. Gray,*
  483 U.S. 1306 (1987) .............................................................................. 11

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) .................................................................................. 20

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ......................................................................... 15, 25

*Christian Legal Soc'y. v. Martinez,*
  561 U.S. 661 (2010) ........................................................................... 4, 31

*Cohen v. California,*
  403 U.S. 15 (1971) ........................................................................... 26, 27

*Davis v. Monroe Cnty. Bd. of Educ.,*
  526 U.S. 629 (1999) ................................................................................ 25

*Elrod v. Burns,*
  427 U.S. 347 (1976) ................................................................................ 27

*Erzoznik v. Jacksonville,*
  422 U.S. 205 (1975) ................................................................................ 25

*Flores v. Bennett,*
  635 F. Supp. 3d 1020 (E.D. Cal. 2022) ............................................... 3, 30

*Flores v. Bennett,*
  No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023) ......................... 3

*Freedman v. Maryland,*
  380 U.S. 51 (1965) .................................................................................... 1

*Healy v. James,*
  408 U.S. 169 (1972) .......................................... 4, 14, 20, 21, 28, 29, 31

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
  515 U.S. 557 (1995) ......................................................................... 16, 17

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 389 (4th Cir. 1993) .................................................. 14, 20, 26, 33

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ................................................................ 13

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ................................................................ 26

*Little Sisters of the Poor Home for the Aged v. Sebelius*,
571 U.S. 1171 (2014) .............................................................. 11

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
584 U.S. 617 (2018) ................................................................ 13

*Matal v. Tam*,
582 U.S. 218 (2017) ............................... 1, 3, 9, 21, 22, 23, 25, 30, 31

*McCauley v. Univ. of the Virgin Islands*,
618 F.3d 232 (3d Cir. 2010) ................................................... 33

*Miller v. California*,
413 U.S. 15 (1973) .................................................................. 19

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976) ........................................................ 1, 12, 18

*Neb. Press Ass'n v. Stuart*,
423 U.S. 1327 (1975) .............................................................. 32

*Papish v. Bd. of Curators of the Univ. of Mo.*,
410 U.S. 667 (1973) ........................... 3, 9, 21, 22, 23, 25, 28, 31

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......................................... 12, 21, 23, 26

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) .......................................................... 11, 28

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ..................................... 1, 20, 23, 28

*Rumsfeld v. Forum for Academic & Institutional Rights*,
547 U.S. 47 (2006) .................................................................. 18

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) .................................................. 24

*Se. Promotions, Ltd. v. Conrad,*
420 U.S. 546 (1975) ........................................... 3, 12, 13, 14, 15, 18, 19, 26

*Shuttlesworth v. City of Birmingham.*
394 U.S. 147 (1969) ........................................... 19

*Speech First, Inc. v. Cartwright,*
32 F.4th 1110 (11th Cir. 2022) ........................................... 33

*Stanley v. Georgia,*
394 U.S. 557 (1969) ........................................... 28

*Sweezy v. State of New Hampshire,*
354 U.S. 234 (1957) ........................................... 34

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
732 F.3d 535 (5th Cir. 2013) ........................................... 28

*Texas v. Johnson,*
491 U.S. 397 (1989) ........................................... 3, 13, 14, 15, 16

*U.S. v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000) ........................................... 26

*Uzuegbunam v. Preczewski,*
141 S. Ct. 792 (2021) ........................................... 30

*Widmar v. Vincent,*
454 U.S. 263 (1981) ........................................... 21, 23, 24

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ........................................... 11

*Winters v. New York*
333 U.S. 507 (1948) ........................................... 15

**Statutes**

28 U.S.C. § 1292 ........................................... 5

28 U.S.C. § 1651 ........................................... 5

28 U.S.C. § 1651(a) ........................................... 11

**Rules**

Supreme Court Rule 23.1 ........................................... 11

**Other Authorities**

Andrew R. Chow, "A Charged Title. A Canceled Show. Now a Cal State Official Resigns, " N.Y. Times (Sept. 13, 2016)......................................................29

Cebelihle Hlatshwayo, et al., "SMC 'By The River Rivanna' Production Is Cancelled," The Corsair (Oct. 20, 2023) ..................................................29

Emma Camp, "Brooklyn College Forced a Student To Take Down Anti-Israel Signs While Leaving Other Posters Untouched," Reason (Dec. 14, 2023) ...........31

Josh Hammer, "The University of Michigan Failed To Protect My Right To Free Speech," Newsweek (Nov. 24, 2023) ................................................31

Tex. A&M Univ. Sys. Office of the Chancellor, Sys. Pol'y 02.02 §§ 1.12, 2.1 ............10

Tex. A&M Univ. Sys. President of Sys. Member Univs., Sys. Pol'y 02.05.................10

Walter Wendler Full Interview, KAMR (Apr. 27, 2023)........................................9, 27

William Biagani, "Long Island University Suspends American Club for Declaring Men Are Not Women," Campus Reform (March 27, 2023) ...............4, 30

**To the Honorable Samuel A. Alito, Associate Justice of the Supreme Court of the United States and Circuit Justice for the Fifth Circuit:**

Without the Court's intervention before March 22, 2024, a viewpoint-based prior restraint will silence students at a public university.

This Application presents this Court with an extraordinary circumstance in which, for almost a year, a university president and key administrators have imposed a prior restraint on protected speech, "the most serious and the least tolerable infringement" of the First Amendment. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976). This act of censorship is predicated on nothing more than the president's personal opinion that a planned performance on campus "demeans," "mock[s]," and "denigrates" women. App. 91–93. But the president's actions defy basic constitutional principles: The First Amendment protects speech even when it is offensive because "[g]iving offense is a viewpoint," *Matal v. Tam*, 582 U.S. 218, 243 (2017), and "[v]iewpoint discrimination is . . . an egregious form of content discrimination" that is "presumptively unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829–30 (1995)**.** This act of speech suppression has endured not because the officials involved are ignorant of their constitutional duties, but despite *the president's frank confession* that his actions violate "the law of the land." App. 93.

Ordinarily, judicial review provides a constitutional safety net against prior restraints. As this Court has recognized, "[b]ecause the censor's business is to censor, there inheres the danger that he may well be less responsive than a court . . . to the constitutionally protected interest in free expression." *Freedman v. Maryland*, 380 U.S. 51, 57–58 (1965). But here, the judicial safety net broke down. The district court

denied injunctive relief without even addressing plaintiffs' prior restraint claim, and the court of appeals declined either to expedite the appeal or timely entertain a motion for injunction pending appeal. As a consequence, the university is poised to repeat and perpetuate its act of censorship, preventing the planned annual performance this coming March 22, 2024. In this unique circumstance, only this Court can halt an ongoing violation of two of the most fundamental First Amendment protections: the bars against prior restraint and viewpoint-based censorship.

Specifically, this case involves efforts by Applicants Spectrum WT, Barrett Bright, and Lauren Stovall (Plaintiffs) to perform Spectrum WT's charity drag show on March 22, 2024, at West Texas A&M University. Plaintiffs did everything by the book to get approval for a similar show in 2023, but President Walter Wendler, along with Vice President Christopher Thomas, denied Plaintiffs the use of campus facilities for the event. The president sent an edict to the university community to justify the cancellation based on what he called drag shows' supposed "ideology," claiming such performances are "derisive, divisive, and demoralizing." App. 91–93. President Wendler's decree that "West Texas A&M will not host a drag show on campus" remains in place and will block Plaintiffs' annual charity event set for March 22 unless this Court grants the requested relief.

Plaintiffs filed a complaint eleven months ago and sought a preliminary injunction after President Wendler banned the show in March 2023. The district court denied relief based on the premise that drag shows are not "inherently expressive," in the face of this Court's well-established precedents that public officials cannot use

a prior restraint to suppress an artistic performance they believe would not be "clean and healthful and culturally uplifting," *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 549–52 (1975), and that that expression "on a state university campus may not be shut off in the name alone of 'conventions of decency." *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam). The district court did not address the First Amendment's near-categorical ban on viewpoint discrimination, *Matal*, 582 U.S. at 243, or the bedrock principle that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). And while Applicants have sought expedited appeal of this clear legal error as well as an injunction pending appeal, the courts below declined to act before March 22, ensuring that neither will consider these grave constitutional questions in time for a remedy.

This would be bad enough if the problem were confined to having the president of one small public university in the Texas Panhandle defy what he knows to be the First Amendment's command. But it isn't. Public university and college officials nationwide from across the political spectrum are appointing themselves censors-in-chief, separating what they consider "good" from "bad" expression on their campuses. For instance, California's Clovis Community College refused to let students post anti-communist and pro-life flyers on a campus bulletin board, claiming they were inappropriate and offensive. *Flores v. Bennett*, 635 F. Supp. 3d 1020 (E.D. Cal. 2022), *aff'd*, No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023). And in New York, Long Island University punished students who criticized International Women's Day social

media posts celebrating transgender women, claiming the criticism was "offensive."[1] These are just two stark examples of many showing today's campus censors flouting the First Amendment's great virtue of neutrality. If courts abdicate their responsibility to provide oversight when university officials overstep constitutional bounds, it will hollow out this Court's well-settled rule that university presidents cannot arbitrarily parcel out First Amendment rights only to those groups of which they approve. *Healy v. James*, 408 U.S. 169 (1972).

Any other outcome will embolden campus leaders to silence unpopular speech on campus. The Court should grant this application, staying "true to the principle that when it comes to the interpretation and application of the right to free speech, we exercise our own independent judgment." *Christian Legal Soc'y Chapter of the Univ. of Cal. Hastings v. Martinez,* 561 U.S. 661, 721 (2010) (Alito, J., dissenting) ("[T]here is no reason why we should bow to university administrators."). In particular, the Court should grant a writ of injunction, pending appeal, prohibiting Respondents from denying Plaintiffs' use of campus facilities open to expressive activity based on the content or viewpoint of Spectrum WT's charity drag show planned for March 22, 2024. Alternatively, the Court should treat this application as a petition for a writ of certiorari, grant certiorari, and issue an injunction pending a ruling on the merits.

---

[1] William Biagani, "Long Island University Suspends American Club for Declaring Men Are Not Women," Campus Reform (March 27, 2023), https://www.campusreform.org/article/long-island-university-suspends-american-club-declaring-men-not-women-/21587.

## OPINIONS BELOW

The district court denied Plaintiffs' motion for a preliminary injunction on September 21, 2023. App. 4–29. Less than a month later, the Fifth Circuit denied Plaintiffs' motion to expedite the appeal of the district court's ruling. App. 31. On February 5, 2024, the district court declined to expedite Plaintiffs' motion for an injunction pending appeal. App. 33, Then, on February 22, 2024, the Fifth Circuit ordered that it will carry Plaintiffs' motion for an injunction pending appeal with the case. App. 36.

## JURISDICTION

Applicants have a pending interlocutory appeal in the United States Court of Appeals for the Fifth Circuit, under 28 U.S.C. § 1292. Briefing is complete, and oral argument is tentatively calendared for the week of April 29, 2024, more than a month after Spectrum WT's scheduled performance. The Court has jurisdiction under 28 U.S.C. § 1651.

## STATEMENT OF THE CASE

**West Texas A&M opens Legacy Hall to all for expressive activities.**

West Texas A&M policy prohibits "deny[ing] [a student] organization any benefit generally available to other student organizations" because of the "political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." App. 99. One of those benefits is reserving university facilities for events. App. 46–47 ¶¶ 28, 32–34. And those facilities include Legacy Hall, a performance venue open to both student

5

organizations and the public for expressive activity, including past drag shows, beauty pageants for men and women, singing competitions, concerts, and political speeches. App. 47–49 ¶¶ 33–34, 40; *see also* App. 110–117 ¶¶ 6–20; App. 126–82.

**Spectrum WT has a message to share though performance.**

Spectrum WT is a longstanding, recognized student organization at West Texas A&M. App. 41 ¶ 10. Plaintiffs Barrett Bright and Lauren Stovall are two of Spectrum WT's student leaders. App. 42–43 ¶¶ 14–15. Spectrum WT often organizes campus events like proms, movie nights, and discussions about history, all focusing on issues important to the LGBTQ+ campus community. App. 42 ¶ 13. Its members express themselves through these events, raising awareness of LGBTQ+ culture on campus and in the surrounding community. App. 41–43 ¶¶ 11, 13–15.

To that end, in November 2022, Spectrum WT started planning its first annual charity drag show for March 31, 2023, at Legacy Hall. App. 52 ¶¶ 52–56. For Spectrum WT and its members, the show was important to express support and advocate for the LGBTQ+ community. App. 55 ¶ 74. Proceeds from the event would benefit an LGBTQ+ suicide prevention charity. App. 42.

The students planned their event to be anything but risqué. They instructed performers to avoid profane music and "lewd" conduct. App. 55–56 ¶¶ 79, 81. They also planned only performances appropriate for those over 13 years old. App. 55 ¶¶ 76–79; App. 58 ¶ 94. And the students also barred minors from attending, except those accompanied by a parent or guardian so that performers' family members could attend. App. 55 ¶ 80.

University staff helped Spectrum WT plan the show, working with the students and helping them with promotional materials. App. 53 ¶ 60; App. 56–59 ¶¶ 86–94, 99–100. They expressed support for the event, praised the students' leadership, and approved the show to move forward. *Id.*

**President Wendler cancels Spectrum WT's performance, rebuking drag shows as "expression which denigrates" women.**

Eleven days before Spectrum WT's March 2023 show, Defendant and Vice President for Student Affairs Christopher Thomas informed Spectrum WT that President Wendler was canceling the drag show. App. 59 ¶¶ 103–04. Thomas explained that Wendler disliked the idea of the drag show, believing it discriminated against women. *Id.* ¶ 104.

Wasting no time, President Wendler published an edict and emailed it to the campus community, declaring that "West Texas A&M will not host a drag show on campus" because a "harmless drag show" could never be "possible." App. 91–93. Wendler's 734-word edict focused on the "ideology" underlying drag shows. *Id.* Drag, he wrote, is "a performance exaggerating aspects of womanhood (sexuality, femininity, gender)" that, through "slapstick," "stereotype women in cartoon-like extremes for the amusement of others." *Id.* And he insisted that "[d]rag shows are derisive, divisive and demoralizing," promoting "ideology" by focusing on "group membership," not "individual" achievement. *Id.*

At the same time, Wendler admitted the Constitution stood in his way:

> I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, *even when the law of the land appears to require it.*

App. 93 (emphasis added). Nowhere in Wendler's 734-word edict did he raise concerns about "lewdness" or similar conduct App. 91–93.

**Plaintiffs sue to stop Defendants' First Amendment violations.**

On March 24, 2023, Plaintiffs sued to enjoin the campus drag show ban. *See.* Dist Ct. Dkt. 1. They also moved for a temporary restraining order and preliminary injunction. Dist. Ct. Dkt. 8. As the March 31 show date neared without a TRO ruling, Spectrum WT made the difficult decision to move the event off-campus so their charity show could go on. App. 62 ¶¶ 122–126.

Shortly after, Spectrum WT applied to hold a second annual drag show on March 22, 2024. App. 201 ¶ 17. Just like the 2023 performance, Spectrum WT is planning a PG-13 performance in Legacy Hall and it is meeting the requirements to perform at the campus venue. *Id.* ¶¶ 17–28.

Seeking to prevent Defendants from imperiling the upcoming March 2024 drag show, Plaintiffs amended their complaint on April 18, 2023, App. 38–101, and their preliminary injunction motion, two days later. Dist. Ct. Dkt. 30. In response, President Wendler argued, for the first time—contrary to his edict—that drag shows are not inherently expressive. Dist. Ct. Dkt. 37 at 11–14. He also suggested for the first time that Plaintiffs' planned show was "lewd," despite never letting the students take the stage. *Id.* at 16–17. But Wendler submitted no affidavit or other evidence

that he considered "lewdness" when he exiled drag shows from campus. *See* App. 91–93. *See generally* Dist. Ct. Dkt. 37–37-4.

**The district court denies injunctive relief.**

In late September, the district court denied Plaintiffs' motion for a preliminary injunction. App. 4–29. Reasoning that "it is not clearly established that all drag shows are inherently expressive," the district court effectively held that Plaintiffs' planned drag shows lack First Amendment protection. App. 17. It also discounted *Papish* and *Southeastern Promotions* as factually different, while never addressing *Matal*. App. 17, 19–20. Equally troubling, the district court ignored Plaintiffs' prior restraint claim.[2] App. 4–29.

Plaintiffs timely appealed to the Fifth Circuit, moving to expedite the appeal on the hope they could secure injunctive relief before their upcoming March 22, 2024 show. Dist. Ct. Dkt. 61. The Court declined to expedite the appeal. App. 31. The appeal is fully briefed and is tentatively set for oral argument the week of April 29.

**President Wendler's imminent censorship is certain.**

After blocking Plaintiffs' 2023 drag show, President Wendler revealed in a television interview his determination to ban campus drag shows: "I wouldn't have done anything any differently."[3] To that end, Wendler has not renounced his public edict banishing drag shows from campus. ROA. 61 ¶ 119.

---

[2] It did hold, however, that Plaintiffs have standing as to Respondents Chancellor John Sharp and Vice President Christopher Thomas, and rejected Wendler's claim to sovereign immunity. App. 27.

[3] Walter Wendler Full Interview, KAMR (Apr. 27, 2023), https://www.myhighplains.com/video/walter-wendler-full-interview/8598931, at 25:11–26:36.

Instead, Wendler recently reaffirmed his commitment to censorship, acknowledging in the Fifth Circuit his "rejection of future drag shows." Ct. App. Dkt. 94 at 32. Wendler also claims he and other "officials" (presumably Defendants Vice President Thomas and Chancellor John Sharp) have unfettered authority to "assess" the content of students' planned events and deny Plaintiffs' "application" to host any future event. *Id.* at 1–2, 23, 36, 39, 41. For his part, Chancellor Sharp has permitted Wendler's censorship to go on for a year, despite having legal authority to stop it.[4]

**The courts below decline to expedite relief pending appeal.**

Spectrum WT is prepared to hold its scheduled March 22 drag performance. It has reserved Legacy Hall and received tentative approval for the show from university staff. App. 237 ¶ 5. All that remains for Spectrum WT is not-yet-due paperwork, like marketing materials and proof of insurance. *Id.*

In short, Spectrum WT is in the same position as it was when President Wendler cancelled their 2023 show and banned drag shows from campus. App. 59–59, ¶¶ 84–102. So on January 31, 2024, Plaintiffs moved for an injunction pending appeal in the district court under Fed. R. Civ. P. 62(d). Dist. Ct. Dkt. 82. Plaintiffs informed the district court that if it did not grant relief, they would seek an injunction pending appeal in the Fifth Circuit by February 9, 2024. *Id.* The district court declined to expedite the motion, starting it would not depart from the usual briefing

---

[4] *E.g.*, Tex. A&M Univ. Sys. Office of the Chancellor, Sys. Pol'y 02.02 §§ 1.12, 2.1 (May 20, 2021), https://policies.tamus.edu/02-02.pdf; Tex. A&M Univ. Sys. President of Sys. Member Univs., Sys. Pol'y 02.05 (Aug. 26, 2021), https://policies.tamus.edu/02-05.pdf.

deadlines. App. 33. Plaintiffs then moved for an injunction pending appeal in the Fifth Circuit on February 9. Ct. App. Dkt. 114. The Fifth Circuit declined to rule on the motion, instead carrying it with the case. App. 36.

## REASONS FOR GRANTING THE APPLICATION

This Court can and should enjoin the ongoing infringement of Plaintiffs' protected expression under the All Writs Act, which authorizes an individual Justice or the Court to "issue all writs necessary or appropriate in aid of" the Court's "jurisdiction[]." 28 U.S.C. § 1651(a); *see also* Rule 23.1. To obtain relief under Section 1651, an applicant must make a "strong showing" that it is "likely to prevail," while also showing that "denying . . . relief would lead to irreparable injury, and that granting relief would not harm the public interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A Justice or the Court may also grant injunctive relief "[i]f there is a 'significant possibility' that the Court would" grant certiorari "and reverse, and if there is a likelihood that irreparable injury will result if relief is not granted." *Am. Trucking Ass'ns, Inc. v. Gray*, 483 U.S. 1306, 1308 (1987) (Blackmun, J.) The Court may issue an injunction "based on all the circumstances of the case," without its order "be[ing] construed as an expression of the Court's views on the merits" of the underlying claim. *Little Sisters of the Poor Home for the Aged v. Sebelius*, 571 U.S. 1171, 1171 (2014).

