NO. 23-10994

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

SPECTRUM WT, BARRETT BRIGHT, and LAUREN STOVALL,

*Plaintiffs-Appellants*,

v.

WALTER WENDLER, *et al.*,

*Defendants-Appellees.*

## SUPPLEMENTAL EN BANC BRIEF OF APPELLANT
## SPECTRUM WT

On Appeal from the United States District Court for the
Northern District of Texas, Amarillo Division,
Civil Action No. 2:23-CV-48
Hon. Matthew J. Kacsmaryk Presiding

JT Morris
   *Counsel of Record*
Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Suite 340
Washington, D.C. 20003
Tel:  (215) 717-3473
jt.morris@thefire.org
conor.fitzpatrick@thefire.org

Adam Steinbaugh
Jeffery D. Zeman
Sara Berinhout
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St., Suite 900
Philadelphia, PA 19106
Tel:  (215) 717-3473
adam@thefire.org
jeff.zeman@thefire.org
sara.berinhout@thefire.org

*Attorneys for Plaintiff-Appellant*

# CERTIFICATE OF INTERESTED PARTIES

The cause number and style of the case is No. 23-10994, *Spectrum WT v. Wendler* (USDC Civil No. 2:23-CV-48, Northern District of Texas).

Counsel of record certifies that the following listed persons or entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.[1]

**Plaintiffs-Appellants**
Spectrum WT
Barrett Bright
Lauren Stovall

**Attorneys for Plaintiffs-Appellants**
JT Morris
Conor T. Fitzpatrick
Foundation for Individual Rights and Expression
700 Pennsylvania Ave. SE, Suite 340
Washington, D.C. 20003

---

[1] In September 2023, the district court dismissed all Defendants except for Defendants Wendler, Thomas, and Sharp for lack of standing, which Plaintiffs have not contested on appeal. In September 2025, the district court also dismissed Plaintiffs Bright and Stovall's prospective relief claims, as they are no longer enrolled at West Texas A&M University. Finally, the parties filed a stipulated dismissal of Chancellor Glenn Hegar, former Chancellor Sharp's successor, which the district court entered on November 14.

Thus, the active parties remaining for purposes of this interlocutory appeal include Plaintiff-Appellant Spectrum WT and Defendants-Appellees Wendler and Thomas. Spectrum WT includes the non-active parties in this certificate of interested parties for completeness.

Adam Steinbaugh
Sara Berinhout
Jeffrey Daniel Zeman
Foundation for Individual Rights and Expression
510 Walnut St., Suite 900
Philadelphia, PA 19106

**Defendants-Appellees**
Dr. Walter Wendler
Dr. Christopher Thomas
John Sharp
Glenn Hegar
Robert L. Albritton
James R. Brooks
Jay Graham
Michael A. Hernandez, III
Tim Leach
Bill Mahomes
Elaine Mendoza
Michael J. Plank
Cliff Thomas
Demetrius L. Harrell, Jr.

**Attorneys for Defendants-Appellees**

William R. Peterson
William F. Cole
Monroe David Bryant, Jr.
Zachary Berg
Munera Al-Fuhaid
Jacob C. Beach
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711

Allison Marie Collins
Foster Swift Collins & Smith PC
313 South Washington Square

Lansing, MI 48933

**<u>Other Interested Parties</u>**
West Texas A&M University
Texas A&M University System

Respectfully,

<u>/s/ JT Morris</u>
JT Morris
*Counsel of Record for Plaintiff-Appellant*
*Spectrum WT*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ............................................ i

TABLE OF AUTHORITIES ................................................................. vii

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 4

STATEMENT OF ISSUES .................................................................. 5

STATEMENT OF THE CASE .............................................................. 6

    West Texas A&M opens its facilities to student expression, including stage performance ............................................................ 6

    Spectrum WT, a recognized student group, organizes a drag show in Legacy Hall. ........................................................................ 7

    President Wendler cancels Spectrum WT's performance, describing drag shows as "expression which denigrates others." ........................................................................................ 8

    The district court denies injunctive relief. ....................................... 9

    President Wendler cancels another Spectrum drag performance. ................................................................................. 11

    The panel reverses and remands. .................................................. 12

    After the panel majority opinion issues, the district court holds Spectrum WT still has standing to pursue injunctive relief. ...................................................................................... 13

    The drag show ban is irreparably harming Spectrum WT. .......... 14

STANDARD OF REVIEW ................................................................ 16

SUMMARY OF THE ARGUMENT ...................................................... 17

ARGUMENT .................................................................................. 19

I. Spectrum WT is Likely to Succeed on the Merits.......................... 19

   A. Like with any stage performance, the First Amendment protects Spectrum WT's drag show. ................ 20

      1. The First Amendment protects expression beyond the written or spoken word. ......................... 21

      2. The First Amendment protects stage performances, like drag shows, because they are inherently expressive.................................................... 21

      3. The context of Spectrum WT's planned performances also establishes First Amendment protection..................................................................... 24

      4. The district court departed from decades of Supreme Court precedent establishing constitutional protection for expressive conduct......... 26

   B. The district court erred by not enjoining Defendants' ban as unconstitutional viewpoint discrimination............... 30

      1. President Wendler's blanket ban on expression based on its perceived offensiveness is viewpoint discrimination. ............................................................ 31

      2. The First Amendment bar against viewpoint discrimination protects expressive conduct. ............... 36

   C. Excluding Spectrum WT's drag show from a designated public forum because of its content violates the First Amendment. ......................................................................... 38

      1. University policy and practice establish Legacy Hall as a designated public forum. .............................. 38

      2. Because Wendler's ban is content-based, it is subject to strict scrutiny.............................................. 41

      3. *CLS* does not control the forum analysis question. .... 43

4. Wendler's ban is subject to strict scrutiny even if Legacy Hall is a limited public forum .......................... 45

D. The district court erred by not enjoining Defendants' ongoing drag show ban as an unconstitutional prior restraint. ................................................................. 46

1. The First Amendment forbids banning speech in advance, as Wendler has done. .................................. 47

2. Wendler's post hoc speculation about Spectrum's performances do not save his prior restraint. ............. 50

E. Defendants cannot satisfy strict scrutiny as required to justify a blanket ban on protected expression at a public university. ...................................................... 53

1. None of President Wendler's contemporaneous reasons for the ban are a compelling interest. ........... 54

2. Banning an entire class of protected expression from campus is not the least restrictive means of achieving any interest. ................................................ 56

3. The district court's proffered interests for not enjoining Wendler's ban likewise fail strict scrutiny ................................................................. 57

II. A Preliminary Injunction Against Vice President Thomas is Proper Because He Enforces President Wendler's Ban. ............... 60

III. Absent Injunctive Relief, Spectrum WT Will Continue to Suffer Irreparable Harm ............................................................... 61

IV. Enjoining a Prior Restraint Against Protected Expression That Public University Officials Deem Offensive Serves the Public Interest. ................................................................. 62

CONCLUSION ................................................................. 67

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ........................................................ 29, 30

*Ark. Educ. Television Comm'n. v. Forbes,*
  523 U.S. 666 (1998) ............................................................. 46

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ........................................... 27, 57, 58, 59

*Byrum v. Landreth,*
  566 F.3d 442 (5th Cir. 2009) ............................................. 16

*Chiu v. Plano Indep. Sch. Dist.,*
  260 F.3d 330 (5th Cir. 2001) ................................... 40, 46, 53

*Chiu v. Plano Indep. Sch. Dist.,*
  339 F.3d 273 (5th Cir. 2003) ............................................. 31

*Christian Legal Soc'y v. Martinez,*
  561 U.S. 661 (2010) ..................................................... passim

*Christian Legal Soc'y v. Walker,*
  453 F.3d 853 (7th Cir. 2006) ............................................. 62

*City of Erie v. Pap's A.M.,*
  529 U.S. 277 (2000) ........................................................... 58

*City of Lakewood v. Plain Dealer Publ'g Co.,*
  486 U.S. 750 (1988) ..................................................... 50, 51

*City of Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41 (1986) ............................................................. 43

*Clark v. Cmty. for Creative Non-Violence,*
  468 U.S. 288 (1984) ........................................................... 24

*Cohen v. California,*
  403 U.S. 15 (1971) ............................................... 56, 57, 62

*Davis v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) ................................................................. 49

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) ................................................................. 59

*FCC v. Pacifica Found.*,
  438 U.S. 726 (1978) ................................................................. 58

*Flores v. Bennett*,
  635 F. Supp. 3d 1020 (E.D. Cal. 2022) .................................. 64

*Free Speech Coalition, Inc. v. Paxton*,
  606 U.S. 461 (2025) ........................................................... 59, 60

*Freedom From Religion Found. v. Abbott*,
  955 F.3d 417 (5th Cir. 2020) .................................................. 42

*Friends of Georges, Inc. v. Mulroy*,
  675 F. Supp. 3d 831 (W.D. Tenn. 2023) .............................. 20

*Gay Student Servs. v. Tex. A&M Univ.*,
  737 F.2d 1317 (5th Cir. 1984) .......................... 18, 47, 52, 55

*Hays Cnty. Guardian v. Supple*,
  969 F.2d 111 (5th Cir. 1992) .................................................. 45

*Healy v. James*,
  408 U.S. 169 (1972) .......................................... 26, 34, 36, 50

*HM Fla.-ORL, LLC v. Griffin*,
  679 F. Supp. 3d 1332 (M.D. Fla. 2023) ................................ 20

*Hornbeck Offshore Servs., LLC v. Salazar*,
  713 F.3d 787 (5th Cir. 2013) .................................................. 54

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
  515 U.S. 557 (1995) .......................................... 22, 27, 28, 30

*Imperial Sovereign Ct. v. Knudsen*,
  699 F. Supp. 3d 1018 (D. Mont. 2023) ............................ 20, 41

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
    993 F.2d 386 (4th Cir. 1993) .................................................... 26, 38, 50

*Jackson v. Wright*,
    82 F.4th 362 (5th Cir. 2023) ............................................................ 60

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ....................................................................... 23

*Justice for All v. Faulkner*,
    410 F.3d 760 (5th Cir. 2005) ...................................................... 39, 46

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ................................................................... 26, 50

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    584 U.S. 617 (2018) ....................................................................... 21

*Matal v. Tam*,
    582 U.S. 218 (2017) ................................................................ passim

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ....................................................................... 42

*Miller v. California*,
    413 U.S. 15 (1973) ......................................................................... 48

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ....................................................................... 29

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ................................................................... 17, 46

*Norma Kristie, Inc. v. City of Oklahoma City*,
    572 F. Supp. 88 (W.D. Okla. 1983) .................................................. 20

