No. 23-10994

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVALL,

*Plaintiffs-Appellants*,

v.

WALTER WENDLER; Dr. CHRISTOPHER THOMAS; JOHN SHARP;
ROBERT L. ALBRITTON; JAMES R. BROOKS; JAY GRAHAM;
TIM LEACH; BILL MAHOMES; ELAINE MENDOZA;
MICHAEL J. PLANK; CLIFF THOMAS; DEMETRIUS
L. HARRELL, JR.; MICHAEL A. HERNANDEZ, III,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

**UNOPPOSED MOTION OF *AMICI CURIAE* PROFESSORS
SPECIALIZING IN LGBT+ STUDIES, LGBT+ LEGAL ISSUES,
AND THE HISTORY OF DRAG TO FILE *AMICUS* BRIEF
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Martin J. Siegel
LAW OFFICES OF
  MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (281) 772-4568
Martin@Siegelfirm.com

*Counsel for Amici Curiae*

# SUPPLEMENTAL CERTIFICATE
## OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case.  This representation, supplemental to that of the parties and other *amici*, is made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1.   *Amici Curiae* Esther Newton, Eliot Tracz, Mark Satta, Joe E. Jeffreys, Scott Skinner-Thompson, Luke Boso, Carlos Ball, and Nancy Marcus

2.  Martin J. Siegel, Law Offices of Martin J. Siegel, P.C., Attorney for *Amici Curiae*

s/     *Martin J. Siegel*
Martin J. Siegel
Attorney for *Amici Curiae*

2

*Amici* Esther Newton, Eliot Tracz, Mark Satta, Joe E. Jeffreys, Scott Skinner-Thompson, Luke Boso, Carlos Ball, and Nancy Marcus, professors specializing in LGBT+ studies, LGBT+ legal issues, and the history of drag, file this unopposed motion respectfully seeking leave to file an *amicus* brief, attached at Tab 1, in support of Appellants Spectrum WT, Barrett Bright and Lauren Stovall, and state the following:

1.  *Amici* are professors of LGBT+ studies, law, philosophy, and other disciplines with an extensive record of scholarship and practice concentrating on LGBT+ rights, constitutional law, and the history and legal status of drag.  As leading authorities in these fields, they are deeply concerned with the development of First Amendment law governing drag and with ensuring that this artistic means of social and political expression receives full constitutional protection.  The qualifications of each *amicus* are detailed in the attached *amicus* brief at pp. 1-3.

2.  Whether drag shows constitute expressive conduct worthy of First Amendment recognition is a key issue in this important appeal.  The district court found, and Appellees now argue, that drag shows do not transmit any particular message, depriving them of First Amendment protection, while the panel majority concluded otherwise.  *Compare*

*Spectrum WT v. Wendler*, 693 F. Supp. 3d 689, 699 (W.D. Tex. 2023), *rev'd*, 151 F. 4th 714, 726 (5th Cir. 2025), *reh'g granted*, __, F.4th __, 2025 WL 3008019 (5th Cir., Oct. 27, 2025), *with Spectrum WT v. Wendler*, 151 F. 4th 714, 726 (5th Cir. 2025), *reh'g granted*, __, F.4th __, 2025 WL 3008019 (5th Cir., Oct. 27, 2025).

3.   *Amici's* brief addresses this pivotal question.  As experts in LGBT+ studies and legal questions as well as the history of drag performance, they bring specialized, unique, and broad knowledge and perspective to the question of what statement is intended by drag artists today when they perform in shows like the one planned by Spectrum WT and canceled by Appellants, and what is received by their audiences. Having studied the past and present of drag in the United States in great depth, they can assist the Court's understanding of what drag shows say and are understood to mean about LGBT+ life and culture and the now passionately debated claim that gender may be mutable. Consequently, their brief has much to offer the Court as it considers the vital question of whether drag is simply contentless and bawdy entertainment, as Appellees claim, or art expressing a social and political message about LGBT+ and gender issues, as Appellants argue and the panel agreed.

4.    This Court generally welcomes *amicus* briefing "unless it is obvious that the proposed briefs do not meet Rule 29's criteria as broadly interpreted." *Lefebure v. D'Aquilla*, 15 F.4th 670, 676 (5th Cir. 2021). In *Lefebure*, this Court noted that "courts should welcome *amicus* briefs for one simple reason: '[I]t is for the honour of a court of justice to avoid error in their judgments,'" *Id*. at 675 (quoting *The Protector v. Geering*, 145 Eng. Rep. 394 (K.B. 1686)). Quoting Judge A. Leon Higginbotham, the Court added: "even in a court as learned as ours, we might be able to avoid some unnecessary catastrophes if we have the will and the patience to listen." *Id.* (*quoting Am. College of Obstetricians v. Thornburgh*, 699 F.2d 644, 647 (3d Cir. 1983) (Higginbotham, J., dissenting)).

5.    Likewise, in an influential 2002 opinion, then-Judge Alito noted that "a broad reading [of Fed. R. App. P. 29] is prudent." *Neonatology Assoc., P.A. v. Comm'r of Internal Revenue*, 293 F.3d 128, 132 (3d Cir. 2002). "[I]t is preferable to err on the side of granting leave. If an *amicus* brief that turns out to be unhelpful is filed, the merits panel, after studying the case, will often be able to make that determination without much trouble and can then simply disregard the *amicus* brief.

On the other hand, if a good brief is rejected, the merits panel will be deprived of a resource that might have been of assistance." *Id.* at 133.

6.      The Court has already ruled in favor of permitting *amicus* briefs in this case, granting a motion for reconsideration of an order denying leave to file an *amicus* brief before the panel. *See* Document 80 (Order dated December 12, 2023). *Amici* briefing should likewise be permitted at the *en banc* stage, which is all the more important in light of the full Court's participation and the significant precedent likely to emerge from any decision.

For the foregoing reasons, the Court should grant this unopposed motion and permit the filing of *Amici's* brief.

