No. 23-10994

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVALL,
*Plaintiffs-Appellants,*

v.

WALTER WENDLER; DR. CHRISTOPHER THOMAS; JOHN SHARP; ROBERT
L. ALBRITTON; JAMES R. BROOKS; JAY GRAHAM; TIM LEACH; BILL
MAHOMES; ELAINE MENDOZA; MICHAEL J. PLANK; CLIFF THOMAS;
DEMETRIUS L. HARRELL, JR.; MICHAEL A. HERNANDEZ, III,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas in No. 2:23-cv-48,
Hon. Matthew J. Kascmaryk, U.S. District Judge

# EN BANC BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF TEXAS AND  EQUALITY TEXAS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

***Counsel for* Amici Curiae**

Brian Klosterboer
Chloe Kempf
Charelle Lett
Thomas Buser-Clancy
Adriana Piñon
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(346) 299-6811
bklosterboer@aclutx.org

## CERTIFICATE OF INTERESTED PERSONS

**Case Number and Style**: 23-10994, *Spectrum WT, et al. v. Wendler, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## 1. Plaintiffs-Appellants

Spectrum WT
Barrett Bright
Lauren Stovall

## 2. Counsel for Plaintiffs-Appellants

JT Morris
Conor T. Fitzpatrick
Foundation for Individual Rights and Expression
700 Pennsylvania Ave. SE, Suite 340
Washington, D.C. 20003

Adam B. Steinbaugh
Sara Berinhout
Jeffrey D. Zeman
Foundation for Individual Rights and Expression
510 Walnut St., Suite 1250
Philadelphia, PA 19106

## 3. Defendants-Appellees

Dr. Walter Wendler
Dr. Christopher Thomas
John Sharp
Glenn Hegar
Robert L. Albritton
James R. Brooks

Jay Graham
Michael A. Hernandez, III
Tim Leach
Bill Mahomes
Elaine Mendoza
Michael J. Plank
Cliff Thomas
Demetrius L. Harrell, Jr.

## 4. Counsel for Defendants-Appellees

William R. Peterson
William F. Cole
Monroe David Bryant, Jr.
Zachary Berg
Munera Al-Fuhaid
Jacob C. Beach
Office of the Attorney General of Texas
P.O. Box 12548
Capitol Station
Austin, TX 78711

Allison Marie Collins
Foster Swift Collins & Smith PC
313 South Washington Square
Lansing, MI 48933

## 5. Other Interested Parties

West Texas A&M University
Texas A&M University System

## 6. Amici Curiae

American Civil Liberties Union of Texas
Equality Texas

## 7. Counsel of Amici Curiae

Brian Klosterboer

Chloe Kempf
Charelle Lett
Thomas Buser-Clancy
Adriana Piñon
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288

Respectfully,

/s/ Brian Klosterboer
Brian Klosterboer
*Counsel of Record for*
Amicus Curiae
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ..................................................................1

ARGUMENT ................................................................................. 5

I.  The Context and History of Drag Performances Demonstrate Their Inherently Expressive Nature and the Political, Social, and Cultural Messages They Convey............. 5

    A.  Drag Is a Type of Performance Art that Is Inherently Expressive .......................................................... 5

    B.  The History of Drag Gives Vital Context to Its Expressive Nature ......................................................7

        1.  Drag Has Existed for as Long as Theater Itself .......7

        2.  Drag in Texas Has a Rich History ..........................10

II.  Drag Performance, like Other Forms of Artistic Expression and Live Entertainment, Enjoys First Amendment Protection ........................................................14

III.  Binding Case Law Does Not Require a Particularized Message for Live Performances ............................................... 17

IV.  The District Court's Other First Amendment Rule Language Is Onerous and Unfounded ..................................... 22

V.  Even Under the District Court's Erroneous Test, Plaintiffs' Proposed Performance Would Still Receive Constitutional Protection ................................................................... 26

VI.  Texas's Current Political Climate Adds to the Expressive Nature and Political Message of Drag Shows .......................... 29

CONCLUSION .........................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ........................................................17, 20

*Barnes v. Glen Theatre, Inc.,*
    501 U.S. 560 (1991) ................................................................ 24

*Brown v. Ent. Merchants Ass'n,*
    564 U.S. 786 (2011).............................................................. 3, 23

*Communist Party of U.S. v. Subversive Activities Control Bd.,*
    367 U.S. 1 (1961) (Black, J., dissenting) .................................... 4

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975) ...............................................................14

*Edge v. City of Everett,*
    929 F.3d 657 (9th Cir. 2019) .................................................. 25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ........................................................ 3, 20, 26

*Imperial Sovereign Ct. v. Knudsen,*
    699 F. Supp. 3d 1018 (D. Mont. 2023)....................................15

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason
    Univ.,*
    993 F.2d 386 (4th Cir. 1993) ..................................................16

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952) ................................................................ 24

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n,*
    138 S. Ct. 1719 (2018) (Thomas, J., concurring) .....................18

*Norma Kristie, Inc. v. City of Oklahoma City,*
    572 F. Supp. 88 (W.D. Okla. 1983).................................... 16, 17

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ....................................................................21

*S. Utah Drag Stars v. City of St. George*,
  677 F. Supp. 3d 1252 (D. Utah 2023). ................................. 7, 15

*Sable Commc'ns of California, Inc. v. F.C.C.*,
  492 U.S. 115 (1989) ................................................................ 27

*Schacht v. United States*,
  398 U.S. 58 (1970) ...................................................................16

*Schad v. Borough of Mount Ephraim*,
  452 U.S. 61 (1981) ................................................14, 18, 23, 24

*Southeast Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975) .................................................................14

*Spence v. State of Wash.*,
  418 U.S. 405 (1974).........................................................7, 19, 20

*Texas v. Johnson*,
  491 U.S. 397 (1989).......................................................18, 19, 26

