No. 23-10994

---

## In the United States Court
## of Appeals for the Fifth Circuit

---

SPECTRUM WT; BARRETT BRIGHT; LAUREN STOVALL,
*Plaintiffs-Appellants*

v.

WALTER WENDLER, *et al.*,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of Texas in No. 2:23-CV-48,
Honorable Matthew Joseph Kacsmaryk, U.S. District Judge

---

**EN BANC BRIEF OF *AMICI CURIAE* NATIONAL COALITION AGAINST
CENSORSHIP, DRAMATISTS GUILD OF AMERICA, COMIC BOOK
LEGAL DEFENSE FUND, FASHION LAW INSTITUTE, AUTHORS
GUILD, WOODHULL FREEDOM FOUNDATION, FREEDOM TO READ
FOUNDATION, AMERICAN BOOKSELLERS ASSOCIATION, AND
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE
IN SUPPORT OF APPELLANTS AND REVERSAL**

---

Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX  75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

*Attorneys for Amici Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

1. No. 23-10994, *Spectrum WT, et al. v. Walter Wendler, et al.*

2. The undersigned counsel of record certifies that—in addition to the persons and entities listed in Appellants' Certificate of Interested Persons and in the Certificates of Interested Persons of the other *Amici Curiae*—the following listed persons or entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

### *Amici Curiae*
National Coalition Against Censorship
Dramatists Guild of America
Comic Book Legal Defense Fund
Fashion Law Institute
Authors Guild
Woodhull Freedom Foundation
Freedom to Read Foundation
American Booksellers Association
Americans United for Separation of Church and State

### *Attorneys for Amici Curiae*
Peter B. Steffensen
SMU Dedman School of Law
First Amendment Clinic
P.O. Box 750116
Dallas, TX  75275-0116

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305

No publicly traded company has an ownership interest of 10% in the entities listed above.

Respectfully submitted,

/s/ Peter B. Steffensen
Attorney of Record for Amici Curiae

## TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ......................2

TABLE OF CONTENTS ..........................................................................4

TABLE OF AUTHORITIES ....................................................................5

STATEMENT OF AMICI CURIAE ........................................................8

INTRODUCTION.................................................................................12

ARGUMENT .......................................................................................14

   I.   The Doctrine of Prior Restraint Imposes Strict Censorship Guardrails. ......15

      A.   The Doctrine of Prior Restraint is the Appropriate First Amendment Analysis When a Public University Cancels a Planned Performance.............15

      B.   Prohibitions on Prior Restraints are Enshrined in the Text, History, and Tradition of the First Amendment.................................................................18

   II.   President Wendler's Cancellation of Spectrum WT's Drag Show Should Have Been Scrutinized by the District Court as a Prior Restraint......................19

   III.   Compared to *Healy* and *Widmar*, *CLS Hastings* is a Poor Fit. ...................23

CONCLUSION ...................................................................................27

CERTIFICATE OF SERVICE...............................................................28

CERTIFICATIONS UNDER ECF FILING STANDARDS .................29

CERTIFICATE OF COMPLIANCE .....................................................30

# TABLE OF AUTHORITIES

## Cases

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963).................................................................16, 26

*Brooks v. Auburn Univ.*,
412 F.2d 1171 (5th Cir. 1969) ...........................................19

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)..............................................................26

*Chiu v. Plano Indep. Sch. Dist.*,
339 F.3d 273 (5th Cir. 2003) ......................................15, 17

*Christian Legal Society v. Martinez* (*CLS Hastings*),
561 U.S. 661 (2010)........................................................13, 23

*Freedman v. Maryland*,
380 U.S. 51 (1965)................................................................21

*Freedom from Religion Found., Inc. v. Abbott*,
955 F.3d 417 (5th Cir. 2020) ..............................15, 19, 20

*Gay Student Servs. v. Tex. A&M Univ.*,
737 F.2d 1317 (5th Cir. 1984) ....................................17, 25

*Healy v. James*,
408 U.S. 169 (1972)........................................17, 20, 24, 25

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967)..............................................................17

*Kingsley Int'l. Pictures Corp. v. Regents of Univ. of State of N.Y.*,
360 U.S. 684 (1959)..............................................................26

*Matal v. Tam*,
582 U.S. 218 (2017)..............................................................21

*Near v. Minn. ex rel. Olson*,
283 U.S. 697 (1931)......................................................15, 26

