# In the United States Court of Appeals for the Fifth Circuit

SPECTRUM WT,

*Plaintiff–Appellant*,

v.

WALTER WENDLER; DR. CHRISTOPHER THOMAS,

*Defendants–Appellees*.

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

## SUPPLEMENTAL EN BANC BRIEF FOR APPELLEES

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

WILLIAM R. PETERSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

JACOB C. BEACH
Assistant Solicitor General

CHRISTOPHER J. PAVLINEC
Assistant Attorney General

*Counsel for Appellees*

# CERTIFICATE OF INTERESTED PERSONS

SPECTRUM WT,

*Plaintiff–Appellant,*

v.

WALTER WENDLER; DR. CHRISTOPHER THOMAS,

*Defendants–Appellees.*

---

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

---

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellees, as governmental parties, need not furnish a certificate of interested persons.

/s/ William F. Cole
WILLIAM F. COLE
*Counsel for Appellees*

## Statement Regarding Oral Argument

The Court has calendared this case for oral argument on January 23, 2026. Appellees agree that oral argument would be helpful to the Court in addressing the complex First Amendment issues presented.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ............................................................. i

Statement Regarding Oral Argument ........................................................ ii

Table of Authorities ............................................................................... iv

Introduction ........................................................................................... 1

Statement of Jurisdiction ....................................................................... 3

Issues Presented .................................................................................... 3

Statement of the Case ............................................................................ 4

    I.    Factual Background .................................................................. 4

        A.    Spectrum plans a charity drag show ................................. 4

        B.    Spectrum applies to reserve Legacy Hall for the drag show ................. 5

        C.    President Wendler does not approve Spectrum's drag show ............... 6

    II.    Procedural Background .............................................................. 8

Summary of the Argument ..................................................................... 10

Standard of Review ................................................................................13

Argument ............................................................................................. 14

    I.    Spectrum Is Unlikely to Succeed on Its First Amendment Claims ........... 14

        A.    Spectrum did not meet its burden to demonstrate it wished to engage in inherently expressive conduct ..................................... 14

        B.    If First Amendment conduct is implicated, the University applied reasonable, viewpoint-neutral restrictions in a limited public forum. 25

            1.    Legacy Hall is a limited public forum. ......................... 25

            2.    The University's actions survive constitutional scrutiny ............ 36

                 a.    The University's restriction was reasonable in the light of the forum's purpose. ........................................... 36

                b.    The University's restriction was viewpoint neutral. ............. 41

            3.    The University's forum-based restriction is not a prior restraint. ....................................................................... 45

    II.    The Remaining Preliminary-Injunction Factors Support Affirmance. ...... 46

Conclusion ........................................................................................... 48

Certificate of Compliance ...................................................................... 49

# Table of Authorities

Page(s)

**Cases:**

*Alexander v. United States,*
509 U.S. 544 (1993)....................................................... 45

*Ark. Educ. Television Comm'n v. Forbes,*
523 U.S. 666 (1998)...............................................28, 33, 47

*Barrett v. Walker Cnty. Sch. Dist.,*
872 F.3d 1209 (11th Cir. 2017) .................................. 27

*Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,*
458 U.S. 176 (1982) ...................................................... 37

*Bloedorn v. Grube,*
631 F.3d 1218 (11th Cir. 2011) ...............................29, 39

*Brown v. Louisiana,*
383 U.S. 131 (1966)........................................................16

*Cabrol v. Town of Youngsville,*
106 F.3d 101 (5th Cir. 1997) .............................. 16, 18, 20

*Cath. Leadership Coal. of Tex. v. Reisman,*
764 F.3d 409 (5th Cir. 2014) ...................................... 45

*Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.,*
660 F. App'x. 600 (10th Cir. 2016) .............................. 46

*Chiu v. Plano Indep. Sch. Dist.,*
260 F.3d 330 (5th Cir. 2001) .................. 27, 28, 29, 31, 33, 36, 47

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez,*
561 U.S. 661 (2010) .................. 1, 2, 11, 12, 27, 29, 32, 36, 37, 38, 39, 40, 42

*City Council of L.A. v. Taxpayers for Vincent,*
466 U.S. 789 (1984) ...................................................... 41

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985)...................................................... 24

*City of Dallas v. Stanglin,*
490 U.S. 19 (1989)................................................ 15, 18, 22

*Clark v. Cmty. for Creative Non-Violence,*
468 U.S. 288 (1984) ......................................................17

*Cornelius v. NAACP Legal Def. & Educ. Fund Inc.,*
473 U.S. 788 (1985) ..............................................25, 29, 30

iv

*Currier v. Potter*,
  379 F.3d 716 (9th Cir. 2004) ............................................................ 34

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
  661 F.2d 328 (5th Cir. 1981) ............................................................ 47

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ........................................................................ 24

*Doe v. Santa Fe Indep. Sch. Dist.*,
  168 F.3d 806 (5th Cir. 1999) ...................................................... 29, 30

*Easom v. US Well Servs., Inc.*,
  37 F.4th 238 (5th Cir 2022) ............................................................. 31

*Estiverne v. La. State Bar Ass'n*,
  863 F.2d 371 (5th Cir. 1989) ............................................................ 28

*Evans v. Garza*,
  No. 23-50541, 2025 WL3524176 (5th Cir. Dec. 9, 2025) ................... 13

*F.C.C. v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) ........................................................................ 24

*Fairchild v. Liberty Indep. Sch. Dist.*,
  597 F.3d 747 (5th Cir. 2010) ...................................................... 27, 28

*Freedom from Religion Found., Inc. v. Abbott*,
  58 F.4th 824 (5th Cir. 2023) ............................................................ 34

*Freedom from Religion Found. v. Abbott*,
  955 F.3d 417 (5th Cir. 2020) ...................................................... 26, 45

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001) ............................................................. 27, 28, 36

*Greer v. Spock*,
  424 U.S. 828 (1976) ........................................................................ 25

*Harrison v. Young*,
  103 F.4th 1132 (5th Cir. 2024) ........................................................ 13

*Harrison v. Young*,
  48 F.4th 331 (5th Cir. 2022) ............................................................ 13

*Hays Cnty. Guardian v. Supple*,
  969 F.2d 111 (5th Cir. 1992) ...................................................... 29, 32, 35

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ........................................................................ 36

*Healy v. James*,
  408 U.S. 169 (1972) ................................................................... 36, 37

*Heaney v. Roberts*,
    846 F.3d 795 (5th Cir. 2017) ............................................................ 41

*Heller v. Doe ex rel. Doe*,
    509 U.S. 312 (1993) ....................................................................... 24

*Hunt v. Bd. of Regents of Univ. of N.M.*,
    792 F. App'x 595 (10th Cir. 2019) ................................................. 44

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ......................................................... 15, 20, 21

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) ................................................................. 26, 27

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
    993 F.2d 386 (4th Cir. 1993) ........................................................ 18

*Justice For All v. Faulkner*,
    410 F.3d 760 (5th Cir. 2005) .................................................. 29, 32

*Keister v. Bell*,
    29 F.4th 1239 (11th Cir. 2022) .............................................. 29, 32

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993) ...................................................11, 27, 29, 41

*Lichtenstein v. Hargett*,
    83 F.4th 575 (6th Cir. 2023) ...............................................16, 17, 21

*Littlefield v. Forney Indep. Sch. Dist.*,
    268 F.3d 275 (5th Cir. 2001) ....................................................16, 20

*Matal v. Tam*,
    582 U.S. 218 (2017) ................................................................. 42, 43

*Minn. Voters All. v. Mansky*,
    585 U.S. 1 (2018) ...................................................................... 26, 28

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ......................................................... 47

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ....................................................................... 21

*Nat. Socialist Party of Am. v. Vill. of Skokie*,
    432 U.S. 43 (1997) ........................................................................15

*Papish v. Bd. of Curators of the Univ. of Mo.*,
    410 U.S. 667 (1973) ................................................................. 42, 44

*PCI Transp., Inc. v. Fort Worth & W.R. Co.*,
    418 F.3d 535 (5th Cir. 2005) ........................................................13

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983).........................................25, 26, 28, 29, 30, 34, 39

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
   748 F.3d 583 (5th Cir. 2014) .............................................. 24

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) ....................................................... 26, 27

*Police Dept. of Chi. v. Mosley*,
   408 U.S. 92 (1972) ........................................................... 14

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) .......................................................... 14

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) .................................................... 27, 41, 42

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
   547 U.S. 47 (2006) ....................................... 11, 15, 16, 17, 19

*Sasser v. Bd. of Regents of Univ. Sys. of Ga.*,
   No. 21-14433, 2023 WL 2446720 (11th Cir. Mar. 10, 2023) ............................ 44

*Schacht v. United States*,
   398 U.S. 58 (1970).......................................................... 23

*Schad v. Borough of Mount Ephraim*,
   452 U.S. 61 (1981) ......................................................... 22

*Se. Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975)..................................................22, 23, 46

*Spectrum WT v. Wendler*,
   151 F.4th 714 (5th Cir. 2025)..........................2, 9, 10, 12, 32, 35, 39, 40, 41, 42

*Spectrum WT v. Wendler*,
   157 F.4th 673 (5th Cir. 2025) ............................................. 10

*Spence v. Washington*,
   418 U.S. 405 (1974).....................................................15, 16, 18, 20

*Stromberg v. California*,
   283 U.S. 359 (1931) .........................................................15

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
   732 F.3d 535 (5th Cir. 2013) ............................................. 47

*Texas v. Johnson*,
   491 U.S. 397 (1989) .....................................2, 10, 15, 16, 17, 18, 20, 21, 22, 43

*Tinker v. De Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ..................................................15, 16, 18

