# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 18, 2025

Lyle W. Cayce
Clerk

———————————

No. 23-10994

———————————

Spectrum WT; Barrett Bright; Lauren Stovall,

*Plaintiffs—Appellants*,

*versus*

Walter Wendler; Dr. Christopher Thomas; John Sharp;
Robert L. Albritton; James R. Brooks; Jay Graham; Tim
Leach; Bill Mahomes; Elaine Mendoza; Michael J.
Plank; Cliff Thomas; Demetrius L. Harrell, Jr.;
Michael A. Hernandez, III,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:23-CV-48

———————————————————————

Before Dennis, Southwick, and Ho, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

Spectrum WT is an LGBT+ student organization at West Texas
A&M University. It was in the last stages of organizing a drag show on
campus when University President Walter Wendler canceled the show. The
plaintiffs, Spectrum WT and two of its student-officers, sought a preliminary
injunction on the grounds their free speech rights were violated. The district

court denied the injunction, partly based on a holding that the First Amendment did not apply to the drag show. We REVERSE.

## FACTUAL AND PROCEDURAL BACKGROUND

Spectrum WT is a recognized student organization at West Texas A&M University. Its mission is to "provide a safe space for LGBT+ students and allies to come together," "raise awareness of the LGBT+ community," and "promote diversity, support, and acceptance on campus and in the surrounding community." Plaintiffs Barrett Bright and Lauren Stovall are undergraduate students at West Texas A&M and officers in Spectrum WT (together, "the plaintiffs").[1] Spectrum WT hosts various events in support of its mission such as Lavender Prom, Queer History Night, and Queer Movie Night.

One planned event was a charity drag show scheduled for March 31, 2023. The show, titled "A Fool's Drag Race," would raise funds for The Trevor Project, a charitable initiative addressing suicide in the LGBT+ community. The plaintiffs intended to host the event in Legacy Hall, a university venue space. West Texas A&M has permitted a variety of student and non-student groups to use Legacy Hall. The purposes have included song-and-dance competitions, beauty pageants, praise and worship nights, and political events. Students even used Legacy Hall to host a drag show on at least one prior occasion in 2019.

Planning for the March 2023 drag show began in November 2022. The plaintiffs submitted their formal request to reserve Legacy Hall on January 27, 2023, and began navigating the university's event approval process. University staff issued a "[t]entative [c]onfirmation," and, during

---

[1] Stovall has withdrawn from the university, but Spectrum WT is still a registered student organization and Bright is enrolled as a student at the university.

No. 23-10994

the first week of March, began helping to put together flyers to promote the event.

The plaintiffs intended for the show to be "PG-13." They allege that West Texas A&M's administration and staff understood this. To that end, the plaintiffs instructed performers not to engage in lewd conduct or use music containing profanity, and they forbade anyone under 18 from attending unless accompanied by a parent or guardian. The event was to be emceed, however, by "Myss Myka," who had performed in a highly sexual drag show off campus in February.[2]

The plaintiffs allege that on March 20, 11 days before the show, Defendant and Vice President of Student Affairs Dr. Christopher Thomas informed Barrett Bright that the university was canceling the drag show. Dr. Thomas explained that President Wendler believed drag shows discriminated against women.

President Wendler emailed campus students, faculty, and staff later that day announcing that "West Texas A&M University will not host a drag show on campus." The subject of the email was "A Harmless Drag Show? No Such Thing." President Wendler explained that support for The Trevor Project and its work on suicide prevention was "a noble cause." President Wendler believed, however, that a drag show does not "preserve a single thread of human dignity" which comes from being "created in the image of God." "As a performance exaggerating aspects of womanhood (sexuality, femininity, gender), drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood."

---

[2] President Wendler asserts, and the plaintiffs do not dispute, that "Myss Myka" simulated masturbation before the audience and simulated frottage with an audience member at this show.

No. 23-10994

President Wendler made a variety of references, including to the book of Matthew, Newton's Third Law of Motion, and the Equal Employment Opportunity Commission, and made an analogy to blackface performances. He explained that he does "not support any show, performance or artistic expression which denigrates others." Toward the close of his email, he stated: "Supporting The Trevor Project is a good idea. My recommendation is to skip the show and send the dough."

On March 24, 2023, the plaintiffs sued President Wendler and Texas A&M System officials, including Chancellor John Sharp, Dr. Thomas, and members of the Board of Regents of the Texas A&M University System. The plaintiffs moved for a temporary restraining order and preliminary injunction the same day. They ultimately withdrew the request for a TRO and held the show off campus. The plaintiffs amended their motion for a preliminary injunction in order to be allowed to host future shows. The defendants moved to dismiss. President Wendler argued that drag shows are not expressive conduct implicating First Amendment constitutional protections and that he rightly prohibited the show as a restriction on lewd conduct.

The district court granted the defendants' motions in part on September 21, 2023. The bulk of its analysis concerned whether President Wendler was entitled to qualified immunity on the claim for damages. The district court concluded that he was entitled to qualified immunity because he had not violated any clearly established right. The court held that it was not clearly established that all drag shows are inherently expressive and therefore implicate the First Amendment, and President Wendler's cancellation of the drag show was not objectively unreasonable given the show's "potential lewdness." The district court appeared to deem Legacy Hall, the venue where the drag show would have taken place, a limited public forum.

No. 23-10994

The district court concluded that the plaintiffs had standing to bring claims against Chancellor Sharp and Vice President Thomas but not against the Board defendants.[3] The district court also concluded that sovereign immunity did not bar the plaintiffs' claims for injunctive relief against President Wendler, but that their request for a preliminary injunction should be denied. The plaintiffs could not show a likelihood of success on the merits "for the same reasons that President Wendler [was] entitled to qualified immunity." The district court also rejected the plaintiffs' irreparable harm argument.

The plaintiffs timely appealed the denial of the preliminary injunction under 28 U.S.C. § 1292(a)(1). Although they sought a partial final judgment to appeal the denial of the damages claim, the district court denied it. Only the denial of the preliminary injunction is at issue in this appeal.

## DISCUSSION

This court ordinarily reviews a district court's grant or denial of a preliminary injunction for an abuse of discretion. *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023). "Whether free speech rights have been infringed presents a mixed question of law and fact reviewed *de novo*, and when a preliminary injunction turns on a mixed question of law and fact, it, too, is reviewed *de novo*." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

### I. *Preliminary injunction against President Wendler*

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Because a

---

[3] The plaintiffs do not contest their lack of standing against the Board defendants.

No. 23-10994

preliminary injunction is an "extraordinary and drastic remedy," a court should not grant one "unless the movant clearly carries the burden of persuasion." *Anibowei*, 70 F.4th at 902 (quoting *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).  The movant must show:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Id.* (quoting *Canal Authority*, 489 F.2d at 572).

We now examine these factors.