Without an immediate injunction, a viewpoint-driven prior restraint that has hung over West Texas A&M for nearly a year will continue to irreparably injure

college students' free expression. Prior restraints are "the most serious and the least tolerable infringement" of the First Amendment, unjustified even to thwart publication of military secrets. *Neb. Press Ass'n*, 427 U.S. at 558–59. Yet one persists at a public university. That is an intolerable First Amendment violation, born of President Wendler's open disregard for the Constitution.

Here, all paths support an injunction pending appeal, or alternatively, granting certiorari and issuing an injunction pending a ruling on the merits.

## I. Plaintiffs Are Likely to Succeed on the Merits, As It Is Indisputably Clear That the University Officials Are Violating the First Amendment.

When Americans get on stage and express themselves, the First Amendment provides broad protection to their performances, even if the performances are not a government official's cup of tea. *Se. Promotions*, 420 U.S. at 557. That is why the First Amendment protects drag performance, including in a designated public forum like Legacy Hall at West Texas A&M. By denying First Amendment protection to Spectrum WT's performance, the district court departed from this Court's rulings— so sharply that even kneeling at the 50-yard line or wearing an armband in protest would fall victim to the district court's reasoning.

By banning drag performance from a public university just because he thinks it "demeans" and "mocks," President Wendler's ban on drag shows violates the First Amendment three times over. It is a prior restraint, it discriminates based on viewpoint, and it discriminates based on content in a designated public forum. Strict scrutiny applies. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And Respondents cannot meet it.

**A. Like with any stage performance, the First Amendment protects Spectrum WT's drag performance.**

The First Amendment protects stage performance, whether a drag show, a classical ballet, or a Christmas pageant. The Court confirmed this fundamental principle in *Southeastern Promotions*. 420 U.S. at 557–58. In holding otherwise, the district court deserted this Court's long-settled precedent, imperiling protected expressive conduct.

**1. The Court's precedent affirms that stage performance like drag is protected expressive conduct, including at public universities.**

This Court has "long recognized" the First Amendment's "protection does not end at the spoken or written word." *Johnson*, 491 U.S. at 404. As Justice Thomas explained, the First Amendment protects "a wide array of conduct that can qualify as expressive, including nude dancing, burning the American flag. . . . wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 657 & n.1 (2018) (Thomas, J., concurring) (collecting cases).

In *Southeastern Promotions*, the Court confirmed that the First Amendment protects stage performance, because theatre, like film, is not "subject to a drastically different standard" under the First Amendment. 420 U.S. at 557–58 (citing *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). The First Amendment makes "freedom of expression the rule," no matter whether one expresses himself through speaking, writing, acting, or dance. *Se. Promotions*, 420 U.S. at 558 (quoting *Burstyn*, 343 U.S. at 503).

That lack of a constitutional distinction makes sense. Stage performances like drag shows are inherently expressive, and have been since the Ancient Greeks took the Athenian stage and Shakespeare's plays were performed at the Globe Theatre in Elizabethan England. And as this Court made clear in *Johnson,* the First Amendment protects inherently expressive conduct. 491 U.S. at 406.

The specific context of drag shows, including Plaintiffs', cements why the First Amendment protects them. *Id.* at 405–06. Audience members, having bought a ticket to view a show promoted to raise LGBTQ+ awareness and support a suicide prevention charity, would see performers on stage dancing in eye-catching clothing and makeup, with lighting and music. App. 53 ¶¶ 40(c), (i); App. 58 ¶¶ 63–66, 94–97. With those cues, the audience would know Spectrum WT's performers are trying to communicate a message. Just as context distinguishes Cirque du Soleil from playing on a park jungle gym, it distinguishes a choreographed drag show on stage from putting on steel-toe boots for a shift at the job site.

The First Amendment protects Spectrum WT's show just as strongly on the campus stage at West Texas A&M, no different than if they took the municipal stage in *Southeastern Promotions.* This Court's decisions "leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large," and its protection is "nowhere more vital" than on college campuses. *Healy*, 408 U.S. at 180. As the Fourth Circuit correctly concluded, the First Amendment protects stage entertainment at a public university even if some might find it "low quality" and "crude." *Iota Xi Chapter of Sigma Chi*

*Fraternity v. George Mason Univ.*, 993 F.2d 389, 392 (4th Cir. 1993) (holding a fraternity's "ugly woman contest" was protected expressive conduct). So too here. The First Amendment protects Spectrum WT's campus performance, no matter if President Wendler thinks the performance will be "demeaning" and "divisive."

## 2. The district court departed from the Court's decades of precedent establishing constitutional protection for expressive conduct.

By concluding that the First Amendment does not protect Plaintiffs' show, the district court made several fundamental errors misconstruing the Court's precedent. Not only did the district court shun *Southeastern Promotions*' ruling that stage performance is not subject to a different First Amendment standard, but it also misread the Court's precedent on expressive conduct.

For one thing, the district court suggested that under *Texas v. Johnson,* the First Amendment protects only expressive conduct that conveys "'overtly political' message[s]." App. 17. *Johnson* says no such thing. Otherwise censors could prevent students from a host of expressive conduct, like kneeling to pray or displaying a wide variety of art, if it offends their tastes.

Whether one views drag performance as political commentary, high art, or slapstick entertainment, the First Amendment protects it. The Court has "long recognized that" when it comes to First Amendment protection, "it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011); *Winters v. New York*, 333 U.S. 507, 510 (1948) ("The line between the informing and the entertaining is too elusive for the protection of

that basic right. . . . What is one man's amusement teaches another's doctrine."). Likewise, when art meshes with "live entertainment, such as musical and dramatic works," it "fall[s] within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981). The Constitution does not distinguish between dancing on stage to "Born in the U.S.A." at a political rally, performing under the stage lights to Prince in a feather boa, or gliding across the stage to Tchaikovsky in a tutu.

Nor does it matter to the First Amendment if the audience cannot discern a single, specific message from a stage performance. The district court got this wrong, too. It reasoned that expressive conduct must "obviously convey or communicate a discernable, protectable message." App. 9. But the Court squarely rejected that reasoning decades ago: "[A] narrow, succinctly articulable message is not a condition of constitutional protection." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995). If the First Amendment were "confined to expressions conveying a particularized message, [it] would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id*. Thus, even if "an observer" of Plaintiffs' drag performance "may not discern that the performers' conduct communicates 'advocacy in favor of LGBTQ+ rights,'" as the district court claimed, App. 16, the First Amendment still protects Plaintiffs' performance because they intend to communicate *something*—and the audience understands that. *Johnson*, 491 U.S. at 404.

Suppose Spectrum WT were a recognized student group interested in history, taking the Legacy Hall stage to reenact the Battle of Fort Sumter. Some audience members might perceive an educational message. But others might see it as glorifying treason and slavery. Differing interpretations of the performance's message would not deprive it of First Amendment protection, even if one interpretation is offense. *See Hurley*, 515 U.S. at 569.

So too with Spectrum WT's PG-13 drag performance. The First Amendment does not teeter on President Wendler's personal sensitivities. In fact, that Wendler perceives *some* message from drag shows underscores that Plaintiffs' planned performance is inherently expressive; he calls it "artistic expression" and a "performance exaggerating aspects of womanhood," while accusing it of "impertinent gestures." That he misperceives the intended message does not deprive Plaintiffs of the First Amendment. If public officials bent on silencing expressive conduct can invoke (or invent) perceived messages to justify censorship, no viewpoint is safe— including at public universities, where too often administrators invoke offense and controversy to excuse silencing students. *See infra* Section III.

But they cannot. "[T]he First Amendment extends to all persons engaged in expressive conduct," underpinning "this Court's enduring commitment to protecting the speech rights of all comers, no matter how controversial—or even repugnant— many may find the message at hand." *303 Creative LLC v. Elenis*, 600 U.S. 570, 600–

01 (2023).[5] And that is the heart of this case: The Constitution bars public universities from wrapping censorship in concerns about controversy, offense, or upset feelings.

### B. The district court's refusal to consider the ongoing prior restraint highlights why this is an extraordinary case, making the Court's intervention vital.

For nearly a year, a ban on drag performance has persisted at West Texas A&M—all before Plaintiffs took the stage, and all because President Wendler thinks the shows will demean and mock others. That is a classic prior restraint, "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. Yet in denying Plaintiffs a preliminary injunction, the district court did not address the prior restraint once. *See* App. 4–29. When a federal court fails to address such an intolerable prior restraint, let alone enjoin it, this Court's intervention is both necessary and appropriate.

*Southeastern Promotions* shows why Wendler's ban is unconstitutional. There, the Court concluded that city officials imposed a prior restraint by excluding the musical "Hair" from a municipal theater because it did not fit the city's "clean and healthful and culturally uplifting" criteria. 420 U.S. at 549. President Wendler's edict imposed a prior restraint on Spectrum WT based on a similar rationale: He barred

---

[5] The district court also claimed the Court's decision in *Rumsfeld v. Forum for Academic & Institutional Rights (FAIR)*, 547 U.S. 47, 66 (2006), limits First Amendment protection for inherently expressive stage performance like Spectrum WT"s show. App. 15 & n.16. Not so. As Chief Justice Roberts noted during oral argument in *303 Creative*, *FAIR* "involved [law] schools providing rooms for the military recruiter," and "what the Court said is empty rooms don't speak." Tr. of Oral Arg. At 65:1–9, *303 Creative*, 600 U.S. 570 (2023) (No. 21-476). A stage filled with costumed and choreographed performers dancing to music under the lights is no empty room. It is inherently expressive, and thus protected. And as the Court's opinion in *303 Creative* confirmed, "[n]o government, *FAIR* recognized . . . may 'interfer[e] with' [a speaker's] 'desired message.'" 600 U.S. at 596 (quoting *FAIR*, 547 U.S. at 64).

Plaintiffs' drag shows from campus forums because their message does not meet Wendler's criteria about what does or does not "demean women." App. 93.

Under *Southeastern Promotions*, public officials cannot bar stage performances "in advance of actual expression," except where two stringent requirements are met: First, the performance "must fit within one of the narrowly defined exceptions to the prohibition against prior restraints," like obscenity; and second, the system for preemptively banning the performance must be "bounded" by "narrow, objective, and definite standards." 420 U.S. at 553, 559 (quoting, in part, *Shuttlesworth v. City of Birmingham*. 394 U.S. 147, 150–51 (1969)).

The University officials have met neither here. On the former, Wendler's edict does not even hint at obscenity, nor has he argued that Spectrum WT's performance would qualify as obscenity. *See Miller v. California*, 413 U.S. 15, 24 (1973) (to qualify as obscene, the expression must "appeal to the prurient interest in sex," "portray sexual conduct in a patently offensive way," and "not have serious literary, artistic, political, or scientific value"). On the latter, Wendler had "unbridled discretion" to decide whether Spectrum WT's performance could go on, the content of which he had no way of knowing in advance. *Se. Promotions*, 420 U.S. at 553. As the Court explained in *Southeastern Promotions*, "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand," when "the risks of freewheeling censorship are formidable." *Id.* at 559. Thus, only *after* misconduct occurs can the University enforce a constitutional policy against it.

Under *Southeastern Promotions*, then, Wendler's edict should never have survived a day, let alone an entire year. Nor is there any distinction between a municipal stage and one at a public university: The First Amendment stands strong at both. *Healy*, 408 U.S. at 180; *see also Iota Xi*, 993 F.2d at 392–93.

And it must. Too often public university officials block controversial speech for ideological reasons or impose unbounded speech-licensing schemes, just as President Wendler has. *See infra* Section III. Only the First Amendment and the "heavy presumption against [a prior restraint's] constitutional validity" stand in the way. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Nothing Wendler or the University can muster overcomes that heavy presumption: They have banned protected expression from campus forums for nearly a year, just to placate Wendler's sensitivities. The Court should immediately enjoin that prior restraint at West Texas A&M.

### C. President Wendler's edict discriminates against perceived "offensive" viewpoints.

A government official must overcome strict scrutiny when he preemptively stops a stage performance from going forward because he thinks it may offend. In striking down a restriction of speech at a prominent public university, the Court left no doubt: "Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. "Denigrat[ing]," "demeaning," or otherwise offending others via a stage performance are viewpoints Wendler perceives—and strongly disagrees with. App. 92. So when Wendler chose to block Spectrum WT's performance before it happened because of that disagreement, he

imposed an ongoing prior restraint based on viewpoint discrimination. And in cases of viewpoint discrimination, this Court applies strict scrutiny.

If Spectrum WT's performance is allowed to go forward, it will take place at Legacy Hall, a venue the University has opened to student organizations and the public for expressive activity. App. 47–49 ¶¶ 33–34, 40; *see also* App. 110–117 ¶¶ 6–20; App. 126–82. That makes it a designated public forum on campus, where any content-based restriction is subject to strict scrutiny. *See Widmar v. Vincent*, 454 U.S. 263, 269–70 (1981) (applying strict scrutiny to denial of religious student group's use of a "generally open forum" at a public university campus); *Reed v. Town of Gilbert*, 576 U.S. at 163 (holding content-based restrictions are subject to strict scrutiny). Two Supreme Court cases make clear that Wendler cannot preemptively block a stage performance at such a forum because of potentially offensive content: *Papish* and *Matal*. Either case should have compelled the district court to enjoin Wendler's ban, but the combination deals it a lethal blow.

In *Papish*, the Court held the First Amendment prohibits universities from restricting student speech because it is immoral or indecent. *Papish* was a per curiam opinion, but it was only so short because the Court considered the result to be so obvious. 410 U.S. at 670 (noting that the result was "clear"). The Court had just ruled on *Healy*, which held that a university president could not deny a student club recognition based his disagreement with the group's "philosophy." 408 U.S. at 187–88 ("The College, acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be

abhorrent."). Relying on this holding, the *Papish* Court held that "the mere dissemination of ideas—no matter how offensive to good taste—on a state university may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670. Wendler clearly views drag shows in the same light that the University of Missouri chancellor in *Papish* viewed political cartoons of "policemen raping the Statue of Liberty." *Id.* at 667. But no matter how personally abhorrent Wendler may find such performances, *Papish* makes clear that the First Amendment requires he let the show go on.

*Matal* is the final nail in the coffin for Wendler's edict because it affirms the "bedrock First Amendment principle" that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal*, 582 U.S. at 223. At issue was a "disparagement clause" in the trademark code that denied trademark registration to any mark that was "offensive" to "any person, group, or institution." *Id.* at 243, 246 (emphasis omitted). The Court rejected the idea that an "evenhanded[]" prohibition on all disparagement was viewpoint-neutral. *Id.* at 243. Even though the disparagement clause "applie[d] equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue," it still discriminated on the basis of viewpoint, because ultimately, "[g]iving offense is a viewpoint." *Id.*

President Wendler's rationale for banning Spectrum's performance maps onto *Matal* so well it could be a verbatim quote: He finds their message "derisive, divisive and demoralizing misogyny." App. 92. But just as the Trademark Office could not refuse to register Simon Tam's mark he used to empower because those officials

thought it would disparage, Wendler and other University officials cannot bar Plaintiffs' stage performance they use to empower because Wendler thinks it will demean. *See Matal*, 582 U.S. at 228. Wendler's offense at Spectrum WT's performance was the sole basis for his ban, and that is nothing but viewpoint discrimination. Yet the district court did not address *Matal*. *See* App. 4–29.

The combination of *Papish* and *Matal* should have made Wendler's prior restraint on offensive performance dead on arrival. Viewpoint discrimination alone is grounds for strict scrutiny, particularly in a designated public forum. *Rosenberger,* 515 U.S. at 828 ("Discrimination against speech because of its message is presumed to be unconstitutional."); *accord Reed*, 576 U.S. at 163 ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."). That is why, for example, a public university could not bar a student group from publishing a religious magazine. *Rosenberger*, 515 U.S. at 835–37. Banning expression from a public campus, based merely on the fact that a university president finds it offensive, should invite the highest degree of constitutional skepticism from this Court. And as the next section demonstrates, Wendler's edict fails that skepticism and strict scrutiny.

**D. The University officials' ongoing viewpoint- and content-based ban on drag performance cannot survive strict scrutiny.**

The University officials cannot show that the ban on drag shows "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar,* 454 U.S. at 270. In no case do public university officials have a

compelling interest in banishing a class of protected speech from campus like President Wendler has done.

The Court rejected a similar viewpoint-driven speech restriction in *Widmar*, explaining that singling out a Christian student group from facilities "available for . . . registered student groups" was subject to "the most exacting scrutiny." *Id*. at 264–65, 276. Because the university "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in" protected expression, the Supreme Court concluded that the university's stated goal, "achieving greater separation of church and State," was not a compelling interest. *Id*. at 269, 277–78.

In the same way, advancing President Wendler's belief that drag shows "demean" women and promote "misogyny" is not a compelling interest that excuses preemptively barring protected expression from a designated public forum. App. 92–93. Drag shows present no tangible harm to women—and the University has failed to show otherwise. At most, Wendler's edict contains offhand remarks about the "U.S. Equal Opportunity Commission," "prejudice in the workplace and our campus," and "humor becom[ing] harassment" App. 92–93, which the district court pointed to in not enjoining Wendler's censorship. App.10. But Wendler's edict states no more. Even if he had detailed his concerns about "harassment," it would not justify censorship: "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist*., 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.). Muzzling expression that offends or demeans is unconstitutional viewpoint

discrimination, even if it flows from an interest in curbing prejudice or harassment. *See Matal*, 582 U.S. at 243; *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (recognizing the "severe, pervasive, and objectively offensive" standard for harassment in education).

Here, any interest in preventing harassment is especially weak, given that Plaintiffs will perform in front of a willing audience in an enclosed space. A compelling interest demands more, for good reason. Permitting public university presidents to quash speech on flimsy concerns about harassment would endanger protected expression from political speech to pure entertainment.

While Wendler claimed an interest in trying to prevent "lewd" conduct only after Plaintiffs sued, Dist. Ct. Dkt. 37 at 14–16,[6] that does not make out a legitimate interest, let alone a compelling one. Indeed, the Court all but settled in *Papish* that censoring speech on a state university campus in the name of "lewdness" does not

---

[6] The district court went a step further, fixating on interests in protecting minors from "sexualized" speech. App. 9. Not even Wendler went so far. In any case, those interests are not compelling for several reasons. First, labeling protected expression like drag shows "lewd" or "sexualized" does not give the University a license to censor those shows, especially when Plaintiffs have never taken the stage. Second, neither "lewd" nor "sexualized" expression fall within the few narrow categories of unprotected speech, like "obscenity" does, and no one has claimed the shows are obscene. *See Brown* 564 U.S. at 804. Third, censorship on a college campus because officials deem it "sexualized" serves no compelling interest; otherwise, expressive conduct from displaying a replica of Michelangelo's David to ballet dancers in skin-tight outfits would be at the mercy of every college administrator's particular tastes. Finally, expression "cannot be suppressed solely to protect the young from ideas or images" that an official "thinks unsuitable for them." *Erzoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). That includes on a university campus: In *Papish*, the Court upheld the First Amendment right to distribute what university officials called "indecent" material, even in a part of campus the dissent described as frequented by "many" minors. *Papish*, 410 U.S. at 670; *id.* at 675–76 (Rehnquist, J., dissenting). And here, Plaintiffs empower parents to decide, prohibiting minors from a ticketed PG-13 show on a university campus after-hours unless accompanied by a parent or guardian. App. 55 ¶ 80; App. 201 ¶ 19; *cf. Brown* 564 U.S. at 804 (2011) (officials cannot dictate what "parents ought to want.")

serve a compelling interest. 410 U.S. at 669–70. And in all cases, concerns about potential "lewdness" do not justify a prior restraint on theatrical performance. *Se. Promotions*, 420 U.S. at 555.

What is more, Wendler offered no evidence that he considered "lewdness" when banning drag shows; in fact, his edict is silent on it. App. 91–93. The Court has cautioned against the dangers of after-the-fact justifications for interfering with free expression. *E.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022). Those dangers are at a zenith here.