*Oliver v. Arnold*,
    19 F.4th 843 (5th Cir. 2021) ............................................................ 2

*Papish v. Bd. of Curators of the Univ. of Mo.*,
    410 U.S. 667 (1973) ................................................................ passim

*Pro-Life Cougars v. Univ. of Hou.*,
 259 F. Supp. 2d 575 (S.D. Tex. 2003)..................................................47

*Reed v. Town of Gilbert*,
 576 U.S. 155 (2015)..........................................................................18, 42

*Reeves v. McConn*,
 631 F.2d 377 (5th Cir. 1980)..................................................................37

*Reno v. ACLU*,
 521 U.S. 844 (1997).................................................................................43

*Robinson v. Hunt County*,
 921 F.3d 440 (5th Cir. 2019)...........................................................31, 33

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
 515 U.S. 819 (1995)........................................................................ passim

*Rumsfeld v. F. for Acad. & Inst. Rts.*,
 547 U.S. 47 (2006)...................................................................21, 28, 29

*S. Utah Drag Stars v. City of St. George*,
 677 F. Supp. 3d 1252 (D. Utah 2023)............................................20, 23

*Sable Commc'ns v. FCC*,
 492 U.S. 115 (1989).................................................................................59

*Saxe v. State Coll. Area Sch. Dist.*,
 240 F.3d 200 (3d Cir. 2001) ..................................................................48

*Schacht v. United States*,
 398 U.S. 58 (1970)...........................................................................23, 28

*Schad v. Borough of Mount Ephraim*,
 452 U.S. 61 (1981)...................................................................................23

*Se. Promotions, Ltd. v. Conrad*,
 420 U.S. 546 (1975)........................................................................ passim

*Shuttlesworth v. City of Birmingham*,
 394 U.S. 147 (1969)..................................................................................48

*Spectrum WT v. Wendler*,
   151 F.4th 714 (5th Cir. 2025) ...................................................... passim

*Spectrum WT v. Wendler*,
   No. 2:23-cv-00048 (N.D. Tex. Oct. 28, 2025)........................................ 14

*Spectrum WT v. Wendler*,
   No. 2:23-cv-00048 (N.D. Tex. Oct. 8, 2025)......................................... 14

*Spectrum WT v. Wendler*,
   No. 2:23-CV-048-Z, 2025 WL 2712511 (N.D. Tex. Sept. 23,
   2025) ........................................................................................ 13, 14

*Spectrum WT v. Wendler*,
   No. 2:23-cv-00048 (N.D. Tex. Nov. 10, 2025)....................................... 14

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020)............................................... 60, 62, 63, 67

*Tex. A&M Queer Empowerment Council v. Mahomes*,
   772 F. Supp. 3d 792 (S.D. Tex. 2025)................................................. 20

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
   732 F.3d 535 (5th Cir. 2013)........................................................ 61, 62

*Texas v. Johnson*,
   491 U.S. 397 (1989)................................................................... passim

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ...................................................................... 2

*United States v. O'Brien*,
   391 U.S. 367 (1968) ...................................................................... 37

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021) ...................................................................... 64

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ................................................................... 39, 45

*Widmar v. Vincent*,
   454 U.S. 263 (1981)......................................................... 36, 45, 46, 54

*Woodlands Pride, Inc. v. Paxton*,
   694 F. Supp. 3d 820 (S.D. Tex. 2023)...................................................... 20

*Woodlands Pride, Inc. v. Paxton*,
   No. 23-20480, 2025 WL 3096979 (5th Cir. Nov. 6, 2025).............. 20, 52

**Statutes**

28 U.S.C.
   § 1331......................................................................................................... 4
   § 1343......................................................................................................... 4
   § 1292(a)(1)............................................................................................... 4

Tex. Educ. Code § 51.9315(g) ............................................................... 6, 44

Tex. Health & Safety Code § 769.002...................................................... 56

Tex. Loc. Gov't Code § 243.0031 ............................................................. 56

Tex. Penal Code § 43.28 ........................................................................... 56

**Other Authorities**

Andrew R. Chow,
   *A Charged Title. A Canceled Show. Now a Cal State Official
   Resigns*, N.Y. Times (Sep. 13, 2016) ...................................................... 65

Cameron Ehsan,
   Stanford President Renews Commitment to Academic Freedom
   Amid Law School Controversy, Stanford Daily (Apr. 3, 2023)........... 63

Cebelihle Hlatshwayo et al.,
   *SMC 'By The River Rivanna' Production Is Cancelled*, The
   Corsair (Oct. 20, 2023).................................................................. 64, 65

Comm. on Freedom of Expression,
   Univ. of Chicago, Report of the Committee on Freedom of
   Expression (2015)................................................................................... 62

Emma Camp,
   *Brooklyn College Forced a Student To Take Down Anti-Israel
   Signs While Leaving Other Posters Untouched*, Reason (Dec. 14,
   2023) ................................................................................................ 66

Josh Hammer,
   Opinion, *The University of Michigan Failed To Protect My Right
   To Free Speech*, Newsweek (Nov. 24, 2023)........................................ 66

KAMR,
   *Walter Wendler Full Interview*, at 25:11–26:36 (Apr. 27, 2023, at
   16:28 CT) ...................................................................................... 15

Lewis Carroll,
   *Jabberwocky, in Jabberwocky and Other Poems* (Courier Dover
   Publ'ns 2001) (1871) ...................................................................... 28

Nicolaas H. Gootjes,
   *The Virgin Birth: Stumbling Block for Feminist Theology*,
   Christian Libr. (1994) .................................................................... 30

Texas A&M University System Board of Regents,
   *Agenda Items Meeting of the Board of Regents* (Nov. 13, 2025) ......... 39

Walter Wendler,
   "Opinion: Texas DEI ban lets universities rediscover their
   purpose," Amarillo Globe News (Mar. 25, 2025) ................................ 67

## INTRODUCTION

If public officials can invoke their own interpretations of expression to justify censoring it, no viewpoint is safe. Public university administrators are no exception. Even today, campus administrators regularly wrap censorship in concerns about offensiveness and controversy, whether they are trying to silence political views, performers, or persons of faith.

Ensuring the First Amendment stands strong against that threat to expressive liberty is what's at stake here. The president of West Texas A&M University has banned from his campus all drag performances—which are protected expression, like any other stage performance—before a single student took the stage. Why has he imposed that prior restraint? He believes the shows are offensive.

That violates the First Amendment. Time and again, the Supreme Court and this Court have invalidated speech restrictions that rest on a public official's opinions about which messages are appropriate and which are not. And make no mistake: "That's offensive" is a speech-chilling device for public university censors of all stripes. Take a student group inviting a well-known critic of modern feminism to speak, or

perhaps a student art show featuring a painting of Eve handing Adam the forbidden fruit. One can easily envision a public university president banning the critic or the artistic work under Wendler's criteria of what is "divisive," "misogynistic," and "derisive."

In those cases and this one alike, the Constitution prohibits silencing students under the banner of preventing offense. From the public square to public universities, the First Amendment demands the government remain neutral whether expression involves our "political system" or our "cultural life." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). Sticking to that principle is as important now as ever. As one member of this Court recently remarked, "[i]t's a sad fact of modern life in America that the culture wars are no longer limited to skirmishes between elected officials on Capitol Hill or in our state capitals," but "are increasingly fought" at our schools. *Oliver v. Arnold*, 19 F.4th 843, 843 (5th Cir. 2021) (Ho, J., concurring in denial of rehearing en banc).

This case is an opportunity for the Court to insulate our prized expressive freedoms at public universities from those culture wars, to

enjoin President Wendler's unconstitutional ban, and to restore the First Amendment to West Texas A&M. Spectrum WT urges it to do so.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because Plaintiff-Appellant Spectrum WT appeals from the district court's September 21, 2023, order denying its amended motion for a preliminary injunction. ROA.849–74. Plaintiff filed a timely notice of appeal on September 26, 2023. ROA.882–84.

## STATEMENT OF ISSUES

1.    From stage performances to video games, the Supreme Court has long held that the First Amendment protects art and entertainment because it is inherently expressive. Spectrum WT wishes to perform a PG-13 charity drag show at West Texas A&M University, which the University's president agreed is "performance" and "artistic expression." Did the district court err in concluding that Spectrum WT's drag show lacks First Amendment protection?

2.    Public officials violate the First Amendment when they stifle protected expression based on its viewpoint. Before anyone took the stage, West Texas A&M's president banned drag shows in campus forums open to student expression because, in his view, drag shows promote values he disagrees with. Did the district court err in not enjoining this viewpoint-based prior restraint on protected expression?

## STATEMENT OF THE CASE

**West Texas A&M opens its facilities to student expression, including stage performance.**

West Texas A&M University opens certain campus spaces for students, recognized student organizations, and the public to use for a broad range of expressive activity. ROA.220–21, ¶¶ 27–35. Texas law and university policy bar administrators from denying access to these spaces based on students' "political, religious, philosophical, ideological, or academic viewpoint" or the content of their "expressive activities." Tex. Educ. Code § 51.9315(g); ROA.340.

One of these spaces is Legacy Hall in West Texas A&M's JBK Student Center. ROA.221, ¶¶ 33–34. The university maintains Legacy Hall as an open forum for students' expressive activities like concerts, theatrical performances, and other entertainment. *Id.* ¶¶ 32–34. Students and the public alike use Legacy Hall and similar campus forums for an array of events, including beauty pageants, singing competitions, concerts, worship, political events—and, as recently as 2019, student drag shows. ROA.327–32, ¶¶ 6–16; ROA.343–83.

**Spectrum WT, a recognized student group, organizes a drag show in Legacy Hall.**

Spectrum WT (Spectrum) is a longstanding, recognized student organization at West Texas A&M. ROA.215, ¶ 10. Spectrum often organizes campus events like proms, movie nights, and discussions about history, all focusing on issues important to the LGBTQ+ campus community. ROA.216, ¶ 13. Spectrum members express themselves through these events, raising awareness of their mission on campus and in the surrounding community. ROA.215–17, ¶¶ 11, 13–15.

To that end, in November 2022, Spectrum started planning a March 31, 2023, charity drag show at Legacy Hall. ROA.226, ¶¶ 52–56. For Spectrum and its members, the show was important to express support and advocate for the LGBTQ+ community. ROA.229, ¶ 74. Proceeds from the event would benefit a suicide prevention charity. ROA.216, ¶ 13; ROA.223–24, ¶ 41; ROA.328–29, ¶¶ 8–9; ROA.351–60.

The students planned their event carefully. Spectrum described the planned performances as appropriate for those over 13 years old. ROA.229, ¶¶ 76–79; ROA.232, ¶ 94. They instructed performers to avoid profane music or "lewd" conduct. ROA.229–30, ¶¶ 79, 81. Being even more cautious, the students also barred minors from attending, unless

accompanied by a parent or guardian so that performers' family members could attend. ROA.229, ¶ 80.