December 1, 2025                          Respectfully Submitted,


                                        s/ *Martin J. Siegel*
                                        Martin J. Siegel
                                        LAW OFFICES OF
                                           MARTIN J. SIEGEL, P.C.
                                        2222 Dunstan Road
                                        Houston, Texas 77005
                                        Telephone: (281) 772-4568
                                        Email: Martin@Siegelfirm.com

                                        *Attorney for Amici Curiae*

## **CERTIFICATE OF CONFERENCE**

I hereby certify under 5th Cir. R. 27.4 and Fed. R. App. P. 29(a)(2) that I

conferred with William Cole, counsel for remaining Appellees, on November 20-

21, 2025, and he confirmed that Appellees consent to the filing this motion and an

*amicus* brief.


s/      *Martin J. Siegel*
Martin J. Siegel
*Counsel for Amici*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2025, in compliance with Rules 25(b)
and (c) of the Federal Rules of Appellate Procedure, the undersigned served the
foregoing motion and attached brief on all registered counsel of record via the
Court's ECF Filing system.


s/       *Martin J. Siegel*
Martin J. Siegel

## <u>CERTIFICATE OF COMPLIANCE</u>

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using the Microsoft Word 2004 for Mac, Version 11.5.6, program in 14 point, Times New Roman font in body text and 12 point, Times New Roman font in footnote text.  This motion complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because it contains 740 words, excluding parts exempted by Fed. R. App. P. 32(f).

s/      *Martin J. Siegel*
Martin J. Siegel

Dated:  December 1, 2025

**ATTACHMENT 1**

No. 23-10994

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVALL,

*Plaintiffs-Appellants*,

v.

WALTER WENDLER; Dr. CHRISTOPHER THOMAS; JOHN SHARP;
ROBERT L. ALBRITTON; JAMES R. BROOKS; JAY GRAHAM;
TIM LEACH; BILL MAHOMES; ELAINE MENDOZA;
MICHAEL J. PLANK; CLIFF THOMAS; DEMETRIUS
L. HARRELL, JR.; MICHAEL A. HERNANDEZ, III,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

## BRIEF OF *AMICI CURIAE* PROFESSORS SPECIALIZING IN LGBT+ STUDIES, LGBT+ LEGAL ISSUES, AND THE HISTORY OF DRAG IN SUPPORT OF PLAINTIFFS-APPELLANTS

Martin J. Siegel
LAW OFFICES OF
    MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (281) 772-4568
Martin@Siegelfirm.com

*Counsel for Amici Curiae*

# SUPPLEMENTAL CERTIFICATE
# OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. This representation, supplemental to that of the parties and other *amici*, is made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. *Amici Curiae* Esther Newton, Eliot Tracz, Mark Satta, Joe E. Jeffreys, Scott Skinner-Thompson, Luke Boso, Carlos Ball, and Nancy Marcus

2. Martin J. Siegel, Law Offices of Martin J. Siegel, P.C., Attorney for *Amici Curiae*

s/ *Martin J. Siegel*
Martin J. Siegel
Attorney for *Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .................................... i

TABLE OF CONTENTS .................................................................................... ii

TABLE OF AUTHORITIES .............................................................................. iii

AMICI'S STATEMENT OF IDENTITY AND INTEREST ........................................... 1

INTRODUCTION ............................................................................................ 4

ARGUMENT .................................................................................................. 5

    I.    Spectrum WT's Planned Drag Show is Expressive
        Speech ........................................................................................ 6

        A.    A Spectrum WT Drag Show Would Express
            Support for LGBT+ Culture and Equality and
            the Gay and Transgender Community ............................... 6

        B.    Spectrum WT's Show Would Communicate
            a Message About Gender Identity and Fluidity ............... 13

    II.    Wendler's and Other Officials' Statements About
        Drag and Gender Mutability Confirm That
        Drag is Expressive .................................................................... 16

CONCLUSION .............................................................................................. 22

CERTIFICATE OF SERVICE ............................................................................ 23

CERTIFICATE OF COMPLIANCE ..................................................................... 24

# TABLE OF AUTHORITIES

page:

## Cases

*Bostock v. Clayon Cty.*,
  590 U.S. 644 (2020)...................................................................... 9

*Defending Education v. Olentangy Local Sch. Dist. Bd. of Ed.*,
  __ F.4th __, 2025 WL 3102072 (6th Cir. 2025) (*en banc*) ............... 18, 21

*Friends of George's, Inc. v. Mulroy*,
  675 F. Supp. 3d  831 (W.D. Tenn. 2023);
  *rev'd on other grounds*, 108 F.4th 431 (6th Cir. 2024)........................... 16

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995)........................................................... 6, 9, 10

*Imperial Sovereign Court v. Knudsen*,
  699 F. Supp. 3d 1018 (D. Mont. 2023).................................................. 16

*Janus v. Am. Fed. of State, Cty. and Mun. Employees Council 31*,
  585 U.S. 878 (2018)................................................................... 5

*Matal v. Tom*,
  582 U.S. 218 (2017)................................................................. 17

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2020) .................................................... 18

*Naples Pride, Inc. v. City of Naples*,
  2025 WL 1370174 (M.D. Fl., May 12, 2025) ......................................... 12

*Rosenberger v. Rector and Visitors of the Univ. of Virginia*,
  515 U.S. 819 (1995)................................................................ 17

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc. (FAIR)*,
  547 U.S. 47 (2006)................................................................. 6

*Southern Utah Drag Stars v. City of St. George*,
   677 F. Supp. 3d 1252 (D. Utah 2023)................................................. 12, 15

*Spectrum WT v. Wendler*,
   151 F. 4th 714 (5th Cir. 2025), *reh'g granted*, __, F.4th __,
   2025 WL 3008019 (5th Cir., Oct. 27, 2025) .................................... *passim*

*Spectrum WT v. Wendler*,
   693 F. Supp. 3d 689, 699 (W.D. Tex. 2023),
   *rev'd*, 151 F. 4th 714 (5th Cir. 2025), *reh'g granted*, __, F.4th __,
   2025 WL 3008019 (5th Cir., Oct. 27, 2025) ...................................... 4, 12

*Spence v. Washington*,
   418 U.S. 405 (1974)...................................................................... 6

*Trump v. Orr*, __ U.S. __,
   2025 WL 3097824 (Nov. 6. 2025)............................................... 20

*United States v. Skremetti*,
   145 S. Ct. 1816 (2025)................................................................. 21

*United States v. Varner*,
   948 F.3d 250 (5th  Cir. 2020) ...................................................... 18

*Voting for America, Inc. v. Steen*,
   732 F.3d 382 (5th Cir. 2013) ....................................................... 6

*Woodlands Pride, Inc. v. Paxton*,
   694 F. Supp. 3d 820 (S.D. Tex. 2023), *rev'd on other grounds*,
   __ F.4th __, 2025 WL 3096979 (5th Cir., Nov. 6, 2025)........................ 13