*Texas A&M Queer Empowerment Council v. Mahomes*,
  772 F. Supp. 3d 792 (S.D. Tex. 2025)....................................15

*United States v. O'Brien*,
  391 U.S. 367 (1968)..................................................................21

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ...........................................................14, 24

*Winters v. New York*,
  333 U.S. 507 (1948) ............................................................... 23

*Woodlands Pride, Inc. v. Paxton*,
  157 F.4th 775 (5th Cir. 2025)....................................................1

*Woodlands Pride, Inc. v. Paxton*,
  694 F. Supp. 3d 820 (S.D. Tex. 2023)......................................7

## Statutes

Tex. Health & Safety Code § 769.001 ............................................31

Tex. Loc. Gov't Code § 243.0031 ................................................31

Tex. Penal Code § 43.28 ..............................................................31

## Other Authorities

BBC BITESIZE (May 2019),
    https://www.bbc.co.uk/bitesize/articles/zbkmkmn ...............................7

Ben Rimalower, *From Ancient Greece to Angry Inch, Take a
    Look at the History of Drag in Theatre*, PLAYBILL (Aug. 15,
    2015), https://playbill.com/article/from-ancient-greece-to-
    angry-inch-take-a-look-at-the-history-of-drag-in-theatre-
    com-357650; ............................................................................... 8

Benji Hart and Michael Roberson, *Ballroom Scene Has Long
    Offered Radical Freedoms For Black and Brown Queer
    People. Today, That Matters More Than Ever*, TIME (Feb.
    26, 2021), https://time.com/5941822/ballroom-voguing-
    queer-black-culture-renaissance/ ............................................10

Cari Shane, *The First Self-Proclaimed Drag Queen Was a
    Formerly Enslaved Man*, SMITHSONIAN MAGAZINE (June 9,
    2023), https://www.smithsonianmag.com/history/the-first-
    self-proclaimed-drag-queen-was-a-formerly-enslaved-man-
    180982311/ ............................................................................... 9

Daisy Woodward, *Celebrating Ernest 'Stella' Boulton:
    Victorian Drag Pioneer*, ANOTHER MAGAZINE (June 2, 2016),
    https://www.anothermag.com/fashion-
    beauty/8742/celebrating-ernest-stella-boulton-victorian-
    drag-pioneer ............................................................................... 8

Emily Martin, *From police raids to pop culture: The early
    history of modern drag*, NATIONAL GEOGRAPHIC (June 2,
    2023),
    https://www.nationalgeographic.com/history/article/drag-
    queen-drag-balls-early-history-pop-culture ...........................8

Frances Anderton, *A history of drag, from Caligula to RuPaul*,
KCRW (Oct. 15, 2019),
https://www.kcrw.com/culture/shows/design-and-
architecture/building-housing-affordably-drag-through-the-
ages/a-history-of-drag-from-caligula-to-rupaul ..................................... 8

GLAAD, *GLAAD Report: Drag events faced at least 141
protests and significant threats in 2022* (Nov. 21, 2022),
https://glaad.org/glaad-report-drag-events-faced-least-125-
protests-and-significant-threats-2022/ .................................................31

Hugh Ryan, *How Dressing in Drag Was Labeled a Crime in the
20th Century*, HISTORY CHANNEL (Sept. 14, 2023),
https://www.history.com/news/stonewall-riots-lgbtq-drag-
three-article-rule ................................................................................... 11

Jennifer Wilber, *Gender Roles and Gender Relations in
Shakespeare's "Twelfth Night"*, HUBPAGES (Oct. 29, 2023),
https://discover.hubpages.com/literature/Gender-Roles-
and-Gender-Relations-in-Shakespeares-Twelfth-Night. ........................ 8

Kiana Shelton, *The Joy of Drag,* PSYCHIATRIC TIMES (June 29,
2022), https://www.psychiatrictimes.com/view/the-joy-of-
drag ........................................................................................................ 5

Lauren McGaughy, *A brief history of drag queens in Texas*, THE
DALLAS MORNING NEWS (Oct. 28, 2022) .................................................. 11

Legislative Bill Tracker 2023, EQUALITY TEXAS (last accessed
July 20, 2023)
https://www.equalitytexas.org/legislature/legislative-bill-
tracker-2023/. .......................................................................................31

*LGBTQIA+*, LGBTQIA RESOURCE CENTER, UC DAVIS,
https://lgbtqia.ucdavis.edu/educated/glossary (last accessed
Nov. 25, 2025). ....................................................................................... 4

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ...............................................................................21

Robert Downen, *How Texas activists turned drag events into fodder for outrage*, TEXAS TRIBUNE (Feb. 24, 2023), https://www.texastribune.org/2023/02/24/texas-drag-protests-children/ .................................................................13

Sayantan Datta, *India's drag scene is nothing like America's. Here's how it's different & why*, LGBTQ NATION (June 22, 2022), https://www.lgbtqnation.com/2022/06/indias-drag-scene-nothing-like-americas-heres-different/......................................... 8

Scottie Andrew, *The US has a rich drag history. Here's why the art form will likely outlast attempts to restrict it*, CNN (April 29, 2023), https://www.cnn.com/style/article/drag-queen-us-history-explainer-cec/index.html ............................................. 6

Steve Ramos and David Taffet, *Drag queens pulled us through, one dollar at a time,* DALLAS VOICE (April 25, 2014), https://dallasvoice.com/drag-queens-pulled-through-dollar-time/...........................................................................................12

Todd Camp, *Fort Worth LGBT Community*, TEX. STATE HISTORICAL ASS'N (May 12, 2021), https://www.tshaonline.org/handbook/entries/fort-worth-lgbt-community ........................................................12

Trixie J*., Drag Through Time: Drag Has Always Been a Form of Art*, NEXUS RADIO (June 15, 2022), https://nexus.radio/news/drag-through-time-drag-has-always-been-a-form-of-art ....................................................... 6

## INTEREST OF *AMICUS CURIAE*[1]

The American Civil Liberties Union of Texas ("ACLU of Texas") is a nonpartisan, nonprofit organization with thousands of members and supporters across the State. Founded in 1938, the ACLU of Texas is headquartered in Houston and is the one of the largest ACLU affiliates in the nation. The ACLU of Texas works with communities, at the State Capitol, and in the courts to fulfill the promises of the Constitution for every Texan, no exceptions. From Amarillo to Brownsville and Beaumont to El Paso, we believe in a Texas that works for all of us—a Texas where each person has an equal say in the decisions that shape our future and everyone can build a good life. The ACLU of Texas has expertise in the First Amendment and an interest in guarding against government censorship of free expression and ideas, and is counsel in *Woodlands Pride, Inc. v. Paxton*, 157 F.4th 775, 780 (5th Cir. 2025), which is mentioned in this brief.