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976)......................................................................14, 16

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022), *rev'd sub nom. Moody v. NetChoice,*
  *LLC*, 603 U.S. 707 (2024).......................................................................18

*New York Times Co. v. United States*,
  403 U.S. 713 (1971)...............................................................................15

*Org. for a Better Austin v. Keefe*,
  402 U.S. 415 (1971)...........................................................................16, 22

*Pitt. Press Co. v. Pitt. Comm'n on Human Relations*,
  413 U.S. 376 (1973)...............................................................................16

*Pro-Life Cougars v. Univ. of Hous.*,
  259 F. Supp. 2d 575 (S.D. Tex. 2003). *appeal dismissed*, 67 F. App'x
  251 (5th Cir. 2003)................................................................................16

*Shelton v. Tucker*,
  364 U.S. 479 (1960)...............................................................................17

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)...........................................13, 15, 16, 17, 20, 21, 26

*Spectrum WT v. Wendler*,
  151 F.4th 714 (5th Cir. 2025) ...............................................................12

*Staub v. City of Baxley*,
  335 U.S. 313 (1958)...............................................................................15

*Texas A&M Queer Empowerment Council v. Mahomes*,
  772 F. Supp. 3d 792 (S.D. Tex. 2025) ...................................................20

*Thomas v. Chi. Park Dist.*,
  534 U.S. 316 (2002)...............................................................................18

*Thornhill v. Alabama*,
  310 U.S. 88 (1940).................................................................................19

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969)...............................................................................15

*United States v. Assoc. Press*,
    52 F. Supp. 362 (S.D.N.Y. 1943) .......................................................17

*Univ. of S. Miss. Chapter, Miss. C.L. Union v. Univ. of S. Miss.*,
    452 F.2d 564 (5th Cir. 1971) .............................................................17

*Widmar v. Vincent*,
    454 U.S. 263 (1981).............................................................18, 25, 26

**Other Authorities**

4 W. Blackstone, Commentaries on the Laws of England (1769) .........................18

Eugene Volokh, "Fifth Circuit: West Texas A&M Violated First
    Amendment by Blocking Student Group's Drag Show," The Volokh
    Conspiracy (Aug. 18, 2025),
    https://reason.com/volokh/2025/08/18/fifth-circuit-texas-am-violated-
    first-amendment-by-blocking-student-groups-drag-show/.................................20

Jack M. Balkin, *Old-School/New-School Speech Regulation*, 127 Harv.
    L. Rev. 2296 (2014).........................................................................22

Stephen R. Barnett, *The Puzzle of Prior Restraint*, 29 Stan. L. Rev. 539
    (1977).......................................................................................16

**Rules**

Fed. R. App. P. 29(a)(4)(E) .................................................................8

## STATEMENT OF AMICI CURIAE[1]

The **National Coalition Against Censorship** (NCAC) is an alliance of more than 60 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC's mission is to protect freedom of thought, inquiry, and expression and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of authors, readers, publishers, booksellers, teachers, librarians, artists, students, and others. NCAC is dedicated to defending robust First Amendment protections of the public's access to art, literature, and culture. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

The **Dramatists Guild of America** is the only professional organization promoting the interests of playwrights, composers, lyricists, and librettists writing for the stage. Established over 100 years ago for the purpose of aiding dramatists in protecting both the artistic and economic integrity of their work, The Dramatists Guild of America continues to educate, and advocate on behalf of, its over 8,000 members. The Dramatists Guild of America believes a vibrant, vital theater is an

---

[1] No party's counsel authored this brief in whole or in part. No party, or party's counsel, made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici curiae* or their counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E). Counsel for *amici curiae* conferred with counsel for the parties via email on November 25, 2025, and no party opposes the filing of this brief.

essential element of this country's ongoing cultural debate, and seeks to protect those individuals who write for the theater to ensure its continued success.

The **Comic Book Legal Defense Fund** (CBLDF) is a nonprofit organization dedicated to protecting the legal rights of the comic arts community. With a membership that includes creators, publishers, retailers, educators, librarians, and fans, the CBLDF has litigated First Amendment cases in courts across the United States and led important educational initiatives promoting all forms of free expression through the comic arts, including the right to cosplay.

The **Fashion Law Institute**, a nonprofit organization and the world's first academic center dedicated to the law and business of fashion, was founded by Professor Susan Scafidi with the assistance of the Council of Fashion Designers of America and its then president, Diane von Furstenberg, and is headquartered at Fordham Law School.