*United States v. Abbott,*
    110 F.4th 700 (5th Cir. 2024) ........................................ 47

*United States v. Bjerke,*
    796 F.2d 643 (3d. Cir. 1986) ......................................... 34

*United States v. O'Brien,*
    391 U.S. 367 (1968) ...............................................15, 44

*Voting for Am., Inc. v. Steen,*
    732 F.3d 382 (5th Cir. 2013) ...............................17, 20, 24

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ....................................................15

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ................................................... 26

*Wandering Dago, Inc. v. Destito,*
    879 F.3d 20 (2d Cir. 2018) ........................................... 44

*Widmar v. Vincent,*
    454 U.S. 263 (1981) .............................. 12, 29, 36, 46

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................14, 46

*Yeasin v. Durham,*
    719 F. App'x 844 (10th Cir. 2018) ................................ 44

*Ysleta Fed'n of Tchrs. v. Ysleta Indep. Sch. Dist.,*
    720 F.2d 1429 (5th Cir. 1983) ...................................... 34

**Constitutional Provisions, Statutes and Rules:**

U.S. Const. amend. I ...........................................*passim*

U.S. Const. amend. XIV ......................................15, 22

20 U.S.C. § 1681 ................................................... 38

28 U.S.C.
    § 1292 ....................................................................... 3
    § 1331 ....................................................................... 3
    § 1343 ....................................................................... 3

42 U.S.C. § 1983 ...................................................... 3

Tex. Educ. Code § 1.002 ........................................ 38

34 C.F.R. § 106.31 .................................................. 38

**Other Authorities:**

Student Handbook: WTAMU Rules & Procedures for Students, West
Texas A&M University (August 2022), http://tinycc.oiqw001/ ...................... 6

*Venues at WTAMU*, West Texas A&M University,
https://tiny.cc/ekqw001.................................................................................. 30

# Introduction

The First Amendment does not compel public universities to open their indoor event spaces to host minstrel shows featuring students in blackface or reenactments of Nazi plays denigrating Jews. Universities are entitled to adopt reasonable policies, "due decent respect" by federal courts, that help advance their educational mission and enforce "[n]ondiscrimination" policies and "state-law proscriptions on discrimination." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 687, 689-90 (2010) (*CLS*).

That principle controls this appeal. In March 2023, Dr. Walter Wendler, long-time President of West Texas A&M University, cancelled Spectrum WT's charity drag show because in his judgment the event consisted of "conduct" and "impertinent gestures" that "[m]ock[] or objectif[y]" women "based on appearance, bias or predisposition" in a manner contrary to "the purpose of" the University, its "educational mission," and state and federal antidiscrimination law. ROA.265-67. Though that drag show was eventually held off campus, Spectrum sued and sought a preliminary injunction, but the district court denied its motion.

This Court should affirm. While the Free Speech Clause respects a broad berth, Spectrum has not demonstrated that its drag show involved inherently expressive conduct protected by the First Amendment. At least on this record, Spectrum has not demonstrated that the conduct of "choreographed performers dancing on stage in costume accompanied by music," Spectrum.Br.22 (citing ROA.227), would convey a generalized message of "support and advoca[cy] for the LGBTQ+

community," Spectrum.Br.7 (citing ROA.229), that was "overwhelmingly" likely to be understood by viewers. *Texas v. Johnson*, 491 U.S. 397, 404, 406 (1989). Even Spectrum concedes as much. *See* Spectrum.Br.29.

But even if Spectrum had identified some First Amendment-protected conduct, the University's exclusion of its drag show from Legacy Hall comports with the Constitution. Legacy Hall—an indoor event venue that student groups may reserve for use after securing approval from the University—is a limited public forum because it is not generally accessible to students or the public for indiscriminate use. And because Legacy Hall is a limited public forum, the University need only show that its exclusion of Spectrum's drag show was "reasonable" in the light of the forum's purpose and viewpoint neutral. *CLS*, 561 U.S. at 679. It was.

The University's exclusion of Spectrum's drag show was grounded in President's Wendler's judgment about the show's effect on the educational environment and out of concern for compliance with antidiscrimination law—decisions the Supreme Court has held federal courts are bound to respect. *Id.* at 686-87. And even the panel acknowledged that "President Wendler's objections were not to the message but to the way [in which] it would be delivered." *Spectrum WT v. Wendler*, 151 F.4th 714, 728 (5th Cir. 2025). No evidence in the record supports the notion that President Wendler discriminated against Spectrum's message of support for the LGBT+ community; if anything, he supported it, calling their cause "noble" and encouraging students to donate. ROA.265, 267.

## Statement of Jurisdiction

Spectrum invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, for its federal constitutional claims brought under 42 U.S.C. § 1983. ROA.23, 37-47. Spectrum timely noticed its appeal of the district court's September 21, 2023, order denying its preliminary-injunction motion on September 26, 2023. ROA.15, 882-84. This Court has appellate jurisdiction over Spectrum's appeal of the district court's denial of its preliminary-injunction motion under 28 U.S.C. § 1292(a)(1).

## Issues Presented

**1.** Whether Spectrum demonstrated that the conduct in which it sought to engage—presenting student "performers on stage dancing in eye-catching clothing and makeup, with lighting and music," Spectrum.Br.25—transmits a particularized message of support for the LGBTQ+ community that would be overwhelmingly likely to be understood by viewers such that it constitutes inherently expressive conduct protected by the First Amendment.

**2.** Whether Legacy Hall—a University-owned, on-campus event space that may be reserved for use through a multi-step event-approval process—constitutes a limited public forum, and whether the University's exclusion of Spectrum's drag show from that forum, grounded in concerns about the educational environment, antiharassment, and antidiscrimination, was a reasonable, viewpoint-neutral restriction on the forum.

## Statement of the Case

## I. Factual Background

### A. Spectrum plans a charity drag show

West Texas A&M University (the "University") is a public university located in the Texas Panhandle, just south of Amarillo. ROA.540. It is part of the Texas A&M University System, which includes ten other universities. ROA.545. Since 2016, Dr. Walter Wendler has served as the University's President and chief executive officer, ROA.540, and since 2022, Dr. Christopher Thomas has served as the Vice President for Student Affairs, ROA.539.

Spectrum WT ("Spectrum") is one of several recognized student organizations at the University. ROA.215. Spectrum has existed for almost 20 years, and it has around 20 members who are undergraduate or graduate students. ROA.215. Spectrum's mission is to "provide a safe space for LGBT+ students and allies to come together," to "raise awareness of the LGBT+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community." ROA.215. To further these ends, Spectrum hosts weekly meetings and puts on "periodic events" throughout the school year, "including Lavender Prom, Queer History Night, and Queer Movie Night." ROA.216. Since the events underlying this lawsuit, Spectrum has continued to host a variety of similar events on the University's campus. ROA.541.

In the spring of 2023, Spectrum planned to host a charity drag show, ROA.216, with the proceeds of ticket sales "earmarked for donation to an LGBTQ+ suicide-prevention group," the Trevor Project, ROA.229. Spectrum alleges that drag shows

typically involve "some combination of singing, dancing, lip-synching, comedy, or spoken word." ROA.227. But this drag show appears to have been set to primarily involve students dancing to pre-selected music, as the event was advertised to "feature drag performers from an array of student organizations stomping it out to see who's the fiercest of them all." ROA.449. As Spectrum puts it, the show would involve "choreographed performers dancing on stage in costume accompanied by music." Spectrum.Br.22; *see also* Spectrum.Br.29 ("[a] stage filled with costumed and choreographed performers dancing to music under the lights"). It was also set to be emceed by "Myss Myka," a "popular Amarillo drag queen," ROA.515, albeit one with a history of risqué performances, *see* ROA.516.

## B. Spectrum applies to reserve Legacy Hall for the drag show

In January 2023, Spectrum "submitted a formal request" to the University to reserve Legacy Hall for its charity drag show. ROA.230. Legacy Hall is a "multipurpose" event space housed in the University's Jack B. Kelley Student Center. ROA.220-21. Certain areas of the University campus—including "places located outside a building or facility that are accessible to the public, such as streets, sidewalks, plazas, lawns, and parks," ROA.272—are "deemed traditional public forums" in which "[a]ny person is permitted to engage in expressive activities … freely" and "without a permit or other permission from the institution." ROA.273-74. But students who wish to use University facilities, such as classrooms and other indoor spaces like Legacy Hall, must specifically request and reserve them. ROA.269-70. Relevant here, the University expressly "reserves the right to cancel an event and immediately remove access to campus if an event violates the policies

and regulations of the Texas A&M University System, the rules and procedures of [the University], or if an event is deemed to be unsafe." ROA.269.

As Spectrum alleges, University policy provides that the event-approval process moves forward in three stages: (1) the "Request," when spaces are temporarily reserved; (2) the "Tentative Confirmation," during which logistics are worked out alongside university staff; and (3) a final confirmation. ROA.230. For Spectrum, this three-step process included hashing out "logistical details, including the time, date, and audio-visual needs," as well as completing a university "risk assessment" that would have required student participants to complete a waiver. ROA.231.

## C. President Wendler does not approve Spectrum's drag show

Spectrum's drag show ultimately did not make it through all three phases of the approval process. Exercising his authority to foster a healthy campus culture and effective educational environment—and consistent with University policies in the Code of Student Life promoting "respect for the dignity of all individuals"[1] and prohibiting "harassment" and "disruptive activity," ROA.472, 484-85—President Wendler made the decision to cancel Spectrum's drag show. ROA.233.