### A.    *Likelihood of success on the merits*

To demonstrate an entitlement to a preliminary injunction here, the plaintiffs must first show that the intended drag show implicates the First Amendment. *See Voting for America, Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013).  If that is shown, we conduct a forum analysis to determine the appropriate level of scrutiny given to the denial of their drag show. *See Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020). The last step is to determine whether the denial of the opportunity to put on a drag show survives the applicable scrutiny. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez* (*CLS Hastings*), 561 U.S. 661, 684–85 (2010).  "A plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes." *Byrum*, 566 F.3d at 446.

No. 23-10994

### 1.     *Applicability of the First Amendment to a drag show*

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. CONST. amend. I. "The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Free speech caselaw balances two considerations: a rejection of "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea," and an acknowledgement that conduct is sometimes "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* (first quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968); and then quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974) (per curiam)). The party invoking the First Amendment's protection has the burden of proving it applies. *Voting for America*, 732 F.3d at 388.

The parties disagree on the legal standard for determining when conduct is sufficiently expressive to implicate the First Amendment. President Wendler asserts the First Amendment is not implicated because the plaintiffs have failed to identify the "*particular* views" expressed through the drag show. President Wendler also argues that drag shows require explanation before any meaning may be discerned, and this need for explanation demonstrates "that drag shows are *not* inherently expressive conduct." The plaintiffs take a more expansive view of expressive conduct. They reject the requirement of a "particularized message" and state that conduct implicates the First Amendment "so long as there is an intent to convey a message and viewers would understand the conduct as expressive."

We divide this section of our analysis into two parts. The first will evaluate President Wendler's argument that a particular view must be

discernible.  The second will determine whether the proposed drag show meets whatever standard we determine applies to conduct.

### a.    The need for a discernible message

We start with a Supreme Court opinion stating that "a narrow, succinctly articulable message is not a condition of constitutional protection" for expressive conduct. *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995).  Hurley dealt with private parade organizers who were required to admit marchers that they wished to exclude. *Id.* at 563.  The parade organizers argued the forced inclusion violated their First Amendment speech rights, *id.* at 566, but the Massachusetts trial court concluded it was "impossible to discern any specific expressive purpose entitling the Parade to protection under the First Amendment." *Id.* at 563.  The Supreme Judicial Court of Massachusetts affirmed. *Id.* at 563–64.  A unanimous Supreme Court rejected this view.  *Id.* at 566.  If a specific message were necessary for free speech protection, the First Amendment "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.* at 569.  Or, even, opaque judicial opinions.

The *Hurley* opinion involved a group's mix of messages, not a group without a message.  The Court held that "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Id.* at 569–70.

With that as a foundation, we examine three of the precedents on which President Wendler relies to support his argument that the plaintiffs'

No. 23-10994

drag show does not implicate the First Amendment because it does not communicate a particular message or view.[4]

The first is *Spence*, 418 U.S. 405. In that case, Seattle police officers arrested Harold Spence after he flew an American flag upside-down with a peace symbol fashioned on it in black tape. *Id.* at 405–06. At his trial, Spence testified the display was in protest against American military action in Cambodia and the killings at Kent State University, both of which had occurred shortly before his display of the altered flag. *Id.* at 408. The Supreme Court of Washington affirmed Spence's resulting conviction under a state statute forbidding the display of a United States flag with superimposed symbols. *Id.* at 405–06. The Supreme Court of the United States reversed and held that the statute violated Spence's free speech rights. *Id.* at 406.

Acknowledging that only some conduct intended as expressive could be deemed speech for First Amendment purposes, the Supreme Court framed the controlling question as "whether [Spence's] activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* at 409. The Court explained that "the nature of [Spence's] activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that he engaged in a form of protected expression." *Id.* at 409–10.

The communicative nature of flags was clear. *Id.* at 410. The temporal context of the flag's display also gave meaning to the symbol. *Id.* Against the backdrop of Cambodia and Kent State, the display was "a

---

[4] On whether the drag show is expressive, President Wendler cites *United States v. O'Brien*, 391 U.S. 367 (1968). He does not argue that the ban passes the *O'Brien* test for incidentally regulating expressive conduct, so we do not address that argument.

pointed expression of anguish by appellant about the then-current domestic and foreign affairs of his government." *Id.* "A flag bearing a peace symbol and displayed upside down by a student today might be interpreted as nothing more than bizarre behavior, but it would have been difficult for the great majority of citizens to miss the drift of appellant's point at the time that he made it." *Id.* The Supreme Court then stated the phrase at the heart of President Wendler's stance: "An intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Id.* at 410–11. We will refer to this as the "*Spence* test."

The next relevant precedent is *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* (*FAIR*), 547 U.S. 47 (2006). FAIR was an association of law schools and law faculties that opposed the military's then-existing policy on homosexuality. *Id.* at 52. FAIR sought to restrict military recruiters' access to their law schools by forcing those recruiters to conduct interviews on the undergraduate campus. *Id.* at 53. In response, Congress prohibited federal funding to universities that denied military recruiters equal access to their campuses and students. *Id.* at 54.

The Supreme Court explained that it had "extended First Amendment protection only to conduct that is inherently expressive." *Id.* at 66. The conduct at issue — the law schools' forcing military recruiters to conduct interviews on the undergraduate campuses — was not inherently expressive. *Id.* These restrictions were expressive "only because the law schools accompanied their conduct with speech explaining it." *Id.* The Court concluded that an observer would have no way of knowing if military recruiters were interviewing away from the law school because the law school disapproved of military policy. *Id.* An observer could just as easily have concluded the law school's interview rooms were full, or that the military

No. 23-10994

recruiters had themselves decided to hold interviews away from the law school. *Id.* There is a limit on deeming conduct expressive:

> The expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it. The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under *O'Brien.* If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it.

*Id.* The Supreme Court did not mention the need for a speaker to identify a *particularized* message that a listener would understand. *See id.* The Supreme Court recently clarified its reasoning, stating that a school is "not speaking when they host interviews." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) (quoting *FAIR*, 547 U.S. at 64). Stated another way, the "law school's recruiting services lack[ed] the expressive quality of a parade." *Id.* (quoting *FAIR*, 547 U.S. at 64).

Finally, we consider this court's opinion in *Voting for America*, 732 F.3d 382. We rejected a First Amendment challenge to a Texas voting law that regulated volunteer deputy registrars. *Id.* at 385–86. Voting for America claimed that the law's "Non-Resident and County [p]rovisions," which required volunteers to be Texas residents and only register voters for counties in which the volunteers had been appointed, implicated expressive conduct. *Id.* at 389.

We disagreed. *Id.* at 391. "To determine whether particular conduct possesses sufficient 'communicative elements' to be embraced by the First Amendment, courts look to whether the conduct shows an 'intent to convey a particular message' and whether 'the likelihood was great that the message would be understood by those who viewed it.'" *Id.* at 388 (quoting *Johnson*,

No. 23-10994

491 U.S. at 404).  The court held the Non-Resident and County provisions regulated non-expressive activity.  *Id.* at 391.  The activity in question amounted simply to "the receipt and delivery of completed voter-registration applications," distinct from advocacy to register to vote.  *Id.*

Other Supreme Court opinions also have held that conduct within certain expressive settings and media is protected.  For example, "live drama" implicates the First Amendment, given that "theater usually is the acting out — or singing out — of the written word, and frequently mixes speech with live action or conduct." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975).  Films are no different.  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502–03 (1952).  Violent video games also fall under First Amendment doctrine.  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011).  Even "nude dancing is not without its First Amendment protections from official regulation." *Doe I v. Landry*, 909 F.3d 99, 106–07 (5th Cir. 2018) (quoting *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66 (1981)).