Not only does the University fail the compelling interest requirement, but it fails narrow tailoring and the least-restrictive means requirements, too. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (content-based regulation must "choose[] the least restrictive means to further the articulated interest") (cleaned up). A content-based law is not narrowly tailored if it leaves untouched a significant amount of expression causing the same problem. *Reed*, 576 U.S. at 172. And that's exactly what this ban does, leaving untouched music, visual art, books, cheerleading, or other expression that some might think demeans women. *See Iota Xi*, 993 F.2d at 393 ("[A] public university has many constitutionally permissible means to protect female and minority students" short of censorship.).

At bottom, exiling protected expression from a university campus just to shield some from offense is neither narrowly tailored nor a least restrictive means. Instead, those who find a drag show offensive can simply not attend and "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen v.*

*California*, 403 U.S. 15, 21 (1971). As this Court observed, "the First Amendment leaves matters of taste and style so largely to the individual," because government officials "cannot make principled distinctions" between what is "palatable" or "distasteful." *Id.* at 25. President Wendler, like so many censors before him, has proven this Court right.

## II.   Without a Swift Injunction Against the Ongoing Prior Restraint, Plaintiffs Will Suffer Irreparable Harm to Their Expressive Freedoms.

Wendler has every intent to enforce the ban against Plaintiffs' future drag shows, like the one planned for March 22, 2024. App. 63 ¶ 130(b). He has refused to renounce his published edict. App. 61 ¶ 119. At the same time, Wendler declared that "I wouldn't have done anything any differently."[7] He even recently defended his "rejection of future drag shows," claiming power to deny Spectrum WT's "application" for future events. Ct. App. Dkt 94 at 1–2, 23, 32 36, 39, 41.

In the end, Plaintiffs' performance will most likely never see the campus stage without an immediate injunction, causing them irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). And Plaintiffs' loss of First Amendment freedoms here has exceeded any "minimal period." For nearly a year, Plaintiffs and their fellow students have lived under a prior restraint imposing President Wendler's preferred values over campus expression. Not only has this ongoing censorship stifled Plaintiffs' right to express themselves, but it

---

[7] *See supra* note 3, "Walter Wendler Full Interview."

also has stifled their fellow students right to see and hear Spectrum WT's performances. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]his right to receive information and ideas, regardless of their social worth, is fundamental to our free society.") (citation omitted). Swift intervention to enjoin that prior restraint and restore the First Amendment to campus cannot come soon enough.

## III. Ensuring Public University Presidents Do Not Impose Their Views Over Free Expression on Campus is Critical to the Public Interest.

Protecting First Amendment rights is always in the public interest. *See, e.g., Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19–21; *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted). And at America's public universities, "[t]he vigilant protection of constitutional freedoms is nowhere more vital," as they are "peculiarly the 'marketplace of ideas." *Healy* 408 U.S. at 180–81 (citations and internal quotation marks omitted); *see also Rosenberger*, 515 U.S. at 836 ("For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses."). So when campus officials single out speech they find distasteful just to censor it, enjoining that censorship serves the public interest in protecting First Amendment rights. *See, e.g., Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19–21.

Enjoining that censorship also meets the strong public interest in free expression on college campuses. *E.g.*, *Papish*, 410 U.S. at 668–70. Alas, judicial intervention to defend that public interest is no less needed today than it was 50 years

ago when the Court decided *Papish* and *Healy*. The modern campus censor regularly ignores the First Amendment, retreating into vague and infantilizing justifications about offense and divisiveness, just like President Wendler has. Or they offer bare-faced ideological reasons for muzzling free expression. Either way, examples beyond West Texas A&M paint an ever-stark tide of campus censorship. One that immediate action from this Court can help quell.

Wendler is far from the only administrator trying to stifle expression on the public university performance stage. For instance, administrators at Santa Monica College hassled students to cancel a play depicting a romantic relationship between an enslaved man and a male slave owner in the 1850s after some "employee-based organizations" complained it contained offensive themes. Cebelihle Hlatshwayo et al., "SMC 'By The River Rivanna' Production Is Cancelled," The Corsair (Oct. 20, 2023).[8] The show's playwright had "no reason to believe [students] would have voted to cancel the play if the . . . administration hadn't harassed them." *Id.* Likewise, administrators at California State University, Long Beach canceled a scheduled performance of the play "N*W*C" (standing for "nigger," "wetback," and "chink") because the university's president received complaints about the title. Andrew R. Chow, "A Charged Title. A Canceled Show. Now a Cal State Official Resigns," N.Y. Times (Sept. 13, 2016).[9] The president's heavy-handed censorship silenced three actors of Black, Asian, and Latino

---

[8] https://www.thecorsaironline.com/corsair/2023/10/20/smc-by-the-river-rivanna-production-is-cancelled.

[9] https://www.nytimes.com/2016/09/14/theater/a-charged-title-a-canceled-show-now-a-cal-state-official-resigns.html.

descent who, like the speaker from *Matal*, use the slurs to reclaim them and quell their harmful effects. *Id.* Unwilling "to continue working for someone that canceled a show like that," the university's performing arts director resigned. *Id.*

So too have public college officials trampled student speech to stake out positions in the culture wars. For example, in California, a local college official withheld approval for a registered student organization to post anti-communist and pro-life flyers on a student bulletin board, claiming the flyers conveyed "inappropriate or offense language or themes." *Flores*, 635 F. Supp. 3d at 1027–28. And in March 2023, administrators at Long Island University suspended a registered student organization for its Instagram posts criticizing International Women's Day posts celebrating transgender women, pointing to the school's "respect for others" requirement. William Biagani, "Long Island University Suspends American Club for Declaring Men Are Not Women," Campus Reform (Mar. 27, 2023).[10]

Today's public college censor even targets religious speech. Chike Uzuegbunam sought to share his Christian faith with fellow students in the public spaces of Georgia's Gwinnett College. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). But although Uzuegbunam obtained a permit and spoke in a designated location, a campus police officer ordered to him to stop and threatened disciplinary action because "people had complained about his speech." *Id.* at 797.

---

[10] https://www.campusreform.org/article/long-island-university-suspends-american-club-declaring-men-not-women-/21587.

In short, public college officials remain all too willing to embrace censorship under an inconsistently-raised banner of fighting offense, discomfort, and harassment. Just take the Israel-Hamas conflict, revealing a host of campus censors eager to silence speech—on both sides—in the name of preventing offense.[11] If history tells us anything, it is that public university presidents will keep abusing their authority trying to submit free expression to their subjective values. So long as public university officials shun the Court's commands from cases like *Papish*, *Healy*, and *Matal*, the courts must exercise "independent judgment" and refuse to "bow to university administrators" who fancy themselves arbiters of what speech is worthy. *Christian Legal Soc'y*, 561 U.S. at 721 (Alito, J., dissenting). Indeed, for students, the First Amendment—and the courts tasked with upholding it—are the last line of defense against public university administrators cowed by other students, faculty, lawmakers, donors, and squeaky wheels.

But here, the courts below declined that vital role, failing to halt President Wendler's year-long campaign of knowingly violating this Court's clear holdings against prior restraints and against viewpoint discrimination on college campuses. When that happens, extraordinary circumstances are at hand—and they call for this

---

[11] *See, e.g.,* Emma Camp, "Brooklyn College Forced a Student To Take Down Anti-Israel Signs While Leaving Other Posters Untouched," Reason (Dec. 14, 2023) https://reason.com/2023/12/14/brooklyn-college-forced-a-student-to-take-down-anti-israel-signs-while-leaving-other-posters-untouched (police officers at Brooklyn College forcing student to remove two door signs that read "Free Palestine" and "Zionism is fascism," while leaving other political door signs untouched); Josh Hammer, "The University of Michigan Failed To Protect My Right To Free Speech," Newsweek (Nov. 24, 2023), https://www.newsweek.com/university-michigan-failed-protect-my-right-free-speech-opinion-1846259 (University of Michigan heckler's veto of a pro-Israel speech hosted by Young Americans for Freedom).

Court's intervention. The Court should enjoin Respondents from blocking Plaintiffs' access to the campus stage as the First Amendment guarantees, and reaffirm the First Amendment's primacy at our public universities.

## IV. Alternatively, the Court Should Treat This Application as a Petition for Certiorari and Grant Certiorari Now, As This Case Reveals Conflict Between Lower Courts Over a Constitutional Issue of Immediate Importance.

The district court's rationale (untouched by the Fifth Circuit pending appeal) for denying Spectrum WT and its members the right to perform splits with the Third, Fourth, and Eleventh Circuits (as well as several of this Court's rulings, *see supra* Section I), on an issue of great national importance, so this Court will very likely grant certiorari when the merits appeal percolates up through the Fifth Circuit. That satisfies the standard for injunctive relief under the All Writs Act, which permits an injunction when there is a "significant possibility that this Court would grant plenary review and reverse" the courts below, and supports this Court granting an injunction pending appeal. *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1331 (1975).

When the Fifth Circuit decided to carry Spectrum WT's emergency motion with its merits appeal, it effectively denied it by guaranteeing that no decision will come out in time for Spectrum WT's scheduled performance.  App. 36. Plaintiffs' appeal has been tentatively calendared for oral argument the week of April 29, and no ruling will issue for at least weeks or months later. That will be far too late for Spectrum WT's performance to go forward on March 22, 2024.

When the merits of this case do make it to this Court, there is a "significant possibility" this Court will grant certiorari: Any grounds for ruling against Plaintiffs

will create a circuit split with at least the Third, Fourth and Eleventh Circuits. In *Iota Xi*, the Fourth Circuit ruled that a college stage performance was protected by the First Amendment, and the university administration violated the First Amendment when they sanctioned fraternity members based on viewpoint. 993 F.2d at 393. The fraternity's "ugly woman contest" skit featured various male students dressed up "as caricatures of different types of women," and even the fraternity admitted "the contest was sophomoric and offensive." *Id.* at 387–88. When university officials sought to punish the fraternity for this display, the Fourth Circuit held that they did so "because [the fraternity's performance] ran counter to the views the University sought to communicate to its students and the community." *Id.* at 393. That court forbade University officials from "silencing speech," including drag, "on the basis of its viewpoint." *Id.* at 393.

Similarly, though less directly apposite on the facts, the Third and Eleventh Circuits have both held that university rules addressing harassment must yield to the First Amendment, not the other way around. *Compare, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125–29 (11th Cir. 2022) ("[I]t is imperative that colleges and universities toe the constitutional line when monitoring, supervising, and regulating student expression."), and *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 252 (3d Cir. 2010) (concluding that a university harassment provision was "overbroad in violation of the First Amendment" because it could "be used to punish *any* protected speech, without forewarning"), *with* App. 10 (district court ruling that "binding

harassment laws, regulations, and policies" must be considered as to whether Wendler's edict violated "applicable Free Speech standards").

For these same reasons and others articulated throughout this application, in the alternative, the Court should treat this application as a petition for certiorari and grant certiorari, with an interim injunction that would allow Spectrum WT's performance to go forward on March 22, 2024. Certiorari is warranted due to the important federal questions at issue, the conflicts with this Court's precedents, and the decision's creation of a growing split in authority over what protection to afford offensive stage performances on campus.

## CONCLUSION

The First Amendment's promise of neutrality is at its zenith at America's public colleges and universities, where "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 (1957). But President Wendler has deprived West Texas A&M students of that promise for a year—and knowingly so. When courts below have allowed a viewpoint-based prior restraint to persist, the judicial safety net has broken down.

Under these extraordinary circumstances, the Court should intervene and immediately enjoin Respondents, pending appeal, from denying Plaintiffs' use of campus facilities open to expressive activity based on the content or viewpoint of Plaintiffs' planned March 22, 2024 drag show performance.

Respectfully Submitted,

/s/ JT Morris

Adam B. Steinbaugh　　　　　　　Robert Corn-Revere
Jeffrey D. Zeman　　　　　　　　JT Morris
FOUNDATION FOR INDIVIDUAL　　　*Counsel of Record*
RIGHTS AND EXPRESSION　　　　　Conor T. Fitzpatrick
510 Walnut St.　　　　　　　　　Joshua T. Bleisch
Suite 900　　　　　　　　　　　FOUNDATION FOR INDIVIDUAL
Philadelphia, PA 19106　　　　　RIGHTS AND EXPRESSION
　　　　　　　　　　　　　　　700 Pennsylvania Ave.
　　　　　　　　　　　　　　　Suite 340
　　　　　　　　　　　　　　　Washington, DC 20003
　　　　　　　　　　　　　　　215-717-3473
　　　　　　　　　　　　　　　jt.morris@thefire.org

Dated: March 4, 2024　　　　　　Counsel for Applicants

# ATTACHMENT C

# In the Supreme Court of the United States

---

SPECTRUM WT, ET AL.,

*Applicants,*

*v.*

WALTER WENDLER, ET AL.

*Respondents*

---

## PRESIDENT WALTER WENDLER'S RESPONSE IN OPPOSITION TO THE APPLICATION FOR WRIT OF INJUNCTION PENDING APPEAL OR, IN THE ALTERNATIVE, PETITION FOR WRIT OF CERTIORARI BEFORE JUDGMENT

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Lanora.Pettit@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General
  *Counsel of Record*

JOSEPH N. MAZZARA
Assistant Solicitor General

*Counsel for President Walter Wendler*

# TABLE OF CONTENTS

Page

Table of Authorities.................................................................................................ii

Parties to the Proceeding....................................................................................vi

Related Proceedings.............................................................................................vi

Introduction.............................................................................................................1

Statement of the Case..........................................................................................2

    I.   Factual Background.....................................................................................2

    II.  Procedural Background...............................................................................4

Summary of the Argument...................................................................................6

Argument....................................................................................................................9

    I.   Applicants' dilatory conduct precludes any form of equitable relief.......9

    II.  Relief under the all writs act is unwarranted........................................11

    A.  A writ of injunction is neither necessary nor appropriate in aid of this Court's jurisdiction....................................................................................11

    B.  The legal rights at issue are not indisputably clear...............................12

        1.  The First Amendment does not apply to non-expressive conduct.........13

        2.  Even if the First Amendment applies, the challenged policy satisfies the applicable forum analysis...........................................17

    III. Certiorari before judgment is unwarranted..........................................23

Conclusion...............................................................................................................26

**Page(s)**

**Cases:**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ...........................................................24

*Barnette v. Wells Fargo Nev. Nat'l Bank of S.F.,*
  270 U.S. 438 (1926) .............................................................9

*Bd. of Educ. of Hendrick Hudson Cent. School Dist. v. Rowley,*
  458 U.S. 176 (1982) ...........................................................19

*Benisek v. Lamone,*
  585 U.S. 155 (2018) ......................................................1, 6, 9

*Biden v. Nebraska,*
  143 S. Ct. 477 (2022) .........................................................24

*Brown v. Gilmore,*
  533 U.S. 1301 (2001) (Rehnquist, C.J., in chambers)............6, 8, 10, 13

*Chapman v. Bd. of Cnty. Comm'rs of Douglass Cnty.,*
  107 U.S. 348 (1883) .............................................................9

*Cheney v. U.S. Dist. Court for D.C.,*
  542 U.S. 367 (2004) .............................................................9

*Christian Legal Soc. v. Martinez,*
  561 U.S. 661 (2010) .......................................................7, 17-21

*Clark v. Cmty. For Creative Non-Violence,*
  468 U.S. 288 (1984) ...........................................................13

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
  473 U.S. 788 (1985) ...........................................................18

*Dep't of Com. v. New York,*
  139 S. Ct. 953 (2019) .........................................................24

*Dep't of Educ. v. Brown,*
  143 S. Ct. 541 (2022) .........................................................24

*Elmendorf v. Taylor,*
  23 U.S. 152 (1825) .............................................................9

*Fishman v. Schaffer,*
  429 U.S. 1325 (1976) (Marshall, J., in chambers) ...........................9, 12

*Hobby Lobby Stores, Inc. v. Sebelius,*
  568 U.S. 1401 (2012) (Sotomayor, J., in chambers)........................7, 11, 12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
  515 U.S. 557 (1995) ...........................................................16

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
  993 F.2d 386 (1993) .........................................................15-16

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ...........................................................24

*Lux v. Rodrigues,*
　561 U.S. 1306 (2010) (Roberts C.J., in chambers)............................................11-12

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy,*
　141 S. Ct. 2038 ........................................................................................................ 25

*Matal v. Tam,*
　582 U.S. 218 (2017) ...........................................................................................21-22

*McIntyre v. Ohio Elections Comm'n,*
　514 U.S. 334 (1995) ............................................................................................... 25

*Moyle v. United States,*
　144 S. Ct. 540 (2024) ............................................................................................. 23

*Ohio Citizens for Responsible Energy, Inc. v. NRC,*
　479 U.S. 1312 (1986) (Scalia, J., in chambers) ................................................ 1, 11

*Papish v. Board of Curators of the University of Missouri,*
　410 U.S. 667 (1973) ....................................................................2, 8, 12, 21-22

*Respect Me. PAC v. McKee,*
　562 U.S. 996 (2010) ........................................................................................... 1, 11

*Rosenberger v. Rectors and Visitors of the Univ. of Va.,*
　515 U.S. 819 (1995) ...................................................................................18-19, 21

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
　547 U.S. 47 (2006) ......................................................................................5, 7, 13-16

*S. Pac. Co. v. Bogert,*
　250 U.S. 483 (1919) ................................................................................................. 6

*Sample v. Barnes,*
　55 U.S. 70 (1852) ..................................................................................................... 9

*Southeastern Promotions v. Conrad,*
　420 U.S. 546 (1975) .......................................................................................... 15, 18

*Spectrum WT v. Wendler,*
　No. 23-10994 (Feb. 22, 2024) .....................................................................3, 6, 10-11

*Spence v. State of Wash.,*
　418 U.S. 405 (1974) ............................................................................................... 13

*Texas v. Johnson,*
　491 U.S. 397 (1989) .......................................................................................5, 13, 15-16

*Trump v. United States,*
　No. 23A745, 2024 WL 833184 (U.S. Feb. 28, 2024).............................................. 24

*Turner Broad. Sys., Inc. v. FCC,*
　507 U.S. 1301 (1993) (Rehnquist, C.J., in chambers)......................................1, 11-12

*United States v. O'Brien,*
　391 U.S. 367 (1968) ......................................................................................5, 13-14, 22

*United States v. Stevens,*
　559 U.S. 460 (2010) ............................................................................................... 15

*United States v. Texas,*
　142 S. Ct. 14 (2021) ............................................................................................... 24

*United States v. Trump*,
  144 S. Ct. 539 (2023) .................................................................................. 24

*Upton v. Tribilcock*,
  91 U.S. 45 (1875) ........................................................................................ 1

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) .................................................................................. 1, 9

*West Virginia v. B. P. J., by Jackson*,
  143 S. Ct. 889 (2023) (Alito, J., dissenting from denial of application to
  vacate injunction) ...................................................................................... 9

*Whole Woman's Health v. Jackson*,
  142 S. Ct. 415 (2021) ................................................................................ 24

*Widmar v. Vincent*,
  454 U.S. 263 (1981) .............................................................................. 19, 21

**Constitutional Provisions and Statutes and Rules:**

U.S. Const. amend. I ........................................... 5, 7, 12-17, 19, 22, 24-25

28 U.S.C. § 1651(a) ........................................................................................ 1

Fed. R. App. P. 31 ........................................................................................ 10

Sup. Ct. R.:
  10 ............................................................................................................... 23
  11 ............................................................................................................... 23
  20.1 ........................................................................................................ 1, 6

**Other Authorities:**

*A Bit of Fry and Laurie*'s "Iron Skit," Season 2, Episode 1,
  https://www.youtube.com/watch?v=dUM6MxqaMDA (last accessed on
  March 12, 2024) ........................................................................................ 16

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal
  Practice and Procedure* § 2948.1 (3d ed. 2023) ...................................... 9

Dr. Walter V. Wendler, WEST TEXAS A&M, https://tinyurl.com/mr3mmtuz ...................... 20

Elies Baltimore, *Myss Myka Peforming 2-23-24*, YouTube (Feb. 27, 2023),
  https://www.youtube.com/watch?v=QR9BjFpPeK0 (last accessed on
  March 12, 2024) .......................................................................................... 3

Fifth Circuit Clerk's Office, *Most Frequently Asked Questions* 11,
  https://www.ca5.uscourts.gov/docs/default-source/forms-and-documents-
  --clerks-office/faqs/faqs.pdf (last accessed March 12, 2024) .................. 10

Jamelle Bouie, *The Supreme Court is Turning Into a Court of First Resort*,
  NEW YORK TIMES (Dec. 7, 2022) .............................................................. 23

Kaitlyn Bancroft, *A Black USU grad says a professor drew a racist cartoon
  of him. Now he's suing*, KSL.com (Mar. 21, 2023),
  https://www.ksl.com/article/50605040/a-black-usu-grad-says-a-professor-
  drew-a-racist-cartoon-of-him-now-hes-suing .......................................... 22

"Ladies of the Chorus" in Ronald Reagan's movie *This is the Army*, http://tinyurl.com/mu664msb (last accessed on March 12, 2024) .......................... 16

Lorraine Boissoneault, *Noose Found in National Museum of African American History and Culture*, Smithsonian Magazine (May 31, 2017), https://www.smithsonianmag.com/smithsonian-institution/noose-found-national-museum-african-american-history-and-culture-180963519/. ............................. 22

Miss Myka's performance, https://www.youtube.com/watch?v=QR9BjFpPeK0 (last accessed on March 12, 2024) ................................................................................................. 16

Model Code of Student Conduct, Foundation for Individual Rights in Education (FIRE) 13, https://tinyurl.com/48scr44y ........................................... 18

Mone Bassu & Daphne Sashin, *Students in blackface re-enact Chris Brown beating Rihanna*, CNN (Oct. 17, 2012), https://www.cnn.com/2012/10/16/us/new-york-blackface-skit/index.html ..................... 22

Oral Argument Hearings for March, 2024, U.S. Court of Appeals for the Fifth Circuit, https://www.ca5.uscourts.gov/oral-argument-information/court-calendars/MonthYear/2024/3/ ................................................... 10

Stephen M. Shapiro et al., Supreme Court Practice § 4.20 (11th ed. 2019) ............................................................................................................ 23

Steve Vladeck, *The rise of certiorari before judgment*, SCOTUSBLOG (Jan. 25, 2022), https://tinyurl.com/2bdpe39e ...................................................................... 23

*Trans/Non-Non-binary Resources*, W. TEX. A&M UNIV., http://tinyurl.com/bdz4a7uv ............................................................................................ 4

Transcript of Oral Argument at 19-20, *Moody v. Netchoice*, No. 22-277 (Feb. 26, 2024), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/22-277_8n59.pdf ........................................................................................................... 14

*WTAMU Resources*, W. TEX. A&M UNIV., http://tinyurl.com/2hu38rtj ................................. 4

## Parties to the Proceeding

Applicants (plaintiffs-appellants below) are Spectrum WT; Barrett Bright; and Lauren Stovall.