Administrators and staff helped Spectrum plan the show, working with the students to consider any risks to participants or the audience, and helping them with promotional materials. ROA.227, ¶ 60; ROA.230–33, ¶¶ 86–94, 99–100. They expressed support for the event, praised the students' leadership, and approved the show to move forward. ROA.230–33, ¶¶ 86–94, 99–100.

**President Wendler cancels Spectrum WT's performance, describing drag shows as "expression which denigrates others."**

Eleven days before the show, Vice President for Student Affairs Christopher Thomas informed Spectrum that President Wendler was canceling the drag show. ROA.233, ¶¶ 103–04. Thomas explained that Wendler disliked the idea of the drag show, believing it discriminated against women. *Id.* ¶ 104.

In a public edict posted online and emailed to the campus community, President Wendler declared that "West Texas A&M will not host a drag show on campus" because a "harmless drag show" could never be "possible." ROA.265–67. Wendler's 734-word edict focused on the "ideology" underlying drag shows. *Id.* Drag, he wrote, is "a performance

exaggerating aspects of womanhood (sexuality, femininity, gender)" that, through "slapstick," "stereotype[s] women in cartoon-like extremes for the amusement of others." *Id.* "When humor becomes harassment, it has gone too far," Wendler opined. *Id.* And he pronounced that "[d]rag shows are derisive, divisive and demoralizing," promoting "ideology" by focusing on "group membership," not "individual" achievement. *Id.*

At the same time, Wendler admitted the Constitution stood in his way:

> I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, *even when the law of the land appears to require it.*

ROA.267 (emphasis added). Nowhere in Wendler's email did he mention concerns of "lewdness." ROA.265–67.

**The district court denies injunctive relief.**

On March 24, 2023, Spectrum and two of its then-officers, Barrett Bright and Lauren Stovall, sued President Wendler and Texas A&M System officials. ROA.16. The same day, they moved for a temporary restraining order and a preliminary injunction. ROA.126–62. The students explained that without immediate relief, they would have to

seek an off-campus venue, as the banned campus event was scheduled for the next Friday. ROA.157.

Three days later, the district court ordered Defendants to respond to the TRO motion by March 30, just one day before the students' scheduled on-campus show. ROA.163. Left with little choice, the students withdrew their TRO to avoid simultaneously planning two events—one on-campus if the district court granted the TRO, and another off-campus if the court denied relief. ROA.172–73; ROA.236, ¶ 122. Blocked from performing on campus, the registered student organization scrambled to raise funds and organize a show at a public park far from West Texas A&M. ROA.236, ¶¶ 122–26.

Soon, Plaintiffs amended their verified complaint, alleging four causes of action: three claims for injunctive and declaratory relief based on First Amendment viewpoint discrimination, exclusion from a public forum, and prior restraint; and a damages claim against President Wendler. ROA.212–75. In response, President Wendler argued for the first time—contrary to his edict—that drag shows are not inherently expressive. ROA.446. He also claimed for the first time that Spectrum's planned show was "lewd," despite never letting the students take the

stage. ROA.446–47. But Wendler submitted no affidavit or other evidence that he considered "lewdness" when he issued his edict banning drag shows from campus because of their perceived "ideology." *See generally* ROA.468–517. He and the other Defendants also moved to dismiss. ROA.411–38, 521–37.

The district court denied Plaintiffs' motion for a preliminary injunction and dismissed all damages claims against Wendler. ROA.849–74. Reasoning that "it is not clearly established that all drag shows are inherently expressive," the district court effectively held that Spectrum's planned drag shows lack First Amendment protection. ROA.858–62. It did uphold, however, Plaintiffs' standing to sue Vice President Thomas, and rejected Wendler's claim to sovereign immunity. ROA.868–72. In sum, the district court allowed only Plaintiffs' claims for declaratory and permanent injunctive relief to remain. ROA.873. Plaintiffs soon appealed the denial of their preliminary injunction motion. ROA.882.

**President Wendler cancels another Spectrum drag performance.**

Spectrum had applied to hold a drag show in Legacy Hall on March 24, 2024. ROA.237, ¶ 130(b). Before this Court's panel heard oral argument, President Wendler announced in another campus-wide email

that he was canceling Spectrum's 2024 performance, "for the reasons given previously and for the reasons further explained in court filings and those provided by the courts themselves." Spectrum WT Rule 28(j) Letter, Dkt. No. 156.

**The panel reverses and remands.**

On August 18, a panel majority of this Court reversed and remanded. Writing for the majority, Judge Southwick explained that the First Amendment protects Spectrum's planned drag performances, because given their context, "the message sent by parading on a theater stage in the attire of the opposite sex would have been unmistakable." *Spectrum WT v. Wendler*, 151 F.4th 714, 726 (5th Cir. 2025), *reh'g granted and vacated mem.*, 2025 WL 3008019 (5th Cir. Oct. 27, 2025) (per curiam). Next, the majority held Legacy Hall is a designated public forum, citing how West Texas A&M policy and practice both open the venue to expression from students and the public alike. *Id.* at 727–28. And because President Wendler's ban is a content-based restriction on expression in a designated public forum, the majority concluded, it violates the First Amendment unless it overcomes strict scrutiny, and "President Wendler did not argue, either before the district court or on

12

appeal, that restricting the intended drag show would survive strict scrutiny." *Id.* at 729. The panel majority also affirmed that Spectrum has standing to sue Vice President Thomas. *Id.* at 732.

Judge Ho dissented, arguing that the Supreme Court's decision in *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661 (2010) (*CLS*), authorizes President Wendler to ban drag performances over his concerns that they discriminate against women. *Spectrum WT*, 151 F.4th at 735–36, 738 (Ho, J., dissenting). In response, the majority distinguished *CLS*, noting that (a) *CLS* involved a limited public forum, and (b) *CLS* was about a restriction on student group's freedom of association, unlike the direct restriction on expression Wendler's ban imposes. *Id.* at 728.

**After the panel majority opinion issues, the district court holds Spectrum WT still has standing to pursue injunctive relief.**

Soon after the panel majority reversed and remanded, Defendants moved for dismissal on lack of subject matter jurisdiction, arguing Plaintiffs lack standing and that their claims are moot and unripe. Although the district court dismissed Plaintiffs Bright and Stovall, who are no longer enrolled at West Texas A&M, it rightly held Spectrum has maintained standing to pursue equitable relief. *Spectrum WT v. Wendler*,

No. 2:23-CV-00048-Z, 2025 WL 2712511, at *4–5 (N.D. Tex. Sept. 23, 2025). It also rejected Defendants' ripeness and mootness arguments, recognizing "the injury here is still ongoing" because "any similar drag show Spectrum applies to host on campus is likely to be canceled as well." *Id.* at *6.[2]

**The drag show ban is irreparably harming Spectrum WT.**

Spectrum has every intent to put on future drag shows at Legacy Hall. *E.g.*, ROA.236, ¶ 127; ROA.237, ¶ 130; ROA.239, ¶ 136. But Defendants are certain to cancel any campus show Spectrum applies to host at Legacy Hall or any other campus forum.

As public attention grew after Spectrum sued, President Wendler revealed in a television interview his resolve to ban drag shows from

---

[2] On October 8, 2025, the district court set a bench trial for this case to occur during a three-week trial docket starting February 3, 2026. Civ. Scheduling Ord., *Spectrum WT v. Wendler*, No. 2:23-cv-00048 (N.D. Tex. Oct. 8, 2025), Dkt. No. 120. In an amended scheduling order dated October 28, the day after this Court granted rehearing, the district court did not change the trial date. Amended Civ. Scheduling Ord., *Spectrum WT*, No. 2:23-cv-00048 (N.D. Tex. Oct. 28, 2025), Dkt. No. 122. After the parties jointly moved to continue the trial date, the district court moved up the trial date, to occur during the district court's three-week trial docket starting January 14, 2026. Second Amended Civ. Scheduling Ord., *Spectrum WT v. Wendler*, No. 2:23-cv-00048 (N.D. Tex. Nov. 10, 2025), Dkt. No. 126. As a result, Plaintiffs have moved this Court to hold the appeal in abeyance. Dkt. No. 232.

campus: "I wouldn't have done anything any differently." ROA.623.[3] Wendler has not renounced his public edict banishing drag shows from campus and twice has canceled Spectrum's planned performances at Legacy Hall. ROA.235, ¶ 119; Spectrum WT Rule 28(j) Letter, Dkt. No. 156. This ongoing drag performance ban continues to imperil Spectrum's First Amendment rights and its ability to plan and prepare for an on-campus performance. ROA.238–39, ¶¶ 133, 136; ROA.240–41, ¶ 144. Given that irreparable harm, the panel majority remanded for entry of a preliminary injunction. *Spectrum WT*, 151 F.4th at 733.

---

[3] *See also* KAMR, *Walter Wendler Full Interview*, at 25:11–26:36 (Apr. 27, 2023, at 16:28 CT), https://www.myhighplains.com/video/walter-wendler-full-interview/8598931.

## STANDARD OF REVIEW

A preliminary injunction denial "grounded in erroneous legal principles is reviewed *de novo*," even if "the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (citation omitted). "Whether free speech rights have been infringed presents a mixed question of law and fact reviewed *de novo*, and when a preliminary injunction turns on a mixed question of law and fact, it, too, is reviewed *de novo*." *Id.* (citation omitted).

## SUMMARY OF THE ARGUMENT

For over two years, a university president and his vice president of student affairs have imposed a prior restraint on protected expression, "the most serious and the least tolerable" First Amendment violation. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). This act of censorship stands on President Wendler's view that a planned drag performance in a campus designated public forum "demeans," "mock[s]," and "denigrates" women.

This censorship violates basic constitutional principles. The First Amendment protects speech even if some find it offensive because "[g]iving offense is a viewpoint," *Matal v. Tam*, 582 U.S. 218, 243 (2017) (opinion of Alito, J.), and "[v]iewpoint discrimination is … an egregious form of content discrimination" that is "presumptively unconstitutional," *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829–30 (1995). President Wendler understands this principle, acknowledging "the law of the land" protects Spectrum's show. ROA.267.

Whether tinged with political views or pure "slapstick" humor, the First Amendment protects stage performance like Spectrum's planned drag performance at Legacy Hall, a designated public forum at the

university. So by barring Spectrum from holding a drag performance at Legacy Hall because President Wendler believes it "demeans" and "mocks," Defendants are violating the First Amendment three times over. They are discriminating based on viewpoint. They are discriminating based on content in a designated public forum. And they are imposing an unconstitutional prior restraint. The First Amendment does not tolerate public officials banning expressive conduct from a public venue because they dislike the message. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555–58 (1975).