## Constitutional, Statutory, and Administrative Provisions

U.S. CONST. amend. I ............................................................. *passim*

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ........................ 20

Exec. Order No. 14183, 90 Fed. Reg. 8757 (Feb, 23, 2025)........................ 21

**Miscellaneous Authorities**

CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/
us/dictionary/English/indoctrination........................................................ 19

Giulia Carbonaro, *Greg Abbott Issues Blistering Response
to Drag Show Ban Controversy*, NEWSWEEK, March 16, 2024,
https://www.newsweek.com/greg-abbott-issues-blistering-
response-drag-show-ban-controversy-1879949 ...................................... 19

*The Latex Ball 2024*, GMHC,
https://gmhc.org/gmhc_events/latex-ball-2024/ ........................................ 8

Matt Lavietes and Jay Valle, *Who Belongs in Drag? First
Straight Man on 'RuPaul's Drag Race' Reignites Debate*,
NBC NEWS, Dec. 9, 2021, https://www.nbcnews.com/nbc-out/
out-pop-culture/belongs-drag-first-straight-man-rupauls-drag-
race-reignites-debate-rcna8112.................................................................. 11

Letter from Texas Attorney General Ken Paxton to Joseph R. Biden,
March 8, 2021, chrome-extension://
efaidnbmnnnibpcajpcglclefindmkaj/https://www.
texasattorneygeneral.gov/sites/default/files/images/
admin/2021/Press/FINAL%20Signed%20Letter%
20to%20Biden%20re%20Bostock%20and%20
Trans%20Agenda.pdf ............................................................................. 20

Letter from Texas Gov. Gregg Abbott to chairmen and executive
directors of Texas state agencies, Jan 30, 2025, chrome-
extension://efaidnbmnnnibpcajpcglclefindmkaj/https://gov.
texas.gov/uploads/files/press/State_Agency_Heads_01.30.25.pdf .......... 20

Emily Martin, *From Police Raids to Pop Culture:
The Early History of Modern Drag*, NAT'L GEOGRAPHIC,
June 2, 2023, https://www.national geographic.com/history/
article/drag-queen-drag-balls-early-history-pop-culture .......................... 7

Sergio Martinez-Beltran, *Texas Panel Debates Measure That Would Prohibit Drag Performances in Front of Minors*, KUT News, March 23, 2023, https://www.kut.org/politics/2023-03-23/texas-senate-panel-debates-measure-that-would-prohibit-drag-performances-in-front-of-minors ...................................... 19

Merriam-Webster, https://www.merriam-webster.com/dictionary/drag................................. 14

Jennifer Minear, *Performance and Politics, An Argument for Expanded First Amendment Protection of Homosexual Expression*, 10 Cornell J. L. Pub. Pol'y 601 (2001)............................ 14

Thaddeus Morgan, *How 19th-Century Drag Balls Evolved into House Balls, Birthplace of Voguing*, History, https://www.history.com/articles/drag-balls-house-ballroom-voguing ..................................................................................... 7

Joshua Nelkin-Zitser, *By Championing Self-Expression, RuPaul's 'Drag Race' Has Encouraged a Generation of Young LGBTQ+ Fans to Come Out*, Business Insider, June 23, 2022, https://www.businessinsider.com/rupauls-drag-race-helped-lgbtq-teens-to-come-out-2021-1 .............................................. 11

Esther Newton, *Mother Camp: Female Impersonators in America* (1979 ed.) .................................................. 7, 8, 9, 14

James Michael Nichols and Cole Delbyck, *"RuPaul's Drag Race" is Leaving TV's Biggest Gay Network – Now What?*, HuffPost, March 23, 2017, https://www.huffpost.com/entry/rupauls-drag-race-logo-vh1_n_58d1b0bce4b0b22b0d17f9aa................. 15

Office of the Texas Attorney General, *Press Release: Attorney General Ken Paxton Defends Texas A&M's Ban on Drag Shows Against Lawsuit from Left-Wing Group*, March 14, 2025, https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-defends-texas-ams-ban-drag-shows-against-lawsuit-left-wing-group .......................................................... 19

Office of the Lt. Governor, *Press Release: Lt. Gov. Dan Patrick: Statement on the Passage of Senate Bill 12 – Banning Children's Exposure to Drag Shows*, April 5, 2023, tgov.texas.gov/ 2023/04/05/ lt-gov-dan-patrick-statement-on-the-passage-of-senate-bill-12-banning-childrens-exposure-to-drag-shows/#:~:text=Lt., Shows%20 %20Lieutenant %20Governor%20Dan% 20Patrick ............. 19

Luna Luis Ortiz, *How GMHC's Latex Ball Has Been Promoting LGBTQ+ Health for 30 Years*, Advocate, Mar. 22, 2022, https://www.advocate.com/commentary/2022/3/22/how-gmhcs-latex-ball-has-been-promoting-lgbtq-health-30-years-luna-luis-ortiz........ 8

Presidential Address to Join Session of Congress, March 4, 2025, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-joint-session-congress-2025-march-4-2025/ ............................... 20

Brett V. Ries, *Don't Be a Drag: How Drag Bans Can Violate the First Amendment*, 33 Tul. J. Law & Sex. 1 (2025)............... 22

Mark Satta, *Shantay Drag Stays: Anti-Drag Laws Violate the First Amendment*, 25 Geo. J. Gender & L. 95 (2023) ................... 9, 10, 14

Brooke Schultz, *Ed Dept. Imposes Funding Restrictions for 5 Districts Over Transgender Policies*, Educ. Week, Aug. 19, 2025, https://www.edweek.org/policy-politics/ed-dept-imposes-funding-restrictions-for-5-districts-over-transgender-policies/2025/08................. 20

Laurence Senelick, The Changing Room: Sex, Drag and Theatre (2000)................................................................. 8

Craig Seligman, *You Just Don't Silence a Drag Queen*, TIME, Mar. 23, 2023, https:// time.com/6265333/ drag-queen-political-act/ ...................................................................... 8, 10

Kiana Shelton, *The Joy of Drag*, Psychiatric Times, June 29, 2022, https://www. psychiatrictimes.com /view/the-joy-of-drag ..................................................................... 7

Jazz Tangcay, *'RuPaul's Drag Race' Blends Art and Politics*
*in a Potent Pop Stew That Continues to Draw Viewers,*
VARIETY, Aug. 21, 2024, https://variety.com/2024/artisans/
news/rupauls-drag-race-politics-1236109870/ ........................................ 11

Eliot Tracz, *Drag: Art. Obscenity. Crime*,
23 CONN. PUB. INT. L.J. 2024 (2024)................................................. 14, 15

Sasha Velour, *The Big Reveal:*
*An Illustrated Manifesto of Drag* (2023).................................................. 15

## *AMICI'S* STATEMENT OF IDENTITY AND INTEREST

*Amici* are professors of LGBT+ studies, law, philosophy, and other disciplines with an extensive record of scholarship and practice concentrating on LGBT+ rights, constitutional law, and the history and legal status of drag. As leading authorities in these fields, they are deeply concerned with the development of First Amendment law governing drag and with ensuring that this artistic means of social and political expression receives full constitutional protection.