Equality Texas engages, educates, and undertakes policy advocacy to secure full equality for LGBTQIA+ Texans. In addition to advocating to protect all forms of gender expression, Equality Texas is committed to

---

[1]    No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E), (b)(4); 5th Cir. R. 29.2.

defending safe spaces for LGBTQIA+ Texans. Drag performances have also helped raise funds to support the work that Equality Texas does on behalf of the LGBTQIA+ community in Texas.

## INTRODUCTION

Drag is a form of artistic and creative expression that is deeply rooted in our country's culture and tradition. Like theater, ballet, or abstract art, drag shows are inherently expressive and shielded from government censorship under the First Amendment. It is clearly established that the government cannot censor live performances based on their content or viewpoint without satisfying strict scrutiny. This principle gives breathing room to the performing arts and shields them from governmental oppression. Here, the district court strayed from binding precedent and required Plaintiffs' performance to meet a more exacting standard of conveying to their audience a "particularized message" that is "political," "unmistakable," and "overwhelmingly apparent." ROA.859-60. This is not a constitutional requirement for live performances or other forms of inherently expressive activity. But even if it were, the district court still erred by construing well-pleaded facts against the Plaintiffs and failing to recognize the message, intent, history, and context of their planned drag performance.

The Supreme Court has explicitly rejected the district court's cramped conception of First Amendment protections, finding that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' . . . would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995) (citation omitted). While holding that violent video games are shielded by the First Amendment, the Supreme Court warned that "we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011). Indeed, the district court's attenuated view of the First Amendment is dangerous because it opens the door for any government official to censor any performance or event that they dislike or disagree with. Such overt and arbitrary censorship has been strictly forbidden by our Constitution since the nation's founding.

The district court's narrowing of the First Amendment's protective scope sets an alarming precedent, which, if left uncorrected, could extend beyond the drag performance at issue in this case. As Justice Black explained over 50 years ago, "the freedoms of speech, press, petition and assembly

3

guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish." *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 137 (1961) (Black, J., dissenting). If President Wendler is permitted to shut down a drag performance based on his disagreement with the views and content of the performance, then little is stopping other university presidents from censoring symphonies they dislike, modern dance performances they consider risqué, beat-boxing or break-dancing competitions they do not understand, silent protests in the campus quad, or prayer circles on the sidelines of football games.

The ACLU of Texas and Equality Texas submit this amicus brief to explain why drag performances are inherently expressive; discuss the social and political history of drag, its importance to the LGBTQIA+[2] community, and the context that adds to its expressive message; expound upon the correct legal standards under the First Amendment; and explain why the district court erred by ignoring the message, intent, and context of Plaintiffs'

---

[2]    LGBTQIA+ refers to people who are lesbian, gay, bisexual, transgender, queer or questioning, intersex, asexual, or another sexual orientation or gender identity beyond the heterosexual and cisgender majority. *See LGBTQIA+*, LGBTQIA RESOURCE CENTER, UC DAVIS, https://lgbtqia.ucdavis.edu/educated/glossary (last accessed Nov. 25, 2025).

drag performance. Because the district court's decision contradicts clearly established precedent under the First Amendment, this Court should reverse.

## ARGUMENT

**I. The Context and History of Drag Performances Demonstrate Their Inherently Expressive Nature and the Political, Social, and Cultural Messages They Convey**

### A. Drag Is a Type of Performance Art that Is Inherently Expressive

Drag performance often involves the exaggeration of feminine or masculine characteristics and the challenging or subversion of gender stereotypes.[3] People of every gender perform in drag and convey different types of gender expression.[4] While drag performances can be entertaining, they also convey social, cultural, economic, and political messages, including the fundraiser for an LGBTQIA+ suicide hotline that the Plaintiffs in this case

---

[3]     Kiana Shelton, *The Joy of Drag,* PSYCHIATRIC TIMES (June 29, 2022), https://www.psychiatrictimes.com/view/the-joy-of-drag ("Drag has many interpretations but is loosely defined as performing in an exaggerated way that caricatures or challenges male or female stereotypes. With bold costumes, makeup, and characters, drag taps into our human desire for fun, play, and creativity. At its core, drag is a creative act—a powerful and personal form of self-expression.").