The **Authors Guild** was founded in 1912, and is a national non-profit association of more than 17,000 professional, published writers of all genres. The Guild counts historians, biographers, academicians, journalists, poets, translators, and other writers of non-fiction and fiction as members. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, fighting censorship, and taxation. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography,

science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. One of the Authors Guild's primary areas of advocacy is to protect the free expression rights of authors.

The **Woodhull Freedom Foundation** (Woodhull) is a non-profit group dedicated to affirming sexual freedom as a fundamental human right. It regularly advocates for sexual freedom in the courts, legislatures, and the public sphere. Woodhull is particularly concerned with governmental censorship of sexual expression against LGBTQ+ individuals using a prior restraint such as occurred in this case.

The **Freedom to Read Foundation** was established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections, and make available, any work they may legally acquire; establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to collect, and individuals to access, information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

The **American Booksellers Association** (ABA) was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned

bookstores grow and succeed. ABA represents 2,863 bookstore companies operating in 3,281 locations. ABA's core members are key participants in their communities' local economy and culture. To assist them, ABA provides education, information dissemination, business products, and services; creates relevant programs; and engages in public policy, industry, local first, and free expression advocacy, emphasizing the rights of booksellers to freely curate books and events.

**Americans United for Separation of Church and State** is a nonpartisan, not-for-profit educational and advocacy organization that brings together people of all religions and none to protect the right of everyone to believe as they want and stop anyone from using their beliefs to harm others. We fight in the courts, legislatures, and the public square for freedom without favor and equality without exception. We regularly file lawsuits and submit amicus briefs to defend the Constitution, the rule of law, and our cherished American principle of the separation of religion and government. Opposing religiously based censorship has been part of AU's mission since its earliest days.

## INTRODUCTION

Drag performance has a long and varied history, tracing its roots from Ancient Egypt and Greece, through the Shakespearean era in Europe and Kabuki art in Japan. As modern forms of drag performance have evolved to serve as explicitly political art—expressing solidarity for queer communities and standing against censorship and rigid gender roles—so, too, have unlawful attempts to silence or ban them. This case is one of the more recent and egregious examples of this trend. Appellee Walter Wendler, the President of West Texas A&M University, where Appellants planned to host their drag show, intervened to cancel the show because of his personal belief—his viewpoint—that drag shows are offensive to women. Even though President Wendler freely acknowledged that "the law of the land appears to require" that he tolerate Appellants' drag show, *see* ROA.265-267, he proceeded with the cancellation and forced Appellants to sue to vindicate their rights.

The panel here reversed the district court's denial of a preliminary injunction against Wendler. *Spectrum WT v. Wendler*, 151 F.4th 714, 733 (5th Cir. 2025). The panel rightly disagreed with the district court's view that drag shows were not expressive, *id.* at 721-26, concluding, correctly, that Appellants' drag show was entitled to First Amendment protection because the planned performance would have conveyed a discernible message in support of the LGBTQ+ community. *Id.* at 726. As the panel cogently explained, drag shows "mark a deliberate and theatrical

subversion of gender-based expectations and signify support for those who feel burdened by such expectations," including the LGBTQ+ community. *Id.* at 725-26.

In dissent, Judge Ho concluded that *Christian Legal Society v. Martinez* (*CLS Hastings*), 561 U.S. 661 (2010), compelled the Court to side with Appellees. 151 F.4th at 733-39. His analysis is rooted in the flawed premise that President Wendler's decision was *not* viewpoint-based and, flowing from that premise, that Appellants were refused access to a limited public forum under a policy intended to enforce the "university's fundamental mission to ensure a welcoming educational environment for all." *Id.* at 738.

Though the panel reached the right conclusion as to Appellants' direct infringement and forum exclusion claims, neither the panel, nor the court below addressed Appellants' prior restraint claim. *See* 151 F.4th at 729 n.5; ROA.849-874. The en banc Court, however, should, because Appellants' prior restraint claim is compelling. The record shows that President Wendler personally intervened to cancel an expressive performance before it could be staged, while publicly proclaiming that his reason for doing so was viewpoint-based. ROA.265-267. That violates Founding-era principles against giving officials such as President Wendler "the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). As explained further below, this Court should review Appellants' prior restraint claim and remand to the district

court with a direction that it preliminarily enjoin Appellees from preventing Spectrum WT from staging their drag show.