Although he commended Spectrum's "noble" goal of "focus[ing] on suicide prevention" in the LGBTQ+ community and encouraged students to "send the dough" to the Trevor Project, ROA.265, 267, President Wendler explained that drag

---

[1] While this policy is formulated slightly differently in the Student Handbook that was current at the time of Spectrum's proposed March 2023 drag show, the University still maintained a policy seeking to foster "mutual respect for all members of the university community." Student Handbook: WTAMU Rules & Procedures for Students, West Texas A&M University (August 2022), http://tinycc.oiqw001.

shows "exaggerat[e] aspects of womanhood (sexuality, femininity, gender)" and thereby "stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood," ROA.265. As he explained in a University-wide email, "no matter the stated intent," "[s]uch conduct runs counter to the purpose of" the University, which "endeavors to treat all people equally," "intends to provide fair opportunities to all based on academic performance," and whose "educational mission" seeks to "elevate students based on achievement and capability . . . without regard to group membership." ROA.266.

President Wendler also grounded his decision in antidiscrimination law, observing that the University is "charged by the state of Texas to treat each individual fairly," ROA. 266, and that federal agencies like the EEOC aim to root out "harassment" and "acts of prejudice," which "even when not criminal[,] are harmful," ROA.266-67. As he explained, "impertinent gestures" that "[m]ock[] or objectify[] in any way members of any group based on appearance, bias or predisposition" may flout these guarantees. ROA.266, 267. That is why he would no more permit "'blackface' performances" or "a quinceañera celebration" that "debased Latinas." ROA. 265-66. [2]

---

[2] Hewing to this policy, President Wendler also rejected Spectrum's request to host a similar drag show in the spring of 2024. ECF 156.

## II. Procedural Background

Four days after President Wendler's University-wide e-mail explaining his decision to cancel the drag show, Spectrum and two of its student officers[3] sued President Wendler, Dr. Thomas, the Texas A&M System Chancellor, and several members of the Texas A&M Board of Regents.[4] ROA.16-51. Plaintiffs alleged these defendants violated the First Amendment in several ways when President Wendler cancelled their drag show, including by engaging in viewpoint discrimination, excluding them from a public forum, imposing a prior restraint, and retaliating against them. ROA.37-47; *see also* ROA.250-53 (operative complaint adding prior-restraint claim). They sought both a temporary restraining order and a preliminary injunction, ROA.134-60, as well a permanent injunction, declaratory relief, and damages (against President Wendler, who alone was sued in both his individual and official capacity), ROA.259. Plaintiffs later withdrew their request for a TRO, opting to hold their drag show off campus instead. ROA.172.

The district court denied Plaintiffs' motion for a preliminary injunction and dismissed the damages claims against President Wendler. ROA.849-74. The court held that "it is not clearly established that all drag shows are inherently expressive," ROA.862, and thus concluded that "Plaintiffs have not demonstrated they are

---

[3] Those two individuals, Barrett Bright and Lauren Stovall, are now former students at the University, and their claims for injunctive and declaratory relief have since been dismissed by the district court. ECF 245 at 4. They were thereafter voluntarily dismissed from this appeal. ECF 301.

[4] The claims against the members of the Board of Regents and the Texas A&M Chancellor have also since been voluntarily dismissed. ECF 301; *see also* ECF 245 at 5-6.

substantially likely to succeed" on the merits of their First Amendment claims, ROA.873. The court also held that sovereign immunity did not bar Plaintiffs' claims for injunctive relief against President Wendler, ROA.868-70, and that Plaintiffs had standing to sue Dr. Thomas and the Texas A&M System Chancellor, but not the Board of Regents. ROA.870-72. Plaintiffs appealed. ROA.882.

A panel of this Court reversed, entered an injunction, and remanded. *Spectrum WT v. Wendler*, 151 F.4th 714 (5th Cir. 2025). The panel majority concluded that conduct is inherently expressive and protected by the First Amendment so long as "conveying some message, even if nearly opaque or perhaps smeared, was intended." *Id.* at 725. Applying that standard to Plaintiffs' drag show, the majority held that "a message in support of LGBT+ rights was intended." *Id.* The majority also held that Legacy Hall is a designated public forum because the University's facility-use policy "contains no limits on public expression of particular kinds or by particular groups" and there was no evidence that "a request for use has been denied to a student or an outside group." *Id.* at 727. The panel also rejected the applicability of *CLS*, reasoning that *CLS* involved a limited public forum and an expressive-association claim, unlike here. *Id.* at 728.

Judge Ho dissented. He explained that Legacy Hall is a limited public forum because the University's facility-use policy necessarily limited what speech was permissible. *Id.* at 738 (Ho, J., dissenting). Thus, "the government retains the discretion to impose new limits on the forum, as new situations arise." *Id.* at 739. And in the light of the "educational context," under *CLS*, "Judges owe university

administrators 'due decent respect' when considering constitutional objections to their decisions." *Id.* at 734.

This Court later issued an order to rehear this case en banc. *Spectrum WT v. Wendler*, 157 F.4th 673, 674 (5th Cir. 2025) (per curiam).

## Summary of the Argument

This Court should affirm the district court's denial of Spectrum's motion for a preliminary injunction because Spectrum did not meet its burden to establish any of the preliminary-injunction factors.

**I.** At the outset, Spectrum is unlikely to succeed on the merits of its First Amendment claim. On this record, Spectrum has failed to demonstrate that it intended to engage in any First Amendment-protected activity. The Free Speech Clause protects only conduct that is "inherently expressive"—that is, conduct "sufficiently imbued with elements of communication." *Johnson*, 491 U.S. at 404. Conduct qualifies as such only if "[1] an intent to convey a particularized message was present, and . . . [2] the likelihood was great that the message would be understood by those who viewed it." *Id.*

Spectrum fails the latter prong of this two-part test: It cannot show that it would be "overwhelmingly apparent," *id.* at 406, to viewers that "choreographed performers dancing on stage in costume accompanied by music," Spectrum.Br.22 (citing ROA.227), would convey a generalized message of "support and advoca[cy] for the LGBTQ+ community," Spectrum.Br.7 (citing ROA.229). Indeed, Spectrum concedes it would not: "Perhaps 'an observer' of Spectrum's drag performance 'may not discern that the performers' conduct communicates 'advocacy in favor of

LGBTQ+ rights', as the district court claimed." Spectrum.Br.29. Spectrum cannot alter that conclusion by pointing (at 23) to fliers advertising its event: "The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*").

Even if Spectrum planned to engage in inherently expressive conduct protected by the First Amendment, the University's exclusion of its drag show from Legacy Hall was not unconstitutional because it was a reasonable, viewpoint-neutral restriction in a limited public forum. To begin, Legacy Hall—an indoor event space on the University campus that may be reserved for student use with University approval—is a limited public forum. Unlike a designated public forum, Legacy Hall is not "open for indiscriminate public use for communicative purposes." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993); *cf.* ROA.272-74 (expressly designating "common outdoor areas of the university's campus" to be "traditional public forums"). Instead, students who would like to use the forum must obtain approval from the University that is secured through a multi-layered approval process. ROA.229-31. And the University ultimately "reserves the right to cancel an event and immediately remove access to campus if an event violates the policies and regulations of the Texas A&M University System, the rules and procedures of [the University], or if an event is deemed to be unsafe." ROA.269.

Because Legacy Hall is a limited public forum, the University need only show that its exclusion of Spectrum's drag show from that forum was reasonable and viewpoint neutral. *CLS*, 561 U.S. at 679. It was both. The Supreme Court "ha[s] never

denied a university's authority to impose reasonable regulations compatible with [its] mission upon the use of its campus and facilities." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981). It has accordingly instructed courts to "resist substitut[ing] their own notions of sound educational policy for those of the school authorities which they review." *CLS*, 561 U.S. at 686 (citation omitted). And it has deemed "reasonable" university efforts to enforce "[n]ondiscrimination" policies and "state-law proscriptions on discrimination." *Id.* at 689-90. That is precisely what the University did here. As President Wendler explained, by excluding Spectrum's drag show from Legacy Hall, he sought to prevent an event that would "[m]ock[] or objectify[]" women "based on appearance, bias or predisposition" in violation of "the purpose of" the University, its "educational mission," and state and federal antidiscrimination law. ROA.265-67. The University's restriction is particularly reasonable in view of the "substantial alternative channels that remain open"—including numerous on-campus events and other venues—for Spectrum to convey its message. *CLS*, 561 U.S. at 690 (citation omitted).

The University's exclusion of Spectrum's drag show from Legacy Hall was also viewpoint neutral. As the panel correctly concluded, Spectrum "was told to abandon *the way in which* it wished to deliver its message, *i.e.*, the message of support of the LGBT+ community through the *delivery mechanism* of a drag show." *Spectrum WT*, 151 F.4th at 728 (emphases added). Yet critically, "[o]n the record so far, President Wendler's objections were *not to the message* but to the way [in which] it would be delivered." *Id.* (emphasis added). The record fully supports this conclusion, as President Wendler explained that the drag show was barred "no matter the stated

12

intent"—whether to parody the LGBTQ+ community or stand in solidarity with it. ROA.265-66. And since the "conduct" to be regulated, was that of "harassment" or "acts of prejudice," ROA.266-67, President Wendler was prepared to apply the University's policy in various circumstances, including to "'blackface' performances" and a "quinceañera celebration" that "debased Latinas." ROA. 265-66.

**II.** Nor has Spectrum demonstrated that it will suffer irreparable harm in the absence of an injunction or that the balance of equities and public interest support injunctive relief. Because Spectrum has not identified a First Amendment violation, it cannot bootstrap that deficient claim into irreparable injury. And both the public interest and balance of harms tip in favor of the University, as a ruling endorsing an overly expansive forum analysis that would force universities to host conduct antithetical to their mission, harmful to the educational environment, and at odds with antidiscrimination law might encourage universities to close forums for speech.