We summarize these precedents as requiring that the conduct must convey one or more messages to make the First Amendment relevant.  *Spence* and *Voting for America* considered whether conduct communicated a specific message likely to be understood by the recipient.  *See* 418 U.S. at 410–11; 732 F.3d at 388.  With a different emphasis, the Supreme Court in *Hurley* held that "a narrow, succinctly articulable message is not a condition of constitutional protection." 515 U.S. at 569.  Reconciling the precedents, we see the main difference as being the clarity of the message.  To use the Jackson Pollack example from *Hurley*, it must be evident that conveying some message, even if nearly opaque or perhaps smeared, was intended.

### b.    *Expressiveness of the plaintiffs' drag show*

Having set out the relevant principles, we now examine the plaintiffs' intended drag show.  It would have included costumed performers with stage

names, occurred on a stage, and mixed the spoken and sung word with the show's physical components while songs played in the background. *Cf. Southeastern Promotions*, 420 U.S. at 547, 557 (describing a production of *Hair* as protected expression).

The district court suggested that conduct that does not communicate a specific message must amount to a "work[] of fine art" to gain First Amendment protection. The concern for fine art largely stems from *Hurley*'s reference to the works of Picasso, Schöenberg, and Carroll; this court previously stated that "*Hurley* refers solely to great works of art." *Kleinman v. City of San Marcos*, 597 F.3d 323, 326 (5th Cir. 2010) (discussing *Hurley*, 515 U.S. at 569). We have not held, however, that conduct that does not communicate a specific message is entitled to protection only when it amounts to "fine art," an impossibly subjective standard. Instead, "*Hurley*'s reference to works of fine art did not sweep so broadly as to require a judicially crafted hierarchy of artistic expression." *Id.* at 327. In *Kleinman,* we were discussing an ordinance that required the removal of a junked car, smashed, filled with dirt, covered with vegetation, and used as a planter and as an advertisement for a business. *Id.* at 324–25. Though the car was colorfully painted and had "make love not war" written on it, the real message was to advertise the business. *Id.* at 324, 327. That is a reasonable understanding of *Hurley*, that it was not protecting all physical violations of regulations and ordinances that are colorfully painted.

We find no support in this court's caselaw for the proposition that nonspeech conduct must be a work of fine art to receive First Amendment protection if it does not communicate a particularized message. Any such suggestion would be at odds with the guidance provided by the Supreme Court. For example, the Court stated that "[r]eading Dante is unquestionably more cultured and intellectually edifying than playing Mortal Kombat. But these cultural and intellectual differences are not *constitutional*

No. 23-10994

ones." *Ent. Merchs.*, 564 U.S. at 796 n.4. Similarly, the Court stated that "[*m*]*ost* of what we say to one another lacks 'religious, political, scientific, educational, journalistic, historical, or artistic value' (let alone serious value), but it is still sheltered from government regulation." *United States v. Stevens*, 559 U.S. 460, 479 (2010).

In the present dispute, it is evident that a message in support of LGBT+ rights was intended, which is a far clearer message than some of the examples of art identified in *Hurley* as protected by the First Amendment.

We also examine the applicability of the analysis in *Spence.* Whether conduct is communicative is explained in part by societal and temporal context. *Spence*, 418 U.S. at 410. A drag show can communicate a message of solidarity and support for the LGBT+ community. Drag shows — with performers dancing and speaking to music on stage in clothing associated with the opposite gender — mark a deliberate and theatrical subversion of gender-based expectations and signify support for those who feel burdened by such expectations. This group would include the LGBT+ community.

President Wendler's best response is that not all instances of dressing in clothing of the opposite sex communicates a message of support for the LGBT+ community. He gives the example of male Shakesperean actors portraying female roles and the 1943 movie "This Is the Army," in which male actors compare the strangeness of being drafted out of normal life into the army to the experience of being drafted unexpectedly into a female chorus. President Wendler's brief also refers to a sister circuit's opinion in which members of a fraternity dressed as women as part of their "Ugly Woman Contest." *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993).

Certainly, not all instances of displaying oneself in the attire associated with the opposite sex communicate support for the LGBT+ community.

No. 23-10994

This does not mean, though, that drag shows as described here fail to communicate such a message of support. Some do. The question is whether the plaintiffs' intended drag show would have communicated a message. We consider context dispositive. The viewers of the drag show would have been ticketed audience members attending a performance sponsored by LGBT+ student organizations and designed to raise funds for an LGBT+ suicide-prevention charity. Against this backdrop, the message sent by parading on a theater stage in the attire of the opposite sex would have been unmistakable. "An intent to convey a particularized message was present, and *in the surrounding circumstances* the likelihood was great that the message would be understood *by those who viewed it*." *Spence*, 418 U.S. at 410–11 (emphases added).

All we are determining in this step of the analysis is whether a discernible message would have been conveyed. We conclude that this drag show would convey such a message. That is enough to implicate the First Amendment. We next consider whether President Wendler violated the First Amendment when he banned the show.

### 2. *Banning drag show as violation of the First Amendment*

We must determine the correct standards to analyze President Wendler's denial of Legacy Hall to the plaintiffs' drag show. The parties agree that forum analysis applies, as we conclude as well. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). The parties disagree as to the type of forum that is involved.

"The standards that [courts] apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum." *Id.* "There are two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums." *Freedom From Religion Foundation*, 955 F.3d

No. 23-10994

at 426. "Traditional public forums are places such as sidewalks, streets, and parks that have traditionally been devoted to assembly or debate." *Id.* Designated public forums are opened by the government to the same broad use as traditional public forums. *Id.* Limited public forums are opened by the government for specific groups of speakers or types of expression. *Id.* Nonpublic forums have not been opened for public communication. *Id.*

To determine whether a forum is a designated public forum or limited public forum, this court ordinarily looks at two factors: "(1) the government's intent with respect to the forum, and (2) 'the nature of the forum and its compatibility with the speech at issue.'" *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (alterations adopted) (quoting *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 378 (5th Cir. 1989)). "Court[s] look[] to whether the government was motivated by 'an affirmative desire' or 'express policy' of allowing public discourse on the property in question." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992) (citations omitted) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802, 805 (1985)).

President Wendler asserts that "Legacy Hall is not open to the general public." He also argues that our forum analysis is controlled by Supreme Court caselaw dealing with universities placing restrictions on the use of school resources. *See CLS Hastings*, 561 U.S. 661.

To support his argument that Legacy Hall is not open to the public, President Wendler relies on the university's "Facility Use Request Procedure." The cited policy requires those seeking access to the facility to request use of campus spaces and states that the school "reserves the right to cancel an event and immediately remove access to campus if an event violates the policies and regulations of the Texas A&M University System, the rules and procedures of WTAMU, or if an event is deemed to be unsafe."