Respondent (defendants-appellees below) are President Walter Wendler; Dr. Christopher Thomas; John Sharp; Robert L. Albritton; James R. Brooks; Jay Graham; Tim Leach; Bill Mahomes; Elaine Mendoza; Michael J. Plank; Cliff Thomas; Demetrius L. Harrell, Jr.; and Michael A. Hernandez, III.

## Related Proceedings

United States District Court (N.D. Tex.):

*Spectrum WT v. Wendler*, No. 2:23-cv-48 (Sept. 21, 2023).

*Spectrum WT v. Wendler*, No. 2:23-cv-48 (Feb. 5, 2024).

United States Court of Appeals (5th Cir.):

*Spectrum WT v. Wendler*, No. 23-10994 (Feb. 22, 2024).

Applicants ask for perhaps the most difficult form of relief this Court can offer: an injunction pending appeal under the All Writs Act (either with or without a grant of certiorari before judgment). "Such a request 'demands a significantly higher justification' than a request for a stay, because unlike a stay, an injunction 'does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts.'" *Respect Me. PAC v. McKee*, 562 U.S. 996 (2010) (mem.) (citing *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, J., in chambers)). That is particularly so because though denominated as interim, Applicants are effectively seeking the ultimate relief they believe they are entitled to in the present appeal: to be permitted to hold a "drag show" on the campus of West Texas A&M University before a final judgment on the merits. Although "authorized by 28 U.S.C. § 1651(a)," "such an extraordinary writ . . . is not a matter of right," but instead by rule and by practice, a matter of "discretion sparingly exercised." Sup. Ct. R. 20.1; *see also, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1303 (1993) (Rehnquist, C.J., in chambers). Indeed, it is a form of relief reserved for "the most critical and exigent circumstances." *Ohio Citizens*, 479 U.S. at 1313.

Applicants' own conduct demonstrates why they are not entitled to the extraordinary relief they seek. Applicants knew no later than *last October* that their appeal was not likely to be resolved in time to hold a "drag show" on March 22, 2024. Yet they waited until just weeks before their proposed event to cry "emergency." Even apart from the heightened showing required by this Court's rules, such a delay would preclude relief. After all, any "injunction is an equitable remedy," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982), and "[e]quity will not assist a man whose condition is attributable only to that want of diligence which may be fairly expected from a reasonable person." *Upton v. Tribilcock*, 91 U.S. 45, 55 (1875). In other words, "[r]elief is not given to those," like the Applicants, "who sleep on their rights." *Id.*; *accord Benisek v. Lamone*, 585 U.S. 155, 159 (2018). The

Court should not rescue Applicants from their own choices, especially when doing so requires short-circuiting the very process that this Court relies upon to ensure it has the information it needs to resolve what Applicants insist is an "issue of great national importance," Appl. 32, extending to everything from racial slurs, *id.* at 30, to debates over the Israel–Hamas conflict, *id.* at 31.

Moreover, apart from the delay, Applicants are not entitled to relief on the merits because they have shown neither that an injunction pending appeal is necessary and appropriate in aid of this Court's jurisdiction, nor that their legal rights are indisputably clear. As Applicants intend to host annual drag shows, nothing that is going to happen next Friday will deprive this Court of jurisdiction to consider the controversy, which Applicants admit presents an open question in this Court. *See id.* at 25 (asserting that the question was "all *but* settled in *Papish*"). If anything, their putative alternative request demonstrates the point: As Applicants acknowledge, *id.* at 32, the Fifth Circuit has already set the case for argument. If the law is as clearly in Applicants' favor as their request for injunctive relief suggests, the Fifth Circuit will quickly rule for Applicants, obviating any need for this Court's intervention. That Applicants nonetheless seek such review demonstrates that either the law is *not* as clear as they suggest, or that they are trying to short-circuit the normal appellate process to obtain the final relief that the Fifth Circuit would order in this already interlocutory appeal. Neither is an appropriate basis for the extraordinary relief they seek.

STATEMENT OF THE CASE

## I. Factual Background

In March 2023, President Wendler learned that Applicants intended to use a university facility within the West Texas A&M Student Center to host a drag show. App.59. Although Applicants currently emphasize their intent to host a "drag show" that is "PG-13," they have previously conceded that "[s]ome drag performances are intentionally risqué." App.55. And, at the time that President Wendler made his decision, "Spectrum WT forbade

anyone under 18 from attending the event unless accompanied by a parent or guardian," which is hardly consistent with the ordinary meaning of "PG-13." *Id.* Moreover, Applicants' online advertisement boasted that the event's master of ceremonies would be a performer with a history of lewd drag shows, and its participants would *compete* to see who could be the most over-the-top. ROA.514; ROA.516.[1] Specifically, the advertisement boasted that "[t]he night's emcee is popular Amarillo drag queen Myss Myka," and that the events would "feature drag performers from an array of student organizations stomping it out to see who's the fiercest of them all." ROA.515. Although conspicuously omitted from the application, just weeks before the scheduled show "Myss Myka" participated in an extraordinarily lewd drag show in Lubbock during which he simulated masturbation (ROA.516 at 3:14), rubbed his crotch (at 4:16), and simulated frottage with one of the members of the audience (at 5:20).[2] *See also* App.19.

Exercising his responsibility to foster a healthy campus culture and effective educational environment, President Wendler made the difficult decision to cancel the show and announced that school resources would be unavailable for such purposes going forward. App.91. In a University-wide email explaining his decision, President Wendler made clear that the prohibition was limited to hosting a drag show on campus. Far from withdrawing the University's substantial backing for Applicants' other student activities, President Wendler pointedly expressed his support for their charitable purpose of raising money for an LGBTQ+ suicide prevention group—which he celebrated as "a noble cause," App.91— and urged students to donate in lieu of attending the show, App.93. Nor did President Wendler's email place into doubt West Texas A&M's ongoing provision for Applicants'

---

[1] "ROA" refers to the record on appeal in *Spectrum WT v. Wendler*, No. 23-10994 (5th Cir.).

[2] *See* Elies Baltimore, *Myss Myka Peforming 2-23-24,* YouTube (Feb. 27, 2023), https://www.youtube.com/watch?v=QR9BjFpPeK0 (last accessed on March 12, 2024).

other campus events, such as Lavender Prom, Queer History Night, and Queer Movie Night, App.42, which have continued unabated since President Wendler's email announcement. ROA.541. West Texas A&M likewise continues to support its LGBTQ+ community by, among other things, recognizing Applicants' LGBTQ+ affinity group as an official student organization, App.41, and providing extensive campus resources to LGBTQ+ students. *See e.g.*, *Trans/Non-Non-binary Resources*, W. TEX. A&M UNIV., http://tinyurl.com/bdz4a7uv (listing "Dos" and "Don'ts" for LGBTQ+ allies); *WTAMU Resources*, W. TEX. A&M UNIV., http://tinyurl.com/2hu38rtj (providing general resources, such as university counseling, for LGBTQ+ students).

But University policy prohibits "[p]ublic behavior that is disruptive, lewd, or indecent." App.18. Drag shows of the type "Myss Myka" hosted just weeks earlier violate this policy by celebrating conduct that causes many to feel demeaned and objectified. App.91. As President Wendler explained in his email, such shows "exaggerate[] aspects of womanhood" and "stereotype women in cartoon-like extremes for the amusement of others." App.91. President Wendler concluded that "[s]uch conduct runs counter to the purpose of [West Texas A&M]" because it "denigrates others." App.92. Regardless of "stated intent," such drag shows are "derisive, divisive and demoralizing" to many students on campus. *Id.* And just as he would "not support 'blackface' performances in our campus, even if told the performance is a form of free speech or intended as humor," President Wendler announced that his policy extended to "any show, performance or artistic expression which denigrates others." *Id.*

## II. Procedural Background

Applicants filed their complaint four days after President Wendler's email. App.38. They initially requested a temporary restraining order to shield their planned March 2023 show, but subsequently withdrew that motion and hosted the event off campus and without the use of school resources. App.6; ROA.540. Neither President Wendler nor anyone at the University made any effort to stop students from participating in (or advertising for) the

off-campus event. Nevertheless, Applicants continued to seek injunctive and declaratory relief to force the University to open its own venues to their performances. App.6.

The district court denied Applicants' motion for a preliminary injunction because they were unlikely to succeed on the merits of their First Amendment claim for two independent reasons. App.28. *First*, "[a]s pled," the district court explained, Applicants failed to demonstrate a likelihood that the First Amendment even applied to their "proposed event" because it "does not obviously convey or communicate a discernable, protectable message." App.9. As the district court pointed out, this Court has rejected the view that "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." App.8-9 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). Instead, First Amendment protection extends only to "conduct that is inherently expressive." App.13 (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.* (*FAIR*), 547 U.S. 47, 66 (2006)). And Applicants failed to identify the "communicative elements ... [that] bring the First Amendment into play" here. App.14 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).

*Second*, even assuming Applicants' proposed "drag show" involved protected expressive conduct, the district court concluded that Applicants failed to identify, let alone conduct, the relevant forum analysis. App.9. Because the First Amendment does not grant students an unlimited right to use school resources as they please, the district court explained, it is incumbent on the student to show whether the campus facility to which he seeks access is "a 'traditional public forum,' 'designated public forum,' limited public forum,' or 'nonpublic forum' for purposes of the First Amendment analysis." *Id.* Rather than doing so, Applicants offer a mashup of favorable quotations from a cacophony of undifferentiated First Amendment cases involving a variety of unrelated contexts.

Applicants also failed to adequately account for the sexualized nature of their event, which was offered (albeit discouraged) to children. App.9. At this stage of the proceeding, we know little of the planned event other than that Applicants advertised their event as

"PG-13," a designation which, according to the Motion Picture Association, describes content that "may go beyond the PG rating in theme, violence, nudity, sensuality, language, adult activities or elements." App.18 n.21 (citation omitted). And they boasted that their event's emcee would be an individual who, the district court noted, had a reputation for crude stage performances and "frequent presentation of his barely covered crotch." App.19 (citation omitted).

Applicants appealed and sought an expedited briefing schedule. *Spectrum WT v. Wendler*, No. 23-10994, ECF 1 (5th Cir. Sept. 27, 2023); *id.* ECF 12 (5th Cir. Oct. 5, 2023). But when that request was denied in October 2023, they took no further action to expedite their case, such as filing their briefs early. App.31. More importantly, though Applicants have been planning their March 2024 drag show since they initially filed suit in March 2023, App.201, they inexplicably waited to seek interim relief from the Fifth Circuit until February of 2024—more than three months after their request to expedite the appeal had been denied, App.36. That is, knowing that litigation would continue in the due course, they waited until the show was imminent—and the time for careful decisionmaking had passed— to rush the courts claiming emergency. Recognizing that any such exigency was of Applicants' own making, the district court and Fifth Circuit denied relief. App.36. This Application followed and should meet the same fate.

### Summary of the Argument

**I.** Whether sought pending appeal or pending resolution of a petition for a writ of certiorari, a writ of injunction is an extraordinary remedy available only under the All Writs Act, *Brown v. Gilmore*, 533 U.S. 1301 (2001) (Rehnquist, C.J., in chambers), and granted only in the exercise of the Court's equitable discretion, *e.g.*, Sup. Ct. R. 20.1. This Court has long recognized that a party seeking interim equitable relief "must generally show reasonable diligence." *Benisek*, 585 U.S. at 159 (collecting cases); *see also, e.g.*, S. *Pac. Co. v. Bogert*, 250 U.S. 483, 500 (1919) ("[W]hen a party with full knowledge of the facts, acquiesces in a transaction, and sleeps upon his rights, equity will not aid him."). True, what

constitutes reasonable diligence depends on the circumstances. But whatever the outer bounds of reason, a party cannot claim to have been diligent in protecting his rights when he waited almost six months after filing his appeal and nearly four months after the court declined to accelerate its decision before seeking any sort of interim "emergency" appellate relief.

**II.**  Apart from sleeping on their rights Applicants cannot meet either aspect of this Court's test for altering the status quo pending appeal. *First*, Applicants cannot show that an injunction now is necessary and appropriate in aid of the Court's *jurisdiction*. This is a separate question from whether an injury Applicants may suffer during the pendency of appeal is irreparable. The Court will be able to redress any *injury* that occurs in the interim. *E.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 568 U.S. 1401, 1404 (2012) (Sotomayor, J., in chambers). Because Applicants seek a permanent injunction against what they alleged to be a permanent facility-use policy, App.85, nothing that happens between now and next Friday will prevent this Court's exercise of appellate jurisdiction to decide the merits of Applicants' appeal in the ordinary course.

*Second*, for the reasons the district court explained in its opinion, it is far from indisputably clear that Applicants have *pleaded* a First Amendment right to use University facilities to host a drag show. As the district court noted, to avoid subjecting all regulations of conduct to First Amendment scrutiny, this Court treats as expressive only conduct carrying an intended message understandable by the audience. *FAIR*, 547 U.S. at 66. Because at no point in its briefing (let alone pleading) did Applicants demonstrate that their desired "drag show" has such a message, they have not shown the First Amendment is implicated by President Wendler's actions.

Moreover, even assuming the First Amendment is implicated, Applicants entirely failed to conduct the proper forum analysis. Universities may preserve campus property for its intended use, so long as conditions on that use are reasonable and do not discriminate based on viewpoint. *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 685 (2010). President

Wendler's decision that West Texas A&M's policies do not permit drag shows or other performances that denigrate other groups of students on campus meet these hurdles—or, at least, it is far from indisputably clear that they *fail* to meet them. Although Applicants insist (at 25), that this Court "all but settled" the issue in *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667 (1973), they pointedly rely most heavily on district and circuit court opinions that are not even from the Fifth Circuit. That hardly shows an indisputable right to relief when President Wendler has narrowly prohibited conduct that, in his reasonable professional judgment, undermines the educational environment without regard to whether the show is designed to support or humiliate the LGBTQ+ community, while still permitting Applicants to express any message they choose. *Cf. Brown*, 533 U.S. at 1301 (Rehnquist, J.) (denying an injunction pending certiorari without "attempting to predict" the views of the Court because the applicants' position on the merits was "less than indisputable").

**III.** Finally, Applicants cannot evade their failure to meet the standard for an injunction pending appeal by restyling it as a request for an injunction pending a writ for certiorari before judgment. To start, both putative "alternatives" ask this Court to grant injunctive relief that the lower courts deemed inappropriate. Moreover, this Court grants such relief only when time is of the essence to resolve questions of unusual national salience. For the reasons already discussed, time clearly is not of the essence—even to Applicants. And beyond that, this case involves whether a fundraiser for a campus organization at a West Texas University can be held on campus or must be held down the street. It bears no resemblance to the types of cases in which this Court has deemed it appropriate to bypass ordinary appellate procedures—for example, to pause implementation of a $430 billion loan-forgiveness program that would be impossible to unwind, to address the United States' standing to challenge a law addressing time-sensitive medical procedures, or to determine whether a citizenship question should be added to the 2020 census, to name a few.

ARGUMENT

## I. Applicants' Dilatory Conduct Precludes Any Form of Equitable Relief.

"[I]t is a wise rule in general that a litigant whose claim of urgency is belied by its own conduct should not expect discretionary emergency relief from a court." *West Virginia v. B. P. J., by Jackson*, 143 S. Ct. 889, 889 (2023) (Alito, J., dissenting from denial of application to vacate injunction). That is particularly true here where the emergency relief sought takes the form of an injunction, which wherever sought, and in whatever form, "is an equitable remedy," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982). "From the earliest ages, Courts of equity have refused their aid to those who have neglected, for an unreasonable length of time, to assert their claims." *Elmendorf v. Taylor*, 23 U.S. 152, 168 (1825).[3]

That rule applies with no less force to requests for relief under the All Writs Act than to any other instance when equity is asked to remedy a putative failure of remedies at law. *Compare Benisek*, 585 U.S. at 159 (collecting cases requiring "reasonable diligence"), *with Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 379 (2004) (finding a request timely under the All Writs Act where a petitioner took an "active litigation posture" that "was far from . . . neglect or delay"). For good reason. "A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify" such extraordinary interim relief. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2023); *see also Fishman v. Schaffer*, 429 U.S. 1325, 1330 (1976) (Marshall, J., in chambers) (noting, as an "additional factor[] militating against" a writ of injunction, that "the applicants delayed unnecessarily").

Applicants have not acted with the diligence required for an injunction pending either

---

[3] *See also, e.g.*, *Barnette v. Wells Fargo Nev. Nat'l Bank of S.F.*, 270 U.S. 438, 444-45 (1926); *Chapman v. Bd. of Cnty. Comm'rs of Douglass Cnty.*, 107 U.S. 348, 355 (1883); *Sample v. Barnes*, 55 U.S. 70, 75 (1852).

resolution of their appeal in the Fifth Circuit or a petition for certiorari in this Court. By their own account, Applicants' March 2024 drag show has been in the works for nearly a year, *see* App.201, and this appeal has been pending for almost six months. *See* 5th Cir ECF No. 1. The normal time to seek emergency relief would have been in September of 2023, and if denied, Applicants "could have made an immediate application to a Justice of this Court." *Brown v. Gilmore*, 533 U.S. 1301, 1304 (2001) (Rehnquist, C.J., in chambers). They likewise could have moved for such relief immediately after their motion to expedite was denied in October, ECF No. 22, knowing that briefing would not resolve sooner than late December, Fed. R. App. P. 31. Under the Fifth Circuit's publicly available internal practices, such a schedule precludes argument before March 4, 2024.[4] Applicants could not reasonably have assumed that the Fifth Circuit would resolve an issue that they insist is one of "great national importance," Appl. 32, in under three weeks. Their failure to move at either of these times is more than "somewhat inconsistent with the urgency they now assert." *Brown*, 533 U.S. at 1305 (Rehnquist, C.J., in chambers)

Applicants actions have prejudiced both President Wendler and this Court. Though nominally a request for interim relief, the injunction Applicants currently seek would effectively grant them the relief that they have sought on appeal: the preliminary injunction denied them by the district court. After all, Applicants putatively seek to hold an *annual* "drag show." App.199. The district court refused such relief because they were unlikely to succeed on the merits, *supra* pp. 5-6, and in the Fifth Circuit, their briefing has focused on the need for relief before the March 2024 drag show, *Spectrum WT v. Wendler*, No. 23-

---

[4] *See e.g.*, Fifth Circuit Clerk's Office, *Most Frequently Asked Questions* 11, https://www.ca5.uscourts.gov/docs/default-source/forms-and-documents---clerks-office/faqs/faqs.pdf (last accessed March 12, 2024) ("We generally provide you with 60 days notice that your case will be argued during a particular week."); Oral Argument Hearings for March, 2024, U.S. Court of Appeals for the Fifth Circuit, https://www.ca5.uscourts.gov/oral-argument-information/court-calendars/MonthYear/2024/3/ (setting March 4 as the earliest hearing date in the month).