Because viewpoint discrimination violates the First Amendment in any forum, Wendler's ban is per se unconstitutional. Alternatively, if the Court analyzes the ban under strict scrutiny because it is content based, *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), Defendants have made no effort to overcome it, as the panel majority recognized. *Spectrum WT*, 151 F.4th at 729. The same holds for Defendants' "heavy burden" to justify a prior restraint. *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1327 (5th Cir. 1984).

If President Wendler finds Spectrum's protected expression offensive, he has every right not to attend. He can urge others not to

attend, or even criticize it. But the Constitution prevents him from banning Spectrum's charity stage performance from the Legacy Hall stage, and only injunctive relief can protect Spectrum from irreparable harm to its First Amendment rights and protect the public's interest in ensuring university campuses remain strongholds for free expression. This Court should reverse and remand.

## ARGUMENT

### I.    Spectrum WT is Likely to Succeed on the Merits.

By banning an entire genre of stage performance from campus because President Wendler finds it "offensive or disagreeable," Defendants have violated "a bedrock principle underlying the First Amendment." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). This alone establishes Spectrum has shown a likelihood of success on the merits. That Wendler's ban is both a content-based restriction of speech in a designated public forum and prior restraint on speech in advance of Spectrum's performance only magnifies the gravity of Defendants' ongoing First Amendment violation. And while President Wendler has justified his ban by speculating about what Spectrum's planned performances might entail, that cannot overcome strict scrutiny. Our

Constitution demands more than mere guesswork to justify infringing First Amendment rights, let alone imposing a viewpoint-based blanket ban on protected speech at a public university.

### A. Like with any stage performance, the First Amendment protects Spectrum WT's drag show.

When Americans get on stage and express themselves, the First Amendment protects their expression, even if the performances are not a government official's cup of tea. *Se. Promotions*, 420 U.S. at 557. And that includes drag performances in a designated public forum like Legacy Hall at West Texas A&M, as the panel majority correctly held—and the dissent did not disagree. *Spectrum WT*, 151 F.4th at 721–25, 727–28. Nor is the panel majority alone. Several courts have considered the issue and recognized First Amendment protection for drag performance.[4] Only the

---

[4] *Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88 (W.D. Okla. 1983); *Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792 (S.D. Tex. 2025) (enjoining campus drag show ban); *Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820, 842–43 (S.D. Tex. 2023), *vacated on other grounds*, No. 23-20480, 2025 WL 3096979 (5th Cir. Nov. 6, 2025); *HM Fla.-ORL, LLC v. Griffin*, 679 F. Supp. 3d 1332 (M.D. Fla. 2023), *aff'd sub nom.*, *HM Fla.-ORL, LLC v. Governor of Florida*, 137 F.4th 1207 (11th Cir. 2025); *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252 (D. Utah 2023); *Friends of Georges, Inc. v. Mulroy*, 675 F. Supp. 3d 831 (W.D. Tenn. 2023) (holding Tennessee's statutory drag ban violated the First Amendment), *rev'd on other grounds*, 108 F.4th 431 (6th Cir. 2024); *Imperial Sovereign Ct. v. Knudsen*, 699 F. Supp. 3d 1018 (D. Mont. 2023), *argued*, No. 23-3581 (9th Cir. June 4, 2024). *Imperial Sovereign Court* remains on appeal, as does *Queer Empowerment Council*, which is pending in this Court.

district court has held otherwise, departing so sharply from deep-rooted First Amendment precedent that even donning an armband in protest or wearing a religious symbol would fall victim to the district court's reasoning. This Court should reverse that error.

### 1. The First Amendment protects expression beyond the written or spoken word.

As the Supreme Court explained, while the "First Amendment literally forbids the abridgment only of 'speech,' [] we have long recognized that its protection does not end at the spoken or written word." *Johnson*, 491 U.S. at 404. Rather, the First Amendment also protects "expressive conduct." *Id.* at 403. That protection spans "a wide array of conduct that can qualify as expressive, including nude dancing, burning the American flag … wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 657 & n.1 (2018) (Thomas, J., concurring) (collecting cases).

### 2. The First Amendment protects stage performances, like drag shows, because they are inherently expressive.

If conduct is "inherently expressive," the First Amendment protects it. *Rumsfeld v. F. for Acad. & Inst. Rts.* (*FAIR*), 547 U.S. 47, 66 (2006)

(citing *Johnson*, 491 U.S. at 406); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995) ("a narrow, succinctly articulable message is not a condition of constitutional protection" for expressive conduct). That's why the First Amendment protects drag performances, as it does any stage performance. After all, when performers take the stage, they do so to express themselves to the audience. That has been true since the Ancient Greeks took the Athenian stage and Shakespeare's plays were performed at the Globe Theatre in Elizabethan England. And it's true with Spectrum's performance, featuring choreographed performers dancing on stage in costume accompanied by music. *See, e.g.*, ROA.227, ¶¶ 63–64.

An audience member watching a stage performance does not need a viewer's guide to know the performers are conveying *some* message, no matter how opaque it may be. And that's enough for expressive conduct to enjoy First Amendment protection, as the panel majority rightly held. *Spectrum WT*, 151 F.4th at 724–25 ("[I]t must be evident that conveying some message, even if nearly opaque or perhaps smeared, was intended.").

To that end, "live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981). The Supreme Court confirmed that stage performance falls within that guarantee. *Se. Promotions*, 420 U.S. at 557–58 (citing *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). Whether "crude and amateurish" or highbrow, theatrical performances receive the First Amendment's full protection. *Schacht v. United States*, 398 U.S. 58, 61–62 (1970).

Drag performances are no exception. They are "indisputably protected speech" as "a medium of expression, containing political and social messages regarding (among other messages) self-expression, gender stereotypes and roles, and LGBTQIA+ identity." *S. Utah Drag Stars*, 677 F. Supp. 3d at 1286. Spectrum's intended performances fit that bill, as they will convey messages to their ticketed audiences. The organization provides a space for "LGBT+ students and allies to come together" and to "promote diversity, support, and acceptance on campus and in the surrounding community." ROA.215, ¶ 11. To help spread Spectrum's message, it organized a drag show to raise funds for an

LGBTQ+ suicide prevention charity and convey messages about Spectrum's mission. ROA.229, ¶ 74.

President Wendler understands the inherent expressiveness of drag performance. He did not need to see Spectrum's planned performance to describe it as "artistic expression" and a "performance exaggerating aspects of womanhood," which promotes a certain "ideology." ROA.265–66. That alone concedes this issue.

### 3. The context of Spectrum WT's planned performances also establishes First Amendment protection.

As the panel majority correctly reasoned, the specific context of drag shows, including Spectrum's, cements why the First Amendment protects them. *Spectrum WT*, 151 F.4th at 726; *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) ("It is also true that a message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative."). Spectrum's flyers for the 2023 event leave no doubt as to its communicative context as an LGBTQ+ group event sending a message of support for an LGBTQ+ charity:



ROA.232, ¶ 94. And audience members, having bought a ticket to view a show promoted to further the group's mission and support a suicide prevention charity, would see performers on stage dancing in eye-catching clothing and makeup, with lighting and music. ROA.227-29 ¶¶ 62–73. With those cues, the audience would know Spectrum's performers are communicating a message.

The district court downplayed the context of Spectrum's intended shows, equating drag performance to nothing more than "men … dressed in attire stereotypically associated with women" or "scantily clad baristas." ROA.860. That was error. Just as context distinguishes a coach kneeling in prayer at the 50-yard line from one kneeling to tie his shoe,

*see generally Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022), it distinguishes a choreographed drag show on stage from getting dressed for the day.

The First Amendment protection for Spectrum's performance stands just as strong at a public university as it did on the municipal stage in *Southeastern Promotions.* 420 U.S. at 557–58. The Supreme Court's decisions "leave no room for the view that … First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972). Indeed, its protection is "nowhere more vital" than on college campuses. *Id.* As the Fourth Circuit correctly concluded, the First Amendment protects stage entertainment at a public university even if some might find it "low quality" and "crude." *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390–93 (4th Cir. 1993) (holding a fraternity's "ugly woman contest" was protected expressive conduct). So too here.

### 4. The district court departed from decades of Supreme Court precedent establishing constitutional protection for expressive conduct.

By holding the First Amendment does not protect Spectrum's show, the district court made several fundamental errors misreading Supreme

Court precedent and the record. Not only did the district court discount *Southeastern Promotions*'s holding that stage performance falls within the First Amendment and is not subject to a different constitutional standard from any other speech, it also misread the Supreme Court's precedent on expressive conduct more generally.

Twice over the district court erred in not applying the Supreme Court's holding in *Hurley* that expressive conduct does not have to convey a "succinctly articulable message" for the First Amendment to protect it. 515 U.S. at 569. First, the district court suggested the First Amendment protects only expressive conduct that conveys "overtly political" messages. ROA.853; ROA.862. *Hurley* squarely rejects that cramped view. What's more, the Supreme Court has "long recognized that" when it comes to First Amendment protection, "it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011); *see also Winters v. New York*, 333 U.S. 507, 510 (1948) ("The line between the informing and the entertaining is too elusive for the protection of that basic right. … What is one man's amusement, teaches another's doctrine."). The panel majority correctly applied these principles in also rejecting the district

court's conclusion that the First Amendment protects only "work[s] of fine art." *Spectrum WT*, 151 F.4th at 725; *see also Schacht*, 398 U.S. at 61–62.

Second, the district court erred in reasoning that expressive conduct must "obviously convey or communicate a discernable, protectable message." ROA.854. But as the panel majority correctly recognized, *Hurley* plainly rejects that reasoning, too. *Spectrum WT*, 151 F.4th at 722 (citing *Hurley*, 515 U.S. at 569). If the First Amendment were "confined to expressions conveying a 'particularized message,' [it] would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll."[5] *Hurley*, 515 U.S. at 569. It is not. Instead, the First Amendment broadly protects expression open to interpretation, including drag performances. *See id.*

The panel majority also correctly held that the Supreme Court's decision in *FAIR*, 547 U.S. at 66, "did not mention the need for a speaker

---

[5] "Twas brillig, and the slithy toves / Did gyre and gimble in the wabe: / All mimsy were the borogoves, / And the mome raths outgrabe." Lewis Carroll, *Jabberwocky, in Jabberwocky and Other Poems* 17 (Courier Dover Publ'ns 2001) (1871), https://www.poetryfoundation.org/poems/42916/jabberwocky.

to identify a particularized message that a listener would understand." *Spectrum WT*, 151 F.4th at 724. The district court erred suggesting otherwise. ROA.860. As Chief Justice Roberts noted during oral argument in *303 Creative LLC v. Elenis*, *FAIR* "involved [law] schools providing rooms for the military recruiter," and "what the Court said is empty rooms don't speak." Tr. of Oral Arg. at 65:1–9, 600 U.S. 570 (2023) (No. 21-476). As the Court put it differently more recently, "schools are 'not speaking when they host interviews.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) (quoting *FAIR*).