Esther Newton is Professor *Emerita* of Anthropology at State University of New York College at Purchase and retired Term Professor in Gender and Women's Studies at the University of Michigan. She is considered one of the founders of LGBT+ studies and is the author of *Mother Camp, Female Impersonators in America*, the first sociological examination of drag performance. Her articles have been published in many edited collections and academic journals and have been translated into a number of foreign languages.

Carlos A. Ball is Distinguished Professor of Law and Judge Frederick Lacey Scholar at Rutgers Law School. He is a nationally recognized expert in both LGBT+ rights law and First Amendment law. His books include *The First Amendment and LGBT Equality* and *Cases and Materials on Sexuality, Gender Identity and the Law* (with Jane Schacter and Douglas NeJaime). His articles on

the intersection of LGBT+ law and the First Amendment have been published in the *Harvard Law Review Forum*, the *Yale Law Journal Forum* and elsewhere.

Joe E. Jeffreys is a nationally recognized historian of drag who teaches at the Tisch School of the Arts at New York University and the Eugene Lang College of Liberal Arts at the New School.  He has published widely on drag in encyclopedias, academic journals, and essay anthologies.  He has also appeared on the topic on CNN, the BBC, PBS, and other outlets, and has been quoted in *Time*, *The New York Times*, and *The Washington Post*.

Scott Skinner-Thompson is a professor and Dean's Scholar at University of Colorado Law School.  He researches and teaches constitutional law, civil rights, privacy law, and LGBT+ issues.  His current writing focuses on the legal construction of gender and legal protections for transgender people.

Nancy Marcus is an Associate Professor of Law at California Western School of Law.  Her scholarship includes works on constitutional law, LGBT+ rights, torts, and race discrimination and has been cited in a U.S. Commission on Civil Rights report, a United Nations shadow report, judicial opinions, casebooks, and treatises.  She has also served as a senior attorney at Lambda Legal Defense and Education Fund, chaired the LGBT+ Rights Subcommittee of the ABA's Civil Rights Litigation Section, and served on the board of the National Lesbian and Gay Law Foundation.

Luke Boso is a co-associate dean of research and a law professor at Southwestern Law School, where he teaches constitutional law and criminal law. His scholarship examines the intersections of law and sexuality, gender, race, and class. He has published on drag and the First Amendment and twice received the Dukeminier Award, an annual prize given by UCLA Law School's Williams Institute honoring the best legal article on sexual orientation and gender identity.

Mark Satta is Associate Professor of Philosophy and Law with a joint appointment in the Philosophy Department and Law School at Wayne State University. He specializes in LGBT+ civil rights, constitutional law, the First Amendment, legal philosophy, and the philosophy of language. He has published on the First Amendment's coverage of drag and other First Amendment topics.

Eliot Tracz is an Assistant Professor of Law at New England Law, Boston, where he teaches property; law and economics; and a seminar on sexual orientation, gender identity and the law. He is the author of the forthcoming casebook *Cases and Problems on Sexual Orientation, Gender Identity, and the Law*, as well as numerous articles on LGBT+ rights.[1]

---

[1]   No counsel for any party authored this brief in whole or in part, and no party, party's counsel, or other person contributed money to fund its preparation or submission. All parties have consented to the filing of this brief. The undersigned author of this brief gratefully

3

# INTRODUCTION

The district court allowed West Texas A&M President Walter Wendler to prohibit a drag show sponsored by Spectrum WT, an LGBT+ student organization, largely because it concluded the show wouldn't "obviously convey or communicate a discernable, protectable message." *Spectrum WT v. Wendler*, 693 F. Supp. 3d 689, 699 (W.D. Tex. 2023), *rev'd*, 151 F. 4th 714, 726 (5th Cir. 2025), *reh'g granted*, __, F.4th __, 2025 WL 3008019 (5th Cir., Oct. 27, 2025).  On appeal, Wendler makes the same argument – that drag shows aren't "inherently expressive."  Brf. of Def-Appellee Walter Wendler ("Wendler Brf.") 14.  The panel majority, however, disagreed and found that Wendler's action likely violates the First Amendment because Spectrum WT's planned show constitutes expressive conduct plainly conveying two messages: support for the LGBT+ community and its culture, and the idea that gender norms are open to challenge.  *See Spectrum WT v. Wendler*, 151 F. 4th 714, 726 (5th Cir. 2025), *reh'g granted*, __, F.4th __, 2025 WL 3008019 (5th Cir., Oct. 27, 2025).

The panel majority was right about drag.  The public fully understands that drag shows are an artistic product and celebration of the LGBT+ community.  Viewers get that drag represents acceptance of and support for LGBT+ culture and

acknowledges the contributions of Amy Abbott, Caroline Rodriguez, Grace Burgert, and Lauren Santibanez, students at the University of Houston Law Center enrolled in the author's Appellate Civil Rights Clinic in Spring 2025.

equality.  More than that, drag necessarily defies gender norms and stereotypes and consequently makes the controversial suggestion that gender might be mutable.

Of course, many people disagree with both these messages.  How to regard gender and the scope of LGBT+ rights and acceptance are now being hotly debated in social settings and the political arena.  As the Supreme Court has commented, "sexual orientation and gender identity… are sensitive political topics, and they are undoubtedly matters of profound value and concern to the public." *Janus v. Am. Fed. of State, Cty. and Mun. Employees Council 31*, 585 U.S. 878, 913-14 (2018) (quotation omitted).  But no one is confused about the fact that drag shows play a role in that discussion.  In fact, Wendler made clear that he was cancelling the Spectrum WT show *precisely because of* its message about sex and gender, and Texas officials have also condemned drag because it supposedly "indoctrinates" viewers with what they see as a harmful point of view.  In this charged and contentious environment, there can be no doubt that a drag show put on by an LGBT+ group to raise money for the cause of stemming suicide among LGBT youth is expressive conduct.  The Court should therefore reverse the district court's denial of Appellants' requested preliminary injunction.