[4]     *Id.* ("Anyone can do drag. In fact, drag kings (women who personify men) have been around just as long as drag queens (men who perform as women)"). Drag performances are not just limited to "biological men," as the district court incorrectly concluded. ROA.860.

seek to host. ROA.229. Drag shows feature many forms of expression such as singing, dancing, lip-synching, comedy, and spoken words.[5] While costuming is one important aspect of drag performances, it is not the only expressive element.[6] Like a musical or play, what each performer wears conveys subtle or overt messages to the audience that impact the overall performance, but drag shows cannot simply be reduced to "manners of dress" or "men 'performing' while dressed in attire stereotypically associated with women," ROA.860, as the district court erroneously concluded, because they also involve other expressive elements, including pure speech.[7]

In planning their performances, drag performers make a variety of artistic, expressive decisions about their costumes, accessories, makeup, music, dance moves, and spoken remarks.[8] These artistic choices contribute to a drag performer's expression and the message they intend to convey through their performance—"from humor and pure entertainment to social

---

[5]     *See* Scottie Andrew, *The US has a rich drag history. Here's why the art form will likely outlast attempts to restrict it*, CNN (April 29, 2023), https://www.cnn.com/style/article/drag-queen-us-history-explainer-cec/index.html.
[6]     Trixie J., *Drag Through Time: Drag Has Always Been a Form of Art*, NEXUS RADIO (June 15, 2022), https://nexus.radio/news/drag-through-time-drag-has-always-been-a-form-of-art.
[7]     *Id.*
[8]     *Id.*

commentary on gender roles," *Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820, 843 (S.D. Tex. 2023), *vacated and remanded on other grounds*, and "political and social messages regarding . . . self-expression, gender stereotypes and roles, and LGBTQIA+ identity." *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1286 (D. Utah 2023).

## B.    The History of Drag Gives Vital Context to Its Expressive Nature

While drag shows are inherently expressive by nature, the historical and political context of drag artistry strengthens their First Amendment protection. *See Spence v. State of Wash.*, 418 U.S. 405, 410 (1974) ("[T]he context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol.").

### 1.    Drag Has Existed for as Long as Theater Itself

Subverting and challenging gender roles has been a key element of live performance since the days of Shakespeare, when the Church of England allowed only men to perform on stage.[9] Over time, some of Shakespeare's famous works explicitly incorporated gender-bending roles into the script,

---

[9]    *The fabulous history of drag*, BBC BITESIZE (May 2019), https://www.bbc.co.uk/bitesize/articles/zbkmkmn.

including *As You Like It* and *Twelfth Night*.[10] Similar gender-expansive roles have existed for millennia in China, India, and Greece,[11] laying the foundation for what is known as drag today.

In 1860s Victorian England, Earnest Boulton became the first person to describe his cross-dressing stage routine as drag.[12] After Boulton was released from jail for having a same-sex relationship, he traveled to New York, where he performed in drag shows off Broadway.[13] Around the same

---

[10]     Jennifer Wilber, *Gender Roles and Gender Relations in Shakespeare's "Twelfth Night"*, HUBPAGES (Oct. 29, 2023), https://discover.hubpages.com/literature/Gender-Roles-and-Gender-Relations-in-Shakespeares-Twelfth-Night.

[11]     *See, e.g.*, Ben Rimalower, *From Ancient Greece to Angry Inch, Take a Look at the History of Drag in Theatre*, PLAYBILL (Aug. 15, 2015), https://playbill.com/article/from-ancient-greece-to-angry-inch-take-a-look-at-the-history-of-drag-in-theatre-com-357650; Frances Anderton, *A history of drag, from Caligula to RuPaul*, KCRW (Oct. 15, 2019), https://www.kcrw.com/culture/shows/design-and-architecture/building-housing-affordably-drag-through-the-ages/a-history-of-drag-from-caligula-to-rupaul; Sayantan Datta, *India's drag scene is nothing like America's. Here's how it's different & why*, LGBTQ NATION (June 22, 2022), https://www.lgbtqnation.com/2022/06/indias-drag-scene-nothing-like-americas-heres-different/.

[12]     Emily Martin, *From police raids to pop culture: The early history of modern drag*, NATIONAL GEOGRAPHIC (June 2, 2023), https://www.nationalgeographic.com/history/article/drag-queen-drag-balls-early-history-pop-culture.

[13]     Daisy Woodward, *Celebrating Ernest 'Stella' Boulton: Victorian Drag Pioneer*, ANOTHER MAGAZINE (June 2, 2016), https://www.anothermag.com/fashion-beauty/8742/celebrating-ernest-stella-boulton-victorian-drag-pioneer.

time, William Dorsey Swann became the first self-proclaimed "queen of drag."[14] In the late 1880s, Swann was repeatedly arrested for throwing parties where the guests were reportedly men dressed in gowns and danced together.[15] Newspapers said Swann's guests likely competed in a cakewalk, a dance resembling voguing that enslaved people invented to mimic plantation owners.[16]

The attire of these early drag performers—combined with other expressive elements—has been passed down for over a century and a half and lives on in the LGBTQIA+ community today. By the early 1900s, Black and Brown drag artists in Harlem hosted competitions that became some of the most popular social events in New York City.[17] At the same time, Vaudeville theater was popular across the country; and one of the country's first movie stars, Julian Eltinge, was a world-renowned female impersonator.[18]

Although Vaudeville eventually lost its appeal, the art of drag endured, particularly among drag performers who were Black, Brown, and

---

[14]    Cari Shane, *The First Self-Proclaimed Drag Queen Was a Formerly Enslaved Man*, SMITHSONIAN MAGAZINE (June 9, 2023), https://www.smithsonianmag.com/history/the-first-self-proclaimed-drag-queen-was-a-formerly-enslaved-man-180982311/.

[15]    *Id.*

[16]    *Id.*

[17]    *Id.*

[18]    *Supra* note 12.

LGBTQIA+.[19] These artists used drag as a form of self-expression and liberation amidst overlapping discrimination, stigma, and oppression.[20] As they were excluded from many aspects of society based on race, gender identity, and sexual orientation, Black and Brown drag artists hosted drag pageants that ignited a vibrant "House Ballroom" scene.[21] For decades, these drag ballrooms served as a refuge and epicenter for the LGBTQIA+ community, and their unique artistic style achieved worldwide acclaim.[22] The "vogue" performance style created in the House Ballroom space is still used in mainstream drag performances today.[23] This dance style was popularized in mainstream media by Madonna's "Vogue", and has continued to show up in award-winning TV shows and musical performances.[24]

## 2. Drag in Texas Has a Rich History

Drag has as long history in Texas, as it does across the country. In the late 19th century, female impersonators got top billing at the Texas State

---

[19]    *Id.*

[20]    Benji Hart and Michael Roberson, *The Ballroom Scene Has Long Offered Radical Freedoms For Black and Brown Queer People. Today, That Matters More Than Ever*, TIME (Feb. 26, 2021), https://time.com/5941822/ballroom-voguing-queer-black-culture-renaissance/.