## ARGUMENT

The district court denied Plaintiffs' request for preliminary injunctive relief and dismissed their damages claims, largely under the banner of a qualified immunity analysis in which the court held it was not "clearly established" that drag performances were protected speech, ROA.857-862, 864-868, 873, and that President Wendler's viewpoint-based decision to ban Spectrum WT's charity drag show was not "objectively unreasonable." ROA.863-864. Absent from the district court's analysis, however, was any consideration of Plaintiffs' third cause of action: prior restraint. *See* ROA.849-874.

Despite the district court's silence on the issue, and the panel's decision not to address it, Appellants' prior restraint claim provides an independently compelling basis for reversal. The doctrine of prior restraint is concerned with preventing arbitrary exercises of official discretion which stop the exercise of speech in its tracks. That makes a prior restraint "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). And it is why licensing schemes which require official pre-authorization before speakers are given access to a forum must be governed, at a minimum, by

"narrow, objective, and definite standards to guide" official decisionmakers—
qualities which were entirely lacking here. *Conrad*, 420 U.S. at 553.

## I.    The Doctrine of Prior Restraint Imposes Strict Censorship Guardrails.

### A. The Doctrine of Prior Restraint is the Appropriate First Amendment Analysis When a Public University Cancels a Planned Performance

President Wendler's targeted, ex ante decision to bar Spectrum WT's drag
show out of dislike for its potential message is a "classic" example of a prior
restraint, because it commits the very sin the doctrine is meant to guard against—
"regulating speech contingent on the will of an official[.]" *Chiu v. Plano Indep. Sch.
Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) (citing *Staub v. City of Baxley*, 335 U.S.
313, 322 (1958)). Wendler's cancellation of Appellants' drag show was unmoored
from any objective standards which constrained him from acting on the basis of
viewpoint, a fact to which he freely and publicly admitted. ROA.265-267; *see
Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020).

The harm inflicted by a prior restraint is one of means, not ends: a prior
restraint prevents speech—for example, a publication,[2] an act of protest,[3] or a work

---

[2] *Near v. Minn. ex rel. Olson*, 283 U.S. 697, 704-05 (1931); *see also New York Times
Co. v. United States*, 403 U.S. 713, 725-26 (1971) (Brennan, J., concurring) ("[T]he
First Amendment tolerates absolutely no prior judicial restraints of the press
predicated upon surmise or conjecture that untoward consequences may result.").
[3] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 510, 504 (1969) (explaining
that "the action of the school authorities appears to have been based upon an urgent
wish to avoid the controversy which might result from the expression"); *see also*

of performance art[4]—from ever entering the marketplace of ideas, regardless of its perceived value. *See* Stephen R. Barnett, *The Puzzle of Prior Restraint*, 29 Stan. L. Rev. 539, 543 (1977) ("[T]he doctrine focuses on the form or method of the restraint instead of the substance of the speech (or conduct)."). It is an "immediate and irreversible sanction" that "freezes" speech in place, "at least for the time." *Neb. Press*, 427 U.S. 539, 559 (1976); *Conrad*, 420 U.S. at 553 (a trait common to all prior restraints is that they give "public officials the power to deny use of a forum in advance of actual expression."); *see also Pitt. Press Co. v. Pitt. Comm'n on Human Relations*, 413 U.S. 376, 390 (1973) ("The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.").

Accordingly, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). That "heavy presumption" places a "heavy burden" on the official enforcing the restraint to justify its imposition. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). "[A] law subjecting the

---

*Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575, 582-85 (S.D. Tex. 2003), *appeal dismissed*, 67 F. App'x 251 (5th Cir. 2003).

[4] *Conrad,* 420 U.S. at 553 ("[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use.").

exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Chiu*, 339 F.3d at 281 (quoting *Conrad*, 420 U.S. at 553).

These requirements apply with equal force to facilities on public university campuses. *Healy v. James*, 408 U.S. 169, 184 (1972). As the Supreme Court has long held, the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* at 180 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); *see also Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("The Nation's future depends on leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" (quoting *United States v. Assoc. Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943))).

Thus, "[w]hen [a] restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint . . . ." *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984) (quoting *Univ. of So. Miss. Chapter, Miss. C.L. Union v. Univ. of So. Miss.*, 452 F.2d 564, 566 (5th Cir. 1971)). Like any other system of prior restraint, then, the "'denial [to particular groups] of use of campus facilities for meetings and other appropriate purposes' must be subjected to the level of scrutiny

appropriate to *any* form of prior restraint." *Widmar v. Vincent*, <u>454 U.S. 263, 267</u> n.5 (1981) (emphasis added).