## Standard of Review

This Court "review[s] the grant or denial of a preliminary injunction for abuse of discretion, with any underlying legal determinations reviewed de novo and factual findings for clear error." *Evans v. Garza*, No. 23-50541, 2025 WL3524176, at *3 (5th Cir. Dec. 9, 2025) (citation omitted). The Court "may also affirm on any ground supported by the record, including one not reached by the district court." *Harrison v. Young*, 103 F.4th 1132, 1135 (5th Cir. 2024).

A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'" *Harrison v. Young*, 48 F.4th 331, 342 (5th Cir. 2022) (quoting *PCI Transp., Inc. v. Fort*

*Worth & W.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005)). Any "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I. Spectrum Is Unlikely to Succeed on Its First Amendment Claims.

The Court should affirm the district court's denial of Spectrum's motion for a preliminary injunction because Spectrum is unlikely to succeed on its First Amendment claims. On this preliminary-injunction record, Spectrum did not demonstrate that the drag show it wished to hold in Legacy Hall—involving "performers on stage dancing in eye-catching clothing and makeup, with lighting and music," Spectrum.Br.25—constituted inherently expressive conduct entitled to First Amendment protection. But even if Spectrum had identified such inherently expressive conduct, Legacy Hall is a limited public forum, and the University applied reasonable, viewpoint-neutral standards when it excluded Spectrum's drag show.

### A. Spectrum did not meet its burden to demonstrate it wished to engage in inherently expressive conduct.

**1.** The First Amendment's Free Speech Clause forbids the government to "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). Although "[t]he First Amendment literally forbids the abridgment only of 'speech,'" the Supreme Court has "long recognized that

its protection does not end at the spoken or written word." *Johnson*, 491 U.S. at 404. The prohibition also extends to certain "conduct that is inherently expressive." *FAIR*, 547 U.S. at 61, 66.

The Supreme Court has recognized such inherently expressive conduct as including "saluting a flag (and refusing to do so)," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), "wearing an armband to protest a war," *Tinker v. De Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969), "displaying a red flag," *Stromberg v. California*, 283 U.S. 359, 369 (1931), "and even '[m]arching, walking, or parading' in uniforms displaying the swastika," *Nat. Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 43 (1997) (per curiam). *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (collecting these authorities). This line of cases recognizes "that conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Johnson*, 491 U.S. at 404 (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)).

At the same time, the Supreme Court has cautioned that it "cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). After all, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). So, to determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the Supreme Court has long instructed courts to consider "whether 'an intent to convey a particularized message was present, and whether the likelihood was great that the

message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404 (alterations omitted) (quoting *Spence*, 418 U.S. at 410-11). Ultimately, "[i]n order for a message to be delivered by conduct, it must, in context, be reasonably apprehended by viewers." *Cabrol v. Town of Youngsville*, 106 F.3d 101, 109 (5th Cir. 1997).

In applying this test, identifying "the context in which" the conduct "occurred" is key. *Johnson*, 491 U.S. at 405. Indeed, "[t]he protection of the First Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001). Thus, it was critical in *Spence* that the defendant's "taping of a peace sign to his flag was 'roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy.'" *Johnson*, 491 U.S. at 405 (quoting *Spence*, 481 U.S. at 410). And in *Tinker* that the students wore "black armbands to protest American military involvement in Vietnam." *Id.* at 404 (citing *Tinker*, 393 U.S. at 505). Or in *Brown v. Louisiana*, that African Americans engaged in a "sit-in . . . in a 'whites only' area to protest segregation." *Id.* (citing 383 U.S. 131, 141-42 (1966)). Likewise, in *Johnson*, the defendant "burned an American flag as part—indeed, as the culmination—of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President." *Id.* at 406.

As the Supreme Court has elaborated, the message, or "the point," of the conduct should be "overwhelmingly apparent" for it to be deemed inherently expressive. *FAIR*, 547 U.S. at 66 (quoting *Johnson*, 491 U.S. at 406). That is, "a viewer must be able to understand the message from the conduct *alone*." *Lichtenstein v.*

*Hargett*, 83 F.4th 575, 594 (6th Cir. 2023). But if conduct is "expressive only because" it is "accompanied . . . with speech explaining it," it is unlikely to qualify as inherently expressive. *FAIR*, 547 U.S. at 66. "The fact that such explanatory speech is necessary is strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *Id*. Otherwise, "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id*. That is why the First Amendment does not protect, under the rubric of expressive conduct, a person who "announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes." *Id*.

**2.** "As the party invoking the First Amendment's protection, [Spectrum] ha[s] the burden to prove that it applies." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). But on this scarce preliminary-injunction record, Spectrum has not demonstrated that its drag show was intended to convey a message that in "context" had a great likelihood of being understood by viewers. *Johnson*, 491 U.S. at 405.

Spectrum alleges that its drag show would have featured "choreographed performers dancing on stage in costume accompanied by music." Spectrum.Br.22 (citing ROA.227). And it contends that, through this conduct, it intended to convey a generalized message of "support and advoca[cy] for the LGBTQ+ community," Spectrum.Br.7 (citing ROA.229), and "a message of support for an LGBTQ+ charity," Spectrum.Br.24. But Spectrum offers no explanation for why the likelihood is "great," *Johnson*, 491 U.S. at 404, or "high" that, standing "alone," *Lichtenstein*,

83 F.4th at 594, viewers of the performance would necessarily equate students dancing to music on stage while clad in costume with a message of support for the LGBTQ+ community. *Cf. Stanglin*, 490 U.S. at 25 (holding that "dance-hall patrons [] coming together to engage in recreational dancing [] is not protected by the First Amendment"). Spectrum openly admits they would not: "Perhaps 'an observer' of Spectrum's drag performance 'may not discern that the performers' conduct communicates advocacy in favor of LGBTQ+ rights,' as the district court claimed." Spectrum.Br.29 (quoting ROA.861).

Spectrum is correct: Student "performers on stage dancing in eye-catching clothing and makeup, with lighting and music," Spectrum.Br.25, do not automatically convey a message of support for the LGBTQ+ community any more than does an "ugly woman" skit involving members of a fraternity donning the attire of, and caricaturing, the opposite sex, *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 387-88, 391 (4th Cir. 1993), or a U.S. Army recruitment video involving men dressed in women's clothing that compares being drafted in the Army to being drafted into a women's chorus, ROA.228, 517. Even Spectrum agrees that drag shows, in general, could communicate a multiplicity of messages. *See* ROA.227-28, 229. And there is no evidence in the record that the "local public consciousness," *Cabrol*, 106 F.3d at 109—or the national consciousness for that matter, *see Johnson*, 491 U.S. at 406 (Republican National Convention); *Spence*, 418 U.S. at 410 ("Cambodian incursion and the Kent State tragedy"); *Tinker*, 393 U.S. at 505

(Vietnam war)—would have led viewers in this case to associate the student-led choreographed dance routines with generalized support for the LGBTQ+ community.[5]

**3.** Spectrum offers several arguments in response, but none has merit. *First*, Spectrum contends (at 24) that "Spectrum's flyers for the 2023 event," provide the requisite context because they "leave no doubt as to [the event's] communicative context as an LGBTQ+ group event sending a message of support for an LGBTQ+ charity." But that is a concession that "[t]he expressive component of" Spectrum's "actions is not created by the conduct itself but by the speech that accompanies it." *FAIR*, 547 U.S. at 66. And "[t]he fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." *Id.* Spectrum cannot rely on its fliers to bring its conduct within the ambit of the First Amendment.

*Second*, Spectrum and its amici suggest that the historical association of drag shows with LGBTQ+ culture means that viewers would be aware of the "ideological message of support and acceptance for the LGBTQ+ community." ROA.227-29; *see, e.g.*, Professors' Br.6-16; ACLU.Br.7-13. But as one of Spectrum's amici concedes

---

[5] Spectrum's complaint vaguely alludes to "the current political climate" and suggests that drag shows, generally, "offer[] counter-messaging against efforts to ban or regulate expression relating to gender or sexual identity." ROA.228. But this bare allegation does not, without more, provide the requisite "context" demonstrating that these unnamed efforts to "ban or regulate expression relating to gender or sexual identity" were at the forefront during the time of this proposed drag show. Spectrum's amici point to various state and federal laws or policies, as well as statements from state and federal officials. Professors' Br.18-20; ACLU.Br.30-31. But nothing in this record indicates that Spectrum's drag show was a response to any of those laws or statements.

"the history of drag might not be known by all." ACLU.Br.13. Regardless, Spectrum and its amici make the case that Spectrum's drag show was inherently expressive by speaking about drag shows generally. Indeed, one amicus refers to "drag shows" as a category that includes everything from Shakespeare plays, "cross-dressing," 19th century "parties where the guests were reportedly men dressed in gowns [that] danced together," "Vaudeville theater," "Madonna's 'Vogue,'" and "female impersonators . . . at the Texas State Fair." ACLU.Br.7-11. But this argument operates at too high a level of generality. Moving beyond the catchall "drag show" label, what Spectrum has indicated it wished to do was present student "performers on stage dancing in eye-catching clothing and makeup, with lighting and music," Spectrum.Br.25. On this record, nothing about that course of conduct necessarily transmits a generalized message of support for the LGBTQ+ community.