No. 23-10994

The policy details to whom request forms should be routed, when and how alcohol is to be served, specific areas where campus visitors are not permitted, and parking rules. None of these policies limit access of the facilities to students or to only certain parts of the public. This policy contains no limits on public expression of particular kinds or by particular groups and thus does not support the assertion that Legacy Hall is a limited public forum. Legacy Hall, based on the policy and practice of the university as the record exists now, would more comfortably fit among designated public forums than limited public forums.

Based on the current record, Legacy Hall is open both to students and non-students for a wide variety of events. No party offers evidence that a request for use has been denied to a student or an outside group. Past uses include a local church group's "Community Night of Worship and Prayer," a congressional candidate forum, a local high school's "Casino Night" dance, a local non-profit's benefit gala, Randall County's livestock show, and a religious retreat center's event dinner. These past uses, or practices, do not support that West Texas A&M University has limited Legacy Hall to "public expression of particular kinds or by particular groups." *Freedom From Religion Foundation*, 955 F.3d at 426.

A much-discussed precedent in the briefing shows the importance of classifying the forum. It concerns a law school's conditioning the grant of registered student organization ("RSO") status on adherence to a policy of accepting anyone as a member. *CLS Hastings*, 561 U.S. at 670–71. RSO status conferred benefits that included access to financial subsidies for events and use of the law school's facilities for meetings. *Id.* at 699–70. The Christian Legal Society, or CLS, argued that Hastings violated its First Amendment rights to free speech and expressive association by conditioning RSO status and its attendant benefits on CLS accepting all who sought

membership. *Id.* at 678–79. In rejecting that argument, the Supreme Court applied the limited public forum analysis. *Id.* at 679–83, 698.

There is no issue of expressive association here as was central in *CLS Hastings*. The group wishing to use Legacy Hall was not being forced to change its membership in order to do so. Instead, the group was told to abandon the way in which it wished to deliver its message, *i.e.*, the message of support of the LGBT+ community through the delivery mechanism of a drag show. On the record so far, President Wendler's objections were not to the message but to the way it would be delivered. That objection distinguishes *CLS Hastings*. Instead of the significant interference with the right of expressive association that the Supreme Court permitted there, the university here was interfering with the expressive activity itself, the speech.

The interference was allowed in *CLS Hastings* for three principal reasons, all based on the conclusion that the school maintained a limited forum, where student groups were the sole users of the facilities. *Id.* at 680–83. Two reasons are relevant here. "First, the same considerations that have led us to apply a less restrictive level of scrutiny to speech in limited public forums as compared to other environments apply with equal force to expressive association occurring in limited public forums." *Id.* at 680 (citation omitted). "Second, and closely related, the strict scrutiny we have applied in some settings to laws that burden expressive association would, in practical effect, invalidate a defining characteristic of limited public forums — the State may 'reserv[e] [them] for certain groups.'" *Id.* at 681 (alterations in original) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)). Explaining that rationale further, the Court stated that "ordinarily, and without controversy, [schools] limit official student-group recognition to organizations comprising only students — even if those groups wish to associate with nonstudents." *Id.*

No. 23-10994

Unlike in *CLS Hastings*, the evidence here is that West Texas A&M University's policy did not limit use of the auditorium to students. Legacy Hall was a designated public forum. "Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). "Government property . . . does not automatically cease to be a designated public forum because the government restricts some speech on the property." *Hays Cnty. Guardian*, 969 F.2d at 117. "Otherwise, the restriction of speech on government property would be self-justifying." *Id.* "The restriction would disprove any intent to create a designated public forum, and the failure to create a public forum would justify the restriction of speech." *Id.* "The Supreme Court has not adopted such circular reasoning." *Id.* President Wendler's new anti-drag-show policy did not somehow transform Legacy Hall into a limited public forum. "[T]he government's policy is indicated by its *consistent* practice, not each exceptional regulation that departs from the consistent practice." *Id.* at 117–18.

A content-based restriction on First Amendment-protected activity in a designated public forum is subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest. *Freedom From Religion Foundation*, 955 F.3d at 426. The restriction here describes impermissible expression "not in terms of time, place, and manner, but in terms of" content, *i.e.*, a drag show. *Police Dep't. of Chicago v. Mosley*, 408 U.S. 92, 99 (1972). The ban abandons "the neutrality of time, place, and circumstance" and becomes "a concern about content." *Id.* The university may have a legitimate interest in prohibiting some expression to protect the institutional and educational mission, but a justification for a selective exclusion from a designated public forum must be carefully scrutinized. *Id.* at 98–99. Because

No. 23-10994

theatrical performances plainly involve expressive conduct within the protection of the First Amendment, and because we find the plaintiffs' drag show is protected expression, discrimination among such shows must pass strict scrutiny. "The University's institutional mission . . . does not exempt its actions from constitutional scrutiny." *Widmar v. Vincent*, 454 U.S. 263, 268 (1981).

President Wendler did not argue, either before the district court or on appeal, that restricting the intended drag show would survive strict scrutiny. Based on the record before us, the district court erred in concluding that the plaintiffs were not substantially likely to succeed on the merits of their First Amendment claim.[5]

### B.    *Irreparable injury*

It is not enough for the plaintiffs to show a likelihood of success on their First Amendment challenge. To establish an entitlement to a preliminary injunction, they must also establish it is likely, not merely possible, they will suffer irreparable harm absent preliminary relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). President Wendler argues the plaintiffs fail to satisfy this irreparable harm requirement because it is speculative to conclude that future requests to hold drag shows would not be decided on their particular facts. At the time of briefing, the planned March 2024 drag show was tentatively scheduled to go forward. We were informed by letter that President Wendler canceled that show, too. President Wendler stated that the application "is denied for the reasons given previously and for the reasons further explained in court filings and those

---

[5] Because we hold that the plaintiffs are substantially likely to succeed on the merits due to other reasons, we do not reach their argument that the anti-drag-show policy is a prior restraint.

No. 23-10994

provided by the courts themselves. Moreover, it is denied because S.B. 12 went into effect as a Texas law in September 2023, as well as a number of other compelling considerations." At oral argument, counsel for President Wendler represented that no drag show is permissible at West Texas A&M University.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). In light of the March 2024 show's cancellation and the representation at oral argument that no drag shows will be permitted, we conclude the plaintiffs have shown a substantial threat of irreparable harm to their First Amendment rights absent an injunction against President Wendler.[6]

### C.    *The balance of equities and the public interest*

Finally, the plaintiffs must show that the threatened injury outweighs the threatened harm the injunction may do to the university defendants, and

---

[6] For similar reasons, we reject President Wendler's argument that the district court erred in concluding that the plaintiffs have standing against him and that sovereign immunity does not bar their claims. President Wendler asserts the plaintiffs cannot overcome sovereign immunity through the *Ex parte Young* doctrine. *Ex parte Young* requires that "(1) [the] plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 451 (5th Cir. 2022) (alterations adopted) (quotation marks omitted) (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc)); *see also Ex parte Young*, 209 U.S. 123 (1908). President Wendler argues the plaintiffs cannot meet the second and third requirements. His arguments here fail because they mirror his unsuccessful arguments on the merits. He asserts the plaintiffs have not pled a First Amendment violation, and there is no guarantee future events will not be decided on their particular facts. As discussed above, the first contention fails legally, and President Wendler clarified at oral argument that no drag show will be permitted on campus.