10994, ECF 48 at 67 (5th Cir. Nov. 13, 2023). They now demand that *same relief* from this Court, only this time without affording President Wendler the opportunity for full briefing on the merits or this Court the opportunity for reflection before making a consequential decision on matters of first impression. Equity does not permit Applicants to ask this Court to save them from the false emergency created by their own dilatory tactics.

## II. Relief Under the All Writs Act is Unwarranted.

Even if this Court were willing to drop everything and consider Applicants' tardy request for relief, Applicants must still identify a "'significantly higher justification' than a request for a stay, because unlike a stay, an injunction 'does not simply suspend the judicial alteration of the status quo but grants judicial intervention that has been withheld by the lower courts.'" *Respect Me. PAC*, 562 U.S. at 996 (quoting *Ohio Citizens*, 479 U.S. at 1313); *see also, e.g.*, *Lux v. Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers). Such a justification requires Applicants to show *both* that an injunction pending appeal is necessary and appropriate in aid of this Court's jurisdiction *and* that their legal rights are indisputably clear. *Hobby Lobby Stores*, 568 U.S. at 1403 (2012) (Sotomayor, J., in chambers). Applicants can show neither.

### A. A writ of injunction is neither necessary nor appropriate in aid of this Court's jurisdiction.

Applicants have not even attempted to show that an injunction is necessary or appropriate in aid of this Court's jurisdiction. They can't. Even without an injunction, Applicants may continue to press their challenge to West Texas A&M's policy in the lower courts and "[f]ollowing a final judgment, they may, if necessary, file a petition for a writ of certiorari in this Court." *Id.* at 1404. *See also Turner Broad.*, 507 U.S. at 1303 (noting that implementation of a challenged law does not prevent this Court's appellate jurisdiction to decide the merits of the challenge). Although Applicants' current appeal focuses on the fate of their March 2024 show, their claim extends to one for a permanent injunction to protect an annual event. App.74-75. That means these difficult issues are not going anywhere. The

Court should stay its hand and take them up in the ordinary course because "whatever the ultimate merits of [Applicants'] claims," they also cannot show that their entitlement to relief is . . . 'indisputably clear.'" *Hobby Lobby Stores*, 568 U.S. at 1403 (quoting *Lux*, 561 U.S. at 1307).

**B. The legal rights at issue are not indisputably clear.**

To determine whether the second condition for a writ of injunction has been met, members of this Court have looked to whether its own authority ends debate on the legal question at issue. An indication of what the Court *may* hold in a future case does not suffice, and where there is on-point precedent, rules of stare decisis apply even when the lower court relied upon authority that "has been undermined by [this Court's] more recent decisions." *Lux*, 561 U.S. at 1307. In *Hobby Lobby*, for example, Justice Sotomayor declined to halt implementation of the Affordable Care Act's contraceptive mandate because the Court had not yet addressed whether the First Amendment or the Religious Freedom Restoration Act protected for-profit corporations' religious exercise. 568 U.S. at 1402-04. And in *Turner Broadcasting*, Chief Justice Rehnquist refused to enjoin a law requiring cable television systems to carry most local broadcast television channels because the Court had not yet "decided whether the activities of cable operators are more akin to that of newspapers," which enjoy heightened First Amendment protection, "or wireless broadcasters," which enjoy less. 507 U.S. at 1303-04. *See also Fishman*, 429 U.S. at 1328 (denying application after noting "there is little precedent dealing specifically" with the question at issue).

Here, the best Applicants can do is to assert the issue is "all but settled," Appl. 25, by a case that involved political cartoons in a university newspaper—not a school-subsidized sexually charged drag show, the message of which has never been articulated, and that a university official determined in his professional judgment to be degrading to women. *See Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667 (1973); Appl. 25. That does not suffice. Notwithstanding Applicants' attempt to make the issues appear straightforward,

the district court correctly observed (at App.8) that such simplicity is only obtained by "stretch[ing] a number of First Amendment doctrines well beyond the sort of activities these doctrines protect." *FAIR*, 547 U.S. at 70.

### 1. The First Amendment does not apply to non-expressive conduct.

To start, "it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Applicants have not met their burden in this Court to show, "indisputabl[y]," *e.g.*, *Brown*, 533 U.S. at 1304 (Rehnquist, C.J., in chambers), that they met that burden in the district court. Applicants vaguely assert (at 14) that "the audience would know Spectrum WT's performers are trying to communicate a message" based on the context of their desired drag show. Given that even now Applicants cannot identify what that message is, it is hard to say that the district court abused its discretion in refusing a preliminary injunction—let alone that the question is beyond cavil.

**a.** Starting with *O'Brien*, which held that burning a draft card in protest of the Vietnam War was *not* expressive conduct (and thus subject to regulation), 391 U.S. at 375, this Court has repeatedly refused to "accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974) (quoting *O'Brien*, 391 U.S. at 376). Instead, to determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," this Court has "asked whether 'an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404 (alterations omitted) (quoting *Spence*, 418 U.S. at 410-11).

The Court elaborated on this test most recently in *FAIR*, where an association of law schools and law school faculty argued that a statute requiring law schools to grant military recruiters equal access to their campuses violated the First Amendment. 547 U.S. at 52-53. Beginning with *O'Brien*'s teaching that "conduct can[not] be labeled 'speech' whenever the

person engaging in the conduct intends thereby to express an idea," *id.* at 65-66 (quoting *O'Brien*, 391 U.S. at 376), *FAIR* reiterated that First Amendment protections extend "only to conduct that is *inherently expressive*." *Id.* (emphasis added). Barring recruiters, the Court explained, failed to meet that test because it carried communicative value only to the extent that "the law schools accompanied their conduct with speech explaining it." *Id.* Absent explanation, an outside observer "has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." *Id.*

Particularly pertinent here, the Court explained that the Solomon Amendment fell outside the First Amendment because "[t]he expressive component of a law school's actions [was] not created by the conduct itself but by the speech" accompanying it. *Id.* The Court noted that the "fact that such explanatory speech is necessary" represents "strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *Id.* After all, "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* The Court emphasized that if combining speech and conduct were sufficient to raise a First Amendment issue, then if someone said "that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes," the courts "would have to apply *O'Brien* to determine whether the Tax Code violates the First Amendment." *Id.* "Neither *O'Brien* nor its progeny supports such a result." *Id.*

Notwithstanding that whether *FAIR* can be applied outside the scope of the Solomon Amendment is being actively litigated in one of the most hotly contested cases of the Term,[5]

---

[5] *E.g.*, Transcript of Oral Argument at 19-20, *Moody v. Netchoice*, No. 22-277 (Feb. 26, 2024), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/22-277_8n59.pdf ("Well, Mr. Chief Justice, it's difficult for me to argue with you very much about what Rumsfeld versus FAIR means . . . . But let me just take a crack.").

Applicants confine their discussion of *FAIR* to a footnote, brushing off this important decision by asserting that their drag show is "inherently expressive" in a way that the presence of military recruiters is not. Appl. 18 n.5. Respectfully, that begs the central question: whether Applicants made a showing sufficient to justify a preliminary injunction of what their message is, and that others could be expected to understand it *without further explanation. FAIR*, 547 U.S. at 66; *Johnson*, 491 U.S. at 404. They did not. Indeed, the closest they come (at 6) to explaining what their annual drag shows are intended to or would convey is to "express support and advocate for the LGBTQ+ community." But if anything, President Wendler amplified that message by spreading it to a broader campus audience in his email announcement encouraging readers to "send the dough" to Applicants' LGBTQ+ charity. App.93.

**b.** Apparently unable to satisfy the test established in *FAIR*, Applicants cite a scattershot of inapposite cases. Most notably, they cite (at 13) *Southeastern Promotions v. Conrad*, 420 U.S. 546 (1975), for the remarkable proposition that the First Amendment applies to *all* stage performances. *Conrad* said no such thing, and it would be shocking if it had given that defamation is still actionable whether it is printed in the newspaper or announced from a podium—as are obscenity, fighting words, threats, and fraud. None of it is protected by the First Amendment. *United States v. Stevens*, 559 U.S. 460, 468 (2010). Instead, *Conrad* stands for the unremarkable—and far more narrow—proposition that "[e]ach medium of expression ... must be assessed for First Amendment purposes by standards suited to it." 420 U.S. at 557.

Applicants also cite (at 14-15) the Fourth Circuit's decision in *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (1993). Not only is this (1) a lower-court decision, which (2) predates *FAIR* by over a decade, it expressly applied *Johnson. Id.* at 391-92. The Fourth Circuit noted that defendants had effectively conceded they were engaging in viewpoint discrimination. *Id.* at 392. More importantly, the Fourth Circuit held that the plaintiffs showed both an intent to convey a particularized message and that the

message was clear to its intended audience and the defendants effectively conceded they were engaging in viewpoint discrimination. *Id.* at 391-93. In other words, the plaintiffs in *Iota* did what Applicants failed to do here: proffered the necessary allegations and supporting proof that their conduct was inherently expressive.

Applicants insist (at 16) that under *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995), "a narrow, succinctly articulable message is not a condition of constitutional protection." But, as the district court correctly noted, App.14 n.14, *Hurley* did not overrule *Johnson*. It merely held that the First Amendment's protections are "not limited to banners and songs" but extends in certain circumstances to a compilation of curated messages. 515 U.S. at 569. But there still must be communication: An idea still must be shared and understood. As *Hurley* explained, parades throughout history have been understood to "mak[e] some sort of collective point," even if like a mosaic, they do so through the amalgamation of different colors and shapes. *Hurley*, 515 U.S. at 568. Moreover, parades are uniquely "a form of expression, not just motion" because there is an "inherent expressiveness of marching." *Id.* Because Applicants have identified neither a message that can be gleaned from, nor a similar cultural significance of, drag shows— conduct that when recorded and muted conveys nothing about the performers' message[6]— Applicants' "efforts to cast themselves just like . . . the parade organizers in *Hurley*" like the law schools before them, "plainly overstates the expressive nature of their activity and the impact of the [challenged action] on it, while exaggerating the reach of [this Court's] First Amendment precedents." *FAIR*, 547 U.S. at 70. It is thus far from indisputable that

---

[6] To see why explanation is necessary to understand the message of a drag show, one need only mute the sound and compare three such performances: *A Bit of Fry and Laurie*'s "Iron Skit," Season 2, Episode 1, https://www.youtube.com/watch?v=dUM6MxqaMDA (last accessed on March 12, 2024); "Ladies of the Chorus" in Ronald Reagan's movie *This is the Army*, http://tinyurl.com/mu664msb (last accessed on March 12, 2024); and Miss Myka's performance, https://www.youtube.com/watch?v=QR9BjFpPeK0 (last accessed on March 12, 2024).

they are entitled to an injunction pending appeal.

### 2. Even if the First Amendment applies, the challenged policy satisfies the applicable forum analysis.

Applicants' conclusory insistence (at 21) that the campus venue they wish to use for their drag performance is a designated public forum also does not entitle them to the extraordinary equitable relief they seek. At *most*, the record they offered the district court would support a conclusion that Legacy Hall is a limited-public forum upon which University administrators may, consistent with the First Amendment, place reasonable- and viewpoint-neutral conditions. The challenged policy is such a condition.

**a.** To preserve places of higher education for their pedagogical purposes, courts typically examine student requests to use school resources—including campus facilities— under the framework applicable to limited public fora. In *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010), for example, this Court held that an analogous "case fit[] comfortably within the limited-public-forum category" because the plaintiff student group was not asking to be freed from a state prohibition, but to be extended "a state subsidy." *Id.* at 682. Hastings College of Law gave officially recognized student groups' access to campus facilities and student activities fees. *Id.* But official recognition was premised on adherence to the law school's all-comers policy, under which a community of Christian students would have been required to welcome members that did not adhere to the community's statement of faith. *Id.* Although the denial of these university subsidies may have applied some "indirect pressure" on the students to adopt the all-comers policy, the policy was not a mandate. *Id.* Noting that its "decisions have distinguished between policies that require action and those that withhold benefits," the Court determined that "[a]pplication of the less restrictive limited-public-forum analysis better accounts for the fact that" the defendant "is dangling the carrot of subsidy, not wielding the stick of prohibition." *Id.* at 682-83.

Just as the student group in *Christian Legal Society* could continue to meet—albeit

without the benefit of school funding and uninhibited use of campus facilities—President Wendler's policy does not prevent students from meeting off campus to put on a drag show on their own dime (as Applicants in fact did in March 2023). West Texas A&M is not seeking to "interfere" with Applicants' "desired message," Appl. at 18 n.5, but to preserve its facilities for use by all students consistent with its school mission. Moreover, just as the students in *Christian Legal Society* could continue to speak whatever message they wished, the President's policy does not prohibit students to soapbox on the quad, canvass fliers, or author missives in the student paper. They simply may not use the University's resources to put on a "drag show" that the President has determined could be demeaning to others who must live, work, and learn on the same campus. "In sum," the "limited-public-forum precedents adequately respect both [Applicants'] speech and expressive . . . rights, and fairly balance those rights against [West Texas A&M University's] interests as a property owner and educational institution." *Christian Legal Soc'y*, 561 U.S. at 683.

**b.** In arguing to the contrary, Applicants insist (at 20) that there is no distinction between the municipal stage treated as a public forum in *Southeastern Promotions* and a campus venue. The Model Code of Student Conduct published by Applicants' own counsel recognizes that unlike municipal facilities, colleges are not open to all and recommends campus prohibitions on "[u]nauthorized entry to, or use of, College facilities, property, or resources." Model Code of Student Conduct, Foundation for Individual Rights in Education (FIRE) 13, https://tinyurl.com/48scr44y. The unique features of a university setting have also led this Court to long recognize that institutions of higher education may "preserve the property under its control for the use to which it is lawfully dedicated." *Christian Legal Society*, 561 U.S. at 679 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). That is, the fact that the University is a university and not a municipal property is relevant because it is not a high-dollar venue for student events. And "a defining characteristic of limited public forums" is that "the State may 'reserve them for certain groups,'" and to serve certain purposes. *See also id.* at 681 (quoting *Rosenberger v. Rectors*

*and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (alterations omitted)). Because a "[u]niversity's mission is education," federal courts "have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981).

True, universities do not enjoy unbridled authority to restrict access to its limited public fora. Conditions on the use of school facilities must be based in distinctions that (a) are "reasonable in light of the purpose served by the forum" and (b) do not "discriminate against speech on the basis of viewpoint." *Christian Legal Society*, 561 U.S. at 685. But West Texas A&M's prohibition on drag shows clears both of these hurdles.

Beginning with reasonableness, this Court has instructed courts considering restrictions on the use of university property to bear three things in mind. *First*, the reasonableness analysis must be "shaped by the educational context in which it arises." *Id.* at 686. *See also Widmar*, 454 U.S. at 267 n.5 (explaining that First Amendment rights must be analyzed "'in light of the special characteristics of the school environment.'"). *Second*, in assessing whether a restriction is in fact necessary to serve the ends of education, courts should be chary to "substitute their own notions of sound educational policy for those of school authorities." *Bd. of Educ. of Hendrick Hudson Cent. School Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). Indeed, the Court took pains in *Christian Legal Society* to admonish "due decent respect," 561 U.S. at 687, to the law school's "determination of what constitutes sound educational policy," *id.* n.16. *Third*, the authority of school officials to shape the educational environment applies both in and out of the classroom. A university's "commission" to "choose among pedagogical approaches" extends to "extracurricular programs" like the proposed drag show at issue here. *Id.* at 686; *see also id.* at 687 n. 16 (deferring to law school's determination of "what goals a student-organization forum ought to serve").

With these principles in mind, the district court could properly find President Wendler's determinations here reasonable. As just discussed, the purpose of a public

university is education. Access to university property may therefore be lawfully curtailed when necessary to serve the ends of education. President Wendler is a veteran educator with a doctorate in Curriculum and Instruction. He has served in university administrations for decades, including as Chancellor of Southern Illinois University Carbondale and as Vice Chancellor for the entire Texas A&M University system. Dr. Walter V. Wendler, WEST TEXAS A&M, https://tinyurl.com/mr3mmtuz. In President Wendler's professional judgment, drag shows involve "conduct [that] runs counter to the purposes of [West Texas A&M University]" because such conduct is "derisive, divisive and demoralizing." App.92. President Wendler voiced particular concern over the way in which drag shows sexualize and objectify people, and thereby undermine the University's goal of creating an educational environment that "elevate[s] students based on achievement and capability, performance in a word, without regard to group membership." App.92. He also explicitly invoked the University's "educational mission." App.92. In doing so he acknowledged that the campus culture to which West Texas A&M aspires is "implacable and exacting"—yet it is the one "sanctioned by the legislature, the governor and numerous elected and appointed officials." App.92.

Also notable is what President Wendler's prohibition does not entail—a speech code or other policy closing down all "substantial alternative channels" for Applicants to convey their as-yet-unarticulated message. *See Christian Legal Soc.*, 561 U.S. at 690 (deeming law school's all-comers policy "all the more creditworthy in view of the" fact that students could still "use chalkboards and generally available bulletin boards to advertise events"). President Wendler has never tried to prevent discussion of drag shows—much less the voicing of a disfavored opinion on that subject. He has not prohibited pure speech activities like inviting speakers to campus, putting up posters, or handing out flyers. And Applicants' other activities promoting the LGBTQ+ community—such as proms, movie nights, and historical discussions—have been fully welcomed on campus. ROA.541.

The prohibition is also viewpoint neutral. Drag shows are forbidden regardless of their

intended purpose—whether to poke fun at the LGBTQ+ community or to express solidarity with it. The prohibition thus "draws no distinction between groups based on their message or perspective." *Id.* at 694. That critical fact distinguishes this case from *Widmar* and *Rosenberger*, both of which involved university actions that "singled out religious organizations for disadvantageous treatment." *Id.* at 684. Far from disfavoring Applicants' student organization, West Texas A&M provides extensive support for their activities and membership. In addition to hosting its other activities, the University provides significant resources specifically tailored to its LGBTQ+ community. *See supra* at 4.

**c.** Applicants also insist (at 24) that President Wendler's reasoning must be discredited because "[d]rag shows present no tangible harm to women." But their say-so cannot be enough to demonstrate that President Wendler's concerns, anchored as they are in his intimate understanding of college campuses, were indisputably unreasonable. After all, in *Christian Legal Society*, the law school's all-comers policy was deemed to be reasonable in part because the Court accepted the university's position that the policy would "encourage[] tolerance, cooperation, and learning among students." 561 U.S. at 689. That was President Wendler's explicit objective here as well. He stated that he would not support *any* show or performance that "denigrates others." App.92.

Applicants are also wrong to assert (at 20-22) that the prohibition is viewpoint discriminatory because it was justified by President Wendler's determination that drag shows "may offend." Citing this Court's decisions in *Papish v. Board of Curators of the University of Missouri*, 401 U.S. 667, and *Matal v. Tam*, 582 U.S. 218 (2017), Applicants declare any school rule based in concerns about offensiveness to be "dead on arrival." App.23. Morbid rhetoric like "lethal blow[s]," *id.* at 21, "nail[s] in the coffin," *id.* at 22, notwithstanding, it is premature to sound the death knell on campus facility-use policies because President Wendler reasonably prohibited the expenditure of university resources on offensive and lewd conduct.