A stage filled with costumed and choreographed performers dancing to music under the lights is no empty room or interview event. It is inherently expressive and protected. Perhaps "an observer" of Spectrum's drag performance "may not discern that the performers' conduct communicates 'advocacy in favor of LGBTQ+ rights,'" as the district court claimed. ROA.861. But as the panel majority held, that does not matter. *Spectrum WT*, 151 F.4th at 724–25. What matters under the First Amendment is that Spectrum intends to communicate *something*— and the audience understands that. *Johnson*, 491 U.S. at 404.

Suppose Spectrum were instead a recognized student ministry, taking the Legacy Hall stage to reenact The Nativity. Some audience members might perceive a righteous expression of faith, or even a historical message. But others might see it as demeaning to other religions, or perhaps to women.[6] Differing interpretations of the performance's message would not deprive it of First Amendment protection. *See Hurley*, 515 U.S. at 569.

So too for Spectrum's performance. "[T]he First Amendment extends to all persons engaged in expressive conduct," underpinning our "enduring commitment to protecting the speech rights of all comers, no matter how controversial—or even repugnant—many may find the message at hand." *303 Creative*, 600 U.S. at 600–01. And that is the heart of this case: The Constitution bars public universities from wrapping censorship in concerns about controversy or offense.

### B.   The district court erred by not enjoining Defendants' ban as unconstitutional viewpoint discrimination.

President Wendler's basis for banning drag shows, which he explained at length stems from disagreement with the shows' "ideology"

---

[6] *See, e.g.*, Nicolaas H. Gootjes, *The Virgin Birth: Stumbling Block for Feminist Theology*, Christian Libr. (1994), https://www.christianstudylibrary.org/article/virgin-birth-2.

and his concern that they are offensive to women, violates the First Amendment. ROA.265–67. "Official censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal*, 582 U.S. at 243). In striking down a restriction of speech at a prominent public university, the Supreme Court left no doubt: "Viewpoint discrimination is … an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. To that end, viewpoint discrimination like President Wendler's ban is "presumptively unconstitutional" no matter the forum type. *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 284 (5th Cir. 2003).

> **1. President Wendler's blanket ban on expression based on its perceived offensiveness is viewpoint discrimination.**

President Wendler's words prove he has banned drag shows from campus based on viewpoint. In his edict to the West Texas A&M campus, Wendler accepts that drag shows are "performance" and "artistic expression." ROA.265–67. At the same time, he describes them as "mocking another person or group." *Id.* He condemns Spectrum's yet-to-be-conveyed message as "derisive, divisive and demoralizing misogyny,

no matter the stated intent." *Id.* He claims that drag "stereotype[s]" women in cartoon-like extremes for the amusement of others and discriminate[s] against womanhood." *Id.* And he explains how his beliefs about natural law, religion, and "human dignity" informed his opinions. *Id.*

These are valid reasons for President Wendler to skip Spectrum's performances, or even to criticize them. But they are not constitutional reasons for *banning* Spectrum's performances from campus or preventing other students from viewing them. Rather, they are viewpoint-discrimination that the First Amendment forbids.

Two Supreme Court decisions make clear Wendler cannot preemptively block a stage performance at such a forum because he perceives the performance's perceived message as offensive, "mocking," "stereotyping," or "derisive": *Matal* and *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667 (1973). Either case should have compelled the district court to enjoin Wendler's ban, but the combination deals it a lethal blow.

In *Matal*, the Supreme Court affirmed the "bedrock First Amendment principle" that "[s]peech may not be banned on the ground

that it expresses ideas that offend." 582 U.S. at 223. Under that rule, the Court invalidated the Trademark Act's "disparagement clause" that denied registration to any mark "that disparages any person, group, or institution." *Id.* at 243, 246 (emphasis omitted). The Court rejected that an "evenhanded[]" prohibition on all disparagement could be viewpoint-neutral. *Id.* at 243. Even though the disparagement clause "applie[d] equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue," it still discriminated based on viewpoint, because ultimately, "[g]iving offense is a viewpoint." *Id.*

President Wendler's rationale for banning Spectrum's performance maps onto *Matal* so well it could be a verbatim quote: He finds their message "mocking" and "derisive, divisive and demoralizing misogyny." ROA.265–67. But just as the Trademark Office cannot refuse to register marks it thinks will disparage, Defendants cannot bar Spectrum's performance because Wendler thinks it will demean. *See Matal*, 582 U.S. at 223; *see also Robinson*, 921 F.3d at 447, 452 (reversing denial of preliminary injunction against county's policy prohibiting "inappropriate" comments on the sheriff office's Facebook page).

*Papish* shows the "bedrock principle" *Matal* reaffirmed in action on a public university campus. There, the Court held the First Amendment prohibits universities from restricting student speech because campus administrators find it distasteful. *Papish*, 410 U.S. at 670. *Papish* was a per curiam opinion, but it was so short only because the Court considered the result to be so obvious. *Id.* (noting that the result was "clear"). In fact, it had just ruled in *Healy v. James* that a university president could not deny a student club recognition even if he found the group's "views" and "philosophy" "abhorrent." 408 U.S. at 187. Relying on this holding, the *Papish* Court held "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670.

Wendler views drag shows in the same light that the University of Missouri chancellor in *Papish* viewed political cartoons of "policemen raping the Statue of Liberty." *Id.* at 667. No matter how personally abhorrent Wendler or others may find such performances, *Papish* makes clear the First Amendment requires he let the show go on.

Instead of faithfully applying *Matal* and *Papish*, the district court held Spectrum must show President Wendler targeted its "specific

motivating ideology or the opinion or perspective." ROA.865 (quoting *Rosenberger*, 515 U.S. at 829). That was error. For one thing, Wendler's edict expressly invoked "ideology." ROA.265–66. And even if Wendler perceives a different "ideology" behind Spectrum's planned performance than the one Spectrum intends, the Supreme Court in *Rosenberger* rejected "bipolar" viewpoint discrimination, explaining that "exclusion of several views on" an issue "is just as offensive to the First Amendment as exclusion of only one." *Rosenberger*, 515 U.S. at 831. Letting the district court's reasoning stand would allow campus administrators to silence all stripes of disfavored speech by labeling it "offensive" or "divisive," no matter the speaker's intended message.

The viewpoint-driven nature of President Wendler's ban is also one reason why *CLS* has no bearing on this case, despite what Defendants and the panel dissent have asserted. ECF 94, Wendler Panel Br. 23–24; *Spectrum WT*, 151 F.4th at 733–34 (Ho, J., dissenting). Unlike this case, *CLS* did not involve viewpoint discrimination. Rather, it centered on a viewpoint-neutral law school policy that required registered student organizations to "allow *any* student to participate, become a member, or seek leadership positions in the organization, regardless of [her] status

or beliefs"—*a fact to which the policy's challenger stipulated*. 561 U.S. at 675. But even while upholding that policy as constitutional, the Supreme Court pointedly stressed its "series of decisions" that have "emphasized that the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints." *Id.* at 667–68 (citing *Rosenberger*, *Healy*, and *Widmar v. Vincent*, 454 U.S. 263 (1981)); *see also id.* at 696 n. 26 ("Although registered student groups must conform their conduct to the Law School's regulation by dropping access barriers, they may express any viewpoint they wish—including a discriminatory one. … Today's decision thus continues this Court's tradition of protecting the freedom to express the thought that we hate.") (citation omitted) (cleaned up).

### 2. The First Amendment bar against viewpoint discrimination protects expressive conduct.

The Constitution does not give the government a stronger hand to silence a view just because it's delivered through expressive conduct rather than pure speech, contrary to the district court's suggestion. ROA.864–85. The Supreme Court explained in *Johnson* the "enduring lesson, that the government may not prohibit expression simply because it disagrees with its message, is not dependent on the particular mode in

which one chooses to express an idea." *Johnson*, 491 U.S. at 416. Wendler cannot limit campus stage performances to only those that do not offend him or others any more than Texas could limit flag burning to conveying only messages that "d[o] not endanger the flag's representation of nationhood and national unity." *Id.* at 417.

The district court also erred by holding Wendler was targeting "offensive conduct" instead of pure speech. ROA.865. While campus officials have leeway to target conduct for purposes "unrelated to the suppression of free expression," *United States v. O'Brien*, 391 U.S. 367, 377 (1968), Wendler's edict confirms he is censoring drag performance because of what is expressed. Moreover, "[t]he right to communicate inherently comprehends the right to communicate effectively," and existence of an alternative the government considers less offensive cannot "justify a restraint on some particular means that the speaker finds more effective," as Spectrum finds drag performance. *Reeves v. McConn*, 631 F.2d 377, 382 (5th Cir. 1980). So it makes no difference if students speak through words or conduct: If campus officials censor them because of concerns over offensiveness, they violate the First Amendment.

That's true when campus officials target crude political cartoons. *Papish*, 410 U.S. at 670. It's true when students host an "ugly woman contest" riddled with "racist and sexist" overtones, including contestants "dressed as caricatures of different types of women" and in "black face." *Iota Xi*, 993 F.2d at 387–88 (holding punishing the students who hosted the contest violated the First Amendment). And it is true here, where President Wendler has banned drag performances based on subjective concerns over sexism and misogyny. ROA.265–67, 865–67.

## C.     Excluding Spectrum WT's drag show from a designated public forum because of its content violates the First Amendment.

In addition to Wendler's impermissible viewpoint discrimination, the fact that he is excluding speech from a designated public forum based on content renders his ban presumptively unconstitutional and subject to strict scrutiny. That is an independent ground for reversing the district court's decision.

### 1.     University policy and practice establish Legacy Hall as a designated public forum.

The panel majority correctly held Legacy Hall is a designated public forum where content-based restrictions on expression like Wendler's ban warrant strict scrutiny. *Spectrum WT*, 151 F.4th at 727–29. A public

forum's classification turns on the government's "policy and practice" and the venue's "compatibility with expressive activity." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215–16 (2015). Here, both university policies broadly designating campus indoor venues for students' and the public's expressive activities and the university's longstanding practices involving Legacy Hall confirm it is dedicated for expressive activity.