# ARGUMENT

## I.      Spectrum WT's Planned Drag Show is Expressive Speech

The panel decision correctly observes that conduct becomes constitutionally protected speech when it transmits one or more messages likely to be understood by a recipient. *Spectrum WT*, 151 F. 4th at 724.[2]  "[I]t must be evident that conveying some message, even if nearly opaque… was intended." *Id.* at 725.  The panel majority also rightly determined that the drag show Spectrum WT planned to hold at Legacy Hall would have expressed a clearly intelligible message of support for LGBT+ rights and the LGBT+ community, as well as a "deliberate and theatrical subversion of gender-based expectations." *Id.* at 725-26.  The full Court should reaffirm these unremarkable conclusions on its way to reversing the district court's denial of injunctive relief.

### A.      A Spectrum WT Drag Show Would Express Support for LGBT+ Culture and Equality and the Gay and Transgender Community

Drag is an art form unmistakably linked with the LGBT+ community, which originated it.  Consequently, if Spectrum WT stages the drag show it planned, the performance would be intended and received as a message of solidarity and

---

[2]   The panel correctly derived this precept from *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995); *Spence v. Washington*, 418 U.S. 405 (1974); *Rumsfeld v. Forum for Academic & Institutional Rights, Inc. (FAIR)*, 547 U.S. 47 (2006); *Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013); and other Supreme Court decisions holding "that conduct within certain expressive settings and media is protected." *Id*. at 724.

affinity with that community as well as an endorsement of LGBT+ culture and equality.

While men impersonating women on stage dates to Shakespearean theater if not ancient Greece, the drag familiar to contemporary Americans is deeply rooted in gay and transgender life over the last few decades.[3] "Modern-day drag grew in the 1970s and 80s" in so-called "house balls" in New York and other cities, where LGBT+ performers could express themselves freely and cultivate devoted followings.[4] In her 1972 book, *Mother Camp: Female Impersonators in America*, *Amicus* Esther Newton, a leading cultural anthropologist and one of the founders of LGBT+ studies, observed: "female impersonators are an integral part of the homosexual subculture."[5] In those days, before broader acceptance of openly LGBT+ people and gay rights, drag represented "the stigma of the gay world."[6] Straight people interpreted its message as both gay and threatening:

> The framework is that of a normal audience and a perverted
> performer; the performer knows the audience finds his condition

---

[3] *See* Kiana Shelton, *The Joy of Drag*, PSYCHIATRIC TIMES, June 29, 2022, https://www. psychiatrictimes.com/view/the-joy-of-drag; Emily Martin, *From Police Raids to Pop Culture: The Early History of Modern Drag*, NAT'L GEOGRAPHIC, June 2, 2023, https://www.national geographic.com/history/article/drag-queen-drag-balls-early-history-pop-culture.

[4] Shelton, *supra* note 1; Thaddeus Morgan, *How 19th-Century Drag Balls Evolved into House Balls, Birthplace of Voguing*, HISTORY, https://www.history.com/articles/drag-balls-house-ballroom-voguing.

[5] Esther Newton, *Mother Camp: Female Impersonators in America* 20 (1979 ed.).

[6] *Id*. at 3.

bizarre and/or funny, and he laughs with them at himself. The straight audience is then relaxed and ready to be entertained.

> There is no doubt at all that straight people, on the whole, find the fully costumed drag queen an object of both fright and contempt.[7]

In the 1980s, drag grew and began reaching wider audiences with the emergence of HIV. As LGBT+ people faced the AIDS crisis, drag performers "became recognized as keepers of the flame of gay culture by a gay population finally proud to acknowledge it *had* a culture."[8] Drag shows projected self-confidence and frank openness in an otherwise besieged community.[9] As important, "drag competitions and performances across the country raised awareness and money for research and treatment."[10] In 1989, the organization Gay Men's Health Crisis established a large drag ball fundraiser, the Latex Ball, which attracted wide publicity, drew tens of thousands of LGBT+ and straight attendees over the years, and continues to this day.[11]

---

[7] *Id.* at 65.

[8] Craig Seligman, *You Just Don't Silence a Drag Queen*, TIME, Mar. 23, 2023 (emphasis in original), https://time.com/6265333/drag-queen-political-act/.

[9] Laurence Senelick, THE CHANGING ROOM: SEX, DRAG AND THEATRE 469 (2000).

[10] Shelton, *supra* note 1.

[11] Luna Luis Ortiz, *How GMHC's Latex Ball Has Been Promoting LGBTQ+ Health for 30 Years*, ADVOCATE, Mar. 22, 2022, https://www.advocate.com/commentary/2022/3/22/how-gmhcs-latex-ball-has-been-promoting-lgbtq-health-30-years-luna-luis-ortiz; *The Latex Ball 2024*, GMHC, https://gmhc.org/gmhc_events/latex-ball-2024/.

More recently, LGBT+ people and gay culture enjoy much wider public understanding and acceptance.  As Justice Alito has written, "[f]or most 21st century Americans, it is painful to be reminded of the way our society once treated gays and lesbians… To its credit, our society has now come to recognize the injustice of past practices."  *Bostock v. Clayon Cty.*, 590 U.S. 644, 709, 713 (2020) (Alito, J., dissenting).  In this more tolerant environment, drag communicates an open celebration of LGBT+ identity, culture and art, and many straight observers no longer feel the "fright and contempt" Newton recorded a half century ago.[12]

Rather, drag "seems to send the message that LGBTQIA+ people exist along with messages about the value, dignity, and worth of LGBTQIA+ people.  Drag performances often also send the message that such people and such views are worth celebrating, promoting, patronizing, and applauding."[13]  This is essentially identical to the point made by GLIB, the Irish-American Gay, Lesbian & Bisexual Grp. of Boston, and recognized as expressive in *Hurley*: "a contingent marching behind the organization's banner would at least bear witness to the fact that some Irish are gay, lesbian, or bisexual, and the presence of the organized marchers

---

[12]  Newton, *supra* note 5 at 65.

[13]  Mark Satta, *Shantay Drag Stays: Anti-Drag Laws Violate the First Amendment*, 25 GEO. J. GENDER & L. 95, 104 (2023).

would suggest their view that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals." 515 U.S. at 574.