[21]    *Id.*

[22]    *Supra* note 12.

[23]    *Id.*

[24]    *Id.*

Fair.[25] Drag shows in Texas grew in popularity in the 1920s and '30s when the prohibition of alcohol drew larger audiences to underground clubs where LGBTQIA+ artists performed.[26] However, growing popularity did not stop law enforcement from targeting and arresting drag performers in Texas.[27] In the mid-1930s, a club in San Antonio, Texas, was raided and seven drag performers were arrested.[28] In 1938, a Houston drag show venue was set on fire just after a grand jury decided to look into its "type of entertainment."[29]

The backlash that drag shows faced increased after World War II, when same-sex relations were criminalized and heavily policed in many states.[30] Drag shows in the LGBTQIA+ community were often forced underground and raided by police, who relied on local cross-dressing bans to surveil, target, and arrest drag performers and LGBTQIA+ Texans.[31] For example, in

---

[25]    Lauren McGaughy, *A brief history of drag queens in Texas*, THE DALLAS MORNING NEWS (Oct. 28, 2022), https://www.dallasnews.com/news/politics/2022/10/28/a-brief-history-of-drag-queens-in-texas/.

[26]    *Id.*

[27]    *Id.*

[28]    *Id.*

[29]    *Id.*

[30]    *See* Hugh Ryan, *How Dressing in Drag Was Labeled a Crime in the 20th Century*, HISTORY CHANNEL (Sept. 14, 2023), https://www.history.com/news/stonewall-riots-lgbtq-drag-three-article-rule.

[31]    *Id.*

1973, seven drag performers were arrested and charged in Fort Worth under a city ordinance that made it illegal for anyone to wear clothing "in a dress not belonging to his or her sex."[32] The charges were dismissed, and the city ordinance was ultimately overturned.[33]

By the early 1980s, drag artists were allowed to perform on stage with less risk of arrest or harassment by police. During the 1980s and early 1990s, drag artists took to the stage "[i]n almost every gay bar in Texas" to raise money for those losing to their lives to AIDS.[34] As this history is remembered by the *Dallas Voice:*

> There isn't a granite wall where the drag queens' names are etched, but . . . so great was their contribution in the fight against the epidemic. . . . the drag queens looked out across a ravaged community and sang for dollars. One dollar became 10. The 10 dollars became a thousand, and the thousand dollars became millions. On that foundation, . . . [t]he sick and the dying had a place to get medical help, food, a place to live and a place to rest.[35]

Still today, drag performances serve as a form of free expression, a source of joy and liberation, and an engine of economic empowerment for Texas's

---

[32]    Todd Camp, *Fort Worth LGBT Community*, TEX. STATE HISTORICAL ASS'N (May 12, 2021), https://www.tshaonline.org/handbook/entries/fort-worth-lgbt-community.

[33]    *Id.*

[34]    Steve Ramos and David Taffet, *Drag queens pulled us through, one dollar at a time*, DALLAS VOICE (April 25, 2014), https://dallasvoice.com/drag-queens-pulled-through-dollar-time/.

[35]    *Id.*

LGBTQIA+ community. Verniss McFarland III, founder of The Mahogany Project, a Houston nonprofit that provides resources and support to the Black Trans community explained: "Drag is how we've buried our dead, and how we've raised money for our community and programs. It has funded people after their houses have been burned down or broken into. It's how we provide Christmas and holiday support. Drag provides sustainable life to all of our community."[36]

While the history of drag might not be known by all, it holds deep significance and underscores the social, political, and cultural context that gives meaning to drag shows and strengthens their expressive nature. Just as someone who sees a Jackson Pollock painting for the first time might not know its significance to the history of art—and consider it splattered paint with no message or meaning—the district court erred by failing to recognize the inherently expressive nature of drag and its rich artistic, social, and political context.

---

[36]     Robert Downen, *How Texas activists turned drag events into fodder for outrage*, TEX. TRIBUNE (Feb. 24, 2023, 5:00 AM), https://www.texastribune.org/2023/02/24/texas-drag-protests-children/.

## II.  Drag Performance, like Other Forms of Artistic Expression and Live Entertainment, Enjoys First Amendment Protection

An unbroken line of case law confirms that expressive activities like music, dance, and theater—which are all elements of drag performance—are shielded by the First Amendment. Indeed, the Supreme Court has repeatedly held that live entertainment, including theatrical works, music, and nude dancing fall within the First Amendment's protective sphere. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65-66 (1981) (collecting cases); *Southeast Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932–33 (1975); *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989).

Many such forms of live entertainment "frequently mix[] speech," such as "the acting out—or singing out—of the written word," with "live action or conduct." *Southeast Promotions, Ltd.*, 420 U.S. at 557–58. In this way, drag performances are analytically indistinguishable from the other forms of live entertainment that indisputably enjoy First Amendment protection. *See id.* at 558 (the varying forms of expression in a work of musical theater are "no reason to hold theater subject to a drastically different standard" because "[t]he basic principles of freedom of speech and the press . . . do not vary") (quoting, in part, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).

14

In light of the wealth of case law upholding the free speech protections of live theater, dancing, music, and movies, it is no surprise that courts across the country have overwhelmingly held that drag performances are entitled to First Amendment protections. *See, e.g.*, *S. Utah Drag Stars*, 677 F. Supp. 3d at 1286 (finding that drag shows at issue are "indisputably protected speech," in part because "speech includes expressive conduct and live entertainment, such as musical and dramatic works") (cleaned up); *Texas A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 802 (S.D. Tex. 2025) ("The Board's contention that drag shows, and Draggieland, are not expressive conduct directly contradicts the Board's simultaneous assertion that drag performances promote an ideology. . . . The performance is clearly intended to convey 'political, social, and cultural messages.'"); *Imperial Sovereign Ct. v. Knudsen*, 699 F. Supp. 3d 1018, 1037 (D. Mont. 2023) (noting that "speech and expression rang[ing] from theatre productions to book readings to drag shows" is subject to First Amendment protection).