### B. Prohibitions on Prior Restraints are Enshrined in the Text, History, and Tradition of the First Amendment

At the Founding, the prohibition on prior restraints "was central to the Speech Clause as originally understood, because the 'core abuse against which it was directed was the scheme of licensing laws implemented by the monarch and Parliament to contain the 'evils' of the printing press in 16th- and 17th-century England." *NetChoice, L.L.C. v. Paxton*, <u>49 F.4th 439, 453</u> (5th Cir. 2022), *rev'd sub nom. Moody v. NetChoice, LLC*, <u>603 U.S. 707</u> (2024). These concerns grew out of press censorship by the Crown, but "Founding-era Americans similarly viewed the freedom from prior restraints as a central component of the freedoms of speech and the press." *Id.*

Though "[t]he English licensing system expired at the end of the 17th century, . . . the memory of its abuses was still vivid enough in colonial times that Blackstone warned against the 'restrictive power' of such a 'licenser'-an administrative official who enjoyed unconfined authority to pass judgment on the content of speech." *Thomas v. Chi. Park Dist.*, <u>534 U.S. 316, 320</u> (2002) (quoting 4 W. Blackstone, Commentaries on the Laws of England 152 (1769)). As the Supreme Court further explained:

> The power of the licensor against which John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing' is pernicious not merely by reason of the censure of particular comments but by reason of the threat to censure comments on matters of public concern. It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion.

*Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

## II.    President Wendler's Cancellation of Spectrum WT's Drag Show Should Have Been Scrutinized by the District Court as a Prior Restraint.

President Wendler's decision barring Spectrum WT's charity drag show exhibited all the hallmarks of an unconstitutional prior restraint. Wendler's decision to override the University's standard procedure for reserving campus facilities—which Spectrum WT followed and under which it obtained tentative approval, ROA.230-233—and replace it with his own judgment is an exercise of the type of "unbridled discretion" that decades of prior restraint precedent has considered odious. *Freedom from Religion Found.*, 955 F.3d at 427. Even "[a]ttributing the highest good faith" to President Wendler, the right of student groups to access a forum made generally available by the University for all forms of expressive activity "cannot be left to the discretion of the university president on a pick and choose basis." *Brooks v. Auburn Univ.*, 412 F.2d 1171, 1172 (5th Cir. 1969).

That conclusion does not change even if the performance space Spectrum WT sought access to, Legacy Hall, could be considered a limited public forum. Even under the less stringent scrutiny applied under those circumstances, "prior restraints

on speech … must contain neutral criteria sufficient to prevent (1) censorship that is unreasonable in light of the purpose served by the forum *and* (2) viewpoint-based censorship." *Freedom from Religion Found.*, 955 F.3d at 429 (emphasis in original).[5]

President Wendler's actions here failed in both respects. *First*, his decision to bar Spectrum WT's drag show prevented a work of performance art from being staged in a forum designed for that precise purpose. *See* ROA.221-223; *Conrad*, 420 U.S. at 557. Moreover, the JBK Student Center and Legacy Hall hosted drag shows on at least two prior occasions, one during President Wendler's tenure. ROA.223-224. *Second*, President Wendler's own public statements dispelled any notion that his decision was motivated by anything *but* viewpoint animus. *See* ROA.265-267. As the Supreme Court in *Healy* emphasized, a university "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *Healy*, 408 U.S. at 187-88.

Addressing a substantially similar situation in *Texas A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792 (S.D. Tex. 2025), the district court held exactly that. There, after QEC reserved the Rudder Theatre—an

---

[5] *See also* Eugene Volokh, "Fifth Circuit: West Texas A&M Violated First Amendment by Blocking Student Group's Drag Show," The Volokh Conspiracy (Aug. 18, 2025), https://reason.com/volokh/2025/08/18/fifth-circuit-texas-am-violated-first-amendment-by-blocking-student-groups-drag-show/ ("If the rationale for the drag show ban is that drag shows are 'sexist' … that just means that the ban is viewpoint-based, and thus unconstitutional in a limited public forum as well.").

on-campus event space open to students and members of the public—to host its annual drag event, Draggieland, the Texas A&M's Board of Regents issued a resolution that effectively banned Draggieland from being staged because, just as President Wendler asserted here, "these events often involve unwelcome and objectively offensive conduct based on sex[.]" *Id.* at 799.