*Third*, Spectrum contends (at 22) that as long as "the performers are conveying *some* message, no matter how opaque it may be," that is "enough for expressive conduct to enjoy First Amendment protection." It later invokes (at 27-28) *Hurley* and argues that "expressive conduct does not have to convey a 'succinctly articulable message' for the First Amendment to protect it." But this line of argument overlooks that *Johnson* articulates a two-part test that requires *both* "[a]n intent to convey a particularized message" *and* a "great" "likelihood . . . that the message would be understood by those who viewed it." 491 U.S. at 404 (quoting *Spence*, 418 U.S. at 410-11). *Hurley* did not overrule *Johnson* or *Spence*, and this Court continues to apply that two-part test. *See, e.g.*, *Voting for Am.*, 732 F.3d at 388; *Littlefield*, 268 F.3d at 282-83; *Cabrol*, 106 F.3d at 109. True, the "first element" may "not pose a high

bar" following *Hurley*, but "[t]he second element—that the audience will likely understand the message—has more bite." *Lichtenstein*, 83 F.4th at 594. Spectrum's arguments about *Hurley* do not speak to that second element.

*Hurley* is, in any event, distinguishable. It was not a case about how to determine whether conduct is sufficiently communicative to merit First Amendment protection as inherently expressive—*Hurley* did not cite *Johnson* once. Instead, *Hurley* presented a distinct First Amendment problem: "[W]hen an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). But Spectrum does not bring *that* kind of First Amendment claim here; nor could it, since Spectrum has not been forced to include in a compilation of third-party speech messages it would prefer to exclude. If anything, *Moody* supports the University, as Spectrum's First Amendment claims aim to compel the University to host an event it "would rather" exclude and "thus forces [it] to alter the content of [its] expression—a particular edited compilation of third-party speech," *id.* at 728, which may properly exclude "bullying and harassment content," *id.* at 739.

*Fourth*, Spectrum pivots (at 20, 21-23) to an argument that its drag shows are "stage performances" or "live entertainment such as musical[s] and drama[s]," no different from those performed by the Ancient Greeks or written by Shakespeare, that are categorically inherently expressive. Initially, it is far from clear on this preliminary-injunction record that Spectrum's drag show—involving student "performers on stage dancing in eye-catching clothing and makeup, with lighting and music," Spectrum.Br.25—is more analogous to Macbeth, Les Misérables, or Swan

Lake, than it is to recreational ballroom dancing. *Cf. Stanglin*, 490 U.S. at 25. But regardless, the trio of cases Spectrum points to (at 23) does not help it, because none articulates the standards for determining when conduct is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Johnson*, 491 U.S. at 404.

Take *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981). There, the Supreme Court invalidated the criminal convictions of the proprietors of an adult bookstore who were fined under a city ordinance for hosting nude dancing on the premises. *Id.* The Court held that the ordinance was unconstitutionally overbroad because it banned all forms of "live entertainment, including nonobscene nude dancing that is otherwise protected by the First Amendment." *Id.* at 76. No question about the First Amendment's applicability was in view because the Supreme Court has held that "nude dancing is not without its First Amendment protections from official regulation"—though it declined to delineate the level of "First Amendment protection [that] should be extended to nude dancing, live or on film," because of the ordinance's overbreadth problem. *Id.* at 66.

Or consider *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975). There the Court held that a municipality's decision to deny a production company use of a municipal theater to screen a controversial musical was a prior restraint in violation of the First Amendment. *Id.* at 552-57. The Court explained that "[o]nly if we were to conclude that live drama is unprotected by the First Amendment—or subject to a totally different standard from that applied to other forms of expression—could we possibly find no prior restraint here." *Id.* at 557. But the Court elaborated that

"[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Id.* And "[b]y its nature, theater usually is the acting out—or singing out—of the written word." *Id.* at 557-58. Yet nothing in the record here indicates that Spectrum's drag show would involve "the acting out—or singing out—of the written word." *Id.*

Last, consider *Schacht v. United States*, 398 U.S. 58 (1970). In *Schacht*, the Supreme Court overturned the conviction of a person who was fined for wearing a U.S. Army uniform "without authority" because he was not a member of the armed forces. *Id.* at 59. As an affirmative defense, Schacht argued that he was authorized to wear the uniform by a federal statute allowing actors to wear an armed-forces uniform while portraying a member of the armed forces "in a theatrical or motion-picture production," so long as "the portrayal does not tend to discredit that armed force." *Id.* at 60-61. The Supreme Court held that Schacht could take advantage of the exception because he took part in a "street skit" that "expose[d] the evil of the American presence in Vietnam and was part of a larger, peaceful antiwar demonstration." *Id.* at 60, 61-62. The Court also held that the "discredit" clause of the federal statute violated the First Amendment because it was viewpoint discriminatory: It left "Americans free to praise the war in Vietnam but [could] send persons like Schacht to prison for opposing it." *Id.* at 63. But the case presented no question about the level of constitutional protection afforded to Schacht's conduct.

**4.** When a government entity's decisions or policies "regulate conduct only and do not implicate the First Amendment, rational basis scrutiny is appropriate."

*Voting for Am.*, 732 F.3d at 392 (citing *District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008)).

Under rational-basis review, this Court must assume the University's exclusion of Spectrum's drag show from Legacy Hall was valid, and it must be sustained so long as the policy "is rationally related to a legitimate state interest." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 594 (5th Cir. 2014) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). Rational-basis review "seeks only to determine whether any conceivable rationale exists." *Id.* (citing *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). And "the state is not required to 'prove' that the objective of the law would be fulfilled." *Id.* (citing *Beach Commc'ns*, 508 U.S. at 315).

Even if the University's policy has no evidentiary or empirical basis, it "satisfies rational basis review." *Id.* (citing *Beach Commc'ns*, 508 U.S. at 315). Indeed, if reasonable minds can disagree on the policy, that "suffices to prove that the [policy] has a rational basis." *Id.* Lastly, "there is no least restrictive means component to rational basis review," and courts must accept generalizations, "'even when there is an imperfect fit between means and ends' or where the classification 'is not made with mathematical nicety.'" *Id.* (quoting *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 321 (1993)).

The University's exclusion of Spectrum's drag show satisfies rational-basis review. President Wendler determined that the proposed drag show would "exaggerat[e] aspects of womanhood (sexuality, femininity, gender)" and thereby "stereotype women in cartoon-like extremes for the amusement of others and discriminate

against womanhood." ROA.265. Such "conduct" and "impertinent gestures" would "[m]ock[] or objectify[]" women "based on appearance, bias or predisposition" in a manner contrary to "the purpose of" the University, its "educational mission," and perhaps state and federal antidiscrimination law. ROA.265-67. These are entirely rational reasons that survive rational-basis review.

## B. If First Amendment conduct is implicated, the University applied reasonable, viewpoint-neutral restrictions in a limited public forum.

Even if Spectrum planned to engage in inherently expressive conduct protected by the First Amendment, the University's restriction of that conduct comports with the Constitution, because Legacy Hall is a limited public forum, and the University's cancellation of Spectrum's drag show was reasonable and viewpoint neutral.

### 1. Legacy Hall is a limited public forum.

a. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund Inc.*, 473 U.S. 788, 799-800 (1985). "[T]he Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Id.* at 800 (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)). "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,

460 U.S. 37, 44 (1983). Such questions are answered using the Supreme Court's "'forum-based' approach for assessing restrictions that the government seeks to place on the use of its property." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (*ISKCON*)).

The Supreme Court has recognized "two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums," *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020), differentiated by the level of scrutiny applicable to speech restrictions in each. Traditional public forums "such as a street or a park" have "'immemorially been held in trust for the use of the public and, time out of mind, ha[ve] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (quoting *Perry*, 460 U.S. at 45). Any "content-based restriction" on speech in a traditional public forum is subject to strict scrutiny, though "[t]he state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45.

Similarly, designated public forums are "'government property that has not traditionally been regarded as a public forum [but] is intentionally opened up for that purpose.'" *Walker*, 576 U.S. at 215 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Such forums are sometimes referred to as designated public forums of "unlimited character," *ISKCON*, 505 U.S. at 678, owing to the fact

that they are "open for indiscriminate public use for communicative purposes," *Lamb's Chapel*, 508 U.S. at 392. Thus, "a designated public forum consists of government property that has been opened for the purpose of functioning, more or less, as a traditional public forum, even though it does not possess the historical pedigree of a traditional public forum." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017). "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." *Pleasant Grove*, 555 U.S. at 469-70.

Limited public forums, on the other hand, are "forums opened for public expression of particular kinds or by particular groups." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (per curiam) (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001), and *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)); *cf. ISKCON*, 505 U.S. at 678 (designated public forums of a "limited . . . character"). "The necessities of confining a forum to the limited and legitimate purpose for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010) (quoting *Rosenberger*, 515 U.S. at 829). The Supreme Court has therefore "appl[ied] a less restrictive level of scrutiny to speech in limited public forums as compared to other environments." *CLS*, 561 U.S. at 680. As a result, "[w]hen a public body establishes a limited public forum . . . that body may restrict the expression that takes place within the forum so long as the restriction (1) does 'not discriminate against speech on the basis of viewpoint' and

(2) is 'reasonable in light of the purpose served by the forum.'" *Chiu*, 260 F.3d at 346 (quoting *Good News Club*, 533 U.S. at 106-07).

The last type of forum is a nonpublic forum—"a space that 'is not by tradition or designation a forum for public communication.'" *Mansky*, 585 U.S. at 11 (quoting *Perry*, 460 U.S. at 46). Like in limited public forums, in nonpublic forums "the government has much more flexibility to craft rules limiting speech." *Id.* at 11-12 (quoting *Perry*, 460 U.S. at 46). "The government may reserve such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.*

**b.** "The action—in this case and most others—exists at the line between designated and limited public forums." *Fairchild*, 597 F.3d at 758. "In distinguishing between the two types of forums," this Court's "precedent directs [it] to focus on two factors: (1) the government's intent with respect to the forum, and (2) 'the nature of the [forum] and its compatibility with the speech at issue.'" *Chiu*, 260 F.3d at 346 (quoting *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 378 (5th Cir. 1989)).