No. 23-10994

that granting the preliminary injunction will not disserve the public interest. When the government is a party, the third and fourth preliminary injunction factors merge. *See Texas v. United States*, 809 F.3d 134, 187 & n.204 (5th Cir. 2015); *Nken v. Holder*, 556 U.S. 418, 435 (2009) (merging the factors in the context of stay of removal proceedings). As the plaintiffs state, "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quoting *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir. 2006)). Because an injunction would protect the plaintiffs' First Amendment rights, they have satisfied these final factors. President Wendler asserts that great harm will befall West Texas A&M if a "blanket injunction that deprives University administrators of their prerogative to professionally assess particular facilities requests" is issued. He argues this is true because the university "do[es] not know the particularities of any future events appellants might wish to hold" and the university should "be given the first opportunity to review these details." President Wendler and the university will not lose that ability. The university may still place reasonable time, place, and manner restrictions on the use of the facilities. Any planned event is still subject to the university's policies and procedures to the extent they are time, place, and manner restrictions rather than content-based restrictions. The plaintiffs are entitled to an injunction protecting their rights, and the district court erred in concluding otherwise.

II.     *Preliminary injunction against Chancellor Sharp and Dr. Thomas*

Last, we consider the claims against Chancellor Sharp and Dr. Thomas. In the district court, these defendants argued the plaintiffs lacked standing against them. The district court concluded the plaintiffs had standing against these two defendants but denied the plaintiffs an injunction against them. Now, Chancellor Sharp and Dr. Thomas argue the district court should be affirmed. Rather than assert the district court erred by failing

to dismiss the plaintiffs' claims against them for lack of jurisdiction, Chancellor Sharp and Dr. Thomas argue the plaintiffs have not demonstrated a likelihood of success on the merits of their claims such that this court should affirm the denial of the preliminary injunction. The plaintiffs, in contrast, argue this court should reverse the district court's denial of their preliminary injunction as to Chancellor Sharp and Dr. Thomas.

We first consider jurisdiction and sovereign immunity. We review issues of standing and sovereign immunity *de novo*. *Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022). Although Chancellor Sharp and Dr. Thomas do not squarely argue the plaintiffs lack jurisdiction at this preliminary stage of the litigation, we must assure ourselves of jurisdiction. *See Elldakli v. Garland*, 64 F.4th 666, 669 (5th Cir. 2023).

A recent precedent guides our jurisdictional analysis. *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023). There, administrators at a state university removed a professor from his role with a scholarly journal out of concern that the journal was espousing racist ideas. *Id.* at 365–66. Included as defendants were the university's board members who were not involved in the decision to remove him but served as the governing body for the university. *Id.* This court held the professor had standing against the board members and his First Amendment claim was not barred by sovereign immunity. *Id.* at 366–67. We explained that for the *Ex parte Young* exception to sovereign immunity to apply, "a plaintiff must sue the right defendants and ask for the right remedy." *Id.* at 367.

As to suing the right defendants, "the officers who are sued must have 'some connection with the enforcement' of the challenged law or policy." *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). Several "guideposts have emerged" in determining whether a sufficient enforcement connection exists. *Texas All. for Retired Americans*, 28 F.4th at 672.

No. 23-10994

First, "[a]ll that is required is a mere scintilla of enforcement by the relevant state official with respect to the challenged law." *Jackson*, 82 F.4th at 367 (quotation marks omitted) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019)). In *Jackson*, this guidepost indicated *Ex parte Young*'s applicability because of the board's ultimate governance authority at the university. *Id.* This guidepost likewise favors the plaintiffs here. Sharp is the chancellor for the Texas A&M University System, and Dr. Thomas manages the Division of Student Affairs. We conclude their roles amount to sufficient governance authority in relation to the challenged drag show ban.

Second, the official "must have more than 'the general duty to see that the laws of the state are implemented.'" *Id.* (quoting *City of Austin*, 943 F.3d at 999–1000). In *Jackson*, this guidepost also indicated *Ex parte Young* applied because the board defendants had authority over the university officials who allegedly violated the professor's First Amendment rights, including the authority to countermand their decisions. *Id.* at 368. We conclude this guidepost also indicates *Ex parte Young* applies here. Dr. Thomas manages the Division of Student Affairs, which is "responsible for oversight and management of all matters related to student issues and affairs, activities, housing, and student rights and responsibilities on campus." While Sharp may not have the authority to countermand specific decisions by university presidents, he has "direct authority and responsibility for" university presidents. Tex. A&M University System, System Policy 2.02, § 1.12, https://policies.tamus.edu/02-02.pdf (May 20, 2021). As it relates to the drag show ban, neither Chancellor Sharp nor Dr. Thomas has merely the general duty to see that the laws of the state are implemented. The plaintiffs have thus "sue[d] the right defendants." *Jackson*, 82 F.4th at 367.

The plaintiffs also "ask for the right remedy," *id.*, because they seek prospective relief and have "allege[d] an ongoing violation of federal law."

No. 23-10994

*Id.* at 368 (alteration in original) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). The plaintiffs may therefore access *Ex Parte Young* to overcome the assertion of sovereign immunity. By extension, the plaintiffs also have standing at least against Dr. Thomas. While the two are not coterminous, we have acknowledged the "significant overlap" between Article III standing analysis and *Ex parte Young* analysis. *Air Evac EMS, Inc. v. Tex. Dep't of Ins. Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017). Supporting this conclusion is our prior recognition that "[a]t earlier stages of litigation, . . . the manner and degree of evidence required to show standing is less than at later stages." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020).

Although the plaintiffs have standing against Dr. Thomas, they do not have standing against Chancellor Sharp. We earlier discussed the significant overlap between Article III standing and *Ex parte Young*. That overlap is not total, however, and the relief requested against Chancellor Sharp illustrates one difference. The relief requested against Chancellor Sharp — an injunction preventing him from enforcing President Wendler's drag show ban — is "the right remedy" for purposes of *Ex parte Young*, as we explained above. *Jackson*, 82 F.4th at 368. The problem is that this relief would do nothing to redress the plaintiffs' injury. The plaintiffs do not fault Chancellor Sharp for *helping enforce* President Wendler's drag show ban, but instead for *not preventing others from enforcing it*.[7] Enjoining Chancellor Sharp from helping enforce the drag show ban would in no way redress the plaintiffs' injury. What plaintiffs would need — and what they specifically did not

---

[7] The plaintiffs suggest that Chancellor Sharp has intervened in past First Amendment controversies and might well help enforce the drag show ban in the future. That suggestion is not supported in the present record, as Chancellor Sharp never acted to enforce the drag show ban. The plaintiffs' suggestion that he will is speculative and cannot provide a basis for redressability.