*Papish* and *Matal* both involved pure speech: in *Papish*, a political cartoon in a campus

newspaper, 410 U.S. at 667; in *Matal*, the registration of a trademark, 582 U.S. at 223. President Wendler has not disputed that, when it comes to pure speech, "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *See Papish*, 410 U.S. at 670. But it is equally true that a university may enforce "nondiscriminatory application of reasonable rules governing conduct," even when that conduct carries some independent expressive value. *Id.* at 671. Put another way, the First Amendment may (or may not) protect the right to draw a racist cartoon about a fellow member of the university community.[7] Assuming it does, that does *not* necessarily mean that the First Amendment applies the same to a student who hangs a noose in a public space,[8] or requesting to use university facilities to reenact an act of domestic violence while wearing blackface.[9] Such a deplorable display may be intended to convey a message, but "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important government interest in regulating the nonspeech element"—such as preservation of mission-consistent use of school property—"can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376. Because President Wendler's actions do not indisputably cross that line, Applicants are not entitled to an injunction pending appeal

---

[7] Kaitlyn Bancroft, *A Black USU grad says a professor drew a racist cartoon of him. Now he's suing*, KSL.com (Mar. 21, 2023), https://www.ksl.com/article/50605040/a-black-usu-grad-says-a-professor-drew-a-racist-cartoon-of-him-now-hes-suing.

[8] Lorraine Boissoneault, *Noose Found in National Museum of African American History and Culture*, Smithsonian Magazine (May 31, 2017), https://www.smithsonianmag.com/smithsonian-institution/noose-found-national-museum-african-american-history-and-culture-180963519/.

[9] Mone Bassu & Daphne Sashin, Students in blackface re-enact Chris Brown beating Rihanna, CNN (Oct. 17, 2012), https://www.cnn.com/2012/10/16/us/new-york-blackface-skit/index.html

or resolution of their parallel request for certiorari before judgment.[10]

## III. Certiorari Before Judgment is Unwarranted.

Not unlike a writ of injunction pending appeal, certiorari before judgment is rarely granted. The overwhelming presumption is that a case should percolate through the courts of appeals. Certiorari before judgment is thus reserved for when "the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." Sup. Ct R. 11. Moreover, although certiorari before judgment has become noticeably more common in recent years, Jamelle Bouie, *The Supreme Court is Turning Into a Court of First Resort*, NEW YORK TIMES (Dec. 7, 2022), https://tinyurl.com/42kfmnb2; Steve Vladeck, *The rise of certiorari before judgment*, SCOTUSBLOG (Jan. 25, 2022), https://tinyurl.com/2bdpe39e, the rule still remains that the relief is not available simply because a case presents important questions of national concern. After all, a case that does not present such "compelling reasons," would not be cert-worthy even *after* judgment. Sup. Ct. R. 10.[11] Instead, "[t]he public interest in a *speedy* determination must be exceptional . . . to warrant skipping the court of appeals." STEPHEN M. SHAPIRO ET AL., SUPREME COURT PRACTICE § 4.20 (11th ed. 2019) (emphasis added).

This case does not present the type of time-sensitive questions of national import that merit early resolution in this Court. For example, the Court granted such relief most recently in *Moyle v. United States*, 144 S. Ct. 540 (2024), which pits state protections of unborn babies against federal actions to allow their termination—perhaps the ultimate time-sensitive question. By contrast, just a few months earlier, the Court *denied* certiorari

---

[10] Though denominated an alternative request for relief, App. 32, because Applicants seek an interim injunction under either scenario, it is better understood as an additional request for relief.

[11] For the avoidance of doubt, President Wendler does not take any position regarding whether the Fifth Circuit's yet-to-be-written opinion will present cert-worthy issues.

before judgment in a case involving former President Trump's immunity from a trial that prosecutors are hoping to squeeze in before the upcoming election because nothing prevented the Court from accepting review after the D.C. Circuit provided its analysis, *United States v. Trump*, 144 S. Ct. 539 (2023) (mem)—which the Court ultimately did, *Trump v. United States*, No. 23A745, 2024 WL 833184, at *1 (U.S. Feb. 28, 2024).

Other instances in which this Court has deemed such relief appropriate reinforce that the tool is reserved for controversies of unusual national salience in which time is of the essence such as to prevent the expenditure of billions of dollars that will be difficult to unwind, *see e.g.*, *Dep't of Educ. v. Brown*, 143 S. Ct. 541 (2022); *Biden v. Nebraska*, 143 S. Ct. 477 (2022); when a statute is alleged to have a widespread and deliberate chilling effect on a then-recognized constitutional right that must be exercised (if it existed) in real time, *United States v. Texas*, 142 S. Ct. 14 (2021); *Whole Woman's Health v. Jackson*, 142 S. Ct. 415 (2021); or a question of what information may be solicited during an upcoming nationwide census, *Dep't of Com. v. New York*, 139 S. Ct. 953 (2019).

Although the issue of drag shows on campus has certainly become politically charged, it is no more time sensitive than any other First Amendment issue that this Court regularly considers in accordance with the usual process in due course. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022). Nor is Applicants' ability to host a particular "drag show" in March of 2024 on a small campus in West Texas of *national* importance. The Court should therefore permit this case to proceed in the ordinary course before announcing a rule that will bind campus administrators nationwide.

Tellingly, to justify bypassing the Fifth Circuit, which is set to hear argument in just 6 weeks, Applicants attempt (at 3-4, 30) to coopt other disputes on other campuses raising different First Amendment interests. For example, California Clovis Community College's alleged refusal to permit students to post anti-communist and pro-life flyers implicates pure speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("[H]anding out

leaflets in the advocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression."). The same is true of Long Island University's alleged punishment of students for politically sensitive social media posts and Georgia Gwinnett College's alleged censorship of a Christian student who sought to share his faith. *See generally Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2047. In this, as throughout much of their briefing, Applicants fail to appreciate that a student's right to speak his or her mind using his or her own resources is altogether different from the asserted right to perform on a university's stage on the university's dime. Because nothing this Court would say in this case would affect these other cases without a sea change in several areas of this Court's First Amendment jurisprudence, invoking them here does nothing to change the fact that though this case about drag shows at West Texas A&M may raise important First Amendment questions, it is not of such immediate national importance that this Court should ignore ordinary rules of appellate procedure.

## Conclusion

The Court should deny the Application.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

LANORA C. PETTIT
Principal Deputy Solicitor General
*Counsel of Record*

BRENT WEBSTER
First Assistant Attorney General

JOSEPH N. MAZZARA
Assistant Solicitor General

OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Lanora.Pettit@oag.texas.gov

*Counsel for President Walter Wendler*

March 2024

# ATTACHMENT
# D

# In the Supreme Court of the United States

SPECTRUM WT, ET AL.,

*Applicants,*

*v.*

WALTER WENDLER, ET AL.,

**CHANCELLOR SHARP AND DR. THOMAS'S RESPONSE IN OPPOSITION TO SPECTRUM WT'S APPLICATION FOR INJUNCTION PENDING APPEAL**

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Aaron L. Nielson
Solicitor General

Allison M. Collins
 Deputy Chief, General Litigation Division
  *Counsel of Record*

Office of the
  Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Allison.Collins@oag.texas.gov

*Counsel for Chancellor John Sharp and Dr. Christopher Thomas*

# TABLE OF CONTENTS

Table of Contents.................................................................................................................i

Table of Authorities...........................................................................................................ii

Parties to the Proceedings ..............................................................................................iv

Related Proceedings ........................................................................................................iv

Introduction.......................................................................................................................1

Statement of the Case.......................................................................................................2

    I. President Walter Wendler's Decision to Cancel Plaintiffs' 2023 Event. ........................2

    II. The District Court's Denial of Plaintiffs' Motion for Preliminary
        Injunction. ...........................................................................................................3

    III. Plaintiffs' Belatedly Filed Motions for Injunctive Relief Pending
        Appeal. .................................................................................................................5

Argument............................................................................................................................7

    I. Emergency Equitable Relief Is Not Warranted for This Self-Created
        Exigency. ..............................................................................................................7

    II. This Court Should Not Disturb the Legal Status Quo. ..........................................9

        A. Plaintiffs Have Not Demonstrated a Clear Entitlement to Relief. ..........................9

        B. Plaintiffs' Requested Injunction Is Overly Broad. ....................................................13

        C. This Court Is Unlikely to Grant Review. ..................................................................15

Conclusion........................................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013) ............................................................... 11

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................. 12

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ............................................................. 14

*California v. Texas,*
141 S. Ct. 2104 (2021) ......................................................... 12

*Carney v. Adams,*
592 U.S. 53 (2020) ............................................................... 10

*Carroll v. President & Comm'rs of Princess Anne,*
393 U.S. 175 (1968) ............................................................. 14

*City of Austin v. Paxton,*
943 F.3d 993 (5th Cir. 2019) ................................................ 12

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ............................................................... 11

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ............................................................. 11

*Covey v. Ark. River Co.,*
865 F.2d 660 (5th Cir. 1989) .................................................. 9

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ............................................................. 10

*Daves v. Dallas Cnty., Tex.,*
22 F.4th 522 (5th Cir. 2022) ................................................ 10

*Ex parte Young,*
209 U.S. 123 (1908) ............................................................. 13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000) ............................................................. 10

*Garcia-Mir v. Smith,*
469 U.S. 1311 (1985) ........................................................... 10

*Gill v. Whitford,*
585 U.S. 48 (2018) ............................................................... 14

*Haverkamp v. Linthicum,*
6 F.4th 662 (5th Cir. 2021) .................................................. 12

*Hollingsworth v. Perry,*
558 U.S. 183 (2010) ............................................................... 7

*In re Abbott,*
956 F.3d 696 (5th Cir. 2020) ................................................ 13

*Kennedy v. Bremerton Sch. Dist.,*
139 S. Ct. 634 (2019) ........................................................... 15

*Lux v. Rodrigues,*
 561 U.S. 1306 (2010) .................................................................... 7
*Merrill v. Milligan,*
 142 S.Ct. 879 (2022) .................................................................. 7, 9
*Morris v. Livingston,*
 739 F.3d 740 (5th Cir. 2014) ...................................................... 12
*O'Shea v. Littleton,*
 414 U.S. 488 (1974) .................................................................... 12
*Planned Parenthood Ctr. for Choice v. Abbott,*
 141 S.Ct. 1261 (2021) ................................................................ 13
*Respect Maine PAC v. McKee,*
 562 U.S. 996 (2010) ...................................................................... 9
*Ruiz v. Estelle,*
 650 F.2d 555 (5th Cir. 1981) ........................................................ 8
*South Bay United Pentecostal Church v. Newsom,*
 140 S. Ct. 1613 (2020) .................................................................. 9
*Tex. Democratic Party v. Abbott,*
 978 F.3d 168 (5th Cir. 2020) ...................................................... 10
*Turner Broadcasting System, Inc. v. FCC,*
 507 U.S. 1301 (1993) .................................................................... 9
*Va. Off. for Prot. & Advoc. v. Stewart,*
 563 U.S. 247 (2011) .................................................................... 13
*West Virginia v. B. P. J., by Jackson,*
 143 S. Ct. 889 (2023) .................................................................... 9
*Whole Woman's Health v. Paxton,*
 972 F.3d 649 (5th Cir. 2020) ........................................................ 7
*Winter v. Natural Resources Defense Council, Inc.,*
 555 U.S. 7 (2008) ........................................................................ 10

## Other Authorities
Practitioner's Guide to the United States Court of Appeals for the Fifth Circuit ................ 5

## Constitutional Provisions, Statutes and Rules
28 U.S.C. § 2101 ............................................................................ 15
Fed. R. App. P. 8 .............................................................................. 8
Supreme. Ct. R. 11 ........................................................................ 15
U.S. Const. Art. III, § 2 ................................................................ 10

## PARTIES TO THE PROCEEDINGS

Applicants, plaintiffs-appellants below, are Spectrum WT, Barrett Bright and Lauren Stovall (collectively, "Plaintiffs").

Respondents, defendants-appellees below, are Dr. Christopher Thomas, in his official capacity as Vice President of West Texas A&M University, and John Sharp, in his official capacity as Chancellor for the Texas A&M University System (A&M System) (collectively, "Defendants"). Additional defendant-appellee below is Walter Wendler, in his official capacity as President of West Texas A&M University.

## RELATED PROCEEDINGS

United States District Court (N.D. Tex.):

*Spectrum WT v. Wendler*, 2:23-CV-048-Z (Sep. 21, 2023), order denying Plaintiffs' motion for preliminary injunction.

*Spectrum WT v. Wendler*, 2:23-CV-048-Z (Feb. 5, 2024), court notice that Plaintiffs' motion for injunction pending appeal would follow the briefing schedule set forth in the court's local rules.

*Spectrum WT v. Wendler*, 2:23-CV-048-Z (Feb. 20, 2024), order denying Plaintiffs' motion for injunction pending appeal as moot following Plaintiffs' notice of withdrawing the motion.

United States Court of Appeals (5th Cir.):

*Spectrum WT v. Wendler*, 23-10994 (October 11, 2023), order denying Plaintiffs' request to expedite the appeal.

*Spectrum WT v. Wendler*, 23-10994 (Feb. 22, 2024), order carrying Plaintiffs' motion for injunction pending appeal with the case.

## INTRODUCTION

Chancellor John Sharp and Dr. Christopher Thomas are not proper defendants in this matter. Whatever one thinks of the merits of Plaintiffs' underlying claims, neither Chancellor Sharp nor Dr. Thomas has remotely engaged in viewpoint discrimination, content discrimination, or a prior restraint of Plaintiffs' speech. Indeed, Chancellor Sharp and Dr. Thomas submit that Plaintiffs lack Article III standing to sue either of them—and that for similar reasons both are entitled to sovereign immunity—because neither is responsible for the decision that Plaintiffs challenge. Plaintiffs' emergency Application to this Court does not meaningfully argue otherwise. It is also highly unlikely that this Court would grant review of this case—especially given its current interlocutory posture, its need for factual development related to threshold jurisdictional issues, and that the Fifth Circuit has not yet even ruled on Plaintiffs' appeal from the denied preliminary injunction, let alone evaluated the merits of Plaintiffs' First Amendment claims. Plaintiffs accordingly have not carried their heavy burden of demonstrating that an injunction against Chancellor Sharp or Dr. Thomas is warranted pending appeal, and their Application should be denied.

Furthermore, even putting aside basic principles of justiciability, Plaintiffs' own conduct confirms that emergency relief is unwarranted. They unexplainably waited almost four months to seek interim injunctive relief from the district court. And then rather than allowing the district court to decide their motion in accordance with that court's longstanding local rules, they attempted to leap-frog ahead to the Fifth Circuit. Given this attempt to sidestep the required process, the Fifth Circuit understandably chose to carry Plaintiffs' procedurally deficient motion with the case. What is more, Plaintiffs admittedly had not completed all steps necessary for their event to be confirmed by West Texas A&M before seeking emergency injunctive relief from this Court. This Court should not exercise its emergency docket to address Plaintiff's' self-created exigency.

## I. PRESIDENT WALTER WENDLER'S DECISION TO CANCEL PLAINTIFFS' 2023 EVENT.

The Texas A&M University System is one of the largest public university systems in the nation. ROA.545.[1] It consists of eleven universities, a health science center, eight state agencies, and the "RELLIS Campus"—a cooperative effort across all eleven member institutions to form the first integrated education, research, and testing institution in the State of Texas. ROA.545. In addition to educating over 150,000 students a year, these institutions are at the forefront of agricultural research, natural resource management, and emergency responder training for Texas and beyond.

John Sharp, as the A&M System Chancellor, is responsible for general management of the A&M System, including its $7.2 billion budget. ROA.545. He oversees the A&M System Central Administration Office, which in turn is primarily responsible for system-wide planning, coordination, and execution of Board of Regents' policies. ROA.545. Chancellor Sharp is also tasked with representing the A&M System before the Texas Legislature and handling legislative relations. ROA.546. Chancellor Sharp answers directly to the Board of Regents, and he cannot take actions against any university president without majority approval of the Board of Regents secured during a public meeting vote. ROA.548.

Each component university is a stand-alone legal entity with its own duly appointed president, leadership team, mission, and goals. ROA.547. Walter Wendler was appointed President of West Texas A&M University by the Board of Regents, and he is responsible for the day-to-day operations and activities of West Texas A&M. ROA.21, 547. President Wendler is subject to annual evaluations by the Chancellor and Board of Regents, but neither the Chancellor nor the Board of Regents possess general "veto power" over the daily decisions of President Wendler or any other component university president.

---

[1] All "ROA" citations are to the Fifth Circuit's record on appeal. Defendants cite to their own appendix as "App.__." They cite to the Plaintiffs' appendix as "Pl.App.__."

ROA.548.

On March 20, 2023, President Wendler canceled Plaintiffs' 2023 drag show event that was scheduled to take place in a campus facility. ROA.540; Pl.App.199. Plaintiffs' facility reservation application had proceeded through West Texas A&M's normal process, but that morning President Wendler informed all West Texas A&M vice presidents—including the Vice President for Student Affairs, Dr. Thomas—of his decision. ROA.540; Pl.App.199. At President Wendler's request, Dr. Thomas informed Plaintiffs of President Wendler's decision and informed Plaintiffs that it was not his own decision. ROA.540; Pl.App.59, 199-200. Dr. Thomas reports directly to President Wendler and does not have authority to overrule his decisions. ROA.540. Shortly after Dr. Thomas told Plaintiffs of President Wendler's decision, President Wendler emailed the university community explaining why he decided to cancel the event. Pl.App.59, 91-93, 200. Plaintiffs do not assert that they attempted to contact Chancellor Sharp regarding President Wendler's decision. Pl.App.61. Plaintiffs' 2023 event went forward at an off-campus location. ROA.540; Pl.App.62.

## II. THE DISTRICT COURT'S DENIAL OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION.

Plaintiffs submitted a facilities reservation request for a 2024 drag show in April 2023, and Plaintiffs filed their operative motion for preliminary injunction on April 20, 2023. Pl.App.63-64, 201, 230; ROA.281-394. Their motion alleged that Plaintiffs were fearful that future events were "in imminent peril due to President Wendler's edict." ROA.302.

Plaintiffs, however, provided precious few allegations against Chancellor Sharp or Dr. Thomas to demonstrate their involvement with President Wendler's 2023 cancellation of Plaintiffs' event or any allegedly ongoing violation of Plaintiffs' First Amendment rights. Chancellor Sharp is charged with managing the entire Texas A&M University System. ROA.218, 545. Plaintiffs assert that he violated their First Amendment rights because he did not somehow stop or intervene when President Wendler canceled their local student event. ROA.215, 218. But Plaintiffs do not allege that they attempted to contact Chancellor

Sharp related to President Wendler's 2023 decision. Pl.App.61. They instead claim that Chancellor Sharp should have stepped in because he has a "history of involving himself in university free speech matters," citing one instance in 2017 when he responded to direct requests from the Texas Legislature related to a planned White Lives Matter rally. ROA.871. They claim President Wendler is "subject to, and under the authority of" Chancellor Sharp, ignoring that he does not have authority over the day-to-day decisions at any component university and cannot take actions toward a component university president without approval of the Board of Regents. ROA.871. Plaintiffs speculate that Chancellor Sharp's failure to countermand President Wendler's 2023 decision shows that he intends to let President Wendler's allegedly unconstitutional actions continue. ROA.248.

Plaintiffs argue that Dr. Thomas somehow violated their constitutional rights by "implementing President Wendler's directive canceling Plaintiffs' event and on-campus drag shows generally" and suggest that he may continue to enforce "President Wendler's content- and viewpoint-based prohibition" on drag shows going forward. ROA.218, 248. Yet Plaintiffs' events thus far have gone forward without issue since the cancelled 2023 event, including drag show practices, protests, and planning for the 2024 drag show. ROA.541. More importantly, Plaintiffs make no specific allegations against Chancellor Sharp or Dr. Thomas with respect to any of their past events, the upcoming 2024 drag show, or their alleged prior restraint claim. ROA.250-53; Pl.App.201-203, 237-238.