West Texas A&M's policy guaranteeing expressive freedom in Legacy Hall (ROA.272–73), with only "minimal" limits on speech, makes it a designated public forum. *See Justice for All v. Faulkner*, 410 F.3d 760, 766 & n.8, 768–69 (5th Cir. 2005) (forum classification is particular to a given space, not one classification for "an entire university campus"). The policy allows any person, "subject to reasonable time, place, and manner restrictions, to engage in expressive activities on campus." ROA.272–73. And it broadly defines "campus" to include both its "land and buildings," like Legacy Hall. ROA.272.[7]

---

[7] The Texas A&M Board of Regents recently met to approve a system-wide policy governing expressive activity on campus. That policy would largely maintain the relevant criteria from West Texas A&M's expressive activity policy. Texas A&M University System Board of Regents, *Agenda Items Meeting of the Board of Regents*, pp. 93–105 (Nov. 13, 2025), https://www.tamus.edu/regents/wp-content/uploads/sites/28/2025/11/Regular-Binder-November-13-2025-website.pdf.

That policy allows student organizations to use facilities like Legacy Hall to plan "any special event," including "fundraising activity" or "social gatherings or functions." ROA.269, 272. And it broadly prohibits administrators from "action" or denial of "any benefit" on the "basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." ROA.273. Those policies establish Legacy Hall as a venue dedicated to student expression of all types.

University practices also underscore Legacy Hall's status as a designated public forum. ROA.221 ¶¶ 32–34. In fact, the University promotes the hall for both student *and* public use, making it available for "events with live bands or live music" or to otherwise "entertain" people, including "events like[] concerts, press conferences, proms and weddings." *Id.* Students and the public thus use Legacy Hall for a wide range of expressive performances—including past drag shows—illustrating the space's "compatibility with the speech at issue." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (citation omitted).

Such uses have included, for example:

- Male ("Big Man on Campus") and female ("Miss Black & Gold") beauty pageants in Legacy Hall (ROA.345–50);

- The 2017–2019 "Mr. and Ms. West Texas Drag Show" performances in Legacy Hall and the 2012 "Buff-a-Woah" drag show in the JBK Student Center (ROA.355–60);

- The annual "University SING" performance competition in Legacy Hall (ROA.361–67);

- A local church group's "Community Night of Worship and Prayer" in Legacy Hall (ROA.370–73);

- A local high school's "Casino Night" dance in Legacy Hall (ROA.387);

- A magic show (ROA.404), galas for local organizations (ROA.369, 389), and musical performances by opera singers and rock bands alike (ROA.383, 379).

In sum, Legacy Hall is a designated public forum open to a wealth of expressive performances, including those like drag shows that use amplified music, lights, and other theatrical features.

### 2. Because Wendler's ban is content-based, it is subject to strict scrutiny.

Because Wendler has singled out drag performances, his ban is content-based. *E.g., Imperial Sovereign Ct. of Mont.*, 699 F. Supp. 3d at 1036–37 (citing cases holding restrictions targeting drag shows are content-based and similarly holding that a ban on drag shows "targets speech based upon content"). Content discrimination occurs when the

41

government "target[s] speech based on its communicative content." *Reed*, 576 U.S. at 163. Defendants do not restrict the dance team, cheerleaders, theatre productions, or any other student group from holding events in Legacy Hall involving performers dancing to music. Nor has President Wendler barred student organizations from showing "PG-13" movies. Wendler's ban restricts only drag shows, even Spectrum's PG-13 ones. *See* ROA.327–28 ¶¶ 6–7, ROA.329–30 ¶ 10, ROA.343–50, ROA.361–67 (showing varied performances at West Texas A&M). Thus, it is presumptively unconstitutional and must overcome strict scrutiny. *Reed*, 576 U.S. at 163; *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020).

The district court erred in assuming Wendler's blanket ban on campus drag performances is "more regulable" as a "time, place, or manner" restriction. ROA.854–55. A time, place, or manner restriction must be "justified without reference to the content of the regulated speech," "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels" for expression. *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (cleaned up). The district court did not

apply that standard, much less explain why Wendler's drag show ban meets it.[8]

Nor could it. Above all, the ban on drag shows is defined *solely* by the content of performers' speech. ROA.265–67. For these reasons, the Court should reject any suggestion that Defendants' drag show ban is a constitutional time, place, or manner restriction, just as the panel majority did. *Spectrum WT*, 151 F.4th at 728–29.

### 3. *CLS* does not control the forum analysis question.

Both Wendler and the panel dissent are incorrect to argue *CLS* governs the public forum question, ECF 94, Wendler Panel Br. 23–24; *Spectrum WT*, 151 F.4th at 733–34 (Ho, J., dissenting). *CLS* has no bearing on this case.

Start with the stark difference between the posture of the student group in *CLS* and Spectrum. CLS sought "not parity with other organizations, but a preferential exemption from [University] policy" that

---

[8] The district court also assumed "sexualized" speech is "more regulable" as a time, place, or manner restriction. ROA.854–55. Whatever "sexualized" means, it refers to expression's content. And so even a ban on "sexualized" speech is subject to strict scrutiny and not a time, place, or manner analysis. *Reno v. ACLU*, 521 U.S. 844, 868 (1997) (distinguishing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46 (1986)).

required registered organizations "to open eligibility for membership and leadership to all students." 561 U.S. at 668–69. Spectrum seeks no preferential exception (nor is the University forcing it to change its membership to use Legacy Hall). Rather, it seeks only the parity the First Amendment demands: the ability to use Legacy Hall for protected expression, as university policy and practice allow for all other recognized student groups and the public.[9] The viewpoint discrimination that bars Spectrum from exercising that right squarely distinguishes Wendler's ban from the neutral policy at issue in *CLS*. *See supra*, Section I.B.

And *CLS* is distinguishable for another reason: There, the Court analyzed the student group's exclusion from a narrow type of public forum—recognition of student organizations—that no one disputed was a *limited* public forum. *See* 561 U.S. at 679. By contrast, Legacy Hall is a *designated* public forum open to anyone, not just students. There is no basis for extending *CLS* to anything but a limited public forum for recognizing student organizations, as the panel majority correctly held. *Spectrum WT*, 151 F.4th at 728.

---

[9] Texas policy demands that parity, too, barring universities from "deny[ing] [student] organization[s] any benefit generally available to other student organizations" because of its viewpoint. Tex. Educ. Code § 51.9315(g).

*CLS* may affirm the unremarkable proposition that campus administrators may deploy reasonable, viewpoint-neutral policies in limited public forums. But that guideline has no application here, where President Wendler has imposed a viewpoint-driven prior restraint in a designated public forum. Decisions like *Papish*, *Widmar*, *Southeastern Promotions*, and *Matal*—not *CLS*—set out the entrenched principles the Court should apply to reverse the district court.

### 4. Wendler's ban is subject to strict scrutiny even if Legacy Hall is a limited public forum.

A limited public forum is a designated forum reserved to particular speakers or subjects. *Walker*, 576 U.S. at 215. But because Legacy Hall is open for public use and not limited to any one subject, it is not a limited public forum. And as the panel majority rightly concluded, Wendler's genre-specific ban on campus drag shows does not convert the venue into a limited forum. *Spectrum WT*, 151 F.4th at 728. A forum's classification turns on "*consistent* practice, not each exceptional regulation that departs from the consistent practice." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992).

But even if Legacy Hall is a limited public forum, Wendler's ban must fall for two reasons. First, it is viewpoint-based, and "viewpoint

discrimination is a clearly established violation of the First Amendment *in any forum.*" *Chiu,* 260 F.3d at 350 (emphasis added); *see also Rosenberger*, 515 U.S. at 829, and *supra*, Section I.B. Second, Wendler's ban triggers strict scrutiny by excluding drag performers "who fall[] within the class to which" Legacy Hall "is made generally available." *Justice for All*, 410 F.3d at 766–67 (quoting *Ark. Educ. Television Comm'n. v. Forbes*, 523 U.S. 666, 677 (1998)); *see also Widmar*, 454 U.S. at 269–70. He cannot meet that burden. *See supra*, Section I.E.

### D.    The district court erred by not enjoining Defendants' ongoing drag show ban as an unconstitutional prior restraint.

For over two years, a ban on drag performance has persisted at West Texas A&M—decreed before students could take the stage and premised on President Wendler's disagreement with the message. *E.g.*, ROA.250–53, 311–13. That is a classic prior restraint, "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559.

Yet in denying Plaintiffs a preliminary injunction, the district court did not address the prior restraint. *See* ROA. 849–74. When a district court fails to address a plainly unconstitutional prior restraint, let alone

enjoin it, this Court's reversal is both necessary and appropriate. *E.g.*, *Se. Promotions*, 420 U.S. at 549; *see also Gay Student Servs.*, 737 F.2d at 1325 (striking down refusal to recognize student group based on ideology as a prior restraint); *Pro-Life Cougars v. Univ. of Hou.*, 259 F. Supp. 2d 575, 583–84 (S.D. Tex. 2003) (granting preliminary injunction against prior restraint on campus public forum).

### 1.    The First Amendment forbids banning speech in advance, as Wendler has done.

*Southeastern Promotions* shows why Wendler's ban is an unconstitutional prior restraint. There, the Court concluded that city officials imposed a prior restraint by excluding the musical "Hair" from a municipal theater because it did not fit the city's "clean and healthful and culturally uplifting" criteria. 420 U.S. at 549. President Wendler has imposed a similar prior restraint on Spectrum based on a similar rationale, barring the drag shows from campus public forums because their message does not meet Wendler's criteria about what does or does not "demean women." ROA.265–67.

Under *Southeastern Promotions*, public officials cannot bar stage performances "in advance of actual expression" unless they meet two stringent requirements: First, the performance "must fit within one of

the narrowly defined exceptions to the prohibition against prior restraints," like obscenity; second, the system for preemptively banning the performance must be "bounded" by "narrow, objective, and definite standards." 420 U.S. at 553, 559 (quoting, in part, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)).

Defendants can meet neither here. On the first requirement, not only is Wendler's edict silent about obscenity, he told the district court that obscenity "is not an issue in the present case." ROA.431; *see also Miller v. California*, 413 U.S. 15, 24 (1973) (to qualify as obscene, the expression must "appeal to the prurient interest in sex," "portray sexual conduct in a patently offensive way," and "not have serious literary, artistic, political, or scientific value").

Nor are Wendler's concerns about the "U.S. Equal Opportunity Commission," "prejudice in the workplace and our campus," and "humor becom[ing] harassment" "narrow exceptions" to prior restraints. ROA. 266–67. "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.). And for good reason. Permitting public university presidents to quash protected speech based on

speculative concerns about harassment would endanger protected expression on campus from political speech to pure entertainment. In any event, a one-time ticketed performance in an enclosed space cannot meet federal requirements for harassment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (recognizing the "severe, pervasive, and objectively offensive" standard for Title IX student-on-student harassment in education).