Indeed, beyond simply winning understanding and acceptance, drag has flourished and gone mainstream. Straight people began "flocking" to performances to signal their approval of LGBT+ culture; "the shows were terrific and hilarious, and they got them. Camp humor, which had begun as a secret code among a coterie of in-the-know urban gay men, had invaded popular culture. And so, somehow, had queer people – and middle Americans were giving them a thumbs-up."[14] Just as drag artists make a positive statement about LGBT+ culture and equality, spectators express their own comprehension and support: "Drag performances also create a unique medium from which audience members can send messages and convey viewpoints. Standing in line to watch, cheering loudly for, and tipping drag performers are all ways of expressing approval of drag and of the various viewpoints that drag represents."[15]

The best example of drag's broader appeal and the public's understanding of its message may be "RuPaul's Drag Race." For seventeen seasons, the TV show

---

[14]  Seligman, *supra* note 8.

[15]  Satta, *supra* note 13 at 107.

has popularized drag performers competing against each other before a panel of judges and host RuPaul Charles.  The show has reached millions of viewers globally, earned high ratings, won 24 Emmy Awards, and generated multiple spin-offs.[16]  It also "shed[s] light on issues important to LGBTQ+ communities, such as HIV, substance abuse, transgender identities, family abandonment and coming out. It has also brought the art of female impersonation into the mainstream."[17]  As one performer who tracks the show put it, drag is now "a celebration of LGBTQ+ Pride."[18]

Given the past and present of drag as an important feature of LGBTQ+ culture, the panel correctly concluded that "a drag show can communicate a message of solidarity and support for the LGBT+ community."  *Spectrum WT*, 151 F.3d at 725.  That is all the more true when it comes to Spectrum WT's show.  As the majority observed, "context [is] dispositive."  *Id*. at 726.  Even if every

---

[16]  Jazz Tangcay, *'RuPaul's Drag Race' Blends Art and Politics in a Potent Pop Stew That Continues to Draw Viewers,* VARIETY, Aug. 21, 2024, https://variety.com/2024/artisans/news/rupauls-drag-race-politics-1236109870/; Matt Lavietes and Jay Valle, *Who Belongs in Drag? First Straight Man on 'RuPaul's Drag Race' Reignites Debate*, NBC NEWS, Dec. 9, 2021, https://www.nbcnews.com/nbc-out/out-pop-culture/belongs-drag-first-straight-man-rupauls-drag-race-reignites-debate-rcna8112.

[17]  Joshua Nelkin-Zitser, *By Championing Self-Expression, RuPaul's 'Drag Race' Has Encouraged a Generation of Young LGBTQ+ Fans to Come Out*, BUSINESS INSIDER, June 23, 2022, https://www.businessinsider.com/rupauls-drag-race-helped-lgbtq-teens-to-come-out-2021-1.

[18]  Lavietes and Jay Valle, *supra* note 16.

instance of female impersonation isn't expressive, Spectrum WT's show was not "*onnagata* in kabuki, Sigma Chi fraternity brothers in a distasteful 'ugly woman' contest, *jogappa* priests worshiping Yellamma, [or] Matt Damon depicting a Yale University thespian." *Spectrum WT*, 693 F. Supp. at 704-05; *see also* Wendler Brf. 15-16. Rather, Spectrum WT's show was "sponsored by LGBT+ student organizations and designed to raise funds for an LGBT+ suicide-prevention charity. Against this backdrop, the message sent by parading on a theater stage in the attire of the opposite sex would have been unmistakable." *Spectrum WT*, 151 F.4th at 726. This is particularly true given America's continuing public discussion about sex, gender, and LGBT+ issues. *See* Point II, *infra*.

Moreover, the panel was firmly in the overwhelming majority of courts to see drag this way. District courts have almost uniformly found drag performances in similar contexts to be expressive. *See* Spectrum WT Supp. Brf. 20 n. 4 (citing cases). That's because such shows "reflect the historical and current importance of drag performance in the LGBTQ+ community," *Naples Pride, Inc. v. City of Naples*, 2025 WL 1370174 at ** 1-2, 10 (M.D. Fl., May 12, 2025); because drag is a form of activism conveying political and social messages about "self-expression, gender stereotypes and roles, and LGBTQIA+ identity," *Southern Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1286 (D. Utah 2023); and because there are "often political, social, and cultural messages involved in drag

performances." *Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820, 844 (S.D. Tex. 2023), *rev'd on other grounds*, __ F.4th __, 2025 WL 3096979 (5th Cir., Nov. 6, 2025) (reversing for lack of standing).

In sum, no viewer would have failed to grasp the promotion and espousal of LGBT+ art, culture, and acceptance transmitted by Spectrum WT's show had it been allowed to go forward. It was therefore expressive conduct protected by the First Amendment.

### B. Spectrum WT's Show Would Also Communicate a Message About Gender Identity and Fluidity

Spectrum WT's proposed show would also present a more specific message than simply celebrating one important facet of LGBT+ culture – it controversially suggests that gender isn't necessarily immutable and that sex-related stereotypes aren't always accurate or uniformly obeyed. As the panel opinion rightly recognizes, drag performance offers a "deliberate and theatrical subversion of gender-based expectations." *Spectrum WT*, 151 F. 4th at 725-26.

By definition, drag shows upend gender norms by depicting performers costumed as and behaving like members of the opposite sex. Merriam-Webster Dictionary actually defines drag as "entertainment in which performers caricature or *challenge gender stereotypes* (as by dressing in clothing that is stereotypical of another gender, by using exaggeratedly gendered mannerisms, or by combining

elements of stereotypically male and female dress) and often wear elaborate or outrageous costumes."[19]

Put differently, drag inherently defies sex roles and gender norms by communicating that what appears normal and expected can actually be altered. This was apparent when Newton completed her ground-breaking study of drag performers in 1972 and remains true today. "Anthropologists say that sex-role behavior is learned," Newton wrote, adding: "The gay world, via drag, says that sex-role behavior is an appearance; it is an 'outside.' It can be manipulated at will."[20] In this sense, another commentator notes, drag "plays with, and often violates, norms of gender expression."[21] When drag artists "misperform their gender… they are exposing gender as a construction."[22] The panel recognized that some people are "burdened" by gender-related norms and "expectations" and therefore seek escape through drag. *Spectrum WT*, 151 F.4th at 726. Consequently, drag artists are necessarily "transgressive, challenging gender

---

[19] *Drag*, MERRIAM-WEBSTER (emphasis added), https://www.merriam-webster.com/dictionary/drag; *see also* Eliot Tracz, *Drag: Art. Obscenity. Crime*, 23 CONN. PUB. INT. L.J. 2024, 49 (2024) (citing definition).