Like other live performances and expressive activities, the First Amendment protection of drag performance is not contingent on the artistry, quality, or public acceptance of the work. In *Schacht v. United States*, the Supreme Court held that a live, outdoor skit was shielded by the First Amendment and noted the importance of theatrical performances in "the

entertainment and education of people in the world" despite the "crude and amateurish and perhaps unappealing" nature of the performance in question. 398 U.S. 58, 61–62 (1970); *see also Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 391 (4th Cir. 1993) ("[I]t appears that the low quality of entertainment does not necessarily weigh in the First Amendment inquiry. It would seem, therefore, that the Fraternity's skit [in which fraternity members dressed as women, in one instance using blackface makeup], even as low-grade entertainment, was inherently expressive and thus entitled to First Amendment protection.").

Like the skits in *Schacht* and *Iota Xi*, a U.S. District Court in Oklahoma acknowledged that a drag competition was entitled to First Amendment protection, despite critics' claims that it lacked artistic merit. *Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983). In *Norma Kristie*, public officials refused to grant a permit for a "Miss Gay America Pageant," which was set to feature drag queens using the "art of illusion" to look like women. *Id.* at 90. The court issued a permanent injunction, noting that the pageant enjoyed constitutional protection even if it—as defendants claimed—was "not a noteworthy artistic endeavor such as a play or musical." *Id.* at 91 ("The First Amendment is not an art critic. . . .

16

Any inequality in aesthetic value between Plaintiff's pageant and a musical or play is a distinction without a difference.").

Two years ago, the Supreme Court reiterated the broad scope of First Amendment protection and reinforced these prior holdings: "*All manner of speech*—from 'pictures, films, paintings, drawings, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections." *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (collecting cases) (emphasis added). Like these other forms of art and expression, drag performances are inherently expressive by their very nature and are shielded by the First Amendment. It is clearly established that *all* manner of speech is protected, and no case suggests the opposite or supports the proposition that drag shows could somehow be categorically excluded from constitutional protection.

## III. Binding Case Law Does Not Require a Particularized Message for Live Performances

The district court distorted binding precedent to create a new—and more exacting—test to categorically disqualify drag performances from *all* First Amendment protection. The central case the district court relied on, *Texas v. Johnson*, did not mention live performances like drag shows, which are inherently expressive by their artistic nature. 491 U.S. 397, 404 (1989). Without explanation, the district court considered Plaintiffs' planned drag

performance limited to pure *conduct*, akin to "burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1741–42 (2018) (Thomas, J., concurring). Although some aspects of drag performances contain aspects of conduct (such as walking across the stage or grabbing the microphone), the performance *as a whole* should be analyzed in the same way that the Supreme Court analyzes other live performances and works of art, which are inherently expressive by their very nature. *See, e.g., Schad,* 452 U.S. at 65 (1981) ("[M]otion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee.") (collecting cases).

Even assuming that an entire drag show could be reduced to pure conduct akin to flag burning, the district court still distorted language from *Texas v. Johnson,* where the Supreme Court asked whether the "conduct [of flag burning] possesses sufficient communicative elements to bring the First Amendment into play." 491 U.S. at 404. In posing this question, the Supreme Court noted that it had previously "asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great

that the message would be understood by those who viewed it.'" 491 U.S. 397, 404 (1989) (quoting *Spence,* 418 U.S. at 411). But this quote comes from dicta in *Spence* that *did not* establish a rule that *all* expressive activities must convey a "particularized message":

> It may be noted, further, that [displaying a taped-on peace sign on an upside-down flag] was not an act of mindless nihilism. Rather, it was a pointed expression of anguish by appellant about the then-current domestic and foreign affairs of his government. An intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.

*Spence*, 418 U.S. at 410-11. While this language is instructive for when acts of pure conduct might be considered inherently expressive, the Supreme Court has never applied this "particularized message" test to live performances or made this rule a threshold requirement for plays, musicals, symphonies, or other inherently expressive activities.

Indeed, in *Hurley*, the Supreme Court explicitly distinguished this quote in *Spence* and held that "a narrow, succinctly articulable message is not a condition of constitutional protection, which i[s not] confined to expressions conveying a 'particularized message,' *cf. Spence,* 418 U.S. at 411." 515 U.S. at 569. In *Hurley*, the Supreme Court held that a parade containing "multifarious voices" of expressive activities, including "[s]pectators lin[ing] the streets; people march[ing] in costumes and

uniforms, carrying flags and banners with all sorts of messages . . . [and] marching bands and pipers play[ing]," qualified for First Amendment protection. *Id.*

In 2023, the Supreme Court cited this holding with approval and explained that designing a website, like organizing a parade, is shielded by the First Amendment because "an individual 'does not forfeit constitutional protection simply by combining multifarious voices' in a single communication." *303 Creative*, 600 U.S. at 588 (quoting *Hurley,* 515 U. S. at 569). According to *303 Creative* and *Hurley*, being forced by the government to change even one aspect of a website or parade infringes on the First Amendment right to free speech. Here, where President Wendler has completely shut down Spectrum's planned drag performances, the unconstitutional infringement on speech is even more plain and severe.