The court held this amounted to a prior restraint, because the plaintiffs established "that the ban is a viewpoint-based prohibition on expressive conduct imposed before it takes place, in a forum that is designated for a wide range of speech and conduct." *Id.* at 807. The court rejected the Board of Regents' contention that it had an interest in preventing "lewd" and "indecent" speech that stereotyped or objectified women. *Id.* It explained that policing offensive speech is inherently a subjective endeavor, made worse by the fact that the Board's resolution failed to define the words "lewd" or "indecent." *See id.* at 807-08; *see also Matal v. Tam*, 582 U.S. 218, 220 (2017) ("Giving offense is a viewpoint.").

Nor did President Wendler's decision here operate under a policy that maintained "procedural safeguards designed to obviate the dangers of a censorship system." *Conrad*, 420 U.S. at 559 (quoting *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)). In *Freedman*, the Court held that for a prior restraint scheme to be upheld, it must ensure: (1) that the "burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor"; (2) that "any restraint prior

21

to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo"; and (3) that "a prompt final judicial determination must be assured." *Id.* at 560. None of these safeguards were present. ROA.252. This lawsuit alone is proof of that—after all, Spectrum WT had to bring this suit in order to vindicate their rights, despite Wendler's direct acknowledgment that his decision to cancel their drag show likely violated "the law of the land." ROA.267.

The lack of these procedural safeguards in President Wendler's censorship decision also places the district court's failure to consider the prior restraint issue into sharper relief. If a lawful speech-licensing regime at a minimum requires that the initial burden on speech be brief, and that it be subjected to prompt judicial resolution, the district court's failure even to consider the prior restraint question has tacitly prolonged the operation of an unlawful censorship scheme which was the censor's "heavy burden" to justify in the first instance—a burden which it still has not met. *Org. for a Better Austin*, 402 U.S. at 419; *see also* Jack M. Balkin, *Old-School/New-School Speech Regulation*, 127 Harv. L. Rev. 2296, 2316-18 (2014) ("Prior restraints (which include licensing schemes) are especially troublesome because they shift the costs of action, the burdens of proof, and the consequences of inertia from the state to the speaker.").

**III.    Compared to *Healy* and *Widmar*, *CLS Hastings* is a Poor Fit.**

In dissent, Judge Ho nonetheless urges that *CLS Hastings* both (1) controls the outcome here and (2) should be overruled. Principally, he insists that President Wendler's decision to ban Spectrum WT's drag show was not viewpoint discriminatory, but merely the exercise of a policy requiring an "inclusive educational environment for all." 151 F.4th at 733. Applying that reasoning, Judge Ho argued President Wendler was authorized to directly intervene against Appellants because Wendler was merely applying a neutral policy to limit their access to a limited public forum.

Judge Ho's analysis is only correct if the Court accepts that President Wendler's actions were not viewpoint discriminatory—a bridge too far here. Though the dissent found "no evidence of discriminatory animus or selective enforcement," *id.* at 738, that contention is extremely difficult to square with President Wendler's own words justifying his personal intervention to cancel the show: "A harmless drag show? Not possible. I will not appear to condone the diminishment of any group at the expense of impertinent gestures toward another group for any reason, even when the law of the land appears to require it." ROA.265-267. It also casts aside the fact that Spectrum WT had received preliminary approval *under the university's own policies* before Wendler intervened, ROA.230-233, and that Legacy Hall—the

putative forum for the show—had hosted drag shows in the past without issue. ROA.223-224.

Against this backdrop, *CLS Hastings* is instructive for its contrasts—between the application of a facially-neutral "all-comers policy," on the one hand; and the decision to directly target a particular group for exclusion from a campus forum because of dislike for the group or its message, on the other. Though the dissent would hold President Wendler's actions here were akin to the former, they more closely resemble the latter.

Indeed, cases like *Healy* and *Widmar*—discussed at length in *CLS Hastings* but left largely unaddressed by the panel—are powerful comparators. In *Healy*, the president of Central Connecticut State College overruled the recommendation of the college's student affairs committee that a chapter of Students for a Democratic Society be recognized as an official student organization. *Healy*, 408 U.S. at 173-74. Several days later, the president issued a statement to explain his reasoning, claiming that "[t]he published aims and philosophy of the Students for a Democratic Society, which include disruption and violence, are contrary to the approved policy [of the college]." *Id.* at 174 n.4. The Supreme Court sided with the students, concluding that the college "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *Id.* at 187-88.