"The Supreme Court has consistently emphasized that public entities have broad discretion to control access to and use of property or events that are not traditional public forums." *Id.* at 346-47 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)). Critically, "[t]he government does not automatically designate a public forum 'by permitting limited discourse' or 'selective access.'" *Id.* at 347 (quoting *Ark. Educ. Television*, 523 U.S. at 677, 679). Instead, "[t]he government creates a designated public forum 'only by intentionally opening a nontraditional

forum for public discourse.'" *Id.* (quoting *Cornelius*, 473 U.S. at 802). "To create such a forum, the government must allow 'general access' to, or 'indiscriminate use' of, the forum in question." *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 819-20 (5th Cir. 1999) (internal citations omitted) (first quoting *Cornelius*, 473 U.S. at 801, then *Perry*, 460 U.S. at 47); *see Lamb's Chapel*, 508 U.S. at 392 (describing a designated public forum as "open for indiscriminate public use for communicative purposes").

Furthermore, "[t]he Supreme Court has recognized that universities differ from other public fora in important ways." *Keister v. Bell*, 29 F.4th 1239, 1252 (11th Cir. 2022) (citing *Widmar*, 454 U.S. at 267 n.5); *see also CLS*, 561 U.S. at 685-87. "Among other distinctions, universities have a particular mission to educate." *Keister*, 29 F.4th at 1252. "So when it comes to their campus and facilities, universities generally may issue reasonable regulations that are consistent with that mission." *Id.* Thus, even in a designated public forum, a university may impose "limits necessary to preserve the academic mission and to maintain order." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992). Although "university public-speaking venues often qualify as limited public fora," a "college campus 'will surely contain a wide variety of fora on its grounds.'" *Kiester*, 29 F.4th at 1252 (quoting *Bloedorn v. Grube*, 631 F.3d 1218, 1232 (11th Cir. 2011)); *see also Justice For All v. Faulkner*, 410 F.3d 760, 766-767 (5th Cir. 2005) (same). Therefore, the Court "must first identify the precise piece of campus the speaker wishes to access." *Kiester*, 29 F.4th at 1252.

Here, that portion of the University is Legacy Hall—a "multipurpose" event space that is capable of hosting a broad range of events. ROA.221; *see also Venues at*

*WTAMU*, West Texas A&M University, https://tiny.cc/ekqw001 (describing Legacy Hall as "a large, modern hall" that "can accommodate anywhere from 200 to 750 people" for a variety of events) (last accessed December 22, 2025). The evidence in the preliminary-injunction record indicates that the University intended Legacy Hall to be a limited, rather than a designated, public forum. Critically, this space is not "general[y] access[ible]" to the public—or even the student body—for "indiscriminate use." *Doe*, 168 F.3d at 819-20 (quoting *Cornelius*, 473 U.S. at 801, then *Perry*, 460 U.S. at 47). Instead, groups wishing to use Legacy Hall must submit a request for use of the space that is approved by the University through several layers of review. ROA.230-31, 269-70. Even then, the University expressly "reserves the right to cancel an event and immediately remove access to campus if an event violates the policies and regulations of the Texas A&M University System, the rules and procedures of [the University], or if an event is deemed to be unsafe." ROA.269.

The facts of this case demonstrate this multi-layered process in action. As Spectrum alleges, it submitted a "formal request to reserve Legacy Hall" to the University in January 2023. ROA.230. It then spent the next month and a half "navigat[ing]" the University's three-step approval process "with help from West Texas A&M staff." ROA.230. That iterative process included "confirm[ing] logistical details, including the time, date, and audio-visual needs." ROA.231. And it required Spectrum's event to "pass[] a risk assessment," which resulted in Spectrum "agree[ing] that student participants would be required to sign a waiver, provided by West Texas A&M." ROA.231. This process also resulted in Spectrum committing to the University that it would "instruct[] [its] performers not to engage in any

'lewd' conduct," impose an age-limit for attendance, and refrain from serving alcohol. ROA.229. Spectrum even "submitted a list of planned songs to West Texas A&M's administration" two weeks before the planned show. ROA.230, 233.

This reservation-based system that vests final approval in the University regarding use of the property does not bear the hallmarks of a designated public forum, like campus streets or sidewalks, where "[m]embers of the university community are allowed to assemble or distribute written material . . . without a permit or other permission from the institution." ROA.274. And indeed, when the University intends to create a designated public forum, it does so explicitly. For example, it has expressly "deemed" "[t]he common outdoor areas of the university's campus" to be "traditional public forums." ROA.273. Those areas include "places located *outside a building or facility* that are accessible to the public, such as streets, sidewalks, plazas, lawns, and parks." ROA.272 (emphasis added). But the University has not done so for venue spaces and other *indoor* facilities like Legacy Hall. *See Easom v. US Well Servs., Inc.*, 37 F.4th 238, 244 (5th Cir 2022) ("The canon of *expressio unius est exclusio [alterius]* is also helpful here.").

That is because the "nature" of a university-owned *indoor* event space, *Chiu*, 260 F.3d at 347, is different from an *outdoor* one. An indoor space is more physically constrained and may require the provision of university resources, such as facilities management, janitorial services, and even "audio-visual support, including light programming concert sound and more." ROA.221. Outdoor areas of universities that this Court has deemed to be designated public forums—such as streets, sidewalks, and common areas—are not subject to similar constraints or resource investments.

*See Justice for All*, 410 F.3d at 769 ("the outdoor open areas of [a university's] campus"); *Hays County Guardian*, 969 F.2d at 116 ("the outdoor grounds of the campus such as the sidewalks and plazas"); *cf. Keister*, 29 F.4th at 1252-56 (concluding that some university sidewalks are limited public forums).

**c.**     Both Spectrum and the panel conclude that Legacy Hall is a designated public forum because it "is open both to students and non-students for a wide variety of events" and "[n]o party offers evidence that a request for use has been denied to a student or an outside group." *Spectrum WT*, 151 F.4th at 727; *see* Spectrum.Br.38-41. Indeed, they note that Legacy Hall has hosted a variety of events, such as "a local church group's 'Community Night of Worship and Prayer,' a congressional candidate forum, a local high school's 'Casino Night' dance, a local non-profit's benefit gala, Randall County's livestock show, and a religious retreat center's event dinner." *Spectrum WT*, 151 F.4th at 727; *see also* Spectrum.Br.41 (listing beauty pageants, a singing competition, a magic show, opera performances, and rock bands). Therefore, they contend that the University's "policy and practice" shows that Legacy Hall is a designated public forum. *Spectrum WT*, 151 F.4th at 727; *see also* Spectrum.Br.38-39.

But the fact that a University is infrequently called upon to enforce the limits on its forum hardly shows that there are no limits at all. In *CLS* for example, the University "ha[d] more than 60 registered [student] groups and, in all its history, ha[d] denied registration to exactly one: the Christian Legal Society," 561 U.S. at 707 (Alito, J., dissenting). Yet this fact did not change the Supreme Court's conclusion that it was confronting a limited public forum. *See id.* at 679 & n.12. So too here. That

the University infrequently excludes events from Legacy Hall is more indicative of the University's broad respect for free expression—as evidenced by its robust expressive-activity policy, *see* ROA.272-75—coupled with the fact that it is rarely faced with requests to host events that might violate its policies or rules. Indeed, no one contends that the University would be required to host minstrel shows, Nazi plays, or KKK demonstrations in Legacy Hall merely because it has not had occasion to exclude them before. Were such a rule adopted, the University "might elect not to open such property for any public discourse," which "would conflict with the broad First Amendment policy of encouraging public discourse on issues of community interest." *Chiu*, 260 F.3d at 347 (citing *Ark. Educ. Television*, 523 U.S. at 681).

Spectrum's attempt to draw parallels between its drag show and past events that Legacy Hall has hosted fails. In the judgment of the University, the events identified—concerts, a livestock show, high school dances, worship nights, magic shows, and beauty pageants—do not pose the same risks to the educational environment that the drag show at issue here did. It is easy to see why. Nothing about high-school dances or beauty pageants poses the risk of "stereotyping women in cartoon-like extremes for the amusement of others and discriminat[ing] against womanhood." ROA.265. And nothing about opera and rock concerts or magic shows "[m]ock[s] or objectif[ies] . . . members of a[] group based on appearance, bias or predisposition" in a manner that borders on "harassment" or "prejudice." ROA.266-67.

Spectrum gestures (at 41) to drag shows that the University allegedly hosted at Legacy Hall in 2012 and between 2017 and 2019 as evidence of past practice. *See* ROA.355-60. But the information about these shows in the record is exceedingly

scanty and, at a minimum, does not show these purported events violated the University's limits on the forum. For example, one of the student organizers of the 2012 event expressly disclaimed that the group was staging a "drag show"; instead, the event was billed as a "cross-dressing fashion show." ROA.352. The University could reasonably view cross-dressing—merely donning the attire of the opposite sex—to be something that does not rise to the level of a "performance exaggerating aspects of womanhood (sexuality, femininity, gender)" that "stereotype[s] women in cartoon-like extremes for the amusement of others," ROA.265. Likewise, there is little information in the record about the drag shows purportedly hosted between 2017 and 2019, but the two photos in the record are of individuals standing around in a circle or posing for a picture; they do not, without more, indicate that these events "[m]ock[ed] or objectif[ied] in any way members of any group based on appearance, bias or predisposition." ROA.266.