No. 23-10994

request, as they emphasize in their reply brief — is an injunction compelling Chancellor Sharp to affirmatively prevent his subordinates from enforcing President Wendler's drag show ban.[8]

The plaintiffs have not demonstrated standing for the relief they requested against Chancellor Sharp. The district court thus did not err in denying a preliminary injunction against Chancellor Sharp. Indeed, the district court should have dismissed the claim against Chancellor Sharp for want of jurisdiction. *See, e.g.*, *Barber v. Bryant*, 860 F.3d 345, 352, 358 (5th Cir. 2017) (holding that the plaintiffs failed to make a clear showing of standing at the preliminary-injunction stage and rendering a judgment of dismissal for want of jurisdiction). True, Chancellor Sharp did not ask for dismissal in his brief, but the import of his argument justifies dismissal, and we have a duty to resolve questions of jurisdiction *sua sponte* if necessary. *See, e.g.*, *Henderson v. Stalder*, 287 F.3d 374, 379 n.5 (5th Cir. 2002). Dismissal is proper in this instance.

We will next consider Dr. Thomas's remaining arguments. He insists the plaintiffs have not shown irreparable harm because any First Amendment injury is speculative and not fairly traceable to him. Those arguments sound in standing, and we have already concluded that the plaintiffs have standing against him.

---

[8] Such an injunction might run afoul of *Ex parte Young*'s limits on affirmative relief. *See Green Valley*, 969 F.3d at 472 n.21 (acknowledging these limits but noting that their precise scope is unclear); *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 241–42 (5th Cir. 2020) (recognizing *Ex parte Young* bars affirmative relief at least insofar as the relief would "control [an officer] in the exercise of his discretion" (alterations in original) (quoting *Ex parte Young*, 209 U.S. at 158)). The precise bounds of those limits are unclear, and we see no occasion here to delineate them because the plaintiffs did not request such an injunction. *See Center for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived.").

No. 23-10994

Next, Dr. Thomas argues that he cannot be held vicariously liable for President Wendler's actions, citing Section 1983 and *Bivens* cases to that effect. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). This argument fails because the claim is not one of vicarious liability. Dr. Thomas engaged in unlawful conduct by helping President Wendler implement the directive canceling the event and on-campus drag shows generally. In other words, the plaintiffs are seeking to hold him liable for his own actions.[9] The district court erred in denying a preliminary injunction against Dr. Thomas.[10]

We AFFIRM in part, REVERSE in part, and REMAND for entry of a preliminary injunction against President Wendler and Dr. Thomas. Additionally, we RENDER a judgment of dismissal for want of jurisdiction on the claim against Chancellor Sharp.

---

[9] Because that is so, we need not address whether Section 1983's limits on supervisory liability apply in suits seeking injunctive relief against state officers through *Ex parte Young*.

[10] The third and fourth preliminary injunction factors favor enjoining Dr. Thomas for the same reason that they favored enjoining President Wendler.

No. 23-10994

J‍ames C. Ho, *Circuit Judge*, dissenting:

Spectrum WT claims that it has a First Amendment right to put on a drag show in a public facility at West Texas A&M University. But university officials have determined that drag shows are sexist, for the same reason that blackface performances are racist. And Supreme Court precedent demands that we respect university officials when it comes to regulating student activities to ensure an inclusive educational environment for all. *See Christian Legal Society v. Martinez*, 561 U.S. 661 (2010).

I disagree with the Supreme Court's decision in *CLS*. But I'm bound to follow it. And I will not apply a different legal standard in this case, just because drag shows enjoy greater favor among cultural elites than the religious activities at issue in *CLS*.

\* \* \*

"Education should not be intended to make people comfortable; it is meant to make them think." C‍omm. on F‍reedom of E‍xpression, U‍niv. of C‍hicago, R‍eport of the C‍ommittee on F‍reedom of E‍xpression (2015) (quoting President Hanna Holborn Gray).

But as anyone aware of current campus conditions nationwide can attest, the vision of the university as a First Amendment haven is woefully naïve—at least when it comes to views disfavored in certain circles.

Just ask the Christian Legal Society. Members of the CLS chapter at the Hastings College of the Law sought to exercise their First Amendment right to associate with fellow believers who share their Biblical views on marriage and sexuality—just as politically affiliated student groups at Hastings have been allowed to associate with fellow partisans who share their ideological priors. *See* 561 U.S. at 672. But university officials chose to expel CLS—and only CLS—from campus. *See id.* at 672–73. And the Supreme Court sided with university officials over CLS. *See id.* at 669.

28

No. 23-10994

In doing so, the Court acknowledged that forcing an organization to accept unwelcome members "directly and immediately affects associational rights" ordinarily protected by the First Amendment. *Id.* at 680 (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 659 (2000)).

But the Court insisted that the First Amendment must be analyzed differently in "the educational context" and "in light of the special characteristics of the school environment." *Id.* at 685–86. The Court contended that "judges lack the on-the-ground expertise and experience of school administrators." *Id.* at 686. So "we have cautioned courts in various contexts to resist substituting their own notions of sound educational policy for those of the school authorities." *Id.* (cleaned up). Universities must "enjoy a significant measure of authority" over student activities. *Id.* (cleaned up). So courts must "approach our task with special caution" when it comes to reviewing university policies. *Id.* at 687. Judges owe university administrators "due decent respect" when considering constitutional objections to their decisions. *Id.*

This is all bunk, of course. To begin with, when it comes to protecting constitutional rights, judges should not blindly trust experts in education, any more than we should in any other field. *See, e.g.*, *United States v. Skrmetti*, 145 S. Ct. 1816, 1840 (2025) (Thomas, J., concurring) (noting "several problems with appealing and deferring to the authority of the expert class"). *See also Whole Woman's Health v. Paxton*, 10 F.4th 430, 468 (5th Cir. 2021) (Ho, J., concurring) ("scientists are . . . susceptible to peer pressure, careerism, ambition, and fear of cancel culture, just like the rest of us"); *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 397 (5th Cir. 2024) (Ho, J., dissenting in part) ("At various times throughout history, medical care has suffered—and patients have been harmed, even killed—because doctors succumbed to social pressure and desire for approval and advancement."). Educational "experts" have been

No. 23-10994

violating the constitutional rights of students for decades. *See*, *e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978).

What's more, we should be especially suspect when academic "experts" advocate policies that violate our nation's most cherished principles. Our Founders built this nation for a people faithful to their Creator—and for educational institutions that favor religious devotion. As the Supreme Court has noted, "[w]e are a religious people whose institutions presuppose a Supreme Being. . . . When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs." *Zorach v. Clauson*, 343 U.S. 306, 313–14 (1952). *See also*, *e.g.*, THE FEDERALIST No. 2, at 9 (John Jay) (J. Cooke ed. 1961) ("Providence has been pleased to give this one connected country to one united people, . . . speaking the same language, professing the same religion, attached to the same principles of government"); Northwest Ordinance of 1789, 1 Stat. 50, 52 (1789) ("Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.").[1]

*CLS* contradicts all of these principles. But only the Supreme Court can overturn its own precedents. So until the Court itself overturns *CLS*, we're bound to follow it.