Chancellor Sharp and Dr. Thomas opposed Plaintiffs' preliminary injunction motion by filing a motion to dismiss based on their sovereign immunity from Plaintiffs' claims and Plaintiffs lack of standing to assert these claims against them. ROA.518-549, 837-844. The district court denied Plaintiffs' preliminary injunction motion on September 21, 2023, because they did not demonstrate a substantial likelihood of success on the merits, and it was "doubtful that Plaintiffs will suffer irreparable harm in the coming months while this issue is litigated." Pl.App.28. The district court did not address Plaintiffs' claims against Chancellor Sharp or Dr. Thomas specifically but did deny their motion to dismiss because,

given the early stage of the proceedings, the district court could not rule out that Plaintiffs may be able to prove some set of facts to support claims against them. Pl.App.27.

### III. Plaintiffs' Belatedly Filed Motions for Injunctive Relief Pending Appeal.

After the preliminary injunction was denied, Plaintiffs appealed to the U.S. Court of Appeals for the Fifth Circuit and requested expedited consideration, which was denied on October 11, 2023. Pl.App.31. Plaintiffs thus were on notice that day that the Fifth Circuit would not decide their appeal before their anticipated March 2024 event; after all, the median time from filing a notice of appeal to issuance of an opinion is over eight months. *See, e.g.*, Practitioner's Guide to the United States Court of Appeals for the Fifth Circuit, p. 4.

Plaintiffs submitted a standard risk assessment for the 2024 drag show on January 9, 2024, but amended it on January 31, 2024, to indicate for the first time that they intended to permit minors to attend the event. Pl.App.237, 240-43. As of the date of Plaintiffs' emergency Application to this Court, Plaintiffs' amended request remained pending because it was incomplete. Pl.App.238. It had proceeded to "Tentative" status, indicating that the standard risk assessment had been completed but there were still certain outstanding items that Plaintiffs needed to submit before the reservation could be "Confirmed." Pl.App.237. Plaintiffs were required to provide proof of liability insurance and submit proposed marketing materials if they planned to advertise their event as indicated in their application. Pl.App.237. As with all student events, West Texas A&M understandably reserves the right to cancel the event if it becomes apparent that the event will violate A&M System policies or regulations or West Texas A&M rules or procedures. Pl.App.238.

Plaintiffs nonetheless waited almost four months after learning the Fifth Circuit would not consider their appeal on an expedited basis—until January 31, 2024—to file a Motion for Injunction Pending Appeal in the district court. Pl.App.33. Plaintiffs did not allege that

they had suffered any harm or irreparable injury in the interceding months, but instead speculated that their March 2024 event may be cancelled by President Wendler. Pl.App.202-203. They offered no new evidence or allegations with respect to Chancellor Sharp or Dr. Thomas; in fact, their motion mentioned these officials only one time. CA5 ECF 114-1. Instead, Plaintiffs contend that President Wendler will cancel their drag show based on his March 20, 2023, statement, a television interview President Wendler gave in April 2023, and an argument made in President Wendler's Appellee Brief to the Fifth Circuit. Pl.App.202-203. The motion was filed the same day Plaintiffs amended their risk assessment submission to West Texas A&M for their planned March 2024 drag show—an assessment that was required to be completed before the event could be confirmed. Pl.App.237. Plaintiffs acknowledged in their motion that they had not completed all steps yet to hold their event. Pl.App.199, 202-203.

Plaintiffs, however, argued that the district court should treat their belated motion as an emergency and requested a ruling within nine days. Pl.App.33. The district court issued a notice declining to deviate from its local rules; its opposed-motion briefing deadlines are "a longstanding norm [and] the Court declines to alter it here," instead ordering Defendants to respond by February 21, 2024—well in advance of Plaintiffs' planned event. Pl.App.33. Plaintiffs subsequently filed a notice to withdraw their motion, and the district court denied the motion as moot based on Plaintiffs' notice. App.1a-4a.

Rather than waiting for the district court to resolve their motion, Plaintiffs sought relief in the Fifth Circuit on February 9, 2024. CA5 ECF 114. Defendants opposed the motion in large part due to Plaintiffs' failure to follow the proper procedure for seeking an injunction pending appeal from that court. CA5 ECF 118. Unsurprisingly given Plaintiffs' delay in seeking interim relief, the Fifth Circuit ordered that Plaintiffs' motion would be carried with the case. Pl.App.36.

On March 8, 2024—after seeking emergency relief from this Court—Plaintiffs completed the remaining steps of the facility reservation process, their 2024 drag show

event reservation request was "Confirmed," and they have begun to publicly advertise for their event.[2] Plaintiffs will still have to submit release forms for each performer and additional details related to the performances, including music selections and technology needs. Pl.App.202; ROA.232-33.

<h2 style="text-align:center">ARGUMENT</h2>

This Court should deny the Application. There is no basis for this Court's intervention given Plaintiffs' procedurally defective path to this Court and the early, factually under-developed nature of this case. This is especially true with respect to Chancellor Sharp and Dr. Thomas, who are not responsible for the decision that Plaintiffs' challenge.

This Court will grant an injunction pending appeal only when an applicant can demonstrate (1) "a reasonable probability that this Court would eventually grant review," (2) "a fair prospect that the Court would reverse," and (3) "that the applicant would likely suffer irreparable harm absent" the injunction. *Merrill v. Milligan*, 142 S.Ct. 879, 880 (2022) (Kavanaugh J., concurring in grant of applications for stays) (citing *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam)). The applicant must show that the "legal rights at issue" are "indisputably clear." *Lux v. Rodrigues,* 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers). Failure to meet any one factor is fatal to an application.

## I. EMERGENCY EQUITABLE RELIEF IS NOT WARRANTED FOR THIS SELF-CREATED EXIGENCY.

This Court will not entertain an application for injunction "unless the relief requested was first sought in the appropriate court or courts below" absent "the most extraordinary of circumstances." U.S. Supreme Ct. Rule 23. Plaintiffs' motion for relief to the Fifth Circuit was "patently procedurally defective" for failing to first secure a decision in the district court or demonstrate that doing so was impracticable. *Whole Woman's Health v. Paxton*, 972 F.3d 649, 653 (5th Cir. 2020). Accordingly, their Application is procedurally defective

---

[2] *See* Spectrum WT's Eventbrite page: https://www.eventbrite.com/e/the-dont-be-a-drag-drag-show-tickets-840027205787. Plaintiffs' event is also listed on West Texas A&M's facilities reservation calendar, found at: https://tinyurl.com/WTfacilities

and should not be entertained by this Court.

Before seeking relief from a federal court of appeals, an applicant must show "that application to the district court for the relief sought is not practicable, or that the district court has denied an application, or has failed to afford the relief which the applicant requested." Fed. R. App. P. 8(a). Particularly where the movant offers new evidence as part of its motion for injunction, Fifth Circuit precedent—which Plaintiffs do not challenge—is plain that the "district court should have the opportunity to rule on the reasons and evidence presented in support" of the motion. *Ruiz v. Estelle*, 650 F.2d 555, 567 (5th Cir. 1981). Such evidence should be "presented to the district judge and should be so considered by him prior to any action" by the circuit court. *Id.*

Here, Plaintiffs filed a motion and new evidence with the district court but withdrew the motion before the district court could resolve it. App.1a-4a. Plaintiffs did so after the district court instructed Defendants to respond in accordance with the court's local rules, a timeline that would have resulted in a ruling before Plaintiffs 2024 event but that Plaintiffs unilaterally decided was untenable given their own self-imposed timeframe. Pl.App.33. Yet Plaintiffs' failure to timely protect their interests artificially constrained the timeframe for securing a district court ruling and subsequent relief, if necessary, from the higher courts. Plaintiffs' motion for preliminary injunction was denied in September 2023, and they have known since October 2023 that the Fifth Circuit would not consider their appeal on an expedited basis. Pl.App.4-29, 31. Despite this, Plaintiffs waited months before seeking an injunction pending appeal from the district court. Pl.App.33. The district court was well within its discretion to follow its ordinary rules.

Plaintiffs' self-created exigency was not the district court's emergency. Nor was it out-of-bounds for the Fifth Circuit to carry Plaintiffs' belated motion with the case given its procedural deficiencies. Pl.App.36. Further, there is no basis for this Court to grant Plaintiffs' Application for emergency equitable relief now. Only "critical and exigent circumstances" justify injunctive relief from this Court in the first instance. *South Bay*

*United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (internal quotation marks omitted). An injunction "requires a significantly higher justification than a request for a stay, because unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010) (quotation omitted) (cleaned up). By any measure, the extraordinary remedy of injunctive relief is not intended to save "a litigant whose claim of urgency is belied by its own conduct." *West Virginia v. B. P. J., by Jackson*, 143 S. Ct. 889, 889 (2023) (Alito, J., dissenting from denial of application to vacate injunction). After all, equitable remedies are "not intended for those who sleep on their rights." *Covey v. Ark. River Co.*, 865 F.2d 660, 662 (5th Cir. 1989). This Court can and should deny the Application for this reason alone.

## II. THIS COURT SHOULD NOT DISTURB THE LEGAL STATUS QUO.

"By seeking an injunction, applicants request … an order *altering* the legal status quo." *Turner Broadcasting System, Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (emphasis in original). Such a change in the status quo requires a compelling showing in any event, and certainly when the applicant seeks emergency relief in this Court. Here, Plaintiffs' Application should also be denied because they have not demonstrated (1) "a reasonable probability that this Court would eventually grant review," (2) "a fair prospect that the Court would reverse," or (3) "that the applicant would likely suffer irreparable harm absent" the injunction. *Merrill*, 142 S.Ct. at 880 (Kavanaugh J., concurring in grant of applications for stays) (citation omitted).

### A. Plaintiffs Have Not Demonstrated a Clear Entitlement to Relief.

Plaintiffs make little effort to demonstrate "a fair prospect that the Court would reverse" the district court's preliminary injunction denial as it pertains to Chancellor Sharp or Dr. Thomas. In fact, Plaintiffs spend little time discussing these Defendants at all. Moreover, the Fifth Circuit's decision to carry Plaintiffs' request for an injunction pending

appeal with the case is "entitled to great deference." *Garcia-Mir v. Smith*, 469 U.S. 1311, 1313 (1985) (Rehnquist, C.J., in chambers).

An injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 22 (2008). Yet Plaintiffs' claimed entitlement to relief against Chancellor Sharp and Dr. Thomas here is far from clear. As set forth in their briefing to the Fifth Circuit, Plaintiffs lack standing to bring claims against Chancellor Sharp and Dr. Thomas in the first place, and they are entitled to sovereign immunity regardless.

Federal courts are limited to resolving only "Cases" or "Controversies." U.S. Const. Art. III, § 2. "The doctrine of standing implements this requirement by insisting that a litigant 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'" *Carney v. Adams*, 592 U.S. 53, 58 (2020) (citation omitted). In the preliminary-injunction context, plaintiffs "must make a clear showing of standing[.]" *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020). Standing to sue one defendant does not, on its own, confer standing to sue a different defendant. *Daves v. Dallas Cnty., Tex.*, 22 F.4th 522, 542 (5th Cir. 2022). Rather, a plaintiff's requested remedy must be tailored to redress that plaintiff's particular injury, and "standing is not dispensed in gross." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quotation omitted). Plaintiffs cannot satisfy any of the requirements for standing against Chancellor Sharp or Dr. Thomas.

**1.** *Injury-in-fact*. Plaintiffs have failed to show a concrete and particularized injury-in-fact attributable to Chancellor Sharp or Dr. Thomas. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). As Plaintiffs concede (at 7), the decision to cancel Plaintiffs' 2023 event was made by President Wendler and no one else; Dr. Thomas was just tasked with telling Plaintiffs the bad news. ROA.540; Pl.App.59, 199-200. Neither Dr. Thomas nor Chancellor Sharp was involved in President Wendler's

decision or his public statement. Even if they had been, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Plaintiffs do not allege facts demonstrating that these Defendants, individually, will disallow Plaintiffs' future events. Pl.App.201-203. Plaintiffs' "subjective fear[s]" to the contrary do "not give rise to standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

Plaintiffs only allegation related to Dr. Thomas is that he informed Plaintiffs of President's Wendler's decision to cancel the 2023 event. ROA.540; Pl.App.59, 199-200. To permit suit against Dr. Thomas because he conveyed the decision of his superior is the sort of "boundless theory of standing" that this Court has consistently rejected. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013). In any event, Plaintiffs make no attempt to show an allegedly ongoing First Amendment injury connected with Dr. Thomas. They speculate that he will enforce President Wendler's 2023 decision going forward, but their own evidence demonstrates otherwise. Even before Plaintiffs sought emergency injunctive relief from this Court, Plaintiffs' 2024 facilities reservation application had proceeded through West Texas A&M's reservation process, undertaken by Departments overseen by Dr. Thomas, to "Tentative" status based on the materials Plaintiffs had provided. Pl.App.237. Plaintiffs admittedly had not submitted all necessary items for the event to be "Confirmed." Pl.App.201-202. Plaintiffs subsequently submitted the remaining materials after filing their Application with this Court, and their event status is now "Confirmed" with Plaintiffs actively advertising their event. *See supra*, fn. 2. There is no evidence that Dr. Thomas has impeded their 2024 event to demonstrate a particularized injury-in-fact, and thus Plaintiffs lack standing to sue him for any allegedly ongoing First Amendment violations.

Plaintiffs have not alleged *any* direct or indirect involvement by Chancellor Sharp in President Wendler's 2023 decision or any subsequent decision at West Texas A&M. Pl.App.201-203. Instead, Plaintiffs hang their proverbial hat on Chancellor Sharp's alleged

general authority over component university presidents. But an official must have more than "the general duty to see that the laws of the state are implemented." *City of Austin v. Paxton*, 943 F.3d 993, 999-1000 (5th Cir. 2019) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). The Chancellor is not tasked with managing student events or the day-to-day activities at each component institution, and Plaintiffs cannot refute this. ROA.546-57. Since there is no injury to trace to Chancellor Sharp, there can be no claim against him for an alleged ongoing violation of Plaintiffs' First Amendment rights, and Plaintiffs' Application for emergency injunctive relief against him should be denied.

**2. *Traceability.*** Plaintiffs complained of injury is also not traceable to Chancellor Sharp or Dr. Thomas. Traceability is not satisfied when the injury is the result of a third party's independent action that was not "produced by determinative or coercive effect" of the defendant. *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). Plaintiffs cannot impute any alleged injury posed by President Wendler to Chancellor Sharp or Dr. Thomas. Neither coerced President Wendler to cancel Plaintiffs' 2023 event or to make a public statement regarding his rationale for doing so. Plaintiffs have also not asserted any new or additional harm attributable to Chancellor Sharp or Dr. Thomas to support an injunction pending appeal—they specifically cite their fear that President Wendler will cancel their event based on his own past actions and statements. Pl.App.202-203.

**3. *Redressability.*** Finally, Plaintiffs' harm cannot be remedied by an injunction against Chancellor Sharp or Dr. Thomas. "Remedies … operate with respect to specific parties" and the court enjoins the acts of the official, not the statute or policy at issue. *California v. Texas,* 141 S. Ct. 2104, 2115 (2021 (quotation omitted). "[A]bsent any allegations tying [defendants] to the specific decisions at issue, it cannot be plausibly inferred that [defendants] played any role in the decisions [the plaintiff] challenges as unconstitutional." *Haverkamp v. Linthicum*, 6 F.4th 662, 671 (5th Cir. 2021).

Plaintiffs have failed to establish any "real and immediate threat of repeated injury" that is fairly traceable to Chancellor Sharp or Dr. Thomas. *O'Shea v. Littleton*, 414 U.S.

488, 496 (1974). Viewed another way, an injunction against these officials will not redress any future injuries to Plaintiffs. Plaintiffs repeatedly identify President Wendler's decision and public statement as the source of their injury, not any action by or decision of Chancellor Sharp or Dr. Thomas. Pl.App.202-203. Injunctions against Chancellor Sharp and Dr. Thomas thus will not stop President Wendler from acting with respect to Plaintiffs' events.

For the same reasons, Plaintiffs' claims are likely barred by sovereign immunity, so Plaintiffs have also not demonstrated a clear entitlement to interim injunctive relief against Chancellor Sharp or Dr. Thomas. While "*Ex parte Young*, 209 U.S. 123 (1908) allows suits for injunctive or declaratory relief against state officials [in their official capacities], provided they have sufficient 'connection' to enforcing" the challenged decision, where there is no such connection, "the suit is effectively against the state [entity] itself and thus barred by the Eleventh Amendment and sovereign immunity." *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), *cert. granted, judgment vacated as moot sub nom, Planned Parenthood Ctr. for Choice v. Abbott*, 141 S.Ct. 1261 (2021). To be sure, under *Ex parte Young* a court is permitted to "command[] a state official to do nothing more than refrain from violating federal law." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011). Yet that is not the situation here; Chancellor Sharp and Dr. Thomas are not violating federal law, and so cannot be ordered to refrain from continuing to do so. Plaintiffs simply want to hold Dr. Thomas liable for the decision of his superior that Dr. Thomas could not override, while attempting to hold Chancellor Sharp liable for a local decision about a student event. For all these reasons, Plaintiffs have failed to demonstrate a fair prospect that the court will reverse the district court's refusal to grant preliminary injunctions against Chancellor Sharp and Dr. Thomas.

## B. Plaintiffs' Requested Injunction Is Overly Broad.

For similar reasons, Plaintiffs' requested injunction pending appeal is overly broad, violates traditional equitable principles, and should be denied. Any interim injunction

should "be tailored as precisely as possible to the exact needs of the case." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 184 (1968). An injunction must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Plaintiffs' request (at 34) that this Court enjoin President Wendler, Chancellor Sharp, and Dr. Thomas from "denying Plaintiffs' use of campus facilities open to expressive activity based on the content or viewpoint of Plaintiffs' planned March 22, 2024, drag show performance." The requested injunction sweeps far beyond what is necessary to address any cognizable harm to Plaintiffs for at least two reasons.

First, the requested injunction is overly broad because no injunction is even plausibly warranted against Dr. Thomas or Chancellor Sharp *at all*. The rule that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury" recognizes a federal court's "constitutionally prescribed role ... to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018). Plaintiffs have not demonstrated that an injunction against anyone other than President Wendler is even arguably necessary to address their alleged harms.

Second, Plaintiffs' requested injunction is overly broad because it would effectively exempt them from complying with the same reasonable A&M System and West Texas A&M policies, procedures, and regulations that apply to all other student groups that seek to hold events in an on-campus facility. Plaintiffs admittedly sought emergency injunctive relief from this Court without completing all the steps required on *their end* for the event reservation to be analyzed and confirmed by West Texas A&M. The application status for their 2024 event is now "Confirmed," but Plaintiffs must still submit release forms for all performers and additional details about the show, including a list of the performers with song selections. Pl's App.202; ROA.232-33. Plaintiffs' requested injunction would prevent West Texas A&M officials from intervening if any later-disclosed event details violate a

policy, procedure, or regulation applicable to all on-campus student events, or if Plaintiffs deviate from their prior representations.

## C. This Court Is Unlikely to Grant Review.

There also is no reasonable prospect that this Court will grant certiorari. The case is in its infancy and the record has not been developed. Discovery has not been completed, and neither the district court nor Fifth Circuit have reached the merits of Plaintiffs' First Amendment claims. The Fifth Circuit has not yet even reached the merits of Plaintiffs' preliminary injunction request. Unresolved factual questions would make it difficult to address Plaintiffs' contentions at this early stage. *See, e.g., Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 635-36 (2019) (Alito, J.). Relatedly, Chancellor Sharp and Dr. Thomas have raised threshold jurisdictional challenges that require factual development and that will be revisited at summary judgment. Discovery will only confirm that Plaintiffs lack standing to sue Chancellor Sharp and Dr. Thomas, and that each of these officials is entitled to sovereign immunity.

Plaintiffs argue that this case presents a split with other circuits that would likely result in this Court granting review. The supposedly relevant cases, however, did not arise in remotely comparable circumstances, let alone in this unusual posture and with such significant vehicle issues. And even if they did, the Fifth Circuit has not decided this case yet. Plaintiffs' reliance on recent instances and cases where other universities or officials have allegedly overstepped the First Amendment's boundaries, moreover, does not suggest that review would be granted *in this case* against *these Defendants*.