On the second requirement, Wendler has confirmed the prior restraint rests on his unfettered discretion, claiming authority in his "judgment" to determine whether the event conforms to the "campus culture." ECF 94, Wendler Panel Br. 31–32. Wendler's ban and two cancelations confirm his unbridled discretion to stifle expression unbounded by any objective and narrow standards.

Even more, Wendler has exercised his power to ban Spectrum's performance from the Legacy Hall stage, the content of which he had no way of knowing in advance. That contradicts the cornerstone rule that "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand,"

when "the risks of freewheeling censorship are formidable." *Se. Promotions*, 420 U.S. at 559 (citation omitted).

And there is no distinction between a municipal stage and one at a public university: The First Amendment applies equally and in the same way to both. *Healy*, 408 U.S. at 180; *see also Iota Xi*, 993 F.2d at 392–93. Under *Southeastern Promotions*, Wendler's edict should never have survived a day, let alone years.

### 2.    Wendler's post hoc speculation about Spectrum's performances do not save his prior restraint.

After Spectrum sued, Wendler offered several reasons at odds with his written edict for why he imposed a prior restraint, but they are mere conjecture that cannot overcome the heavy presumption against a prior restraint. Neither the panel majority nor the dissent credited Wendler's post hoc reasons for banning protected expression. *See generally Spectrum WT*, 151 F.4th at 722–739. This *en banc* Court should not credit them, either. *See Kennedy*, 597 U.S. at 543 n.8.

To begin, the Supreme Court recently reminded about the dangers of after-the-fact justifications for restricting free expression. *Id.*; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988). These warnings apply to Wendler's post hoc reasons for imposing a prior

restraint, which contradict the viewpoint-driven motivations he revealed in his edict. For example, Wendler's edict is silent on lewdness. ROA.265–67. Only after Spectrum sued did Wendler first mention concerns about preventing "lewd" conduct. ROA.456–58. That after-the-fact reason typifies the "shifting" "post hoc rationalizations" that, as the Supreme Court warned, make it easy to "suppress unfavorable expression," especially absent objective, narrow criteria, as are absent here. *City of Lakewood*, 486 U.S. at 758 (cleaned up).

But even if Wendler had expressed his concern about "lewd" conduct from the start, it would fail: Mere conjecture about expression cannot justify prior restraints on it. *Se. Promotions*, 420 U.S. at 554–55. Defendants cannot discern whether a performance that never occurred— or any future campus drag show—violates university policy against "lewd" conduct.

In the same way, President Wendler's other post hoc arguments fail. For instance, he has raised concerns over Texas's 2023 Senate Bill 12 and off-campus performances by "Miss Myka," the slated guest emcee for Plaintiffs' canceled 2023 drag show. *E.g.,* ROA.447, 864; ECF 156, Spectrum WT Rule 28(j) letter (Mar. 29, 2024). At most, Wendler is

*speculating* that Spectrum's PG-13 drag performances could meet S.B. 12's prohibition against "sexually oriented performances" (even though a panel of this Court held that excludes, for example, drag shows without nudity or simulated sex). *Woodlands Pride*, 2025 WL 3096979, at \*3–5. So too could he only speculate that the 2023 guest emcee might have defied Spectrum's clear instruction to avoid lewd conduct. ROA.229 ¶ 79; ROA.447, 449.

Such conjecture can never meet an official's "heavy burden" to justify a prior restraint on expression at a public university. *Gay Student Servs.*, 737 F.2d at 1327–30. Under Wendler's view, public university officials could bar a celebrated actress from performing on campus if she once appeared nude in a blockbuster movie, despite assurances that the campus performance contained no nudity. Or they could ban a student group interested in American history from performing a reenactment of the first Thanksgiving over speculation that it might clash with anti-discrimination law. The Court should reject that expression-chilling view.

If Spectrum's performance ends up violating a constitutional university policy or state law, then—and only then—do university

officials have authority to punish it. But in no case can they ban the students' expression in advance without violating the Constitution, especially on mere speculation. To that end, nothing those officials can muster overcomes the heavy presumption against their prior restraint. In fact, not once have they tried to overcome that presumption. *See* ROA.414–36, ROA.459, *and* ROA.716; ECF 94, Wendler Panel Br. 19. Nor can they now.

### E.    Defendants cannot satisfy strict scrutiny as required to justify a blanket ban on protected expression at a public university.

Because President Wendler's ban is textbook viewpoint discrimination, it is unconstitutional in all cases. *See Chiu,* 260 F.3d at 350 ("[V]iewpoint discrimination is a clearly established violation of the First Amendment *in any forum.*") (emphasis added). Nor can Defendants overcome the strict scrutiny required to justify a content-based prior restraint. *See supra*, Sections I.C–D.

As the panel majority noted, "President Wendler did not argue, either before the district court or on appeal, that restricting the intended drag show would survive strict scrutiny." *Spectrum WT*, 151 F.4th at 729. To that end, Defendants forfeit any argument on their strict scrutiny

burden. *Hornbeck Offshore Servs., LLC v. Salazar*, 713 F.3d 787, 796 (5th Cir. 2013) (citation omitted) (applying forfeiture to appellee). Even if the Court does not find forfeiture, Defendants cannot overcome strict scrutiny, because a blanket ban on protected expression on campus is not "necessary to serve a compelling state interest" or the least restrictive means of achieving that interest. *Widmar*, 454 U.S. at 270.

**1.    None of President Wendler's contemporaneous reasons for the ban are a compelling interest.**

Public university officials do not have a compelling interest in banishing a class of protected speech from campus like President Wendler has done. The Supreme Court rejected such viewpoint-driven speech restrictions in *Widmar*, explaining that singling out a Christian student group from facilities "available for … registered student groups" was subject to "the most exacting scrutiny." *Id.* at 264–65, 276. Because the university "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in" protected expression, the Supreme Court concluded that the university's stated goal, "achieving greater separation of church and State," was not a compelling interest. *Id.* at 269, 276.

In the same way, advancing President Wendler's belief that drag shows "demean" women and promote "misogyny" is not a compelling interest that excuses preemptively barring protected expression from a designated public forum. ROA.265–67. Rather, it's plain viewpoint discrimination. *See supra*, Section I.B. Nor can prior restraints rest on "undifferentiated fear or apprehension" rather than evidence. *Gay Student Servs.*, 737 F.2d at 1330. And here, Defendants have presented no evidence that drag performances involve conduct harmful to women— let alone women who attend a ticketed, enclosed show—to justify their prior restraint.

None of the reasons President Wendler gave for canceling Spectrum's 2024 performance constitute a compelling interest, either. His campus-wide email states he canceled the 2024 performance "for the reasons given previously and for the reasons further explained in court filings and those provided by the courts themselves." ECF 156, Spectrum WT Rule 28(j) letter (Mar. 29, 2024). But those reasons violate the First Amendment, as Spectrum has explained. And while Wendler invoked Texas's 2023 Senate Bill 12, *id.*, that is not a compelling reason either. There is nothing in S.B. 12 forcing public university presidents to do

anything, let alone impose a prior restraint against stage performances.[10] And again, speculating that Spectrum's performance might violate a state law is not a valid reason under the First Amendment for banning a genre of performance before the curtain lifts. *See supra*, Section I.D.2.

Finally, as Spectrum explained, Wendler's after-the-fact justifications for his ban, like his concern over "lewd" conduct, are constitutionally infirm. *See infra*, Section I.E.2. What's more, the Supreme Court effectively settled in *Papish* that censoring speech on a state university campus in the name of prohibiting "lewdness" does not serve a compelling interest. 410 U.S. at 669–70.

### 2. Banning an entire class of protected expression from campus is not the least restrictive means of achieving any interest.

Banning an entire genre of protected expression from a university campus to shield viewers from potentially taking offense is neither narrowly tailored nor a least restrictive means. Instead, those who find a drag show offensive can simply not attend and "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen*

---

[10] S.B. 12's provisions are found at Tex. Health & Safety Code § 769.002; Tex. Loc. Gov't Code § 243.0031; and Tex. Penal Code § 43.28.

*v. California*, 403 U.S. 15, 21 (1971). The same holds for any of the expression one might encounter on a university campus, from politically controversial speakers to the scantily-clad dance team performing at a football game.

Likewise, based on Wendler's edict, "lewd" movies and television, music with parental warnings, and books that some women may find "mocking" remain untouched. *See* ROA.265–67. So do theatrical performances at Legacy Hall other than Spectrum's. Whatever harm Wendler is seeking to curtail, singling out drag performances is nowhere near the narrow tailoring the Constitution requires for his ban to survive strict scrutiny. *E.g.*, *Brown*, 564 U.S. at 805 (explaining that banning minors from purchasing violent video games "is seriously underinclusive" because it "excludes portrayals other than video games").

> **3.  The district court's proffered interests for not enjoining Wendler's ban likewise fail strict scrutiny.**

Even though Defendants did not make the argument, the district court fixated on "sexualized conduct" in denying Spectrum a preliminary injunction, reasoning it "is more regulable under various First Amendment doctrines—especially when children are in the audience."

ROA.854 (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 295 (2000); *FCC v. Pacifica Found.*, 438 U.S. 726, 732 (1978)). But categorically labeling protected expression as "sexualized" does not give the University a license to censor those shows in advance. *See supra*, Section I.D. And "sexualized" expression does not fall within the few narrow categories of unprotected speech, like "obscenity." *Brown,* 564 U.S. at 804. Again, Wendler has conceded that obscenity is not an issue here. ROA.431.

Censorship on a college campus because officials deem speech "sexualized" serves no compelling interest. Imagine if it did. A host of expression would be at the mercy of every college administrator's particular tastes, from displaying a replica of Michelangelo's David to "shar[ing] Biblical views on … sexuality." *Spectrum WT*, 151 F.4th at 733 (Ho, J., dissenting).

The district court's concerns over "children in the audience"—another argument Defendants have not meaningfully raised—also does not save the ban from strict scrutiny. True, the government has an interest in protecting minors. But as Justice Scalia wrote for a Supreme Court majority, "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown,* 564 U.S. at 794. The

government's interest is especially weak here, where Defendants are imposing a prior restraint over protected expression on a college campus where *adults* come to learn, teach, and live. There is no compelling interest in "reducing the adult population to only what is fit for children." *See Sable Commc'ns v. FCC*, 492 U.S. 115, 128 (1989) (cleaned up). And in no case is Defendants' blanket ban on a class of protected expression the least restrictive means of meeting a governmental interest in protecting children.