[20] Newton, *supra* note 5 at 103.

[21] Satta, *supra* note 13 at 97-98.

[22] Jennifer Minear, *Performance and Politics, An Argument for Expanded First Amendment Protection of Homosexual Expression*, 10 CORNELL J. L. PUB. POL'Y 601, 624 (2001).

hierarchies through the idea that '*all* expressions of gender could be worthy and useful.'"[23]   Contrary to Wendler's view, this message is fundamental to and inherent in drag and requires no further "explanatory speech" to be understood. Wendler Brf. 16-17.

The proposition that gender might be mutable also has specifically political resonance today, as discussed more fully below, further cementing drag's expressiveness.  For example, one district court recently emphasized "current political events and discussions" as a reason why the performance at issue there was "indisputably protected speech." *Southern Utah Drag Stars*, 677 F. Supp. 3d at 1286.  The court quoted a performer who testified that drag transmits "a valuable political message…. that individuals with gender presentation and identities outside the majoritarian norm are welcome in public places." *Id*.  RuPaul Charles has been quoted making the same point:

> "Drag challenges the status quo," RuPaul told HuffPost.  "It's always challenged the matrix – the matrix being choose an identity and stick with it the rest of your life because that's how we want to sell products to you, so we'll know who you are and can put you in a box and then sell you beer and shampoo.  Well, drag says 'I'm a shapeshifter, I do whatever the hell I want at any given time.'  And that is very, very political."[24]

---

[23]   Tracz, *supra* note 19 at 50 (*quoting* Sasha Velour, *The Big Reveal: An Illustrated Manifesto of Drag* 11 (2023)) (emphasis added).

[24]   James Michael Nichols and Cole Delbyck, *"RuPaul's Drag Race" is Leaving TV's Biggest Gay Network – Now What?*, HUFFPOST, March 23, 2017, https://www.huffpost.com/entry/rupauls-drag-race-logo-vh1_n_58d1b0bce4b0b22b0d17f9aa.

And because drag expresses the increasingly politicized viewpoint that gender identity is fluid, other courts have struck down drag bans because they "target[] the viewpoint of gender identity." *Imperial Sovereign Court v. Knudsen*, 699 F. Supp. 3d 1018, 1038 (D. Mont. 2023); *Friends of George's, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 865 (W.D. Tenn. 2023); *rev'd on other grounds*, 108 F.4th 431 (6th Cir. 2024) (reversing for lack of standing).

The idea of gender fluidity is therefore a second and more specific meaning attendees would have absorbed had Spectrum WT's show been allowed to proceed, as the panel properly recognized.

## II.    Wendler's and Other Officials' Statements About Drag and Changing Genders Confirm That Drag is Expressive

Lastly, the best evidence that Spectrum WT's drag show would be expressive is the fact that Wendler plainly saw it that way. That's why he nixed it – because of the negative statement he thought it would make. Other government officials have also condemned drag because of its perceived message, eliminating any doubt that drag is expressive conduct deserving full constitutional protection.

Wendler cancelled the Spectrum show because, as he emailed the West Texas A&M community, he believes "drag shows denigrate and demean women." RE 22. "As a performance exaggerating aspects of womanhood (sexuality, femininity, gender)," Wendler explained, "drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminate against

16

womanhood." RE 20. Such performances constitute a "demoralizing misogyny" and an exhibition of sexism sure to cause "women's suffering." RE 21. Wendler acknowledged that the show represented a "gesture toward another group" – presumably LGBT+ people – but he believes this kind of outreach would "condone the diminishment" of women. RE 22. To Wendler, in other words, drag transmits a clear and inescapable message: contempt for women and femininity.

While *amici* respectfully disagree with Wendler's view of drag, its accuracy is beside the point. All that matters is that Wendler perceived a specific social message and stifled it because of its content. Viewpoint discrimination is clearly proscribed by the First Amendment, even if the speech involved is unpopular in some quarters. *See Matal v. Tom*, 582 U.S. 218, 244 (2017) ("We have said time and again that the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers" (quotation removed)); *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys… Discrimination against speech because of its message is presumed to be unconstitutional"). Indeed, Wendler knew full well he was violating the Constitution; he simply resolved to squelch Spectrum WT's free expression "even when the law of the land appears to require it." RE 22.

More generally, there is a "passionate political and social debate in our society" that has "spilled over into the broader political arena" over drag and closely related questions like whether gender can be conceived of as chosen or fluid. *Defending Education v. Olentangy Local Sch. Dist. Bd. of Ed.*, __ F.4th __, 2025 WL 3102072 at * 13 (6th Cir. 2025) (*en banc*); *accord Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2020) (noting "contentious political debate"). This Court has recognized the existence of this public controversy and therefore counseled official neutrality. *See United States v. Varner*, 948 F.3d 250, 256 (5th Cir. 2020) ("Increasingly, federal courts today are asked to decide cases that turn on hotly debated issues of sex and gender identity"). Other courts have found that suppressing the speech of interested private parties on this topic constitutes viewpoint discrimination at odds with the First Amendment. *See, e.g., Defending Education,* 2025 WL 3102072 at * 18; *Meriwether*, 992 F.3d at 517. If teachers' use of one or another pronoun is protected expression on the important question of how to regard gender identity, *see id.*, the same is true of an artistic performance by an LGBT+ student group exploring the same question.

High-ranking Texas officials besides Wendler have joined the political and social debate over gender identity in recent years and specifically condemned drag for the message it sends. Governor Abbott called the cancelled Spectrum WT

show involved in  this case "indoctrinat[ion]."[25]  How can drag indoctrinate

viewers if it expresses nothing?[26]  Attorney General Ken Paxton has called drag

shows events "where men pretending to be women engage in obscene, offensive,

and degrading behavior… [and] vulgar assaults on our values."[27]  Lieutenant

Governor Dan Patrick similarly called drag an example of the "radical Left's

degradation of our society and values,"[28] while the Texas senator who sponsored a

bill banning drag shows open to minors critiqued them for "expos[ing] children to

issues of sexuality and identity."[29]  With this much *amici* agree: drag shows do

express a particular viewpoint about "issues of sexuality and identity."