The district court cited *United States v. O'Brien* for the proposition that "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 391 U.S. 367, 376 (1968). Despite this admonition, the Supreme Court in *O'Brien* assumed without deciding that "the alleged communicative element [of burning a draft card] is sufficient to bring into play the First Amendment." *Id.* The Court then applied

intermediate scrutiny and upheld the federal government's prohibition on the burning of draft cards because of the "[g]overnment's substantial interest in assuring the continuing availability of issued Selective Service certificates . . . [and] an appropriately narrow means of protecting this interest." *Id.* at 382.[37]

Here, the district court refused to apply even intermediate scrutiny and held that Plaintiffs' planned drag performance falls *entirely beyond* the scope of First Amendment protection. The court cited no authority for this extreme conclusion and there is no reasoned basis for why drag performances could receive far less constitutional protection than someone

---

[37]    The district court also cited *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006) ("*FAIR*"). ROA.858. *FAIR* rejected a First Amendment challenge to the Solomon Amendment, which allows the Department of Defense to deny federal funds to law schools that prohibit military representatives from participating in on-campus recruiting. 547 U.S. at 55. Because the Court found that no observer could possibly know why military recruiters were not present on campus absent accompanying speech, the law schools' decision to exclude them was considered pure conduct and not an inherently expressive activity. *Id.*; *see Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) (distinguishing *FAIR* by explaining that schools "are not speaking when they host interviews") (citation and quotation omitted). A decision not to allow recruiters on campus is starkly different from engaging in a live drag performance that is inherently and artistically expressive.

designing a website, organizing a parade, burning a flag, or conflagrating a draft card.

## IV. The District Court's Other First Amendment Rule Language Is Onerous and Unfounded

While applying an overly cramped view of the First Amendment, the district court imposed new rule language that Plaintiffs' performance must convey a message that is "political," "unmistakable," and "overwhelmingly apparent" to find shelter within the First Amendment. ROA.859-60. But this newly imagined rule language departs from Supreme Court precedent and imposes a far-too-stringent test for whether speech or art can receive constitutional protection.

First, there is no constitutional requirement that inherently expressive activities must be "political." To the contrary: "Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad*, 452 U.S. at 65. The prohibition on distinguishing between entertainment and political speech is essential to preserving our nation's robust free speech guarantee because "[t]he line between the informing and the entertaining is too elusive." *Winters v. New York*, 333 U.S. 507, 510 (1948). As such, it is "dangerous" to make constitutional distinctions between entertainment and

political speech, as "[w]hat is one man's amusement, teaches another's doctrine." *Brown*, 564 U.S. at 790 (quoting *Winters*, 333 U.S. at 510).

The district court wrongfully attempted to distinguish Supreme Court case law protecting live performances by suggesting that "*Schacht*'s holding turned on core political speech — specifically, the 'right openly to criticize the Government during a dramatic performance.'" ROA.861 (quoting *Schacht*, 398 U.S. at 63). But the Court in *Schacht* held that "[a]n actor, like everyone else in our country, enjoys a constitutional right to freedom of speech, *including* the right openly to criticize the Government during a dramatic performance." *Id.* at 63 (emphasis added). This right to theatrical expression includes *but is not limited to* criticizing the government, and the *Schacht* Court explained that "[s]ince time immemorial, outdoor theatrical performances, often performed by amateurs, have played an important part *in the entertainment* and the education of the people of the world." *Id.* at 61 (emphasis added). Thus, even performances that are purely for entertainment purposes receive constitutional protection. *See also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) (explaining that even nude dancing "is expressive conduct within the outer perimeters of the First Amendment") (collecting cases).

In recognizing the First Amendment's protection of movies, the Supreme Court noted that sources of entertainment "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Joseph Burstyn, Inc.*, 343 U.S. at 501. In acknowledging the First Amendment's protection of music, the Court noted music's "capacity to appeal to the intellect and to the emotions." *Rock Against Racism*, 491 U.S. at 790. Similarly, drag performances have the capacity to subtly shape the thoughts and emotions of their audiences, regardless of whether they contain explicitly political speech.

Second, the district court's requirement that Plaintiffs' performance have an "unmistakable" message comes from the Ninth Circuit in a case involving only the wearing of "pasties and g-strings." *Edge v. City of Everett*, 929 F.3d 657, 669 (9th Cir. 2019). This case is inapplicable to the performance here because the mere act of wearing clothing—without other expressive elements—was found not to be inherently expressive. *Id.* at 668 (noting that "the act of wearing particular clothing or insignias where circumstances [do not] establish that an *unmistakable* communication is being made" is not inherently expressive). This quote concerning clothing does *not* establish a new rule that all expressive activities must have an

"unmistakable" message to find shelter within the First Amendment. Instead, the Ninth Circuit explicitly distinguished its holding from other inherently expressive activities. *Id.* at 669 ("We stress that plaintiffs deny that they engage in nude dancing and erotic performances, *thereby disavowing the First Amendment protections available for that conduct*"). Thus, the language of *Edge* applies to clothing alone; and the district court here erred by trying to reduce Plaintiffs' proposed drag performance to only "men dressed in attire stereotypically associated with women" while ignoring its other expressive elements. ROA.862.

Third, the district court pulls an additional quote from *Texas v. Johnson* that "[t]he expressive, overtly political nature of th[e act of flag burning] was both intentional and *overwhelmingly apparent*." ROA.859 (quoting 491 U.S. at 406). This comes from an analysis of the context of flag burning, where the Court noted that the burning of an American flag at the very end of a political demonstration helped establish that the burning of the flag was conduct "sufficiently imbued with elements of communication" to implicate the First Amendment. *Texas*, 491 U.S. at 406. The Supreme Court noted that "[t]he expressive, overtly political nature of this conduct was both intentional and overwhelmingly apparent," but it *did not* fashion any kind of rule that *all* forms of expressive activity must have an "overwhelmingly

apparent" message in order to be shielded by the First Amendment. *Texas* did not mention nor opine on live performances or any other kind of expressive activities beyond flag burning, and it predates the Supreme Court's holding in *Hurley* that a "particularized message" is *not* a requisite for First Amendment protection. 515 U.S. at 569.