Likewise, in *Widmar*, a student religious group named Cornerstone had been permitted to use facilities at the University of Missouri at Kansas City to hold its meetings, until university officials suddenly decided to exclude the student group under a five-year-old policy, never previously enforced against Cornerstone, prohibiting the use of campus facilities "for purposes of religious worship or religious teaching." *Widmar*, 454 U.S. at 265. Though the Supreme Court acknowledged "a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities," it held that a policy which targets religious groups for exclusion from campus meeting spaces and other facilities failed strict scrutiny. *Id.* at 267 n.5, 269-70.

*Healy* and *Widmar* are notable for their similarities to this case: each involves the decision of university officials to target particular student groups for exclusion from campus forums. But even more crucial for Appellants' case is how the Supreme Court characterized the official action in *Healy* and *Widmar*: each was a prior restraint. As the *Healy* Court explained, "the effect of the College's denial of recognition was a form of prior restraint, denying to petitioners' organization the range of associational activities" to which other student organizations were entitled. *Healy*, 408 U.S. at 169; *see also Gay Student Servs.*, 737 F.2d at 1325. The Court in *Widmar* went even further, adding that "the denial to particular groups of use of campus facilities for meetings and other appropriate purposes must be subjected to

the level of scrutiny appropriate to *any form of prior restraint*." *Widmar*, 454 U.S. at 267 n.5 (emphasis added) (cleaned up).

That adds to the number of compelling reasons why this Court should take up the prior restraint claim now. The doctrine of prior restraint provides both a clear rule of decision against President Wendler's viewpoint-discriminatory actions, and simultaneously avoids the problems with *CLS Hastings* perceived by the dissent. Whatever stock this Court puts in the long-term viability of *CLS Hastings*, this case is a poor vehicle for the Supreme Court to revisit it. Not only is *CLS Hastings* readily distinguishable because the "access barrier" imposed here was not "reasonable and viewpoint neutral," 561 U.S. at 679; but Appellants are also substantially likely to succeed on their prior restraint claim under a straightforward application of cases like *Healy* and *Widmar*.[6]

As cases which address viewpoint-based censorship in the public university setting, *Healy* and *Widmar* are lodestars here. Applying the teachings of those cases, President Wendler's actions were precisely the kind of prior restraint that the Founders intended to prevent. The district court thus erred by not considering the

---

[6] Not to mention the corpus of prior restraint precedent dealing with many different forms of artistic and political expression, including performance art. *See, e.g.*, *Near*, 283 U.S. at 720–23 (newspapers); *Kingsley Int'l. Pictures Corp. v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 688–89 (1959) (motion pictures); *Bantam Books*, 372 U.S. at 70 (books, pictures, and other printed material); *Freedman*, 380 U.S. at 57–58 (motion pictures); *Conrad*, 420 U.S. at 555–59 (stage performance*); see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 801–05 (2011) (video games).

issue at all. This Court should take that question up and hold President Wendler's viewpoint-based decision to cancel Spectrum WT's drag show was an unconstitutional prior restraint.

## CONCLUSION

For these reasons and the reasons stated by Appellants, the Court should reverse the district court and remand with instructions to grant a preliminary injunction to Appellants.

Dated: December 1, 2025

Respectfully submitted,

*/s/ Peter B. Steffensen*
Peter B. Steffensen
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC[7]
P.O. Box 750116
Dallas, Texas 75275-0116
(214) 768-4077
psteffensen@smu.edu

Thomas S. Leatherbury
Thomas S. Leatherbury Law, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

*Attorneys for Amici Curiae*

---

[7] The First Amendment Clinic is grateful for the contributions of Clinic students Molly Ryan and Betta Whitbeck to this brief.

## CERTIFICATE OF SERVICE

I certify that on December 1, 2025, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Peter B. Steffensen*
*Attorney of Record for Amici Curiae*

**CERTIFICATIONS UNDER ECF FILING STANDARDS**

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Peter B. Steffensen*
*Attorney of Record for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 4,613 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rules 32.1 and 32.2 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Peter B. Steffensen*
*Attorney of Record for Amici Curiae*