Even if these alleged drag shows were evidence of past practice, however, it is well established that "a state is not required to indefinitely retain the open character of" a designated or limited public forum. *Perry*, 460 U.S. at 46; *see also Freedom from Religion Found., Inc. v. Abbott*, 58 F.4th 824, 835 (5th Cir. 2023) (same); *Currier v. Potter*, 379 F.3d 716, 728 (9th Cir. 2004); *United States v. Bjerke*, 796 F.2d 643, 647 (3d. Cir. 1986); *Ysleta Fed'n of Tchrs. v. Ysleta Indep. Sch. Dist.*, 720 F.2d 1429, 1432 (5th Cir. 1983). So even if this past practice suggested that the University once considered drag shows (broadly defined) to be consistent with the limits on the forum, the evidence in the record shows that any such designation had changed, at a minimum, by the date that the University cancelled Spectrum's drag show.

The panel brushed aside this principle, reasoning that "[t]he government's policy is indicated by its *consistent* practice, not each exceptional regulation that departs from the consistent practice." *Spectrum WT*, 151 F.4th at 728 (quoting *Hays Cnty. Guardian*, 969 F.2d at 118). But *Hays County Guardian* explained that "a general policy of open access does not vanish when the government adopts a specific restriction on speech." 969 F.2d at 117-18. Unlike the "outdoor grounds of the campus such as the sidewalks and plazas" at issue in *Hays County Guardian*, *id.* at 116, here Legacy Hall has never had a "general policy of open access" but instead the University operates a reservation-based system that requires University approval before hosting events. *See supra* at 29-31.

The panel found to the contrary by reasoning that, while the University's facility-use policy "details to whom request forms should be routed, when and how alcohol is to be served," identifies "specific areas where campus visitors are not permitted," and lists "parking rules," none of these rules imposes "limits on public expression of particular kinds or by particular groups."[6] *Spectrum WT*, 151 F.4th at 727. Yet the panel overlooked the University's Code of Student Life, which sets forth robust policies barring "harassment" and "disruptive activity" and makes "respect for the dignity of individuals" a "core value[]." ROA.472, 484-85. Those are University "rules," the "violat[ion]" of which triggers the University's reserved "right to cancel an event." ROA.269. That is indeed a "limit[] on public expression of particular kinds." *Spectrum WT*, 151 F.4th at 727.

---

[6] Spectrum entirely ignores both the facility-use policy and the Code of Student Conduct by focusing (at 39-40) exclusively on the University's free-expression policy.

## 2. The University's actions survive constitutional scrutiny.

Because Legacy Hall is a limited public forum, the University need show only that its "access barrier" is "reasonable and viewpoint neutral" to survive constitutional review. *CLS*, 561 U.S. at 679. It is both.

### a. The University's restriction was reasonable in the light of the forum's purpose.

**i.** In making the determination whether the University's restriction "is 'reasonable in light of the purpose served by the forum,'" *Chiu*, 260 F.3d at 345 (quoting *Good News Club*, 533 U.S. at 107), the Supreme Court has instructed that the "inquiry [be] shaped by the educational context in which it arises," *CLS*, 561 U.S. at 685. That is, "'First Amendment rights . . . must be analyzed in light of the special characteristics of the school environment.'" *Id.* at 685-86 (quoting *Widmar*, 454 U.S. at 286 n.5)). While "the campus of a public university. . .possesses many of the characteristics of a public forum," it "differs in significant respects from public forums such as streets or parks or even municipal theaters." *Widmar*, 454 U.S. at 286 n.5.

"A university's mission is education, and decisions of [the Supreme] Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* Universities thus "may expect that its students adhere to generally accepted standards of conduct." *Healy v. James*, 408 U.S. 169, 192 (1972). And schools may restrict "student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns" and "members of the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood Sch. Dist. v.*

*Kuhlmeier*, 484 U.S. 260, 271, 273 (1988). Moreover, "[a] college's commission—and its concomitant license to choose among pedagogical approaches—is not confined to the classroom, for extracurricular programs are, today, essential parts of the educational process." *CLS*, 561 U.S. at 686. So schools "enjoy 'a significant measure of authority over the type of officially recognized activities in which their students participate.'" *Id.* at 686-87. Thus, courts must be "mindful that" the University's decisions regarding "student group[s]" are "due decent respect." *Id.* at 687.

No doubt, courts are "the final arbiter of the question whether a public university has exceeded constitutional constraints." *Id.* at 686. But when assessing the reasonableness of a university's restriction, the Supreme Court has cautioned courts to "resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (quoting *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). That is because "judges lack the on-the-ground expertise and experience of school administrators." *Id.* So courts must afford due "regard for school administrators' judgment" and "'approach [the] task with special caution.'" *Id.* at 687 (quoting *Healy*, 408 U.S. at 171).

**ii.** Under these standards, the University's cancellation of Spectrum's drag show was reasonable in the light of the educational environment. As President Wendler explained, the drag show in question was a "performance exaggerating aspects of womanhood (sexuality, femininity, gender)" that would "stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood." ROA.265. In President Wendler's judgment, this type of "deni[grating] and demean[ing]" performance would be inimical to the University's

goal of fostering an educational environment that "treat[s] each individual fairly" and "elevate[s] students based on achievement and capability," "without regard to group membership." ROA.266-67. As he put it, "[o]ffering respect, not ridicule, is the order of the day for fair play and is the WT way." ROA.267.

But it was not simply concerns about the University climate that motivated the event's cancellation: President Wendler expressed concern that, by "[m]ocking or objectifying" women "based on appearance, bias or predisposition," Spectrum's drag show might rise to the level of "harassment" or "acts of prejudice" that are barred by University policies prohibiting such behavior and requiring equal treatment. ROA.265-66; *see also* ROA.485 (anti-harassment policy); ROA.472 (core value of "respect for the dignity of all individuals"). Nor was it just University policy driving his concerns: President Wendler also referenced state and federal mandates requiring universities to provide equal opportunities to all students regardless of sex. *See* Tex. Educ. Code § 1.002(a); 20 U.S.C. § 1681(a); 34 C.F.R. § 106.31(a)(1).

These are exactly the types of judgments that the Supreme Court has held are reserved for administrators and which the federal courts are ill-equipped to second guess. In *CLS*, the Supreme Court deemed "reasonable" the law school's "all-comers policy" because it "helps Hastings police the written terms of its Nondiscrimination Policy" and "encourages tolerance, cooperation, and learning among students." 561 U.S. at 688, 689. Moreover, that policy "incorporates—in fact, subsumes—state-law proscriptions on discrimination" and "conveys the Law School's decision to decline to subsidize with public monies and benefits conduct of which the people of [the State] disapprove." *Id.* at 689-90 (quotation marks omitted). These

are the exact concerns undergirding the University's decision to cancel Spectrum's drag show, and they are no less reasonable when made by West Texas A&M rather than Hastings Law School.

The reasonableness of the University's actions is "all the more creditworthy in view of the 'substantial alternative channels that remain open for . . . communication to take place.'" *Id.* at 690 (quoting *Perry*, 460 U.S. at 53). The University did not take the drastic step of denying Spectrum status as an official student organization—and the concomitant benefits that flow from such recognition—like Hastings Law School did in *CLS*; it merely cancelled a single event over concerns that "the way in which [Spectrum] wished to deliver its message," *Spectrum WT*, 151 F.4th at 728, might border on harassment or discrimination.

But the University has imposed no barrier to Spectrum communicating its message of "support . . . for the LGBTQ+ community." Spectrum.Br.7. To the contrary, the University has hosted many Spectrum events, including "Lavender Prom, Queer History Night, and Queer Movie Night" without objection or interference. ROA.216. Such events have continued unimpeded—including a "protest" of the drag-show cancellation on the "on-campus lawn"—during the pendency of this litigation. *See* ROA.541. And as for the drag show itself, it was relocated to a public park in the area. ROA.236; *see Bloedorn*, 631 F.3d at 1241-42 (observing that "off-campus locations" and the "public streets and sidewalks" surrounding the campus constituted "ample alternative channels for communication").

**iii.** The panel sidestepped *CLS* and its teachings on the ground that it was merely a case about "expressive association"—*i.e.*, what members a particular group

must welcome—which is not at "issue here." *Spectrum WT*, 151 F.4th at 728. But the Supreme Court expressly rejected that framing, observing that the "expressive-association and free speech arguments merge," the concepts are "closely linked," and it made "little sense to treat CLS's speech and association claims as discrete." *CLS*, 561 U.S. at 680. Instead, the Court explained, its "limited-public-forum precedents supply the appropriate framework for assessing both CLS's speech and association rights." *Id.* Thus, it was error for the panel to "distinguish[]" *CLS* on the ground that Hastings law school was not "interfering with the expressive activity itself, the speech." *Spectrum WT*, 151 F.4th at 728. As the Court explained: "*Who* speaks . . . colors *what* concept is conveyed." *CLS*, 561 U.S. at 680.

Moreover, even if the panel was *factually* correct to distinguish *CLS* on the ground that it involved only an expressive-association claim, that makes its analysis all the more *legally* erroneous. In *CLS*, the Court grappled with the question whether to apply its more lenient limited-public-forum precedents governing freedom of *speech* claims—permitting reasonable, viewpoint-neutral restrictions—to freedom of *association* claims, which had been reviewed under more "rigorous[]" standards. *Id.* at 679-80. It chose the former. *Id.* at 680-83. Arguing that this case involves a free-speech, rather than a free-association, claim makes *CLS* more applicable, not less.

Spectrum's attempt to evade *CLS* fares no better. Spectrum argues (at 43-44) that *CLS* is starkly different because Spectrum "seeks no preferential exception" from a generally applicable policy but "only the parity the First Amendment demands: the ability to use Legacy Hall for protected expression, as university policy and practice allow for all other recognized student groups and the public." Not so.