---

[1] The Continental Congress adopted the Northwest Ordinance of 1787, and the First Congress reaffirmed it in the Northwest Ordinance of 1789. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 577–78 (2021) (Alito, J., concurring); Tara Ross and Joseph C. Smith Jr., UNDER GOD 88–89 (2008).

No. 23-10994

And if we're bound to respect university officials when they regulate Christian groups over (contrived) concerns about discrimination, then we're surely bound to respect university officials when they regulate other groups over concerns about discrimination. We should apply the same First Amendment principles, whether the views are embraced or abhorred by cultural elites. *See, e.g.*, *Oliver v. Arnold*, 19 F.4th 843, 844 (5th Cir. 2021) (Ho, J., concurring in denial of rehearing en banc) (courts should apply same First Amendment principles "whether it's a 'liberal' or 'conservative' public school teacher who is attempting to punish a 'conservative' or 'liberal' student").

It would turn the First Amendment upside down to give greater protection to drag shows than devotional acts. That would violate the Constitution under the guise of enforcing it. It would discriminate not only on the basis of viewpoint, but on the basis of religion as well—in violation of not just the Free Speech Clause, but the Free Exercise Clause, too.

For all these reasons and more, I respectfully dissent.

## I.

West Texas A&M President Walter Wendler concluded that drag shows are demeaning to women. As he explained in an open letter to the community, "WT endeavors to treat all people equally. Drag shows are derisive, divisive and demoralizing misogyny, no matter the stated intent. Such conduct runs counter to the purpose of WT. A person or group should not attempt to elevate itself or a cause by mocking another person or group."

In opposing drag shows as derogatory towards women, Wendler compared them to blackface performances. "As a university president, I would not support 'blackface' performances on our campus . . . . I do not support any show, performance or artistic expression which denigrates others—in this case, women—for any reason."

No. 23-10994

Wendler is hardly the first member of the academy to regard drag shows as sexist—or to compare them to blackface performances, which are widely condemned as racist. *See, e.g.*, Kelly Kleiman, *Drag = Blackface*, 75 Chi.-Kent L. Rev. 669 (2000). As one scholar has observed, "the same arguments that forged the cultural consensus against blackface should forge a consensus against drag." *Id.* at 669.

Drag shows "represent institutionalized male hostility to women." *Id.* They "may be glamorous or comic, and presented by gay men or straight men," but they all "represent a continuing insult to women, as is apparent from the parallels between these performances and those of white performers of blackface minstrelsy." *Id.*

In sum, "[d]rag is misogynistic, no matter who performs it." *Id.* at 682. *See also, e.g.*, Dr. Grace Barnes, *Drag: a sexist caricature, or a fabulous art form?*, The Guardian (Apr. 7, 2024) ("Drag can be compared to blackface and yellowface: those holding the reins of power utilise performance to mock those without power through a demeaning parody. . . . [I]t is . . . exclusionary, sexist and insulting to women."); Meghan Murphy, *Why has drag escaped critique from feminists and the LGBTQ community?*, Feminist Current (Apr. 25, 2014) ("Why do we despise performance in blackface and celebrate performance in drag?").

So it's not surprising that university officials across the country have opposed drag shows as demeaning to women. In *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason University*, 993 F.2d 386 (4th Cir. 1993), for example, university administrators and student leaders were upset that a fraternity hosted an event in which men "dressed as caricatures of different types of women." *Id.* at 387–88. Campus officials concluded that the event had "created a hostile learning environment for women" and was therefore "incompatible with the University's mission." *Id.* at 388. One dean stated

No. 23-10994

in an affidavit that the event "perpetuated derogatory . . . sexual stereotypes" and was "incompatible with, and destructive to, the University's mission of promoting diversity within its student body." *Id.* at 392. The official worried that the event "sends a message to the student body and the community that we are not serious about hurtful and offensive behavior on campus." *Id.* (cleaned up). Hundreds of students protested, similarly condemning the "sexist implications of this event in which male members dressed as women." *Id.* at 388. University officials ultimately sanctioned the fraternity for hosting the event. *Id.* (The court's decision preceded, and thus was not bound by, the Supreme Court's decision in *CLS*.)

University leaders voiced the same concerns in *Texas A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792 (S.D. Tex. 2025). University officials there concluded that it contradicts "the value of respect for others" to allow university facilities to be "used for drag shows that involve biological males dressing in women's clothing" and "wearing exaggerated female make up and/or exaggerated prosthetics meant to parody the female body type." *Id.* at 799. "Drag Show Events are likely to create or contribute to a hostile environment for women . . . as these events often involve unwelcome and objectively offensive conduct based on sex . . . , particularly when they involve the mockery or objectification of women." *Id.* (The district court has stayed proceedings in that case, pending our court's decision here.)

## II.

Moreover, if university officials allow men to act as women in campus events like drag shows, they may feel compelled to allow men to act as women in other campus events as well—like women's sports.

Drag shows and women's sports might seem, on first blush, to have little to do with one another. But "[i]f we accept that people can change

No. 23-10994

genders—or even if we don't but agree to be 'polite' and call a man 'she'—then why shouldn't 'she' be allowed to play women's sports or bathe naked in an all-women's space? Why shouldn't 'she' be allowed to enter women's abuse houses or be transferred to a women's prison? Why accept one lie and not the whole thing?" ALLIE BETH STUCKEY, TOXIC EMPATHY 55–56 (2024). Allowing one activity might be the "predictable result" of the allowing the other. *Id.* at 55. *See also, e.g.*, *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 337–38 (5th Cir. 2019) (Ho, J., concurring) ("[T]his case does not simply concern . . . transgender discrimination. It affects every American who uses the restroom at any restaurant, buys clothes at any department store, or exercises at any gym. . . . [T]his debate also affects virtually every school, college, dormitory, athletic activity, and locker room in America.").[2]

So it's reasonable for officials to worry that these issues are not siloed, but interconnected. What a university allows in an auditorium, it might have to allow on an athletic field, too.