Finally, the Court should similarly decline to treat the Application as a certiorari petition for the same reasons. A petition for a writ of certiorari to review a case before the Court of Appeals has entered judgment should "be granted only upon a showing that the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." Supreme. Ct. R. 11; 28 U.S.C. § 2101(e). That demanding standard is not in the least satisfied here.

## CONCLUSION

This Court should deny the Application.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Aaron L. Nielson
Solicitor General

Allison M. Collins
Deputy Chief, General Litigation Division
*Counsel of Record*

Office of the
  Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
*Counsel for Chancellor John Sharp*
*and Dr. Christopher Thomas*

**APPENDIX**

i

## TABLE OF CONTENTS

*Page*

PLAINTIFFS' NOTICE OF MOTION WITHDRAWAL TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, AMARILLO DIVISION (FEBRUARY 16, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1a

ORDER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, AMARILLO DIVISION, DENYING PLAINTIFFS' MOTION AS MOOT (FEBRUARY 20, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4a

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | |
|---|---|
| SPECTRUM WT, *et al.*, | Case No.: 2:23-cv-00048-Z |
| Plaintiffs, | |
| v. | Hon. Matthew J. Kacsmaryk |
| WALTER WENDLER, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' NOTICE OF WITHDRAWAL OF**
**MOTION FOR INJUNCTION PENDING APPEAL [ECF 82]**

Plaintiffs Spectrum WT, Barrett Bright, and Lauren Stovall, have filed a motion for injunction pending appeal in the U.S. Court of Appeals for the Fifth Circuit (Case No. 23-10994) upon the Court declining to expedite consideration of Plaintiffs' Motion for Injunction Pending Appeal [ECF 82, 85]. For that reason, and to avoid an inconsistent outcome between the district and circuit courts, Plaintiffs withdraw their Motion for Injunction Pending Appeal [ECF 82].

Dated: February 16, 2024          Respectfully submitted,

/s/ JT Morris                                    .
JT Morris
TX Bar No. 24094444
Conor T. Fitzpatrick*
MI Bar No. P78981
Foundation for Individual Rights
and Expression
700 Pennsylvania Ave., SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org
conor.fitzpatrick@thefire.org

1a

Adam B. Steinbaugh*
CA Bar No. 304829
Jeffrey D. Zeman*
PA Bar No. 328570
Foundation for Individual Rights
and Expression
510 Walnut St., Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
adam@thefire.org
jeff.zeman@thefire.org

* Admitted *Pro Hac Vice*

Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 16, 2024, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ JT Morris
JT Morris
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, *et al.*,

     Plaintiffs,

v.

                               2:23-CV-048-Z

WALTER WENDLER, *et al.*,

     Defendants.

**ORDER**

Before the Court is Plaintiffs' Opposed Rule 62(d) Motion for Injunction Pending Appeal ("Motion") (ECF No. 82), filed January 31, 2024. On February 16, 2024, Plaintiffs submitted a notice withdrawing the Motion, due to the Court "declining to expedite consideration of Plaintiffs' Motion" and to "avoid an inconsistent outcome between the district and circuit courts." ECF No. 86 at 1. In light of the foregoing, the Court **DENIES** Plaintiffs' Motion as moot.

     **SO ORDERED**.

     February 20, 2024

                                       MATTHEW J. KACSMARYK
                                       UNITED STATES DISTRICT JUDGE

# Attachment
# E

No. 23A820

# In the
# Supreme Court of the United States

SPECTRUM WT, ET AL.,

*Applicants,*

v.

WALTER WENDLER, ET AL.,

*Respondents.*

To the Honorable Samuel Alito, Associate Justice
of the Supreme Court of the United States and Circuit Justice for the Fifth Circuit

## CONSOLIDATED REPLY IN SUPPORT OF EMERGENCY APPLICATION FOR INJUNCTION PENDING APPELLATE REVIEW

## IMMEDIATE RELIEF REQUESTED

Adam B. Steinbaugh
Jeffrey D. Zeman
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 Walnut St.
Suite 900
Philadelphia, PA 19106

Robert Corn-Revere
JT Morris
  *Counsel of Record*
Conor T. Fitzpatrick
Joshua T. Bleisch
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE
Suite 340
Washington, DC 20003
215-717-3473
jt.morris@thefire.org

*Counsel for Applicants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................iii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 1

I.     Plaintiffs Acted Diligently Before Seeking Emergency Relief and the Court Has Jurisdiction to Grant an Injunction................................................. 1

II.    Stage Performances Like Drag Shows Are Protected Expression. ................... 4

III.   Wendler Has No Constitutionally Permissible Reason for Imposing a Viewpoint-Based Prior Restraint. ....................................................................... 5

IV.   Plaintiffs Have Standing as to Chancellor Sharp and Vice President Thomas. ................................................................................................................ 8

CONCLUSION........................................................................................................... 9

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ................................................. 4

*Bantam Books, Inc., v. Sullivan,*
  372 U.S. 58 (1963) .................................................. 5

*Cheney v. U.S. Dist. Ct.,*
  542 U.S. 367 (2004) ................................................ 3

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
  473 U.S. 788 (1985) ................................................ 6

*Fed. Election Comm'n v. Cruz,*
  596 U.S. 289 (2022) ................................................ 8

*Healy v. James,*
  408 U.S. 169 (1972) ................................................ 6

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
  515 U.S. 557 (1995) ................................................ 4

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
  993 F.2d 386 (4th Cir. 1993) ................................... 4

*Kennedy v. Bremerton Sch. Dist,*
  597 U.S. 507 (2022) ................................................ 7

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
  584 U.S. 617 (2018) ................................................ 4

*Matal v. Tam,*
  582 U.S. 218 (2017) ................................................ 6

*Nat'l Socialist Party of Am. v. Vill. of Skokie,*
  432 U.S. 43 (1977) .................................................. 2

*Neb. Press Ass'n v. Stuart,*
  427 U.S. 539 (1976) ................................................ 1

*Papish v. Bd. of Curators of the Univ. of Mo.,*
  410 U.S. 667 (1973) ............................................ 6, 7

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) ................................................................. 2

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
   515 U.S. 819 (1995) ............................................................... 6

*Rumsfeld v. Forum for Academic & Institutional Rights,*
   547 U.S. 47 (2006) .............................................................. 4, 5

*Se. Promotions, Ltd. v. Conrad,*
   420 U.S. 546 (1975) ............................................................ 4, 7

*Speech First, Inc. v. Sands,*
   601 U.S. ___ (2024) ............................................................... 1

*United States v. Virginia,*
   518 U.S. 515 (1996) ............................................................... 7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ............................................................... 8

**Other Authorities**

Michael Hardy, *Country Revival*, Tex. Monthly (Aug. 2017) ....................... 8

Shannon Najmabadi, *Texas House Calls on Texas A&M Chancellor to Halt White Nationalist Rally*, Tex. Trib. (Aug. 14, 2017) ................................ 8

Tex. A&M Univ. Sys. Office of the Chancellor, Sys. Pol'y 02.02 §§ 1.12, 2.1 (May 20, 2021) ...................................................................... 8

Tex. A&M Univ. Sys. President of Sys. Member Univs., Sys. Pol'y 02.05 (Aug. 26, 2021) ........................................................................... 8

**INTRODUCTION**

West Texas A&M President Wendler's response is a signed confession, confirming "his policy" to censor "any show, performance, or artistic expression which denigrates others." Wendler Resp. 4. This concession cements that Wendler is imposing a viewpoint-based prior restraint over free expression at a public university. No more is needed to establish the extraordinary threat that will irreparably harm Spectrum WT and its student members' First Amendment rights if the Court does not intervene before March 22.

Protecting student speech "presents a high-stakes issue for our Nation's system of higher education." *Speech First, Inc. v. Sands*, 601 U.S. ___, 6 (2024) (Thomas, J., dissenting). When a year-long prior restraint threatens student speech at a public university, those stakes grow even higher. Spectrum WT and its student members have been anything but dilatory, acting at every turn in the courts below to lift the edict barring them from the public campus stage. But the judicial safety net against prior restraints, "the most serious and the least tolerable infringement" of the First Amendment, broke down. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The Court should intervene in these extraordinary circumstances and grant Plaintiffs' application for an injunction pending appeal.

**ARGUMENT**

**I.     Plaintiffs Acted Diligently Before Seeking Emergency Relief and the Court Has Jurisdiction to Grant an Injunction.**

Respondents' arguments about jurisdiction are wrong. *See* Wendler Resp. 11. The Court has before granted an application under the All Writs Act to enjoin First

Amendment violations pending appeal to prevent irreparable harm and preserve jurisdiction. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020). It should do so again here. Unless the Court enjoins Respondents now, Wendler's prior restraint will once again harm *these* university students irreparably and frustrate the Court's later jurisdiction. A prior restraint has a pernicious effect that can wear down even the most determined speaker's will, let alone the will of a recognized student group having endured a prior restraint for a year. The Court cannot unwind that harm through later review, no different than in *Roman Catholic Diocese,* where churchgoers faced harm pending appeal from being forced to watch weekly services on television rather than worship in person. 592 U.S. at 19. Prospects of future in-person services did not render the All Writs Act inapt.

Though Respondents urge the Court to withhold acting until after the Fifth Circuit rules on the merits (Wendler Resp. 2, Sharp Resp. 15), the Court's decision in *National Socialist Party of America v. Village of Skokie* shows why the Court can and should act now. 432 U.S. 43 (1977) (per curiam). There, the Court stayed a prior restraint after the lower courts' refusal to act pending appeal. *Id.* at 43–44. That refusal "determined the merits of petitioners' claim that the outstanding injunction will deprive them of rights protected by the First Amendment during the period of appellate review which, in the normal course, may take a year or more to complete." *Id.* at 44. Just as the Court swiftly halted the prior restraint in *Skokie*, it should swiftly halt President Wendler's prior restraint pending appeal after the courts below declined to do so.

Plaintiffs are not asking this Court for emergency relief because of some "self-created exigency." Sharp Resp. 7–9; *see also* Wendler Resp. 9–11. Instead, Plaintiffs have maintained an "active litigation posture" that is "far from . . . neglect or delay." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 379 (2004) (finding a request timely under the All Writs Act). Plaintiffs immediately moved for a temporary restraining order in March 2023, swiftly sought a preliminary injunction to safeguard their March 22, 2024 performance, immediately appealed the denial of the same, moved to expedite that appeal, sought no briefing extensions in the Fifth Circuit, and moved in both courts below for an injunction pending appeal.

Wendler argues Plaintiffs could have sought emergency relief in September 2023 when the district court denied a preliminary injunction. Wendler Resp. 10. That clashes with Respondents' recent Fifth Circuit briefing arguing that Plaintiffs' harm was "far from imminent" and "entirely speculative." Ct. App. Dkt. 89 at 44; *id.*, 94 at 38. And under Wendler's logic, parties should run to the Court any time the need for emergency relief might arise in the future. That would overwhelm the Court's emergency docket. Plaintiffs sought this Court's intervention only after they had completed essential steps to reserve West Texas A&M facilities[1] and the courts below declined to act in time to preserve Plaintiffs' First Amendment rights pending appeal, making the circumstances extraordinary enough to justify an emergency application.

---

[1] On March 8, 2024, West Texas A&M staff moved Plaintiffs' reservation of Legacy Hall for their performance from "tentative" to "confirmed," cementing that only Wendler stands in the way of Plaintiffs exercising their First Amendment rights.

**II.    Stage Performances Like Drag Shows Are Protected Expression.**

Trying to escape First Amendment scrutiny, President Wendler claims drag shows are unprotected because they "do[] not obviously convey or communicate a discernible, protectable message." Wendler Resp. 14. But that would exclude ballet, orchestral music, interpretative dance, Lewis Carroll's poetry, and Jackson Pollock's paintings from the First Amendment's guard. This Court rightfully has rejected Wendler's misguided view. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995); *see also Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 657 (2018) (Thomas, J., concurring in part and concurring in the judgment) (quoting *Hurley* and reiterating "a 'particularized message' is not required").

Plus, Wendler *insisted* he acted because he did not like what he thinks drag shows express. App. 91–93. To that end, his argument that drag shows are non-expressive is "self-defeating," as his published edict leaves no doubt he is censoring drag shows because he disagrees with the message conveyed. *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 392 (4th Cir. 1993); App. 91–93. Stage performance is protected. *E.g., Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554–58 (1975). Getting on stage and performing in front of an audience, like using a paintbrush on a canvas, is inherently expressive. President Wendler knows this, calling drag shows "artistic expression" and "performance." App. 91–93.

Contrary to Wendler's argument (Wendler Resp. 7, 13–14), *FAIR* did not suddenly exclude a significant portion of humanity's artistic achievements from First Amendment protection. *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47 (2006) (*FAIR*); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023)

("No government, *FAIR* recognized . . . may 'interfer[e] with' [a speaker's] 'desired message'" (quoting *FAIR*, 547 U.S. at 64)). The Court in *FAIR* looked to explanatory speech because there was no inherently expressive conduct at hand. *FAIR*, 547 U.S. at 66. But an accompanying explanation surely does not divest *inherently expressive* conduct—like drag shows—of First Amendment protection. Nor could it. An explanation often augments the message that inherently expressive conduct conveys, like an inscription under a painting, the liner notes of a music album, or a violinist responding to a listener's question about a piece's meaning.

## III. Wendler Has No Constitutionally Permissible Reason for Imposing a Viewpoint-Based Prior Restraint.

Wendler makes no effort to overcome his admitted prior restraint and the "heavy presumption against its constitutional validity." *Bantam Books, Inc., v. Sullivan*, 372 U.S. 58, 70 (1963); Wendler Resp. 4. *See generally* Wendler Resp. 1–26. Instead, Wendler focuses on denying he engaged in viewpoint discrimination and claiming he really wants to prevent "lewd" and "sexually-charged" conduct. None come close to a legitimate reason for imposing a blanket ban on a category of protected speech at a public university, let alone meet strict scrutiny.

***Wendler's prior restraint is viewpoint-based.*** Wendler's words refute his claim that his "prohibition is viewpoint neutral." Wendler Resp. 20. Wendler explains his "policy" reaches *any* expression which "denigrates" others and concedes he is exercising his subjective "judgment" that Plaintiffs' performance is "degrading to women." Wendler Resp. 4, 12. Regulating expression because of its potential to offend others is the essence of viewpoint discrimination. *Matal v. Tam*, 582 U.S. 218, 243

(2017). That Wendler claims he is evenhandedly protecting all groups from offense changes nothing—it is still viewpoint discrimination. *Id.* at 242–43; *see* Wendler Resp. 8. And whether Wendler misinterprets Plaintiffs' intended message also changes nothing. He is acting "because of its message," and that is viewpoint discrimination. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995); *see also Matal*, 582 U.S. at 242–43.

Setting aside Wendler's dispute about forum classification (Wendler Resp. 17), his censorship is doomed because viewpoint discrimination is prohibited even in non-public forums. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985). Wendler also cannot justify viewpoint discrimination by cloaking it as a pedagogical interest. For one, this Court recognizes that universities' special role calls for *less* deference to administrators, not more. *Healy v. James*, 408 U.S. 169, 180 (1972) (holding the First Amendment's "vigilant protection" is "nowhere more vital" than on college campuses). And Plaintiffs' non-classroom, non-academic performance implicates no pedagogical interests. The record also undermines Wendler's newfound "pedagogical" pretext: The university opens Legacy Hall for weddings, parties, religious services, beauty pageants, and cattle shows. App. 46–49 ¶¶ 31–33, 38, 40.

***Wendler's concerns about "lewd" and "sexualized" conduct fail.*** While Wendler might fancy himself a campus Comstock, the Constitution wisely recognizes that courts should not defer to university administrators who single out speech they consider "indecent" to censor it. *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 668–70 (1973) (per curiam); *Healy*, 408 U.S. at 180. Though Wendler argues (only

after Plaintiffs sued) that his ban prevents "lewd" or "sexualized" conduct (*see* Wendler Resp. 3–5, 20)[2] the Court rejected the same excuse for a prior restraint in *Southeastern Promotions.* 420 U.S. at 550, 554–55, 557–58. And "lewdness" is no license to censor speech at a public university. *Papish*, 410 U.S. at 668–70.

Nor is there any First Amendment exception for "sexualized" expression—and for good reason, as the breadth of the term could ensnare everything from Michelangelo's David to religious texts. The mere prospect of "sexualized" speech (Wendler Resp. 5, 20) does not justify a prior restraint on protected expression on a university campus, and Wendler offers no authority otherwise. *Papish*, 410 U.S. at 669–70 (holding "conventions of decency" cannot justify campus censorship, over dissent's qualms, at 676, about "lewd" speech). Wendler can only hazard a guess about Spectrum WT's show, having stopped it before the students took the stage or knowing if the guest emcee he complains about, "Miss Myka," will even appear, let alone what Miss Myka's emceeing might entail. *See* Wendler Resp. 3–4. Banning speech based on speculation about its content—sexual or otherwise—highlights the "perils of prior restraint." *Se. Promotions*, 420 U.S. at 561. Wendler's prior restraint punishes even those with the tamest performances, whether punishable conduct occurs at all.

---

[2] This Court should reject any of Wendler's post-lawsuit excuses because "government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented post hoc in response to litigation." *Kennedy v. Bremerton Sch. Dist*, 597 U.S. 507, 543 n.8 (2022) (cleaned up) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Wendler explained his reasoning for canceling drag shows at length, focusing on his expectation that campus drag shows will offend women, never hinting at concerns about lewdness, "sexualized" conduct, or "Miss Myka" emceeing the event. App.91–93.

## IV. Plaintiffs Have Standing as to Chancellor Sharp and Vice President Thomas.

To ensure Plaintiffs' complete relief, this Court should also enjoin Respondents Thomas and Sharp. Chancellor Sharp and Vice President Thomas's response boils down to standing. Sharp Resp. 10–13. Plaintiffs have shown standing against both at this stage, as the district court recognized in denying Sharp and Thomas's motion to dismiss. App. 26–27. Thomas and Sharp both have authority over the "application or threatened application" of Wendler's prior restraint against Plaintiffs' March 22 show. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 297 (2022). Thomas carried out President Wendler's edict the first time Wendler cancelled Spectrum WT's show, and Thomas will do it again. App. 59 ¶¶ 103–04; App. 236 ¶ 2. Chancellor Sharp has legal authority over President Wendler.[3] But rather than denounce Wendler's ongoing censorship, Sharp departed from his history of intervening in campus speech controversies,[4] effectively authorizing Wendler's censorship. That supports standing. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) (an "injury may be indirect" if it is "fairly traceable to the defendant's acts or omissions").

---

[3] *E.g.*, Tex. A&M Univ. Sys. Office of the Chancellor, Sys. Pol'y 02.02 §§ 1.12, 2.1 (May 20, 2021), https://policies.tamus.edu/02-02.pdf [permalink: https://perma.cc/NAE6-EFRK]; Tex. A&M Univ. Sys. President of Sys. Member Univs., Sys. Pol'y 02.05 (Aug. 26, 2021), https://policies.tamus.edu/02-05.pdf [permalink: https://perma.cc/M4D6-S7KA].

[4] *See, e.g.,* Michael Hardy, *Country Revival*, Tex. Monthly (Aug. 2017), https://features. texasmonthly.com/editorial/country-revival [permalink: https://perma.cc/DCK5-C56C]; Shannon Najmabadi, *Texas House Calls on Texas A&M Chancellor to Halt White Nationalist Rally*, Tex. Trib. (Aug. 14, 2017), https://www.texastribune.org/2017/08/14/texas-house-calls-texas-m-chancellor-stop-white-nationalist-rally-occu [permalink: https://perma.cc/4M5S-XEZC].

## CONCLUSION

For these reasons and those in Plaintiffs' application, they respectfully ask the

Court to grant their emergency application for an injunction pending appeal.

Respectfully Submitted,

Adam B. Steinbaugh
Jeffrey D. Zeman
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 Walnut St.
Suite 900
Philadelphia, PA 19106

/s/ JT Morris
Robert Corn-Revere
JT Morris
  *Counsel of Record*
Conor T. Fitzpatrick
Joshua T. Bleisch
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE
Suite 340
Washington, DC 20003
215-717-3473
jt.morris@thefire.org

Dated: March 14, 2024

Counsel for Applicants