Just consider *Papish*, where the Supreme Court upheld the First Amendment right of a student to distribute what university officials called "indecent" material, even in a part of campus the dissent described as frequented by "many" minors. *Papish*, 410 U.S. at 670; *id.* at 675–76 (Rehnquist, J., dissenting). Any interest in protecting minors is even less compelling here, as ticketed drag performances in an enclosed auditorium are not readily viewable to passersby.[11]

---

[11] Being cautious, Spectrum prohibited minors from attending its planned PG-13 drag shows unless accompanied by an adult or guardian. ROA.229 ¶ 80. That does not change the calculus, however, because the government cannot dictate what consenting "parents *ought* to want." *Brown*, 564 U.S. at 804; *see also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). As Justice Thomas recently explained, PG-13 (or even R-rated) content presents no basis for departing from the Court's longstanding treatment of minors under the First Amendment. *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 481 n. 7 (2025). But that is the extent of *Free*

In all cases, Defendants cannot satisfy strict scrutiny. This Court should reverse.

## II.  A Preliminary Injunction Against Vice President Thomas is Proper Because He Enforces President Wendler's Ban.

While it erred on the First Amendment merits of Spectrum's claims, the district court correctly held Spectrum has standing to sue Vice President Thomas for prospective relief in his official capacity. ROA.870–72. The panel majority affirmed this holding, also explaining why this Court's decision in *Jackson v. Wright* bars sovereign immunity for Thomas. *Spectrum WT*, 151 F.4th at 731–732 (discussing *Jackson*, 82 F.4th 362 (5th Cir. 2023)). That was correct, and this Court should follow suit. Vice President Thomas manages Student Affairs and has enforced President Wendler's ban before. That's enough for standing. *Speech First, Inc. v. Fenves,* 979 F.3d 319, 336 (5th Cir. 2020) ("Past enforcement of speech-related policies can assure standing."). And enjoining Thomas from enforcing the ban again is essential to providing Spectrum complete relief.

---

*Speech Coalition*'s slight impact on this case. In that decision, the Court held the statute at issue was an "incidental burden" on speech because it only required age verification and did not ban speech. *Id.* at 478. By contrast, Wendler's ban is a viewpoint-based prior restraint—a *direct* restriction on protected expression.

### III. Absent Injunctive Relief, Spectrum WT Will Continue to Suffer Irreparable Harm.

Only injunctive relief can stop the ongoing harm to Spectrum's First Amendment rights. This Court has "repeatedly held … that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (cleaned up). Absent injunctive relief, Spectrum faces an impossible choice: Expend scarce time and money to hold its show off campus, or self-censor and remain unable to hold a stage performance where the First Amendment guarantees it can.

President Wendler has proven resolute in preventing drag shows on campus. In a television interview he gave soon after Spectrum sued, Wendler said he couldn't "talk about" his edict due to the litigation, only to affirm: "I wouldn't have done anything any differently." ROA.623 at 25:00–27:47. In short, President Wendler has made clear he will continue enforcing his ban against Spectrum's protected expression. *E.g.*, ROA.237 ¶ 130(b); ECF 156, Spectrum WT Rule 28(j) letter.

## IV. Enjoining a Prior Restraint Against Protected Expression That Public University Officials Deem Offensive Serves the Public Interest.

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). That's especially true at America's public universities. As the panel dissent appreciated, "[e]ducation should not be intended to make people comfortable; it is meant to make them think." *Spectrum WT*, 151 F.4th at 733 (Ho, J., dissenting) (quoting Comm. on Freedom of Expression, Univ. of Chicago, Report of the Committee on Freedom of Expression (2015)).

That is why courts do not defer to campus administrators' restrictions on expression, but "must be especially vigilant against assaults on speech in the Constitution's care." *Speech First*, 979 F.3d at 339. The First Amendment recognizes that public officials cannot make "principled distinctions" between the offensive and inoffensive. *Cohen,* 403 U.S. at 25. So when campus administrators say "trust me" after they stifle speech in the name of preventing offense, *see* ECF 94, Wendler Panel Br. 31–33, 39, it threatens the public interest in ensuring First

Amendment protections remain at a zenith at our nation's public universities.

Serving that public interest has never been more vital. As this Court recently observed, "our current national condition" has administrators, "in a spirit of panicked damage control," trade expressive principles for "hasty and disproportionate punishment." *Speech First*, 979 F.3d at 339. And allowing campus administrators to determine whether "the juice is worth the squeeze" of free expression is an invitation to abuse.[12] The modern campus censor regularly ignores the First Amendment, retreating into vague and infantilizing justifications about offense and divisiveness. Or they offer bare-faced ideological reasons for muzzling free expression. Either way, examples beyond West Texas A&M paint an ever-stark wave of campus censorship—one that reversal can help quell.

For instance, public college officials have trampled student speech to stake out positions in the culture wars. In California, local college

---

[12] *See* Cameron Ehsan, Stanford President Renews Commitment to Academic Freedom Amid Law School Controversy, Stanford Daily (Apr. 3, 2023), https://stanforddaily.com/2023/04/03/stanford-president-renews-commitment-to-academic-freedom-amid-law-school-controversy (administrator questioning whether "the juice was worth the squeeze" in allowing a federal judge to address law students).

officials withheld approval for a registered student organization to post anti-communist and pro-life flyers on a student bulletin board, under a policy prohibiting "inappropriate or offense language or themes." *Flores v. Bennett*, 635 F. Supp. 3d 1020, 1027–28 (E.D. Cal. 2022). Today's campus censor targets religious speech, too. Chike Uzuegbunam sought to share his Christian faith with fellow students in the public spaces of Georgia's Gwinnett College. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 282 (2021). Although Uzuegbunam obtained a permit and spoke in a designated location, a campus police officer ordered to him to stop and threatened disciplinary action because "people had complained about his speech." *Id.* at 283.

So too have public university officials targeted expressive conduct in the name of preventing offense. For example, administrators at Santa Monica College hassled students to cancel a play depicting a romantic relationship between an enslaved man and a slave owner in the 1850s after some "employee-based organizations" complained it contained offensive themes. Cebelihle Hlatshwayo et al., *SMC 'By The River*

*Rivanna' Production Is Cancelled*, The Corsair (Oct. 20, 2023).[13]   The show's playwright had "no reason to believe [students] would have voted to cancel the play if the … administration hadn't harassed them." *Id.* Likewise, administrators at California State University, Long Beach canceled a scheduled performance of the play "N*W*C" (standing for "nigger," "wetback," and "chink") because the university's president received complaints about the title. Andrew R. Chow, *A Charged Title. A Canceled Show. Now a Cal State Official Resigns*, N.Y. Times (Sep. 13, 2016).[14] The president's censorship silenced three actors of Black, Asian, and Latino descent who, like the speaker from *Matal*, use the slurs to reclaim them and subdue their harmful effects. *Id.* Unwilling "to continue working for someone that canceled a show like that," the university's performing arts director resigned. *Id.*

In short, public college officials remain all too willing to embrace censorship under an inconsistently-raised banner of fighting offense, discomfort, and harassment. Just take the Israel-Hamas conflict,

---

[13] https://www.thecorsaironline.com/corsair/2023/10/20/smc-by-the-river-rivanna-production-is-cancelled.

[14] https://www.nytimes.com/2016/09/14/theater/a-charged-title-a-canceled-show-now-a-cal-state-official-resigns.html.

revealing a host of campus censors eager to silence speech—on both sides—in the name of preventing offense.[15] If history tells us anything, it is that public university presidents will keep abusing their authority trying to submit free expression to their subjective values.

The stakes here are not about "giv[ing] greater protection to drag shows than devotional acts." *Spectrum WT*, 151 F.4th at 735 (Ho, J., dissenting). Rather, they are about ensuring public university officials do not shun the First Amendment's commands by silencing *any* type of protected expression—whether religious, political, drag, or otherwise—because they find it distasteful or dislike the creed. For students, the First Amendment and the courts tasked with upholding it are the last line of defense against public university administrators cowed by other students, faculty, lawmakers, donors, and squeaky wheels. This case provides an opportunity for the Court to sustain its "especially vigilant"

---

[15] *See, e.g.,* Josh Hammer, Opinion, *The University of Michigan Failed To Protect My Right To Free Speech*, Newsweek (Nov. 24, 2023), https://www.newsweek.com/university-michigan-failed-protect-my-right-free-speech-opinion-1846259 (University of Michigan heckler's veto of a pro-Israel speech hosted by Young Americans for Freedom); Emma Camp, *Brooklyn College Forced a Student To Take Down Anti-Israel Signs While Leaving Other Posters Untouched*, Reason (Dec. 14, 2023) https://reason.com/2023/12/14/brooklyn-college-forced-a-student-to-take-down-anti-israel-signs-while-leaving-other-posters-untouched.

protection of public university students' expressive freedom. *Speech First*, 979 F.3d at 339.

## CONCLUSION

Recently, President Wendler remarked, "ideas are paramount; ideology is a poor proxy," so "a university should treat every person, in every role, and from every background as fundamentally unique yet equal."[16] He's right about that—and this Court should hold him to those words, upholding the First Amendment's bar against public university officials silencing ideas under the feet of "ideology."

The Court should reverse and remand for entry of a preliminary injunction.

Dated: November 24, 2025          Respectfully,

/s/ JT Morris
JT Morris
Conor T. Fitzpatrick
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE, Ste. 340
Washington, D.C. 20003
Tel: (215) 717-3473

---

[16] Walter Wendler, "Opinion: Texas DEI ban lets universities rediscover their purpose," Amarillo Globe News (Mar. 25, 2025), https://www.dallasnews.com/opinion/commentary/2025/03/18/wtamu-president-dei-ban-lets-universities-rediscover-their-purpose/.

jt.morris@thefire.org
conor.fitzpatrick@thefire.org

Adam Steinbaugh
Jeffrey D. Zeman
Sara Berinhout
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St., Suite 900
Philadelphia, PA 19106
Tel:   (215) 717-3473
adam@thefire.org
jeff.zeman@thefire.org
sara.berinhout@thefire.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

This certifies that on November 24, 2025, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing via the Court's ECF filing system on all registered counsel of record.

/s/ JT Morris
JT Morris
*Attorney for Plaintiff-Appellant*

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. App. P. 32(a)(7)(B) because this brief contains 12,360 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 32.2.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Local Rule 32.1 and the type style requirements of proportionally spaced typeface using 14-point Century Schoolbook font for text and 12-point Century Schoolbook font for footnotes.

Dated: November 24, 2025       /s/ JT Morris
                                    JT Morris
                                    *Attorney for Plaintiff-Appellant*