---

[25]  Giulia Carbonaro, *Greg Abbott Issues Blistering Response to Drag Show Ban Controversy*, NEWSWEEK, March 16, 2024, https://www.newsweek.com/greg-abbott-issues-blistering-response-drag-show-ban-controversy-1879949.

[26] *See, e.g.*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/ us/dictionary/English/ indoctrination (defining "indoctrination" as "the process of repeating an idea or belief to someone until they accept it without criticism or question").

[27]  Office of the Texas Attorney General, *Press Release: Attorney General Ken Paxton Defends Texas A&M's Ban on Drag Shows Against Lawsuit from Left-Wing Group*, March 14, 2025, https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-defends-texas-ams-ban-drag-shows-against-lawsuit-left-wing-group.

[28]  Office of the Lt. Governor, *Press Release: Lt. Gov. Dan Patrick: Statement on the Passage of Senate Bill 12 – Banning Children's Exposure to Drag Shows*, April 5, 2023, tgov.texas.gov/ 2023/04/05/lt-gov-dan-patrick-statement-on-the-passage-of-senate-bill-12-banning-childrens-exposure-to-drag-shows/#:~:text=Lt.,Shows%20 %20Lieutenant %20Governor%20Dan% 20Patrick.

[29]  Sergio Martinez-Beltran, *Texas Panel Debates Measure That Would Prohibit Drag Performances in Front of Minors*, KUT NEWS, March 23, 2023, https://www.kut.org/politics/ 2023-03-23/texas-senate-panel-debates-measure-that-would-prohibit-drag-performances-in-front-of-minors.

Texas and federal officials have also condemned the concept of gender as mutable or fluid, which, as discussed above, is at the heart of drag.  Governor Abbott has stressed that Texas "recognizes only two sexes" and criticized state courts for violating "biological reality" when allowing petitioners to change sex designations on birth certificates and drivers' licenses.[30]  Attorney General Paxton has repeatedly denounced "radical transgender ideology" and the "eviscerati[on of] the concept of biological sex in American law."[31]  President Trump and the federal government have adopted the position across a range of agencies and policies that the "sexes are not changeable" and that "ideologues" who disagree have wrongly "permit[ted] men to self-identify as women."[32]  The President's executive order

---

[30]  Letter from Texas Governor Gregg Abbott to chairmen and executive directors of Texas state agencies, Jan 30, 2025, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/ https://gov.texas.gov/uploads/files/press/State_Agency_Heads_01.30.25.pdf.

[31]  Letter from Texas Attorney General Ken Paxton to Joseph R. Biden, March 8, 2021, *available at* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.texasattorneygeneral. gov/sites/default/files/images/admin/2021/Press/FINAL%20Signed%20Letter%20to%20Biden% 20re%20Bostock%20and%20Trans%20Agenda.pdf.

[32]  Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).  The Administration's view on the immutability of gender has also been expressed through the executive order barring transgender service members, *see* note 33, *infra*.; the State Department's policy requiring passports to reflect sex assigned at birth rather than sex later adopted by the passport holder, *see Trump v. Orr*, __ U.S. __, 2025 WL 3097824 (Nov. 6. 2025); various new policies instituted by the Department of Education, *see, e.g.*, Brooke Schultz, *Ed Dept. Imposes Funding Restrictions for 5 Districts Over Transgender Policies*, EDUC. WEEK, Aug. 19, 2025, https://www.edweek.org/policy-politics/ed-dept-imposes-funding-restrictions-for-5-districts-over-transgender-policies/2025/08; and President Trump's public statements.  *See, e.g.,* Presidential Address to Join Session of Congress, March 4, 2025, https://rollcall. com/factbase/trump/transcript/donald-trump-speech-joint-session-congress-2025-march-4-2025/ (referring to "the lie that any child is trapped in the wrong body").

requiring the expulsion of transgender troops from the armed forces states that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."[33]  Yet drag itself features "men self-identifying as women" and the theatrical "adoption of a gender identity inconsistent with an individual's [original] sex."

Of course, all "voices in these debates raise sincere concerns," and "the implications for all are profound." *United States v. Skremetti*, 145 S. Ct 1816, 1837 (2025).  People of good will strongly agree with state and federal officials on these topics, just as others ardently agree with the other side.  *See Defending Education*, 2025 WL 3102072 at ** 13-14.  The point is only that drag is a recognized and fully understood part of this ongoing public dialogue.  And the contextual expressiveness of drag shows like the one Spectrum WT planned is heightened and confirmed by the existence of this lively debate.  As one commentator has written, everyone knows full well what drag is saying in the current atmosphere, whether they agree or disagree:

> Put simply, everything about drag – the definition, makeup, hair, costuming, performance, and even its opposition – stems from its inherent viewpoint about gender nonconformity and expression.  It seems that everyone, proponents and opponents alike, are on the same page that drag contains a viewpoint about gender nonconformity.

---

[33]  Exec. Order No. 14183, 90 Fed. Reg. 8757 (Feb, 23, 2025).

They differ, though, as to whether that viewpoint – expressed through a *particular* form of expressive conduct (drag) – should be shared with others.[34]

## Conclusion

Spectrum WT's drag show is expressive conduct fully protected by the First Amendment.  Accordingly, the Court should reverse the district court's decision allowing Wendler to prohibit it.

December 1, 2025                    Respectfully Submitted,

                    s/  *Martin J. Siegel*
                    Martin J. Siegel
                    LAW OFFICES OF
                       MARTIN J. SIEGEL, P.C.
                    2222 Dunstan Road
                    Houston, Texas 77005
                    Telephone: (281) 772-4568
                    Email: Martin@Siegelfirm.com

                    *Attorneys for Amici Curiae*

---

[34]   Brett V. Ries, *Don't Be a Drag: How Drag Bans Can Violate the First Amendment*, 33 TUL. J. LAW & SEX. 1, 13 (2025) (emphasis in original).

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2025, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing brief on all registered counsel of record via the Court's ECF Filing system.


s/      *Martin J. Siegel*
Martin J. Siegel

# **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R.

Civ. P. 32(a)(7)(B) because this brief contains 4,954 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I further certify that this

brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the

type style requirements of Fed. R. App. P. 32(a)(6) because this brief is printed in a

proportionally spaced typeface using the Microsoft Word 2004 for Mac, Version

11.5.6, program in 14 point, Times New Roman font in body text and 12 point,

Times New Roman font in footnote text.

s/      *Martin J. Siegel*
Martin J. Siegel

Dated:  December 1, 2025