From these various cases, the district court manufactured new rule language that did not previously exist: that expressive activities must convey a "particularized message" that is "political," "unmistakable," and "overwhelmingly apparent." ROA.859-60. This language squarely conflicts with Supreme Court precedent and defies the unbroken line of cases shielding live performances and entertainment from arbitrary and viewpoint-discriminatory government censorship.

## V.    Even Under the District Court's Erroneous Test, Plaintiffs' Proposed Performance Would Still Receive Constitutional Protection

Even under the district court's erroneous and far-too-stringent test, the Plaintiffs in this case still prevail because their planned performances are entitled to First Amendment protections. Instead of construing the pleadings in the light most favorable to the Plaintiffs, the district court construed fact

after fact against them[38] while ignoring the particularized, political, unmistakable, and overwhelmingly apparent messages of their planned drag performance.

Plaintiffs seek to host a drag show fundraiser on campus "to convey messages advocating for and showing support for the LGBTQ+ community." ROA.229. The event was specifically advertised as a fundraiser for the Trevor Project, a suicide-prevention resource for the LGBTQ+ community. ROA.232. This message is political in that Plaintiffs are advocating for a specific cause about a matter of public concern and conveying support for members of the LGBTQIA+ at a heightened risk of suicide. Indeed, the advertisement for the drag show explicitly stated the unmistakable and overwhelmingly apparent message of the show:

---

[38] Without any basis, the district court repeatedly called the Plaintiffs' drag show "sexualized" or "highly sexualized," ROA.853-54, 863, despite the Plaintiffs' contention that their show would be rated PG-13 and that they explicitly told all performers not to engage in "lewd" conduct, ROA.229-30.

The only evidence to support President Wendler's contention that the show might be "lewd" comes from outside the record, where the district court found a video on YouTube of the emcee at an entirely different setting and performance. ROA.864. Even in these facts could be construed against Plaintiffs, they do not foreclose First Amendment protection since "[s]exual expression which is indecent but not obscene is [still] protected by the First Amendment." *Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).



ROA.232. In addition to having this particularized message for a political cause, the advertisement for the show contains expressive elements that demonstrate performers defying gender stereotypes. ROA.232. The fact that the show contains *both* a political message of support for the LGBTQIA+ community *and* social and cultural messages about gender norms does not strip this performance of First Amendment protection—it makes it even more apparent.

Far from failing to understand the messages of Plaintiffs' performance, President Wendler called the Plaintiffs' goals "noble" and said that "Supporting The Trevor Project is a good idea. My recommendation is to skip the show and send the dough." ROA.267. But he vehemently disagreed with the second part of Plaintiffs' message, which undermined and subverted gender norms through the artistry of drag. In the words of President Wendler: "As a performance exaggerating aspects of womanhood (sexuality, femininity, gender), drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood." ROA.265. Thus, President Wendler clearly understood that Plaintiffs' show had some kind of particularized social and cultural message—he simply disagreed with it and decided to ban it.

## VI.    TEXAS'S CURRENT POLITICAL CLIMATE ADDS TO THE EXPRESSIVE NATURE AND POLITICAL MESSAGE OF DRAG SHOWS

Plaintiffs' planned drag performance and President Wendler's censorship of their show also exist within a political climate that highlights the expressive nature of the performance and the importance of shielding Plaintiffs' speech from governmental oppression.

In 2023, the Texas Legislature introduced approximately 145 bills seeking to curtail LGBTQIA+ rights,[39] and passed several into law, including a restriction on drag shows and other "sexually oriented performances," Senate Bill 12.[40] Plaintiffs' drag performance was scheduled after that law was introduced and at a time when threats of violence against drag artists have risen across the state.[41] Holding a drag show at West Texas A&M University was therefore not simply about  "biological men 'performing' while dressed in attire stereotypically associated with women," ROA.860, but an act of advocacy and support for the LGBTQIA+ community. ROA.229 ("For Spectrum WT, putting on a charity drag show is important to convey messages advocating for and showing support for the LGBTQ+ community.").

Although the Plaintiffs in this case need not have a particularized, political, unmistakable, or overwhelmingly apparent message of their drag

---

[39]    Legislative Bill Tracker 2023, EQUALITY TEXAS (last accessed July 20, 2023), https://www.equalitytexas.org/legislature/legislative-bill-tracker-2023/.
[40]    S.B. 12, 88th Leg. (codified at Tex. Health & Safety Code § 769.001; Tex. Loc. Gov't Code § 243.0031; Tex. Penal Code § 43.28).
[41]    Texas leads the nation in violence and threats of violence against drag performers. *See Updated GLAAD Report: Drag events faced at least 141 protests and significant threats in 2022*, GLAAD (Nov. 21, 2022), https://glaad.org/glaad-report-drag-events-faced-least-125-protests-and-significant-threats-2022/.

performance to be shielded by the First Amendment, the district court here failed to recognize the inherently expressive nature of their planned performance or the political, social, and cultural context undergirding the performance's message. The district court's decision defies Supreme Court precedent and, if left uncorrected, opens the door to dangerous government censorship and oppression.

## CONCLUSION

The Court should reverse the decision below and uphold Plaintiffs' First Amendment rights.


DATED:  December 1, 2025

Respectfully submitted,

*/s/ Brian Klosterboer*

Brian Klosterboer
Chloe Kempf
Charelle Lett
Thomas Buser-Clancy
Adriana Piñon
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF TEXAS
P.O. Box 8306
bklosterboer@aclutx.org
ckempf@aclutx.org
clett@aclutx.org
tbuser-clancy@aclutx.org
apinon@aclutx.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of December, 2025, a true and correct copy of the foregoing was filed electronically using the CM/ECF system, which served counsel for the parties.

/s/ Brian Klosterboer
Brian Klosterboer

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because this brief contains 6,236 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia, font size 14.

*/s/ Brian Klosterboer*
Brian Klosterboer

**CERTIFICATIONS UNDER ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Brian Klosterboer
Brian Klosterboer