The University maintains a generally applicable policy requiring those who use Legacy Hall to adhere to the "policies and regulations of the Texas A&M University System, the rules and procedures of [the University]," ROA.269, including its policies forbidding "harassment" and "disruptive activity" and making "respect for the dignity of all individuals" a "core value[]," ROA.472, 484-85. It is Spectrum who wants an "exception" from those policies to permit a drag show that the University contends would flout them.

### b. The University's restriction was viewpoint neutral.

The University's restriction on Spectrum's drag show was also viewpoint neutral. "'[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Lamb's Chapel*, 508 U.S. at 394 (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). Indeed "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. "Viewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (quoting *Rosenberger*, 515 U.S. at 829)). It is "thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829.

The University's restriction of Spectrum's drag show does not run afoul of these principles. As the panel found, Spectrum "was told to abandon *the way in which* it wished to deliver its message, *i.e.*, the message of support of the LGBT+ community through the *delivery mechanism* of a drag show." *Spectrum WT*, 151 F.4th at 728

(emphasis added). Yet critically, "[o]n the record so far, President Wendler's objections were *not to the message* but to the way it would be delivered." *Id.* (emphasis added). The record amply supports the panel's conclusion. Because the drag show would "stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood," it was barred "no matter the stated intent"— whether to parody the LGBTQ+ community or stand in solidarity with it. ROA.265-66. And since the "conduct" to be regulated was that of "harassment," "impertinent gestures," or "acts of prejudice," ROA.266-67, President Wendler was prepared to apply the University's policy in various circumstances, including to "'blackface' performances" and a "quinceañera celebration" that "debased Latinas." ROA. 265-66.

Stated differently, the University's cancellation of the drag show "draws no distinction between groups based on their message or perspective." *CLS*, 561 U.S. at 694. If anything, President Wendler supported Spectrum's message, characterizing its goal to raise money for suicide prevention as "noble" and "a good idea," and encouraging students to "send the dough." ROA. 265, 267.

Spectrum does not argue that the University's cancellation of its drag show discriminated against "particular views taken by speakers on a subject," *Rosenberger*, 515 U.S. at 829, like its "support and advoca[cy] for the LGBTQ+ community," Spectrum.Br.7. Instead, relying on *Matal v. Tam*, 582 U.S. 218 (2017), and *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667 (1973) (per curiam), Spectrum argues (at 32-38) that the University has discriminated against the viewpoint of

"giving offense"—a viewpoint that it does not claim to be espousing.[7] But both cases are distinguishable.

Start with *Matal*. There the Supreme Court held unconstitutional a provision of the Lanham Act forbidding the registration of a trademark that would "disparage" persons, institutions, beliefs, or national symbols. 582 U.S. at 227. A plurality of the Court held that the Lanham Act's disparagement clause "discriminates on the bas[i]s of 'viewpoint,'" because "[g]iving offense is a viewpoint." *Id.* at 243 (plurality op.). Stated differently, because "an applicant may register a positive or benign mark but not a derogatory one," the disparagement clause "reflects the Government's disapproval of a subset of messages it finds offensive." *Id.* at 249 (Kennedy, J., concurring).

Unlike in *Matal*, the University is not attempting to shield students' sensibilities from *speech* it finds offensive but instead seeks to prevent *conduct* that might rise to the level of harassment or discrimination. "The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Johnson*, 491 U.S. at 406. And "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important government interest in regulating the nonspeech element"—such as preservation of mission-consistent use of school property—"can justify incidental limitations on First

---

[7] In *Matal*, offensiveness was at least part of the reason the plaintiff sought to register "The Slants" trademark: "He chose this moniker in order to 'reclaim' and 'take ownership' of stereotypes about people of Asian ethnicity." 582 U.S. at 228. No evidence indicates that "offensiveness" motivated Spectrum's drag show.

Amendment freedoms." *O'Brien*, 391 U.S. at 376. That is particularly true here: "Most antidiscrimination laws 'regulate[]'" discriminatory practices "as conduct, not as expression," and "not because of the viewpoints such" practices express, but "because of the immediate harms such discrimination causes." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018) (citation modified).

*Papish* is off point for similar reasons. There, the Supreme Court held that a university violated the First Amendment when it expelled a graduate student for distributing a newspaper on campus that contained "forms of indecent speech" that violated university policy. 410 U.S. at 667. The Court held "that the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670. Crucially, the university's actions in *Papish* could not "be justified as a nondiscriminatory application of reasonable rules governing conduct," *id.* at 671, and the case did not involve "any disruption of campus order or interference with the rights of others," *id.* at 670 n.6. As discussed, the same is not true here, where President Wendler cancelled Spectrum's drag show due to the specter of harassment, discrimination, and acts of prejudice. *Cf. Yeasin v. Durham*, 719 F. App'x 844, 851-52 (10th Cir. 2018) (distinguishing *Papish* because it did not "concern university-student conduct that interferes with the rights of other students or risks disrupting campus order"); *Hunt v. Bd. of Regents of Univ. of N.M.*, 792 F. App'x 595, 604-05 (10th Cir. 2019) (similar); *Sasser v. Bd. of Regents of Univ. Sys. of Ga.*, No. 21-14433, 2023 WL 2446720, at *4 (11th Cir. Mar. 10, 2023) (per curiam) (same).

### 3. The University's forum-based restriction is not a prior restraint.

The Court should also reject Spectrum's argument (at 46-53), that the University has imposed a prior restraint on its speech. The classic description of a prior restraint is an "administrative [or] judicial order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). And prior restraints may also include "speech licensing schemes that give the licensor too much discretion in how to exercise his authority," as well as "regulations that require registration before certain types of speech." *Id.*

The University's policies regarding the use of Legacy Hall look nothing like an administrative or judicial order prohibiting certain communications without prior approval from the University. Indeed, the University has not forbidden Spectrum to communicate about drag shows or obtain its approval before doing so; it has merely denied Spectrum the use of a particular university-owned facility to host a drag show. And to the extent that Spectrum means to invoke the related "unbridled discretion" doctrine applicable to certain speech-licensing schemes, this Court has held that "prior restraints on speech in limited public forums must contain neutral criteria sufficient to prevent (1) censorship that is unreasonable in light of the purpose served by the forum *and* (2) viewpoint based censorship." *Freedom From Religion Found.*, 955 F.3d at 429. As demonstrated above, the University's actions are reasonable, *supra* at 36-41, and viewpoint neutral, *supra* at 41-44, under the limited-public-forum framework.

Spectrum primarily leans on (at 47) *Southeastern Promotions*, but it is distinguishable for at least two reasons. First, it "predate[s] the Supreme Court's delineation of limited public fora as a distinct type of government property" and thus does not adequately account for permissible content-based restrictions developed in later cases like *CLS*. *See Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*, 660 F. App'x. 600, 604 (10th Cir. 2016). Second, *Southeastern Promotions* involved a "municipal theater[]," not a university. 420 U.S. at 555. The Supreme Court has explained that a "university differs in significant respects from public forums such as streets or parks or even *municipal theaters*." *Widmar*, 454 U.S. at 267 n.5 (emphasis added). Because a "university's mission is education . . . decisions of [the Supreme Court] have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* Spectrum is therefore flatly wrong to assert that "there is no distinction between a municipal stage and one at a public university," Spectrum.Br.50, and that "[t]he First Amendment protection for Spectrum's performance stands just as strong at a public university as it did on the municipal stage in *Southeastern Promotions*," Spectrum.Br.26. Spectrum thus fails to demonstrate that a prior-restraint analysis like the one in *Southeastern Promotions* applies in the context of a university-created limited public forum.

## II. The Remaining Preliminary-Injunction Factors Support Affirmance.

Spectrum also did not show that it is "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

Because the University's exclusion of Spectrum from Legacy Hall did not violate the First Amendment, *supra* at 14-46, it has not "los[t] First Amendment freedoms for even [a] minimal period[] of time," Spectrum.Br.61 (quoting *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (cleaned up)). Nor would the expenditure of "scarce time and money to hold its show off campus" constitute irreparable injury. Spectrum.Br.61. "An injury is 'irreparable' only if it cannot be undone through monetary remedies," *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981), but Spectrum has sued President Wendler in his individual capacity for damages and likely intends to appeal the district court's (correct) dismissal of that individual-capacity claim following final judgment, *see* ECF 245 at 6.

Nor do the balance of equities and public interest favor issuance of a preliminary injunction. "When the government is a party, 'the government's and the public's interest merge.'" *United States v. Abbott*, 110 F.4th 700, 719 (5th Cir. 2024) (en banc) (quoting *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023)). The issuance of an injunction premised on an overly capacious forum analysis that would require universities to permit conduct at odds with the educational environment and antidiscrimination law—merely because the university opened a forum for broad, but not unlimited, speech—may disincline universities "to open such property for any public discourse." *Chiu*, 260 F.3d at 347 (citing *Ark. Educ. Television*, 523 U.S. at 681). "That result would conflict with the broad First Amendment policy of encouraging public discourse on issues of community interest." *Id.* Moreover, any harm to Spectrum is minimal where substantial alternative channels of communication are available to

Spectrum to communicate its message of support for the LGBTQ+ community. *Supra* at 39. That Spectrum has identified purported instances of campus censorship on other college campuses, Spectrum.Br.62-67, says nothing about why the public interest would be served by issuance of a preliminary injunction in this case, where the University's exclusion of Spectrum's drag show from Legacy Hall was consistent with the First Amendment.

## Conclusion

The Court should affirm the district court's denial of Spectrum's motion for a preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

William R. Peterson
Solicitor General

/s/ William F. Cole
William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Jacob C. Beach
Assistant Solicitor General

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Appellees*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,994 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William F. Cole
William F. Cole