And the fear would be well taken, considering the broad and growing concern that allowing men in women's sports severely harms women—including serious physical injuries as well as denial of athletic opportunities. *See, e.g.*, United Nations General Assembly, *Report of the Special Rapporteur on violence against women and girls, its causes and consequences: Violence against women and girls in sports*, U.N. Doc. A/79/325 (Aug. 27, 2024) ("Female athletes are . . . vulnerable to sustaining serious physical injuries when female-only sports spaces are opened to males, as documented in disciplines such as in volleyball, basketball and soccer. . . . Injuries have included knocked-out teeth, concussions resulting in neural impairment, broken legs and skull

---

[2] *Cf.* George L. Kelling and James Q. Wilson, *Broken Windows*, THE ATLANTIC 29, 38 (March 1982) ("public drunkenness, street prostitution, and pornographic displays can destroy a community more quickly than any team of professional burglars").

fractures."); *Athlete Safety Policy* § 3.3, U.S. Olympic & Paralympic Comm., *available at* https://www.usopc.org/safe-sport (removing men from women's sports, consistent with Executive Order 14201, to ensure that "women have a fair and safe competition environment"); Sarah Parshall Perry, *Trans Athlete Injures Multiple Girls, Forcing Them to Forfeit. Wither Thou, Feminism?*, Heritage Found. (Mar. 5, 2024) (documenting "injuries sustained by girls and women during athletic contests with transgender athletes"); *President Lewis Makes Statement on Women's Collegiate Athletics*, Houghton Univ. (Mar. 4, 2024), *available at* https://www.houghton.edu/news/president-lewis-statement-on-womens-athletics/ ("Biological males' participation in women's athletics is wrong. . . . [F]emale athletes are humiliated, silenced and robbed of hard-earned opportunities."); Elle Rogers, *The Two Sexes Are Not Fungible: The Constitutional Case Against Transgender-Inclusive Sports*, 28 Tex. Rev. L & Pol. 243 (2024); Riley Gaines, *Hearing Before the House Subcomm. on Health Care and Fin. Servs.: "The Importance of Protecting Female Athletics and Title IX"* (Dec. 2023), *available at* https://oversight.house.gov/wp-content/uploads/2023/12/Testimony-Gaines.pdf ("[A]llowing men in women's competitions puts women and girls at greater risk of injury. . . . [U]nsafe, unfair, and discriminatory practices towards women must stop."); Jessica Steffen, *Hearing on the Fairness in Women's Sports Bill Before the S. Educ. Comm.*, 2021 Kan. Leg., Reg. Sess. (Feb. 23, 2021), *available at* https://kslegislature.gov/li_2022/b2021_22/committees/ctte_s_ed_1/documents/testimony/20210223_21.pdf.

## III.

There are additional reasons why the case for respecting university expertise is stronger here than in *CLS*.

No. 23-10994

In *CLS*, it was well documented that university officials were motivated by discriminatory animus against Christians. As Justice Alito detailed in his dissent, CLS was hardly the only student group at Hastings that violated the university's purported "accept-all-comers" policy. Groups like the Hastings Democratic Caucus, the Association of Trial Lawyers of America, the Vietnamese American Law Society, and La Raza (to name just a few) all had bylaws limiting membership or executive positions to only those students who agreed with the organization's viewpoints. *See* 561 U.S. at 712–13 (Alito, J., dissenting). But CLS was the only group that Hastings expelled from campus. *See id.* at 707.

In this case, by contrast, there's no evidence of discriminatory animus or selective enforcement. To the contrary, counsel for Spectrum WT readily concedes that Wendler's policy applies to everyone. Oral Arg. 14:05–:26. Moreover, the record confirms that Wendler supports Spectrum WT. He advocated fundraising for The Trevor Project and encouraged members of the community to donate.

That leads to yet another reason why this is a much easier case for the university than *CLS*. Hastings denied "official recognition" to CLS as a registered student organization—and that included the denial of "the attendant use of school funds and facilities." *CLS*, 561 U.S. at 668. In theory, CLS could still access university facilities—but *only* if facilities were available after priority was first given to registered organizations. *Id.* at 716 (Alito, J., dissenting). That gave university officials the effective ability to exclude CLS altogether. And that's exactly what they did: When CLS tried to reserve facilities, university administrators "did not respond until the dates in question had passed." *Id.* at 717.

Here, by contrast, there is no such blanket expulsion of a student organization. Spectrum WT was stopped from using just one facility, for one

No. 23-10994

event. It continues to enjoy as much access to Legacy Hall—and all other campus facilities—as any other student group. And unlike in *CLS*, there is no suggestion that university officials have ever refused to cooperate with Spectrum WT in its efforts to host other on-campus events.

## IV.

Notwithstanding all of this, the panel majority declines to apply *CLS* here because it concludes that Legacy Hall is a designated public forum that the university intended to keep open to all—and not a limited public forum, as was in the case in *CLS*. *See ante*, at 18–20.

But in reaching this conclusion, the majority acknowledges that the University explicitly "reserves the right to cancel an event and immediately remove access to campus if an event violates the polices and regulations of the Texas A&M University System, the rules and procedures of WTAMU, or if an event is deemed to be unsafe." *Id.* at 17.

This policy should answer all of the majority's concerns. When a university imposes "limits necessary to preserve the academic mission and to maintain order," it has established "a limited public forum, designated for the speech of students." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117–18 (5th Cir. 1992). *See also Doe v. Santa Fe Indep. School Dist.*, 168 F.3d 806, 820 (5th Cir. 1999) (noting that "university campus [in *Hays*] was limited public forum"); *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 n.12 (5th Cir. 2001) (same); *Justice For All v. Faulkner*, 410 F.3d 760, 768 (5th Cir. 2005) (same).

And that policy is plainly triggered here. Like blackface performances, drag shows violate the university's fundamental mission to ensure a welcoming educational environment for all.

No. 23-10994

Tellingly (and quite understandably), the majority does not contend that West Texas A&M would be required to allow a student group to put on a blackface performance. The result should not be different here just because drag shows find favor in certain circles. *See Hays Cnty.*, 969 F.2d at 118 ("the government's policy is indicated by its *consistent* practice").

The majority counters that the university has never used its policy before to "limit access of the facilities to students or to only certain parts of the public." *Ante*, at 17. "No party offers evidence that a request for use has been denied to a student or an outside group." *Id.*

But that was true in *CLS* as well. As Justice Alito pointed out, "Hastings currently has more than 60 registered groups and, in all its history, has denied registration to exactly one: the Christian Legal Society (CLS)." 561 U.S. at 707 (Alito, J., dissenting). That did not prevent the Court from respecting the university's decision in *CLS*.

Moreover, there's yet another problem with the majority's forum analysis. When it comes to non-traditional public forums (like designated public forums), the government retains the discretion to impose new limits on the forum, as new situations arise. "[A] State is not required to indefinitely retain the open character of [a nontraditional public forum]." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). *See also Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802 (1985) (same); *Currier v. Potter*, 379 F.3d 716, 728 (9th Cir. 2004) (concluding that the government may close designated or limited public forums "whenever it wants"); *United States v. Bjerke*, 796 F.2d 643, 647 (3rd Cir. 1986) ("[O]fficials may choose to close . . . a designated public forum at any time."). And if the government retains such discretion even outside the "educational context," then *a fortiori* university officials—whose expertise we are required to respect under *CLS*—retain that discretion as well.

No. 23-10994

So nothing in the majority's forum analysis authorizes us to enjoin West Texas A&M from forbidding drag shows at Legacy Hall in the future.

* * *

If *CLS* requires respect for university efforts to protect members of the LGBT community, then it surely requires respect for university efforts to protect women. If a university may discriminate against a disfavored group like CLS by expelling them from campus altogether, then *a fortiori* a university may limit use of its facilities to protect the dignity and safety of women. I respectfully dissent.